1  XAVIER BECERRA
   Attorney General of California
2  ANTHONY R. HAKL
   Supervising Deputy Attorney General
3  GABRIELLE D. BOUTIN
   Deputy Attorney General
4  State Bar No. 267308
    1300 I Street, Suite 125
5    P.O. Box 944255
    Sacramento, CA 94244-2550
6   Telephone:  (916) 210-6053
    Fax:  (916) 324-8835
7   E-mail:  Gabrielle.Boutin@doj.ca.gov
   *Attorneys for Defendants Attorney General*
8  *Becerra and Director Luis Lopez, in their*
   *official capacities*
9
                 IN THE UNITED STATES DISTRICT COURT
10
             FOR THE SOUTHERN DISTRICT OF CALIFORNIA
11
                          CIVIL DIVISION
12

13

| 14 | **LANA RAE RENNA, et al.,** | Case No. 3:20-cv-02190-DMS-DEB |
| 15 | Plaintiffs, | |
| 16 | **v.** | **MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 17 | | |
| 18 | **XAVIER BECERRA, in his official capacity as Attorney General of California; and LUIS LOPEZ, in his official capacity as Director of the Department of Justice Bureau of Firearms,** | Date/Time:   To Be Set By Court<br>Dept:   13A |
| 19 | | Judge:   Hon. Dana M. Sabraw<br>Trial Date:   None set |
| 20 | | Action Filed: 11/10/2020 |
| 21 | Defendants. | |

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................ 3

Legal Background ....................................................................................... 4

    I.     The California Unsafe Handgun Act ................................................ 4

          A.     The Roster of Handguns Certified for Sale ............................. 4

          B.     Definition of "Unsafe Handgun" ............................................. 5

    II.    The Ninth Circuit Affirms the Constitutionality of the UHA in Pena v. Lindley ................................................................................. 6

    III.   The Legislature Enacts Minor Amendments to the UHA in AB 2847 ........................................................................................... 8

Allegations in the First Amended Complaint .......................................... 9

Legal Standard ......................................................................................... 10

Argument ................................................................................................. 11

    I.     Plaintiffs Lack Article III Standing to Challenge the Roster Removal Provision in Section 31910(b)(7) ..................................... 11

    II.    The Unsafe Handgun Act Does Not Violate the Second Amendment ..................................................................................... 13

          A.     The Two-Step Inquiry Applicable to Second Amendment Challenges in the Ninth Circuit ............................................. 16

               1.     Step One: The UHA Does Not Burden Conduct Protected by the Second Amendment ........................... 16

               2.     Step Two: Even if the Second Amendment Applied, the UHA Withstands Constitutional Scrutiny ................................................................... 19

    III.   The Unsafe Handgun Act Does Not Violate Equal Protection .......... 22

Conclusion ............................................................................................... 24

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ........................................................................ 10

*Bauer v. Becerra*
858 F.3d 1216 (2017) ...................................................................... 22

*City of Cleburne, Tex. V. Cleburne Living Ctr.*
473 U.S. 432 (1985) ........................................................................ 23

*Country Classic Dairies, Inc. v. State of Montana, Dep't of Commerce Milk Control Bureau*
847 F.2d 593 (9th Cir. 1988) .......................................................... 23

*District of Columbia v. Heller*
554 U.S. 570 (2008) ..................................................................*passim*

*Draper v. Healey*
No. CIV.A. 14-12471-NMG, 2015 WL 997424 (D. Mass. Mar. 5, 2015) ............................................................................................ 17

*FCC v. Beach Commc'ns, Inc.*
508 U.S. 307 (1993) ........................................................................ 23

*Fiscal v. City and County of San Francisco*
158 Cal. App. 4th 895 (Ct. App. 2008) .................................... 4, 5, 6

*Freeman v. City of Santa Ana*
68 F.3d 1180 (9th Cir. 1995) .......................................................... 22

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*
528 U.S. 167 (2000) ........................................................................ 11

*Fyock v. Sunnyvale*
779 F.3d 991 (9th Cir. 2015) ..................................................... 20, 21

*Heller v. Dist. of Columbia*
670 F.3d 1244 (D.C. Cir. 2011) ...................................................... 18

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

# TABLE OF AUTHORITIES
### (continued)

Page

*Johnson v. Riverside Healthcare Sys., LP*
534 F.3d 1116 (9th Cir. 2008) ................................................................ 11

*Kampfer v. Cuomo*
993 F. Supp. 2d 188 (N.D. N.Y. 2014) ................................................... 18

*Kwong v. Bloomberg*
723 F.3d 160 (2d Cir. 2013) ................................................................... 22

*Lazy Y Ranch Ltd. v. Behrens*
546 F.3d 580 (9th Cir. 2008) ................................................................. 11

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992) ............................................................................... 11

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ......................................................................... 15, 16

*N. Star Int'l v. Ariz. Corp. Comm'n*
720 F.2d 578 (9th Cir. 1983) ................................................................. 10

*Nat'l Shooting Sports Foundation, Inc. v. State of California*
5 Cal.5th 428 (2018), 2017 WL 4541977 ................................................ 8

*Nelsen v. King Cty.*
895 F.2d 1248 (9th Cir. 1990) ............................................................... 11

*Ohio Forestry Ass'n, Inc. v. Sierra Club*
523 U.S. 726 (1998) ............................................................................... 13

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
676 F.3d 829 (9th Cir. 2012) ................................................................. 12

*Pena v. Lindley*
898 F.3d 969 (2018), *cert. denied*, 141 S.Ct. 108 (2020) ...........................*passim*

*Safer Chems., Healthy Fams. v. EPA*
943 F.3d 397 (9th Cir. 2019) ................................................................. 12

*Schmier v. U.S. Court of Appeals for Ninth Circuit*
279 F.3d 817 (9th Cir. 2002) ................................................................. 11

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Schweiker v.Wilson*
   450 U.S. 221 (1981) ................................................................................23

*Silveira v. Lockyer*
   312 F.3d 1052 (9th Cir. 2002).................................................................23

*Silvester v. Harris*
   843 F.3d 816 (9th Cir. 2016)..................................................................20

*Susan B. Anthony List v. Driehaus*
   573 U.S. 149, 157 n.5 (2014) .................................................................12

*U.S. v. Chovan*
   735 F.3d 1127 (2013) .................................................................16, 17, 19, 20

*United States v. Chester*
   628 F.3d 673 (4th Cir. 2010) ..................................................................16

*United States v. Marzzarella*
   614 F.3d 85 (3d Cir. 2010) .......................................................16, 18, 19

*United States v. Miller*
   307 U.S. 174 (1939) ...............................................................................18

*United States v. Tribunella*
   749 F.2d 104 (2d Cir. 1984) .....................................................................5

*United States v. Vongxay*
   594 F.3d 1111 (9th Cir. 2010)................................................................17

*Washington State Grange v. Washington State Republican Party*
   552 U.S. 442 (2008) ...............................................................................13

**STATUTES**

United States Code, Title 42
   § 1983 ...........................................................................................1, 9

iv

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3      California Penal Code

4         § 17140 ........................................................................................5

5         § 24510 ......................................................................................19

6         § 29182(e)(2) ......................................................................10, 22

          § 31900 .........................................................................................5

7         §§ 31900-32110 .........................................................................22

          § 31905 .........................................................................................5

8         § 31910 .................................................................................5, 6, 9

9         § 31910(a) ....................................................................................5

          § 31910(a)(1) ...............................................................................5

10        § 31910(b)(1) ...............................................................................5

11        § 31910(b)(4) ......................................................................8, 9, 21

          § 31910(b)(4)-(5) .........................................................................8

12        §§ 31910(b)(4)-(b)(6) ...................................................................5

13        § 31910(b)(5) .............................................................................21

          § 31910(b)(6) ........................................................................6, 21

14        § 31910(b)(7 ..........................................................................11, 22

15        § 31910(b)(C)(7) ..........................................................................9

          § 32000(a) ....................................................................................4

16        § 32000(b) ....................................................................................6

17        § 32000(b)(3) ...............................................................................6

          § 32010 ........................................................................................4

18        § 32015 ........................................................................................9

19        § 32015(a) ....................................................................................4

          § 32015(b)(1) .........................................................................5, 21

20        § 32015(b)(2) ...............................................................................5

          § 32030 ..................................................................................4, 22

21        § 32100 ........................................................................................6

22        § 32105 ........................................................................................6

          § 32110 ....................................................................................6, 8

23        § 32110(a) ....................................................................................6

24        § 32110(h) ..........................................................................6, 7, 23

          § 33410 ......................................................................................19

25

26

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Second Amendment .................................................................................*passim*
    Fourteenth Amendment ................................................................. 1, 15

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 12(b)(1) ......................................................................... 1, 10
    Rule 12(b)(6) ...................................................................... 1, 10, 11

**OTHER AUTHORITIES**

Allen Rostron, High-Powered Controversy: Gun Control, Terrorism,
    and the Fight Over .50 Caliber Rifles, 73 U. Cin. L. Rev. 1415,
    1469 n.12 (2005)................................................................................5

Assembly Bill 2847 2019-2020 Reg. Sess. (May 19, 2020) .....................8

Assembly Bill 2847 §1 (h)........................................................................8

Eugene Volokh, Implementing the Right to Keep and Bear Arms for
    Self-Defense: An Analytical Framework and a Research Agenda,
    56 UCLA L.Rev. 1443, 1455-56 (2009) ............................................19

Stricker, Gun Control 2000: Reducing the Firepower (2000) 31
    McGeorge L. Rev. 293, 313 (Gun Control 2000) ..................................4

vi

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT at a date and time to be set by the Court pursuant to the Court's Order Following Status Conference, ECF No. 7, before the Honorable Dana M. Sabraw in Courtroom 13A of the United States District Court for the Southern District of California, located at 333 West Broadway in San Diego, California, 92101, Defendants California Attorney General Xavier Becerra in his official capacity, and Luis Lopez, in his official capacity as Director of the California Department of Justice Bureau of Firearms, will and hereby do move this Court to dismiss Plaintiffs' First Amended Complaint for Injunctive and Declaratory Relief (FAC) and all claims therein, pursuant to rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

This motion to dismiss is made on the grounds that:

Count 1 in the FAC fails to state a claim upon which relief can be granted because California's Unsafe Handgun Act and each of its provisions do not violate 42 U.S.C. § 1983, the Second Amendment of the United States Constitution, or the Fourteenth Amendment of the United States Constitution.

Count 2 in the FAC fails to state a claim upon which relief can be granted because California's Unsafe Handgun Act does not violate 42 U.S.C. § 1983 or the Equal Protection Clause of the United States Constitution.

This Court lacks Article III subject-matter jurisdiction because the claims in the FAC are unripe and Plaintiffs lack standing to bring the claims.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, and the papers and pleadings on file, and upon such matters that may be submitted before or at the hearing.

1

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

1    Dated:  January 25, 2021                        Respectfully Submitted,

2                                         XAVIER BECERRA
Attorney General of California
3                                         ANTHONY R. HAKL
Supervising Deputy Attorney General

4

5

6                                         */s/ Gabrielle D. Boutin*
GABRIELLE D. BOUTIN
7                                         Deputy Attorney General
*Attorneys for Defendants Attorney*
8                                         *General Becerra and Director Luis*
*Lopez, in their official capacities*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

3

4

5

6

7

8

9

10

11

Through this case, Plaintiffs are attempting to relitigate the Ninth Circuit's decision less than three years ago in *Pena v. Lindley*, which upheld the constitutionality of challenged provisions of California's Unsafe Handgun Act (UHA). *See* 898 F.3d 969 (2018), *cert. denied*, 141 S.Ct. 108 (2020). The UHA is not a handgun ban. Handguns have long been and continue to be are widely available for purchase and possession in California. Plaintiffs do not allege that they cannot purchase a handgun suitable for self-defense, nor claim that they do not already own such handguns. Rather, the UHA merely prohibits the manufacture or commercial sale of handguns that do not meet certain safety requirements.

12

13

14

15

16

17

18

To prevail, Plaintiffs would have to establish a constitutional right to purchase any handgun of one's choice from whomever one chooses. No such right exists. Even if the Second Amendment were implicated, however, the UHA would survive intermediate scrutiny because, as this Court recognized in *Pena*, there is a reasonable fit between its provisions and the important public interests of promoting public safety and reducing crime. Under the Ninth Circuit's decision in *Pena*, Plaintiffs' equal protection claim also lacks merit.

19

20

21

22

23

24

25

Although the UHA was amended in 2020 through Assembly Bill (AB) 2478, those amendments do not meaningfully affect the analysis and certainly do not change the result from that in *Pena*. Plaintiffs also challenge the new UHA provision that transitions handgun models off of the state's roster of handguns certified for sale. However, Plaintiffs have suffered no injury-in-fact as a result of the provision and therefore lack standing or a ripe claim. Even if standing and ripeness existed, the provision would withstand intermediate scrutiny.

26

27

28

For these reasons, explained in detail below, this Court should follow the clear Ninth Circuit precedent in *Pena* and dismiss the First Amended Complaint (FAC).

3

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

## LEGAL BACKGROUND

### I.   THE CALIFORNIA UNSAFE HANDGUN ACT

The UHA prohibits the manufacture or sale of any "unsafe handgun" in California, making a violation punishable by imprisonment in a county jail for not more than one year.  Cal. Penal Code § 32000(a).[1]  The California Legislature enacted the UHA in 1999 "in response to the proliferation of local ordinances banning low cost, cheaply made handguns known as 'Saturday Night Specials,' which called to the Legislature's attention the need to address the issue of handguns sales in a more comprehensive manner."  *Fiscal v. City and County of San Francisco*, 158 Cal. App. 4th 895, 912 (Ct. App. 2008) (citing Stricker, Gun Control 2000: Reducing the Firepower (2000) 31 McGeorge L. Rev. 293, 313 (Gun Control 2000)).  According to its legislative history, the UHA was aimed at reducing handgun crime as well as promoting handgun consumer safety.  *Id.* at 913–14.  The UHA took effect on January 1, 2001. § 32000(a).

### A.   The Roster of Handguns Certified for Sale

The UHA directs that DOJ "shall compile, publish, and thereafter maintain a roster listing all of the pistols, revolvers, and other firearms capable of being concealed upon the person that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold in this state pursuant to this title." § 32015(a).  *See Fiscal*, 158 Cal. App. 4th at 912; § 32010 (mandatory testing of handguns to determine if they meet safety device, firing, and drop safety standards).  A firearm shall be deemed to satisfy the roster requirements if manufacturer's similar firearm is already listed and the differences are "purely cosmetic."  § 32030.

The UHA allows the California Department of Justice (DOJ) to collect an annual fee from manufacturers or sellers to cover the costs of maintaining the roster

---

[1] Further statutory references are to the California Penal Code unless otherwise indicated.

4

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

1   and other costs necessary to implement the UHA. § 32015(b)(1).  DOJ may exclude

2   a firearm from the roster if the manufacturer or seller fails to pay the annual fee.

3   § 32015(b)(2).

4   **B.    Definition of "Unsafe Handgun"**

5   Under the UHA, an unsafe handgun is "any pistol, revolver, or other

6   firearm capable of being concealed upon the person," that fails to meet certain

7   firing criteria, does not meet drop safety requirements, or, in some circumstances,

8   does not have specified safety devices.  § 31910; *see also Fiscal*, 158 Cal. App. 4th

9   at 912.  Whether a handgun meets the firing criteria and drop safety requirements is

10  determined in the certified testing laboratory process.  *See* §§ 31900, 31905.

11  In addition to the firing and drop safety requirements, section 31910 sets forth

12  four specific safety features required for a handgun not be deemed unsafe.  Three of

13  those features, which are required only for semiautomatic pistols[2] (and not

14  revolvers), are challenged in this action:  the chamber load indicator, the magazine

15  disconnect mechanism (if the pistol has a detachable magazine), and

16  microstamping.[3]  § 31910(b)(4)-(b)(6).  Chamber load indicators and magazine

17  detachment mechanisms are "safety features designed to limit accidental discharges

18  that occur when someone mistakenly believes no round is in the chamber."  *Pena*,

19      [2] A "semiautomatic pistol" is defined as "a pistol . . . the operating mode of
20  which uses the energy of the explosive in a fixed cartridge to extract a fired
    cartridge and chamber a fresh cartridge with each single pull of the trigger."
    § 17140. With respect to the "center-fire" and "rimfire" distinction in the UHA, in
21  center-fire ammunition, the primer that ignites the gunpowder and causes the
    cartridge to fire is located in the center of the base of the cartridge.  In rimfire
22  ammunition, the primer is located inside a soft outer rim around the edge at the base
    of the cartridge. Center-fire firearms are generally more powerful because center-
23  fire cartridges are stronger and can withstand higher pressures than rimfire
    cartridges.  *See generally United States v. Tribunella*, 749 F.2d 104, 107 (2d Cir.
24  1984) (describing center fire weapons); Allen Rostron, High-Powered Controversy:
    Gun Control, Terrorism, and the Fight Over .50 Caliber Rifles, 73 U. Cin. L. Rev.
25  1415, 1469 n.12 (2005) (explaining rimfire and center fire design).

26      [3] The fourth requirement is that both revolvers and pistols must have a safety
    device.  *See* § 31910(a)(1), (b)(1).  This is, in fact, the only safety device that
27  section 31900 requires for revolvers.  § 31910(a).  The three challenged
    requirements apply only to pistols.  *See i*§ 31910(b).

28

5

898 F.3d at 974.  Microstamping is the placement of "a microscopic array of characters used to identify the make, model, and serial number of the pistol . . . in one or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired." § 31910(b)(6).  Microstamping "will provide important investigative leads in solving gun-related crimes by allowing law enforcement personnel to quickly identify information about the handgun from spent cartridge casings found at the crime scene."  *Fiscal*, 158 Cal. App. 4th at 914.  Similar to the original provisions of the UHA, the micro-stamping amendment "deals with crime prevention and criminal apprehension."  *Id.*

There are exceptions to the definition of an unsafe handgun.  *See* §§ 32000(b), 32105, 32110, 32100.  These include, for example, firearms sold to law enforcement officials (§ 32000(b)(3)), certain curios or relics (§ 32000(b)(3)), pistols used in Olympic target shooting (§ 32105), and firearms transferred between private parties (§ 32110(a)).  The exceptions also include firearms "used solely as a prop during the course of a motion picture, television, or video production by an authorized participant therein in the course of making that production or event or by an authorized employee or agent of the entity producing that production or event." § 32110(h).

## II.    THE NINTH CIRCUIT AFFIRMS THE CONSTITUTIONALITY OF THE UHA IN *PENA V. LINDLEY*

In the 2018 decision of *Pena v. Lindley*, the Ninth Circuit affirmed the constitutionality of most of the UHA provisions at issue in this suit.  *See* 898 F.3d 969 (9th Cir. 2018).  In *Pena*, the firearm purchaser plaintiffs argued that the three safety features in section 31910—the chamber load indicator, magazine disconnect mechanism, and the microstamping—violated their Second Amendment right to purchase firearms in California.  *Id.* at 973.  At the time, the microstamping provision at issue required the firearm to imprint two sets of identifying information

6

on each fired round, rather than one set, as required by the most recent amendments to the UHA.[4]  *See id.* at 974.

The *Pena* plaintiffs also argued that the three requirements violate the Equal Protection because they exempt certain specified purchases, including for use of firearms as props in motion picture productions.  *Id.* at 986-87; *see also* § 32110(h).

The Ninth Circuit upheld the UHA provisions as to both constitutional challenges, emphasizing that the UHA "only regulates commercial sales, not possession, and does so in a way that does not impose a substantial burden on Purchasers."  *Pena*, 898 F.3d at 973.

The Court undertook the two-step inquiry for Second Amendment challenges set forth in *District of Columbia v. Heller*, 554 U.S. 570 (2008): (1) "whether the law "burdens conduct protected by the Second Amendment," and if so, (2) whether the law withstands the appropriate level of scrutiny.  *Pena*, 898 F. 3d at 976.

The Court opted not to conduct step one of the *Heller* analysis because it determined that, regardless of whether the UHA burdens Second Amendment conduct, it withstands the applicable level of scrutiny.  *Id.* at 976.  Before moving to step two, however, the Court recognized that the challenged UHA provisions may not burden protected activity, because they may constitute "laws imposing conditions and qualifications on the commercial sale of arms" that are permissible under *Heller.  Id.* at 975-976 (quoting *Heller*, 554 U.S. at 626-27.)

In step two, the Court determined that intermediate scrutiny was appropriate because the UHA provisions do not substantially burden any Second Amendment right.  *Id.* at 977.  The Court ruled that the UHA provisions withstand intermediate scrutiny because there is a "reasonable fit" between the law and the State's objectives of consumer safety, public safety, and crime prevention.  *Pena* at 979; *id.*

---

[4] The challenge in *Pena* was brought prior to the enactment of AB 2847.  As explained below, the bill also amended the chamber load indicator and magazine disconnect mechanism requirements, though not in a way that affects the legal analysis.

979-986.  Thus, the Court held that the chamber load indicator, magazine disconnect mechanism, and microstamping requirements do not violate the Second Amendment.

The Ninth Circuit also held that the exceptions to these safety features in section 32110, including the exception for firearms used as props in film production do not violate equal protection.  *Id.* at 986-87.  The Court determined that the rational basis review applied because there was no suspect class or fundamental right at issue.  *Id.* at 986.  It held that rational basis review was satisfied because firearms used in film production "are not intended to be used for live fire," or as offensive or defensive weapons, and therefore do not pose the same threat to public safety.  *Id.* at 989.

### III.   THE LEGISLATURE ENACTS MINOR AMENDMENTS TO THE UHA IN AB 2847

In November 2020, the Legislature amended the UHA by AB 2847.  With respect to the chamber load indicator and magazine disconnect mechanism requirements, AB 2847 addressed the effective date of the relevant provisions.  *See* § 31910(b)(4)-(5).  With respect to the microstamping requirement, "AB 2847 ease[d] compliance by requiring that newly developed semiautomatic pistol models etch microstamping characters on one place on the interior of the firearm, as opposed to two," as previously required.  Assem. Comm. on Public Safety, Bill Analysis of Assembly Bill 2847, 2019-2020 Reg. Sess. (May 19, 2020); *see* § 31910(b)(4).  The Legislature noted that while firearm manufacturers claimed that dual-location microstamping was impossible or impractical (a claim that the Legislature expressly "rejected"), the industry had conceded that single-location microstamping, as required in the amended provision, is feasible.  AB 2847, §1 (h); *see also* Appellants' Answer Brief on the Merits at 16, *Nat'l Shooting Sports Foundation, Inc. v. State of California*, 5 Cal.5th 428 (2018) (No. S239397), 2017 WL 4541977 ("Microstamped characters that identify the make, model, and serial

8

number of a semi-automatic pistol (a 'microstamped alpha numeric code') can be etched or imprinted on the tip of the pistol's firing pin").  In AB 2847, the Legislature also addressed the effective date of the microstamping requirement.  § 31910(b)(4).

AB 2847 also added a new provision to section 31910 related to the handgun roster that states in relevant part:

> The Department of Justice shall, for each semiautomatic pistol newly added to the roster pursuant to Section 32015, remove from the roster exactly three semiautomatic pistols **lacking one or more of the applicable features described in paragraphs (4), (5), and (6) of subdivision (b) and added to the roster before July 1, 2022**. Notwithstanding those paragraphs, each semiautomatic pistol removed from the roster pursuant to this subdivision shall be considered an unsafe handgun.

§ 31910(b)(C)(7) (emphasis added).

## ALLEGATIONS IN THE FIRST AMENDED COMPLAINT

Plaintiffs are individuals, sellers of firearms, and organizations who wish to purchase, sell, or self-manufacture particular models of handguns that have been determined to be unsafe under the UHA.  FAC at 26-43.

Defendants are California Attorney General Xavier Becerra in his official capacity and Luis Lopez, in his official capacity as Director of the California Department of Justice Bureau of Firearms.  *Id.* at 9.

Plaintiffs allege two causes of action for injunctive and declaratory relief under 42 U.S.C. § 1983: Count One for alleged violation of the Second Amendment and Count Two for allege violation of the Equal Protection Clause.  The constitutional challenges are both facial and as-applied, as Plaintiffs seek relief both for themselves and for "ordinary citizens not disqualified from exercising Second Amendment rights."  *Id.* at 53-56.

1    Plaintiff's Second Amendment claim appears to allege that the Unsafe

2  Handgun's safety mechanism requirements—relating to chamber load indicators,

3  magazine disconnect mechanisms, and microstamping—are unconstitutional.  *See*

4  *id.* ¶¶ 59-72.  Plaintiffs allege that there are currently no handgun models that meet

5  the microstamping requirement and thus no models that meet all three safety

6  requirements.  *Id.* ¶¶ 69-70.  Notably, Plaintiffs do not allege that it is impossible or

7  impractical to the manufacture handguns meeting any or all of the requirements,

8  including the microstamping requirement, as amended by AB 2847.  *See id.* ¶¶ 62-

9  73.  Plaintiffs claim that the roster is unconstitutional, apparently because allegedly

10  minor changes to handgun models may cause them to be removed from the roster

11  and because the new provision in AB 2847 will supposedly cause the number of

12  handguns on the roster to "shrink into oblivion." *Id.* ¶ 56.  Plaintiffs also appear to

13  allege that the annual fee paid by manufacturers to fund maintenance of the roster

14  to manufacturers violates the Second Amendment.  *Id.* ¶ 58.  Finally, Plaintiffs

15  claim that they are prevented from self-manufacturing unsafe handguns under

16  section 29182(e)(2).

17    In their equal protection claim, Plaintiffs allege that the UHA's exception for

18  firearms used only as props in film productions violates equal protection because it

19  discriminates against other firearms purchases.  *Id.* ¶¶ 206-208.

20                              **LEGAL STANDARD**

21    Federal Rule of Civil Procedure Rule 12(b)(1) allows a party to raise the

22  defense that the court lacks "jurisdiction over the subject matter" of a claim.  Where

23  a Rule 12(b)(1) motion is brought, the "party asserting federal subject matter

24  jurisdiction bears the burden of proving its existence." *Id.* at 1122.

25    A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the

26  complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

27  To survive a motion to dismiss, a complaint must contain sufficient facts to state a

28  claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

10

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

(2009).  "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation omitted).  The court accepts as true all material allegations in the complaint and construes them in the light most favorable to the plaintiff.  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

## ARGUMENT

### I.  PLAINTIFFS LACK ARTICLE III STANDING TO CHALLENGE THE ROSTER REMOVAL PROVISION IN SECTION 31910(b)(7)

Plaintiffs lack Article III standing to challenge the constitutionality of section 31910(b)(7), which directs DOJ to remove certain handgun models from the roster when a new model is added.  This is because Plaintiffs allege only a future injury based on their speculation about the extent to which the number of handguns on the roster may decline over time.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992)).  "[H]ypothetical, speculative or other possible future injuries" do not support standing.  *Schmier v. U.S. Court of Appeals for Ninth Circuit*, 279 F.3d 817, 821 (9th Cir. 2002).  A plaintiff cannot establish standing by alleging a threat of future harm based on a "chain of speculative contingencies."  *Nelsen v. King Cty.*, 895 F.2d 1248, 1252 (9th Cir. 1990).

Plaintiffs lack Article III standing because their alleged injury from section 31910(B)(7)—that it will cause the number of handguns on the roster to become

1    unacceptably small—is hypothetical and speculative, at best.  *Id.*, ¶ 56.  It is

2    unknown how many and how soon handguns may be added to the roster, causing

3    other handguns to be removed.  Moreover, it is also not even possible under the

4    provision that the number of roster handguns will "shrink into oblivion," as

5    Plaintiffs allege.  *See id.*, ¶ 56.  Section 31910(B)(7) instructs the Department of

6    Justice to remove from the roster only handguns that do not comply with

7    requirements for chamber load indicators, magazine disconnect mechanisms, and

8    microstamping.  § 31910(b)(7) (directing the removal of handguns "lacking one or

9    more of the applicable features described in paragraphs (4), (5), and (6) of

10   subdivision (b)").  Thus, once a handgun with those three features is added to

11   roster, it is not subject to removal under section 31910(b)(7), which by its terms

12   comes into play only when one of those features is missing.  Plaintiffs' alleged

13   injury is highly speculative and does not support standing.

14          Plaintiffs' challenge to the roster removal provision is also unripe.  The

15   ripeness inquiry involves "both a constitutional and prudential component."  *Safer*

16   *Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 411 (9th Cir. 2019) (quotation

17   omitted).  Because constitutional ripeness requires cases to present issues that are

18   "definite and concrete, not hypothetical or abstract," it "is often treated under the

19   rubric of standing."  *Id.*; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5

20   (2014).  Thus, because Plaintiffs' alleged injury is hypothetical and speculative,

21   their challenge is also not constitutionally ripe.

22          Prudential ripeness requires the Court "to first consider the fitness of the issues

23   for judicial review, followed by the hardship to the parties of withholding court

24   consideration."  *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d

25   829, 837 (9th Cir. 2012) ("Courts have regularly declined on prudential grounds to

26   review challenges to recently promulgated laws or regulations in favor of awaiting

27   an actual application of the new rule").  Plaintiff's challenge to section 31910(b)(7)

28   is not fit for review because it is not known how it will affect the number of

12

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

handguns on the roster in the future, and the court would therefore be greatly aided by "further factual development" in the form of a concrete dispute.  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998); *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008) (facial challenges are "disfavored," including because they "raise the risk of premature interpretation of statutes on the basis of factually barebones records").  Finally, Plaintiffs would experience no hardship if the courts delay consideration of the constitutionality of the provision.  Plaintiff's challenge is therefore prudentially unripe.

The Court should therefore dismiss Plaintiff's constitutional challenges to section 31910(b)(7) on the grounds that Plaintiffs lack standing and the claims are unripe.

## II.  THE UNSAFE HANDGUN ACT DOES NOT VIOLATE THE SECOND AMENDMENT

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

In *Heller*, the Supreme Court undertook a thorough analysis of the Second Amendment.  In that case, a District of Columbia special police officer sued to invalidate a District law completely banning the possession of a handgun in the home and requiring that any other lawfully owned firearm in the home, such as a registered long gun, be disassembled or otherwise rendered inoperable for immediate use.  554 U.S. at 574.

The Court held that the Second Amendment protects an individual right, not a collective one.  *Id.* at 595.  But critically, in what has become well-known and often-cited language, the Court further held that "[l]ike most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was

13

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

1    not a right to keep and carry any weapon whatsoever in any manner whatsoever and

2    for whatever purpose." *Id.* at 626 (citations omitted).

3        Thus, while Heller did uphold the invalidation of a very strict law of the

4    District of Columbia that generally prohibited the possession of handguns, *id.* at

5    576, 636, *Heller* took care to provide an expressly non-exhaustive list of

6    "presumptively lawful regulatory measures," *id.* at 627 n.26 – "a variety of tools"

7    that "the Constitution leaves . . . for combating" the problem of firearm violence in

8    the United States. *Id.* at 636.  That list includes prohibitions on the possession of

9    "weapons not typically possessed by law-abiding citizens for lawful purposes, such

10   as short-barreled shotguns," *id.* at 625, and "M-16 rifles and the like," *id.* at 627, as

11   well as "longstanding prohibitions on the possession of firearms by felons and the

12   mentally ill, or laws forbidding the carrying of firearms in sensitive places such as

13   schools and government buildings, or laws imposing conditions and qualifications

14   on the commercial sale of arms." *Id.* at 626-27.  Likewise, *Heller* indicated that

15   gunpowder storage laws "do not remotely burden the right of self-defense . . . ." *Id.*

16   at 632.  "Nor . . . does our analysis suggest the invalidity of laws regulating the

17   storage of firearms to prevent accidents." *Id.*

18       Key to *Heller*'s analysis of the District's regulations was the observation that

19   "the law totally bans handgun possession in the home.  It also requires that any

20   lawful firearm in the home be disassembled or bound by a trigger lock at all times,

21   rendering it inoperable." *Heller*, 554 U.S. at 628.  In finding the total ban on

22   handguns unconstitutional, the Court explained:

23

24       [T]he inherent right of self-defense has been central to the Second
         Amendment right. The handgun ban amounts to a prohibition of an
25       entire class of "arms" that is overwhelmingly chosen by American
         society for that lawful purpose. The prohibition extends, moreover, to
26       the home, where the need for defense of self, family, and property is
         most acute.  Under any of the standards of scrutiny that we have
27       applied to enumerated constitutional rights, banning from the home

28

14

1
2
3

"the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," would fail constitutional muster.

4   *Id.* at 628-29 (footnote and citation omitted).  Addressing the requirement

5   that firearms in the home be rendered and kept inoperable at all times, the Court

6   similarly explained that the requirement was unconstitutional because "[t]his makes

7   it impossible for citizens to use them for the core lawful purpose of self-defense[.]"

8   *Id.* at 630.

9          Because the District's law was unconstitutional under any level of

10   constitutional scrutiny, *Heller* declined to indicate precisely what standard of

11   review would apply to Second Amendment challenges.  *Id.* at 628 n.27.  Nor did

12   *Heller* reach the issue of whether the Second Amendment is incorporated by the

13   Fourteenth Amendment and therefore applicable to the States, *id.* at 620 n.23,

14   although the Court would later address that issue in *McDonald v. City of Chicago*,

15   561 U.S. 742 (2010).

16          In *McDonald*, the Supreme Court held that the Second Amendment is fully

17   incorporated against the States via the Fourteenth Amendment.  561 U.S. at 777-78.

18   Yet the Court explained that "incorporation does not imperil every law regulating

19   firearms."  *Id.* at 786.  In doing so, the Court was careful to re-state the critical

20   language from Heller:

21          It is important to keep in mind that *Heller*, while striking down a law
22          that prohibited the possession of handguns in the home, recognized
             that the right to keep and bear arms is not "a right to keep and carry
23          any weapon whatsoever in any manner whatsoever and for whatever
             purpose." [Citation.]  We made it clear in *Heller* that our holding did
24          not cast doubt on such longstanding regulatory measures as
             "prohibitions on the possession of firearms by felons and the
25          mentally ill," "laws forbidding the carrying of firearms in sensitive
26          places such as schools and government buildings, or laws imposing
             conditions and qualifications on the commercial sale of arms."
27          [Citation.]  We repeat those assurances here.

28

15

1   *Id.* (italics added).  In *McDonald*, the Court also declined to address the

2   applicable standard of review, leaving the lower courts to grapple with the

3   question of the standard to apply to laws that arguably implicate the Second

4   Amendment.

### A.   The Two-Step Inquiry Applicable to Second Amendment Challenges in the Ninth Circuit

5
6

7   In *U.S. v. Chovan*, this Court held that a specific two-step analytical

8   framework applies to Second Amendment challenges.  After considering the

9   approach of other circuits, the Court decided to "adopt the two-step Second

10  Amendment inquiry undertaken by the Third Circuit in [*United States v.*

11  *Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)], and the Fourth Circuit in [*United*

12  *States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)], among other circuits." 735

13  F.3d 1127, 1136 (2013).

14  The two-step Second Amendment inquiry "(1) asks whether the challenged

15  law burdens conduct protected by the Second Amendment and (2) if so, directs

16  courts to apply an appropriate level of scrutiny." *Id.*; *accord Pena*, 898 F.3d at 975.

17  The Court explained that "this two-step inquiry reflects the Supreme Court's

18  holding in *Heller* that, while the Second Amendment protects an individual right to

19  keep and bear arms, *the scope of that right is not unlimited*."  *Chovan*, 735 F.3d at

20  1136 (citing *Heller*, 554 U.S. at 626-27) (italics added).

21  As explained below, the UHA does not burden any conduct protected by the

22  Second Amendment.  Thus, this Court should end its analysis at step one of the

23  inquiry.  But even if this Court were to engage in step two of the inquiry, the UHA

24  would survive constitutional scrutiny under *Pena*.

### 1.   Step One: The UHA Does Not Burden Conduct Protected by the Second Amendment

25
26

27  Although in *Pena*, the Ninth Circuit declined to address whether the UHA

28  burdens conduct protected by the Second Amendment, *see Pena*, 898 F.3d at , 976,

16

1  the district court in that case correctly determined that the UHA causes no such

2  burden.

3       Here, Plaintiffs have alleged only that they wish to purchase, sell, or self-

4  manufacture specific models of handguns of their choice.  *See* FAC at 26-43.  They

5  do not allege that they do not already own any handgun, or that they cannot

6  purchase, sell, or manufacture other models of handguns in California.  Plaintiffs

7  even concede that, as of January 4, 2021 the roster includes 779 models of

8  handguns that are available in the state.  *Id.* ¶ 51.  Plaintiffs have therefore failed to

9  show that the UHA hinders "'the right of law-abiding, responsible citizens to use

10  arms in defense of hearth and home.'" *Chovan*, 735 F.3d at 1138 (quoting *Heller*,

11  554 U.S. at 635).

12       The district court in *Pena* also correctly observed that the UHA, which

13  concerns handgun sales, is unlike the total firearm prohibition struck down in

14  *Heller*, which concerned "the *possession* of handguns in the home."  *Pena*, 898

15  F.3d at 977 (emphasis in original) (quoting *Heller*, 554 U.S. at 627).  Indeed, the

16  UHA is like those firearms regulations that *Heller* endorsed because they do not

17  burden the Second Amendment right.  More specifically, on its face the UHA is a

18  "law[] imposing conditions and qualifications on the commercial sale of arms," and

19  therefore presumptively lawful."  *Id.* at 626-27; *see also United States v. Vongxay*,

20  594 F.3d 1111, 1115 (9th Cir. 2010).  The UHA's safety features are akin to the

21  safety laws that *Heller* permits – laws like gunpowder-storage laws, which "do not

22  remotely burden the right of self-defense," and "laws regulating the storage of

23  firearms to prevent accidents."  *Heller*, 554 U.S. at 632.  The challenged provisions

24  of the UHA simply do not prohibit the possession or use of firearms in any fashion.

25       The UHA is also similar to other firearms regulations that courts in other

26  circuits have upheld because they do not burden the Second Amendment right and

27  leave individuals with alternatives for acquiring firearms for self-defense.  *See, e.g.,*

28  *Draper v. Healey*, No. CIV.A. 14-12471-NMG, 2015 WL 997424, at *7 (D. Mass.

17

1   Mar. 5, 2015), *aff'd*, 827 F.3d 1 (1st Cir. 2016) (Second Amendment rights not

2   burdened by regulation requiring handguns sold or transferred in the

3   Commonwealth to have a load indicator or magazine safety disconnect);

4   *Marzzarella*, 614 F.3d at 97 (regulation prohibiting obliterated serial numbers "does

5   not severely limit the possession of firearms" because "[i]t leaves a person free to

6   possess any otherwise lawful firearm"); *Heller v. Dist. of Columbia* ("*Heller II*"),

7   670 F.3d 1244, 1251-58 (D.C. Cir. 2011) (upholding gun registration, assault

8   weapon and large capacity magazine regulations where individuals could still

9   possess other firearms for self-defense); *Kampfer v. Cuomo*, 993 F. Supp. 2d 188,

10  196 (N.D. N.Y. 2014) ("the provisions at issue attempt only to decrease in number

11  certain firearms deemed particularly dangerous by the legislature for the sake of

12  public safety").

13       Plaintiffs may argue, as the plaintiffs did in *Pena*, that the UHA is unlawful

14  because the Second Amendment categorically protects handguns, a kind of weapon

15  that is "in common use" for "lawful purposes."  *Heller*, 554 U.S. at 624.  This

16  argument is flawed.  Even if Plaintiffs could show that the guns they desire are in

17  "common use," that would not support their claim.  Regarding the so-called

18  "common use" test upon which plaintiffs rely, *Heller* stated: "We also recognize

19  another important limitation on the right to keep and carry arms.  [*United States v.*

20  *Miller*, 307 U.S. 174 (1939)] said, as we have explained, that the sorts of weapons

21  protected were those 'in common use at the time.'" *Heller*, 554 U.S. at 627.  Thus,

22  the "common use" test is actually a limitation on the Second Amendment right.

23       Any "common use" argument also depends on a reading of the UHA that is

24  too broad.  The UHA's focus is narrower than handguns as an entire class of

25  firearms; its focus is certain handgun features.  Specifically, the UHA encompasses

26  handgun safety devices, firing requirements, drop safety requirements, chamber

27  load indicators, magazine disconnect mechanisms and microstamping.  Thus,

28  Plaintiffs would be arguing that they have a constitutional right to purchase a

18

handgun without these safety features.  But no court has recognized a constitutional right to purchase any handgun of one's choice regardless of its features.  *Cf. Marzzarella*, 614 F.3d at 93 (rejecting plaintiffs' argument that rested on the conception of firearms without serial numbers "as a constitutionally recognized class of firearms, in much the same way handguns constitute a class of firearms").  Taken to its logical conclusion, that position would require constitutional protection for any firearm that might be called a "handgun," even if it had features allowing for a sound suppressor (i.e., a silencer), or features disguising it as something other than a handgun, for example.  These features are generally unlawful in California.  *See* Cal. Penal Code § 33410 (prohibition on silencers); § 24510 (unlawful to possess firearm not immediately recognizable as firearm).

The UHA is presumptively lawful under *Heller* because it simply regulates the manufacturing and commercial sale of certain models of handguns.  Plaintiffs' allegations do not deny that handguns remain widely available in California and plaintiffs remain free to defend themselves irrespective of the UHA's requirements.  *See* Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L.Rev. 1443, 1455-56 (2009) ("tracking regulations" like serial number and microstamping requirements "are not much of a burden on self-defense").  Accordingly, as the district court correctly concluded in *Pena*, the UHA and its safety feature requirements do not burden the Second Amendment right.

> ### 2.  Step Two: Even if the Second Amendment Applied, the UHA Withstands Constitutional Scrutiny

If the Court finds that the UHA burdens Second Amendment rights and proceeds to step two, it should rule that the UHA withstands constitutional scrutiny.  "Which level of scrutiny to apply depends on 'how close the law comes to the core of the Second Amendment right' and 'the severity of the law's burden on the right.'"  *Pena*, 898 F.3d at 977 (quoting *Chovan*, 735 F.3d at 1138).  Strict scrutiny

19

is applied only when a law "implicates the core of the Second Amendment right and severely burdens that right." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). If both requirements are not met, intermediate scrutiny applies. *Fyock v. Sunnyvale*, 779 F.3d 991, 998-99 (9th Cir. 2015); *see also Pena*, 898 F.3d at 977 ("Our post-*Heller* decisions generally have applied intermediate scrutiny to firearms").

If the Court proceeds to step two of the relevant inquiry, intermediate scrutiny is appropriate here because the UHA does not implicate the core of the Second Amendment.[5] The UHA does not concern possession and use of firearms generally, much less possession and use in the home. *See Heller*, 554 U.S. at 635 (core of Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). Unlike the circumstances in *Chovan*, for example, it does not prohibit a class of people from using or possessing firearms for life. *Chovan*, 735 F.3d at 1129. On the contrary, under the UHA, Plaintiffs may already lawfully possess and use handguns and, like all law-abiding Californians, they remain free to purchase and use additional handguns for self defense. Thus, even if the UHA imposes some burden on Second Amendment rights, at most intermediate scrutiny applies.

Intermediate scrutiny is also appropriate because, as this Court already determined in *Pena*, if the UHA burdens any Second Amendment right, it is not a severe burden. *Pena*, 898 F.3d at 978-79. As explained in *Pena*, the law regulates only the manner of exercise of Second Amendment rights and does not "amount to a total prohibition of that right." *Id.* at 977. Moreover, "being unable to purchase a subset of semiautomatic weapons, without more, does not significantly burden the right to self-defense in the home." *Id.* at 979 (*citing Heller*, 554 U.S, at 626).

_____

[5] In *Pena*, the Court did not decide whether the UHA implicates the core of the Second Amendment. *Pena*, 898 F.3d at 977. The Court explained that no determination was necessary because, since the law did not severely burden Second Amendment rights, intermediate scrutiny was appropriate in any event. *Id.*

20

1    Further, "[a]ny burden on the right is lessened by the UHA's exceptions, which

2    allow for the purchase of firearms that do not have the CLI, MDM, and

3    microstamping features," including those "grandfathered on the roster," and

4    transferred through private transactions.  *Id.* at 979.

5         Here, just as in *Pena*, the challenged UHA provisions withstand intermediate

6    scrutiny.  "Intermediate scrutiny requires (1) a significant, substantial, or important

7    government objective, and (2) a reasonable fit between the challenged law and the

8    asserted objective."  *Id.* (internal quotation omitted).  The law must "promote a

9    substantial government interest that would be achieved less effectively absent the

10   regulation," but need not be the "least restrictive means" of achieving the interest.

11   *Fyock*, 779 F.3d at 1000 (internal quotation omitted).

12        This Court determined in *Pena* that the three challenged safety provisions—

13   the chamber load indicator, magazine disconnect mechanism, and microstamping—

14   withstand intermediate scrutiny because there is a "reasonable fit" between the law

15   and the State's objectives of consumer safety, public safety, and crime prevention.

16   *Pena*, 898 F.3d at 979; *id.* 979-986.  A chamber load indicator promotes safety by

17   "act[ing] as a red flag to show that the gun is loaded."  *Id.* at 980.  AB 2847 has not

18   changed this.  *See* § 31910(b)(4).  A magazine disconnect mechanism promotes

19   safety by "prevent[ing] a firearm from shooting unless a magazine is inserted."

20   *Pena*, 898 F.3d at 979.  AB 2847 also has not changed this.  *See* § 31910(b)(5).

21   And, microstamping promotes public safety and crime prevention by enabling law

22   enforcement to conduct serial number tracing on recovered bullets.  *Pena*, 898 F.3d

23   at 982.  This means-ends fit is even more reasonable now that when *Pena* was

24   decided, since AB 2847 amended the provision to require microstamping only in

25   one location rather than two.  *See* § 31910(b)(6).

26        Moreover, the roster fee paid by manufacturers reasonably facilitates the

27   roster's maintenance and administration.  *See* § 32015(b)(1) (fee may not exceed

28   "the costs of preparing, publishing, and maintaining the roster pursuant to

21

1   subdivision (a) and the costs of research and development, report analysis, firearms

2   storage, and other program infrastructure costs necessary to implement  Sections

3   31900 to 32110, inclusive"); *see also Pena*, F.3d at 981 ("we will not interfere with

4   the orderly administration of California's roster").  And the fee is in line with

5   firearms-related fees that the Ninth Circuit and other courts have upheld.  *See Bauer*

6   *v. Becerra*, 858 F.3d 1216, 1222 (2017) (citing *Kwong v. Bloomberg*, 723 F.3d 160,

7   167 (2d Cir. 2013)).

8        The new roster provision in AB 2847, section 31910(b)(7), which relates to

9   the removal of handgun models from the register, also satisfies intermediate

10   scrutiny.   By including handgun models that existed on the roster before the

11   challenged safety requirements were enacted, the roster grandfathers in non-

12   complying models that meet other safety requirements.  By removing these

13   grandfathered models from the roster when new models are added that do include

14   all mandatory safety features, section 31910(b)(7) facilitates a transition over time

15   towards full compliance.  This transition is also advanced by prohibiting persons

16   from self-manufacturing unsafe handguns and by requiring manufacturers to

17   include the three safety requirements if they alter the model in a way that is not

18   merely cosmetic.  *See* §§ 29182(e)(2), 32030.

19        The challenged UHA provisions therefore satisfy intermediate scrutiny and do

20   not violate the Second Amendment.

21   **III.   THE UNSAFE HANDGUN ACT DOES NOT VIOLATE EQUAL PROTECTION**

22        As already decided in *Pena*, the UHA's exception for handguns used solely as

23   props in film productions does not violate Plaintiffs' rights under the Equal

24   Protection Clause.  *See Pena*, 898 F.3d at 987.  Equal protection is concerned only

25   with "law [being] applied in a discriminatory manner or impos[ing] different

26   burdens on different classes of people."  *Freeman*, 68 F.3d at 1187.  "'The first step

27   in equal protection analysis is to identify the [defendant's] classification of

28   groups.'" *Freeman v. City of Santa Ana,* 68 F.3d 1180, 1187 (9th Cir. 1995)

22

1   (quoting *Country Classic Dairies, Inc. v. State of Montana, Dep't of Commerce*

2   *Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988)).

3       As to step one, the exception in section 32110(h) does not trigger equal

4   protection review at all because the statute does not distinguish between different

5   groups of potential manufacturers or purchasers.  At any given point in time, the

6   roster of handguns certified for sale either makes a particular handgun available for

7   purchase, or it does not.  Section 32110(h) states the UHA "shall not apply to . . .

8   [t]he sale loan or transfer of any semiautomatic pistol that is to be used solely as a

9   prop during the course of a motion picture, television or video production by an

10  authorized participant therein."  § 32110(h).  But it does not dictate who may or

11  may not be such a participant.

12      Even if 32110(h) did trigger equal protection review, which it does not, the

13  UHA would withstand equal protection review, as already decided in *Pena*.  *See*

14  *Pena*, 898 F.3d at 987.  "[I]f a legislative act neither affects the exercise of a

15  fundamental right, nor classifies persons based on protected characteristics, then

16  that statute will be upheld 'if the classification drawn by the statute is rationally

17  related to a legitimate state interest.'"  *Silveira v. Lockyer*, 312 F.3d 1052, 1088 (9th

18  Cir. 2002) (quoting *Schweiker v.Wilson*, 450 U.S. 221, 230 (1981)).  As in *Pena*,

19  Plaintiffs here "do not allege that they are part of any suspect or quasi-suspect

20  class" and they could not do so in good faith.  *Id.* at 986.  Since the UHA also does

21  not infringe on any fundamental rights and simply involves the regulation of

22  commercial handgun sales, "it must be upheld again equal protection challenge if

23  there is any reasonably conceivable state of facts that could provide a rational basis

24  for the classification."  *Pena*, 898 F.3d at 986 (quoting *FCC v. Beach Commc'ns,*

25  *Inc.* 508 U.S. 307, 313 (1993)); *see also City of Cleburne, Tex. V. Cleburne Living*

26  *Ctr.*, 473 U.S. 432, 440 (1985) ("When social or economic legislation is at issue,

27  the Equal Protection Clause allows the States wide latitude[.]").  The exception in

28  section 32110(h) is rational because firearms used in film protection "are not

23

1   intended to be used for live fire," or as offensive or defensive weapons, therefore do

2   not pose the same threat to public safety.  *Pena*, 898 F.3d at 989.

3       The UHA withstands rational basis review and does not run afoul of equal

4   protection.

5                              **CONCLUSION**

6       For the reasons above, the Court should dismiss the First Amended Complaint

7   without leave to amend.

8   Dated:  January 25, 2021                 Respectfully Submitted,

9                                            XAVIER BECERRA
                                             Attorney General of California
10                                           ANTHONY R. HAKL
                                             Supervising Deputy Attorney General
11

12

13                                           */s/ Gabrielle D. Boutin*
                                             GABRIELLE D. BOUTIN
14                                           Deputy Attorney General
                                             *Attorneys for Defendants Attorney*
15                                           *General Becerra and Director Luis*
                                             *Lopez, in their official capacities*
16

17

18

19

20

21

22

23

24

25

26

27

28

Mtn. to Dismiss; Mem. of Pts. & Auth. (3:20-cv-02190-DMS-DEB)

# CERTIFICATE OF SERVICE

Case Name: **Renna, Lana Rae, et al. v.**  No.  **20-cv-2190**
**Xavier Becerra, et al.**

I hereby certify that on January 25, 2021, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on January 25, 2021, at Sacramento, California.

| | |
|---|---|
| Eileen A. Ennis | _Eileen A. Ennis_ |
| Declarant | Signature |

SA2020304764
34765379.docx