Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com

Michael P. Sousa
Law Offices of Michael P. Sousa, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
Tel.: 858-453-6122
Email: msousa@msousalaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LANA RAE RENNA, et al.,<br>Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, et al.,<br>Defendants. | Case No.: 20-cv-2190-DMS-DEB<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT<br><br>Date/Time: TBD<br>Dept: 13A<br>Judge: Hon. Dana M. Sabraw<br>Trial Date: TBD<br>Action Filed: 11/10/2020 |

1

**TABLE OF CONTENTS**

I. Introduction ................................................................................1

II. The Lenient Standards of Review on Motions to Dismiss ...................2

III. The Fundamental Second Amendment Right At Stake ......................3

IV. The UHA *Unquestionably* Implicates the Second Amendment ...........4

   A.  *All* Arms in Common Use for Lawful Purposes Are Protected ...........5

   B.  No "Presumptively Lawful" Loophole Exists for the UHA................8

V. The UHA Flatly Fails Both the True *Heller* Test and Strict Scrutiny .............11

VI. The UHA Resoundingly Fails Intermediate Scrutiny As Well ........14

   A.  The Proper Test of Intermediate Scrutiny ................................14

   B.  Defendants Cannot Carry This Burden, And They Do Not Even Try ...............15

   C.  The Enactment of AB 2847 Substantially Increases the Significant Burdens that the UHA Imposes on the Second Amendment Right .........................20

VII.  Plaintiffs' Righteous Challenge to the UHA is Fully Ripe and Justiciable ..23

VIII. The Equal Protection Claim Also Easily Survives the MTD .........24

IX. Conclusion ................................................................................25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

2

3

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................2

*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3D 986

  (9th Cir. 2011) ..............................................................................................2

*Bd. of Trs. of State Univ. of N.Y.*, 492 U.S. 469 (1989).................................15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...........................................2

*Caetano v. Massachusetts*, __ U.S. __, 136 S.Ct. 1027 (2016).......................5

*Conley v. Gibson*, 355 U.S. 41 (1957) .............................................................2

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009).........................................2

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...............................passim

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) ..................................passim

*Edenfield v. Fane*, 507 U.S. 761 (1993) ........................................................14

*Geraci v. Homestreet Bank*, 347 F.3d 749 (9th Cir. 2003)..............................2

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................3

*Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011) .............................3, 24

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................3

*Miller v. Johnson*, 515 U.S. 900 (1995).........................................................13

*Oklevueha Native American Church of Hawaii, Inc. v. Holder*, 676 F.3d 829

(9th Cir. 2012)................................................................................................24

*Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730 (2017) ............14

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) .........................................passim

*Rhode v. Becerra*, 445 F.Supp.3d 902 (S.D. Cal. 2020)...........................passim

*Schertzer v. Bank of America, N.A.*, 445 F.Supp.3d 1058 (S.D. Cal. 2020)....................3

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ...................................12, 15

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).............................24

*U.S. v. Hempfling*, 431 F.Supp.2d 1069 (E.D. Cal. 2006).............................2

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................3, 24

1

**Statutes**

2
18 U.S.C. § 922 ................................................................20

3
Pen. Code § 16990 ...........................................................19

4
Pen. Code § 26950 ...........................................................20

5
Pen. Code § 26970 ...........................................................20

6
Pen. Code § 27545 ...........................................................19

7
Pen. Code § 27650 ...........................................................20

8
Pen. Code § 27670 ...........................................................20

9
Pen. Code § 27870 ...........................................................19

10
Pen. Code § 27875 ...........................................................19

11
Pen. Code § 27915 ...........................................................19

12
Pen. Code § 27920 ...........................................................19

13
Pen. Code § 28055 ...........................................................19

14
Pen. Code § 29800 ...........................................................20

15
Pen. Code § 29805 ...........................................................20

16
Pen. Code § 29815 ...........................................................20

17
Pen. Code § 29820 ...........................................................20

18
Pen. Code § 29825 ...........................................................20

19
Pen. Code § 29855 ...........................................................20

20
Pen. Code § 29860 ...........................................................20

21
Pen. Code § 29900 ...........................................................20

22
Pen. Code § 29905 ...........................................................20

23
Pen. Code § 30305 ...........................................................20

24
Pen. Code § 30910 ...........................................................19

25
Pen. Code § 30915 ...........................................................19

26
Pen. Code § 31610 ...........................................................20

27
Pen. Code § 32000 .............................................................9

28
Welf. & Inst. Code § 8100 ................................................20

iii

Welf. & Inst. Code § 8103 ............................................................20

**Regulations**

11 CCR § 4250 ...........................................................................20

27 C.F.R. § 478.22 .....................................................................20

Pen. Code § 31910 .....................................................................21

iv

Plaintiffs hereby oppose Defendants' motion to dismiss ("MTD") the First Amended Complaint ("FAC") based on the following points and authorities:

## I.  Introduction

Defendants seek to toss out this challenge to the "Roster of Handguns Certified for Sale" ("Roster") under the auspices of the "Unsafe Handgun Act" ("UHA"), claiming (1) it is of no moment because "the UHA does not burden any conduct protected by the Second Amendment," (2) even assuming it implicates the Second Amendment this Court should apply a deferential form of "intermediate scrutiny"—deferring to the Legislature's policy judgments regarding which handguns in common use for lawful purposes may be purchased and self-manufactured by law-abiding citizens—because any burden imposed is not "substantial," and (3) the UHA survives this test because "there is a 'reasonable fit' between the law and the state's objectives of "consumer safety, public safety, and crime prevention." MTD 16-21. Defendants also claim that Plaintiffs' related challenge to the new rule under the UHA compelling the removal of three "noncompliant" or "grandfathered" handguns for every "compliant" handgun added to the Roster fails for want of standing and ripeness. MTD 11-12, 22.

Defendants fall far short in their attempts to defend the UHA from attack, especially under the lenient pleading standards. Constitutionally, the UHA is indefensible and Plaintiffs righteously seek the crucial vindication through this action.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.  The Lenient Standards of Review on Motions to Dismiss

The standards of review are lenient for all intents and purposes of this MTD. For the challenge to the FAC as failing to state claims for relief under Rule 12(b)(6), "we accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to Plaintiffs and "draw[] all reasonable inferences in their favor." *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3D 986, 990 (9th Cir. 2011). The FAC "need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And the FAC does that so long as it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The FAC should not be dismissed on this ground "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Thus, such motions are "disfavored and rarely granted." *U.S. v. Hempfling*, 431 F.Supp.2d 1069, 1075 (E.D. Cal. 2006).

Similarly, for any challenge to Plaintiffs' standing under Rule 12(b)(1), "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor" of Plaintiffs. *Warth v. Seldin*, 422 U.S. 490,

501 (1975); *accord Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Maya*, at 1068 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *accord Schertzer v. Bank of America, N.A.*, 445 F.Supp.3d 1058, 1070 (S.D. Cal. 2020).

### III.  The Fundamental Second Amendment Right At Stake

"Armed self-defense is a fundamental right rooted in tradition and the text of the Second Amendment." *Duncan v. Becerra*, 970 F.3d 1133, 1140 (9th Cir. 2020). The Second Amendment declares in no uncertain terms: "the right of the people to keep and bear Arms [] *shall not* be infringed." U.S. Const. amend. II (italics added). Incorporated against the states through the due process clause of the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), the Second Amendment confers "an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and always has been key to "our scheme of ordered liberty," *McDonald* at 767-68. "In short, the right of armed self-defense sits atop our constitutional order and remains rooted in our country's history." *Duncan* at 1153. "Any law that limits this right of self-defense must be evaluated under this constitutional and historical backdrop." *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.  The UHA *Unquestionably* Implicates the Second Amendment

In support of their cause, Defendants not only claim that the UHA does not substantially burden the Second Amendment right but they advance the extraordinary argument that the Second Amendment is not even *applicable* to the UHA. MTD 19. They admit that the Ninth Circuit has never reached any such conclusion and, indeed, that even the majority opinion in *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018)—which Defendants herald as entirely dispositive of the outcome here—said no such thing; the *Pena* majority assumed *without deciding* that the UHA burdens the Second Amendment. MTD 16-17. Defendants rely on the *district court's* opinion in *Pena* as their authority, arguing *that* court "correctly held" the UHA does not implicate the Second Amendment. *Id.* At no point did the *Pena* majority adopt or approve this non-binding opinion of the district court. And any such conclusion is just dead wrong, as patently evidenced by the legal and logical fallacies of the arguments that Defendants advance in support of it.

First, Defendants suggest that all the handguns prohibited as "unsafe" under the UHA fall entirely outside the purview of the Second Amendment because, being of the modern era, they were not in "common use *at the time*" of the Founding Era; that is, they portray the "common use" test as "a *limitation* on the Second Amendment right." MTD 18 (italics added). Second, they claim the UHA could not encroach upon the right anyway since it only targets "certain handgun features," not "an entire class of firearms."

4

*Id.* 18-19. Lastly, Defendants say any encroachment is permissible because the UHA is just a restriction on commercial sales, which is "presumptively lawful." *Id.* 17, 19.

### A. *All* Arms in Common Use for Lawful Purposes Are Protected

As the Ninth Circuit itself recently reiterated, the Second Amendment right "'extends, prima facie, to *all* instruments that constitute bearable arms, even those that were *not* in existence at the time of the founding.'" *Duncan*, 970 F.3d at 1146-47 (quoting *Caetano v. Massachusetts*, __ U.S. __, 136 S.Ct. 1027, 1030 (2016) (Alito, J., concurring) (per curiam)) (italics added). It accordingly "guarantees the right to carry weapons '*typically possessed* by law-abiding citizens for lawful purposes.'" *Caetano* at 1030 (quoting *Heller*, 554 U.S. at 625) (italics added); *accord Duncan* at 1146. So long as an arm is "'commonly possessed by law-abiding citizens for lawful purposes today,'" it is protected. Dec. of G. Mocsary ¶ 12 (quoting *Caetano* at 1027). The state may not constitutionally ban any such weapon "'unless it is both dangerous *and* unusual.'" *Duncan* at 1146 (quoting *Caetano* at 1031) (italics added). "And, where a 'weapon belongs to a class of arms commonly used for lawful purposes,' 'the relative dangerousness of a weapon is irrelevant.'" *Id.* at 1147 (quoting *Caetano* at 1031).

As Judge Benitez recently held in enjoining California's "constitutionally defective" background check for ammunition purchasers, "[n]o legislature or popular vote has the constitutional authority to dictate to a citizen that he or she may not acquire ordinary and popular ammunition for his or her guns." *Rhode v. Becerra*, 445 F.Supp.3d

902, 948 (S.D. Cal. 2020). Undoubtedly, this applies with even greater force to "ordinary and popular" *firearms*, and especially the handgun—"the quintessential self-defense weapon," *Heller*, 554 U.S. at 629—which California directly targets through the UHA.

Defendants obfuscate the real issue in casting Plaintiffs' claims as mere petty complaints about not being able to obtain the handguns with features "of their choice" because they may have or could obtain one of the handguns not banned under the UHA. MTD 17. The *Heller* court itself flatly rejected such an argument. 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."). So has the Ninth Circuit in *Duncan*, where it struck down as unconstitutional California's ban on "large capacity magazines" ("LCMs"): while this ban prohibited *half* the LCMs in common use for lawful purposes, people still had access to the other half, but that "substantial swath" of banned LCMs was too much for the Second Amendment to bear. *Duncan*, 970 F.3d at 1147. And this very same kind of argument was just rejected again in *Rhode*: California missed the whole point with its purported defense that "many have been able to buy ammunition" despite the ammunition background check requirement; what mattered was the substantial injurious impact on the fundamental right of

Californians to obtain necessary firearms ammunition, because it was in common use for lawful purposes and thus constitutionally protected. *Rhode*, 455 F.Supp.3d at 932.[1]

The key, and only, question in determining whether the handguns banned under the UHA are protected by the Second Amendment is whether they are in common use for lawful purposes. Significantly, Defendants do not dispute Plaintiffs' contentions—which must be taken as true for purposes of the MTD—that the UHA bans a litany of handguns in common use for self-defense and lawful purposes. *See e.g.*, FAC ¶¶ 40-41, 59-62. The number of such handguns banned by California even dwarfs the number of LCMs prohibited by the LCM ban struck down in *Duncan*. In fact, "*over 100 million handguns are lawfully possessed in all 50 states and the District of Columbia.*" Dec. of G. Mocsary ¶ 20; FAC ¶ 170. Yet, California bans all but a tiny fraction of these widely owned, lawfully used arms—*805* (at last check). https://oag.ca.gov/firearms/certified-handguns/search (as of February 10, 2020); FAC ¶ 48; Dec. of J. Ostini, p. 5 (the Roster bans the "overwhelming majority of handguns for sale in the United States").

As *Duncan* and *Rhode*—which postdate *Pena*—make clear, all such handguns are protected because of their common use for lawful purposes, and the Second Amendment not only *applies* but prohibits any complete ban against purchasing or manufacturing

---

[1]   Conspicuously absent from Defendants' MTD is any mention of *Duncan* or *Rhode*.

such arms for lawful purposes. In fact, "[u]nder the simple *Heller* test"—the test that truly controls—judicial review would end right here." *Rhode*, 455 F.Supp.3d at 931.

## B. No "Presumptively Lawful" Loophole Exists for the UHA

The notion of "presumptively lawful regulatory measures" emanates from the Supreme Court's abstract references to "longstanding prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," and "laws imposing conditions and qualifications on the commercial sale of arms," as *generally* being within the ambit of constitutional firearms restrictions. *Heller*, 554 U.S. at 626-27. "This, of course, raises the question of what constitutes a sufficiently longstanding regulation. In our circuit, we have looked for evidence showing whether the challenged law traces its lineage to founding-era or Reconstruction-era regulations." *Duncan*, 970 F.3d at 1150.

Regarding laws "imposing conditions and qualifications of the commercial sale of arms," the Ninth Circuit, as a whole, has avoided "pars[ing]" this "opaque" language or "relying on it alone" in analyzing the constitutionality of such laws, opting instead to either assume the existence of a burden or "conduct a full textual and historical review." *Pena*, 898 F.3d at 976 ("bypass[ing] this constitutional obstacle course"). As Judge Bybee has observed with unassailable logic, however, it simply cannot be "that *anything* that could be characterized as a condition and qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny." *Id.* at 1005,

1007-08 (Bybee, J., dissenting) (italics added). A condition that commercial sales "may take place only between 11 p.m. and midnight, on Tuesdays," or may be subject to "a $1,000,000 point-of-sale tax" "clearly could not be deemed constitutional, much less "*presumptively* lawful." *Id.* at 1007-08 (italics added). In any event, presumptions by their very nature are rebuttable. https://dictionary.law.com/Default.aspx?selected=1592 (a "presumption" is "a rule of law which permits a court to assume a fact is true until such time as there is a preponderance (greater weight) of evidence which disproves or outweighs (rebuts) the presumption"). In the Second Amendment context, Judge Bybee has explained that this means a plaintiff may "'rebut this presumption by showing the regulation does have more than a de minimis effect upon his right.'" *Pena* at 1006, 1009-1010 (Bybee, J., dissenting) (quoting *Heller II*, 670 F.3d 1244, 1253 (D.C. Cir. 2011)).

The effect of the UHA on the Second Amendment right is surely "more than de minimis" in generally banning all sales, manufacturing, importation, giving, or lending of all but a tiny fraction of the handguns in common use for lawful purposes.[2] And the UHA certainly traces no "lineage to founding-era or Reconstruction-era regulations." *Duncan*, 970 F.3d at 1150. Such bans exist in only two other states (Maryland and Massachusetts) and the District of Columbia and, like California's, all are creatures of

---

[2]   The UHA's criminal sanctions apply to anyone "who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends an unsafe handgun." Pen. Code § 32000.

9

recent modernity—Maryland's was enacted in 1988, Massachusetts' in 1988, and the District's in 2009. Dec. of G. Mocsary ¶¶ 27-31; Dec. of J. Ostini at p. 9. This further undermines any notion that the UHA could even be considered *presumptively* lawful in the first instance. *See Duncan* at 1150-51 (finding the LCM ban was not longstanding and thus not presumptively lawful because the first such ban did not emerge until 1927).

Moreover, on its face, any such presumption concerning the restrictions on the "*commercial sale*" of arms could only apply to the *sales* prohibition under the UHA. It has zero application to the prohibition against the *manufacture* of the banned arms (or to any of the other non-sales activity banned under the UHA), which Plaintiffs have specifically targeted as a core part of their challenge to the UHA. Defendants fail to draw any distinction, advancing a wholesale "presumptively lawful" defense of the UHA that lumps in the manufacturing prohibition with the sales prohibition. MTD 19 ("The UHA is presumptively lawful under *Heller* because it simply regulates *the manufacturing and commercial sale* of certain models of handguns.") (italics added). By such means, Defendants seek to bootstrap the *Pena* majority opinion into the analysis of the manufacturing prohibition. MTD 3, 18-22. And that clearly does not work, as the *Pena* case solely addressed the sales prohibition of the UHA. *Pena*, 898 F.3d at 973 ("The question before us is whether making *specific commercial gun sales* contingent on incorporating these [handgun] innovations violates the constitution.") (italics added).

10

## V.  The UHA Flatly Fails Both the True *Heller* Test and Strict Scrutiny

The simple fact is, the innumerable handguns banned from sales *and* manufacturing in California are commonly used across the country for lawful purposes. "Under the simple *Heller* test, judicial review would end right here." *Rhode*, 455 F.Supp.3d at 931. And with that, a law like the UHA would come to an end, period.

We go on because, as a substitute for this simple test, the Ninth Circuit has developed a complex tiers-of-scrutiny analysis in addressing firearms restrictions—one "only a law professor can appreciate." *Rhode*, 455 F.Supp.3d at 930. At its most basic level, this substitute test is a two-prong inquiry that "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, directs courts to apply an appropriate level of scrutiny." *Duncan*, 970 F.3d at 1145. However, even under this test, the court must recognize that any "severe restriction on the core right of self-defense amounts to a destruction of the Second Amendment right" and is thus "unconstitutional under any level of scrutiny." *Rhode* at 932. And, when the court must go further because the restriction is not necessarily unconstitutional *per se*, the elements of this test focus on the same two essential factors underlying the *Heller* test: whether the arm targeted by the regulation is "both dangerous and unusual" and whether the regulation "is longstanding and thus presumptively lawful." *Duncan* at 1145.

Consistent with the mandates of *Heller*, if the targeted arms are *not* "dangerous and unusual" and the regulation is *not* "presumptively lawful"—which is already clear

11

about the UHA—then the law necessarily *does* "burden protected conduct," and the only remaining question is whether it "imposes substantial burdens on the core right" of self-defense. *Duncan*, 970 F.3d at 1145-46. If it does impose such a burden, the law is subject to strict scrutiny. *Id.* (citing *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). In *Duncan*, the Ninth Circuit explained that this part of the test is a "simple inquiry: If a law regulating firearms *adversely affects* a law-abiding citizen's right of defense of hearth and home, that law strikes at the core Second Amendment right," invoking strict scrutiny. *Id.* at 1152 (italics added). And importantly, in making this burden assessment, neither the state nor the court "weighs the pros or cons" of the restriction, because the *Heller* court "took any such policy-balancing notion of the table." *Id.* at 1157.

"*Heller* counsels use to look at whether the government regulation restricts the core fundamental right from the outset. In other words, we look to what a restriction *takes away* rather than what it leaves behind." *Duncan*, 970 F.3d at 1157 (italics original). "We would be looking through the wrong end of a sight-glass if we asked whether the government permits the people to retain some of the core fundamental and enumerated right." *Id.* That is the view Defendants take here, in pushing their notions that the (tiny subset) of handguns not banned under the UHA absolve all possible ailments. The Supreme Court rightly "does not look away from a governmental restriction on the people's liberty just because the state did not impose a *full-tilt* limitation on a fundamental and enumerated right." *Duncan* at 1157 (italics added).

12

Rather, "the Court shuns policy-balancing and focuses on the erosion of the people's liberties." *Id.* Surely, "we would never sanction governmental banning of allegedly 'inflammatory' views expressed in Daily Kos or Breitbart on the grounds that the people can still read the New York Times or the Wall Street Journal." *Id.* at 1159-60.

"In short, a law that takes away a substantial portion of the arms commonly used by citizens for self-defense imposes a substantial burden on the Second Amendment." *Duncan*, 970 F.3d at 1157. Defendants in no way dispute the crucial fact that the UHA *takes away* a substantial portion of such arms. Instead, they indulge themselves in the fatally erroneous concept that the law survives because it does not ban the sales and manufacturing of all handguns *full tilt*. Given the undisputed effect of the UHA, strict scrutiny not only applies but annihilates it. "Strict scrutiny is the 'most rigorous and exacting standard of constitutional review,' and requires that a state law be 'narrowly tailored to achieve a compelling state interest.'" *Duncan* at 1164 (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995)). A law cannot survive such scrutiny if "the state's chosen method" of achieving its asserted interests "is not the least restrictive means of achieving the compelling interests." *Id.* In unabashedly showing that they have never even *considered* lesser restrictive alternatives to the ban under the UHA—much less the "least restrictive" means—Defendants have no hope of carrying their heavy burden here.

## VI.  The UHA Resoundingly Fails Intermediate Scrutiny As Well

Even assuming the analysis could properly be relegated to intermediate scrutiny, this is not the easy pass that Defendants make it out to be, *see* MTD 19-20, and any analysis true to its doctrinal form deals the UHA an equally fatal blow.

### A.  The Proper Test of Intermediate Scrutiny

"Intermediate scrutiny as traditionally understood has a bite." *Duncan*, 970 F.3d at 1165. "Recently, the Supreme Court emphasized the potent nature of intermediate scrutiny," holding that "to survive intermediate scrutiny a law must be 'narrowly tailored to serve a significant governmental interest.'" *Duncan* at 1165 (quoting *Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730, 1736 (2017)). "It is a demanding test. While its application is neither fatal nor feeble, it still requires a reviewing court to scrutinize a challenged law with a healthy dose of skepticism," and "the law must address 'harms' that 'are real' in a 'material' way." *Id.* (quoting *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)). *Duncan* surveyed the use of this test in the Ninth, and importantly, it expressly rejected the form of intermediate scrutiny employed by the majority in *Pena*—the case on which Defendants seek to hang their hats. Specifically, *Duncan* observed that the *Pena* majority had applied a "less stringent" variety of the test which was "an inappropriate standard" for analyzing a Second Amendment restriction. *Id.* at 1166-67. Ultimately, the *Pena* court had applied to the challenged provisions of

the UHA a form of "*Chevron*-like deference" that the Supreme Court itself denounced in *Heller* and which "amount[ed] to an abdication of our judicial independence." *Id.*

In fact, in addition to granting an "inappropriate" degree of deference to the state in upholding the UHA, the *Pena* court engaged in burden-shifting entirely contrary to a proper analysis: at one point, it reasoned that the record failed to "satisfy *Purchasers'* obligation to show a substantial burden." *Pena*, 898 F.3d at 978, n. 4 (italics added). The correct test, as *Duncan* clarified, is a "demanding" one that requires the restriction be "narrowly tailored to serve a significant governmental interest."' *Duncan*, 970 F.3d at 1165. *That* is the "reasonable fit" required to uphold the law. *Rhode*, 455 F.Supp.3d at 934 (quoting *Silvester*, 843 F.3d at 821-22) (intermediate scrutiny generally requires that "there ... be a 'reasonable fit' between the regulation and the asserted objective"). And big part of the test's "bite" is that the burden here rests squarely on the state:

> The Plaintiffs-citizens do not have to carry the burden of proving that they are entitled to enjoy Second Amendment rights. Quite the opposite, it is the government that must carry the burden of demonstrating that the restriction of Second Amendment rights is a reasonable fit for the asserted substantial interest. If the government does not support its case, the Plaintiffs-citizens win.

*Rhode*, 455 F.Supp.3d at 938. The state must '"affirmatively establish the reasonable fit we require."' *Id.* (quoting *Bd. of Trs. of State Univ. of N.Y.*, 492 U.S. 469, 480 (1989)).

### B.  Defendants Cannot Carry This Burden, And They Do Not Even Try

Harnessing the "inappropriate[ly]" deferential "reasonable fit" analysis of the *Pena* majority in support of their claimed interests behind the UHA, Defendants simply

recycle the same general "consumer safety, public safety, and crime prevention" concerns they advanced in *Pena*, and in particular, the Legislature's interests in targeting "cheaply made, unsafe handguns" (i.e., "Saturday Night Specials"), and the "injuries to firearms operators," and "crime" stemming from the "proliferation" of such guns. MTD 4, 8, 21 (citing *Pena*, 898 F.3d at 979-980). Defendants thus fail the test right out of the gate, because they have presented no evidence at all that *any* of the *millions and millions* of handguns barred from the Roster—much less a significant number of them—is of this "cheaply made" variety or has had *any* connection to any "injury" or any "crime." As the FAC makes clear, *all* the handguns of concern are *in common use for lawful purposes*, and thus by their very nature are not the sort of sketchy "Saturday Night Specials" that Defendants themselves claim the UHA was designed to target.

Indeed, even though the burden here rests solely with Defendants, Plaintiffs have put forth undisputed evidence and allegations that the numerous banned handguns of the *protected* variety are produced, sold, and distributed by highly reputable manufacturers widely known and respected for consistently producing high quality, *safe* firearms. *See* Exh. 1 to Dec. of Ostini (listing numerous makes and models of handguns otherwise widely available for *lawful* commercial sales); FAC ¶ 72, 86 (citing Sturm, Ruger & Co., Inc. as one of the manufacturers of such handguns which are banned in California). The litany of banned handguns specifically listed in the FAC certainly falls into this category. *See e.g.*, FAC ¶¶ 86, 91, 94, 99, 104, 117, 122, 126, 134, 142, 148, 160 (citing highly

popular makes and models produced by highly reputable manufacturers, like Glock, Sig Sauer, and Smith Armory). Defendants make no attempt to even argue otherwise.

Plaintiffs have also supplied further evidence in the form of personal declarations substantiating the individual impacts of the Roster's prohibitions upon them and the many similarly situated Californians they represent. They illustrate how it imposes definite and concrete burdens on real, law-abiding Californians like them, as they attest to the importance of being to purchase and self-manufacture off-Roster handguns, including newer Glock, Sig Sauer, and Smith Amory models, given their superior utility and functionality in ensuring effective self-defense capabilities. *See e.g.*, Decs. Of R. Peterson ¶¶ 9-14, J. Smith ¶¶ 8, L. Schwartz ¶¶ 7-8, R. Macomber ¶¶ 7-8, J. Phillips ¶¶ 11-13, and J. Klier ¶¶ 8 (emphasizing the ambidextrous functionality, superior grip, and several other superior features of popular, high quality off-Roster handguns in enabling effective and safe action in self-defense situations in comparison to the limitations of the largely outdated or otherwise inferior on-Roster handguns, particularly for those of a smaller stature or with dexterity or strength limitations of the hands).

Rather than facing the reality of these burdens imposed by the Roster, Defendants look the other way and do exactly what *Duncan*, and *Heller*, forbid: they point the supposed value of what California has *left behind* for the ordinary person, insisting that the fractional subset of handguns *on* the Roster provides Californians access to "safe" handguns because they contain the statutorily-mandated features that the state has

17

declared necessary to avert the alleged concerns about "Saturday Night Specials." MTD 5, 21. Thus, in addition to the dearth of *any* evidence to support the notion that *any* of the banned arms poses the dangers the state claims to be averting, Defendants' entire argument looks "through the wrong end of [the] sight-glass" in focusing on "whether the government permits the people to retain some of the core fundamental and enumerated right" instead of what the UHA "*takes away*." *Duncan*, 970 F.3d at 1157.

"Few would dispute that the state has a legitimate interest in increasing public safety and preventing crime. The question is how to achieve this objective while respecting the freedoms of law-abiding citizens." *Rhode*, 455 F.Supp.3d at 935. This is achieved by holding the state to its burden of proving "a tight fit" between the restriction and the asserted interest—i.e., "'a means narrowly tailored to achieve the desired objective.'" *Id.* at 934 (quoting *Heller II*, 670 F.3d at 1258). Defendants not only fall far short of the mark here, but the major premise they present for the existence of the Roster—that it is necessary to achieve the ultimate goal of "full compliance" by ensuring that the only handguns on the Roster are those declared "safe" by the state, MTD 22— is self-defeating based on the undisputed evidence. *No* new handguns have been added to the Roster since *2013*. Dec. of J. Ostini, p. 6; FAC ¶ 49; MTD 8-9 (acknowledging the struggles and complaints of manufacturers). Whether it is a matter of an inability to comply with all the requirements for certification or simply a matter of economics that compel handgun manufacturers to avoid the costs and complications of participating in

18

the market, the fact is, it is undoubtedly *the Roster itself* that is preventing the addition of any new handguns which contain the features the state insists are necessary to ensure "safety." And this means that the Roster has remained and will likely continue to remain predominantly populated by "grandfathered" makes and models that do *not* meet the requirements for Roster certification and are thus supposedly "unsafe" based on the state's own standards. *See Pena*, 898 F.3d at 989 (Bybee, J., dissenting) (observing that, for this reason, the fit between the Roster and the state's claimed interests in safety and crime-solving "would not only fail to be reasonable, but would be non-existent").

Even further undermining the legitimacy of the state's claimed interests is the reality that the features Defendants insist are necessary to ensure "safety" are neither necessary nor effective means of advancing the claimed interests. Initially, as the FAC alleges without dispute, the various attributes, systems, and "safety" devices required for Roster inclusion can simply fail, be altered, or removed by the user, FAC ¶ 64, as the only reliable and consistent means of ensuring firearm safety are the basic rules of gun safety, which all gun purchasers must already demonstrate they know, FAC ¶¶ 73-81. In fact, California generally bans all private party transfers with the narrow exception of transfers between parents and children, grandparents and grandchildren, spouses, and domestic partners only, and even then, the recipient must obtain a Handgun Safety Certificate, report the transfer to the DOJ, and pay a fee. Pen. Code §§ 16990(g), 27545, 27870-27875, 27915, 27920(b), 28055, 30910-30915. For the narrow set of acquisitions

19

that California does permits, all ordinary citizens must obtain a "Firearms Safety Certificate" (FSC), by passing a test, performing a "safe handling demonstration," and paying a fee. Pen. Code § 31610; 11 CCR § 4250, et seq.; FAC ¶¶ 73, 79. And they are subject to 10-day waiting period. Pen. Code §§ 26950-26970, 27650-27670.

Beyond all this, California already criminalizes firearm possession and use by the full spectrum of those who do or might potentially pose some kind of safety risk to themselves or others, including all those convicted or even suspected of having committed certain types of misdemeanors, all those subject to most types of restraining orders, all those adjudicated as mentally disordered, all those taken into custody on suspicion of being a danger to themselves or others, narcotics addicts, illegal aliens, and so on. Pen. Code §§ 29800, 29805, 29815, 29820, 29825, 29855, 29860, 29900, 29905, 30305; Welf. & Inst. Code §§ 8100-8103; 18 U.S.C. § 922(g); 27 C.F.R. § 478.22. The state has more than adequate means to address any true concerns about firearms misuse.

## C. The Enactment of AB 2847 Substantially Increases the Significant Burdens that the UHA Imposes on the Second Amendment Right

For all the reasons outlined above, the UHA has imposed significant burdens on the Second Amendment right from its inception and California has incrementally increased those burdens over time. The addition of the "microstamping" requirement in 2013 for any new Roster certification—which evidently no manufacturer has been able

20

or willing to meet—is a prime example.[3] And, again for all the same reasons, the UHA is and has been continuously imposing significant burdens on law-abiding California without any evidence or demonstration by the state that the law *has ever* been "narrowly tailored to serve a significant governmental interest."' *Duncan*, 970 F.3d at 1165.

And, as of January 1, 2021, the state has again upped the ante against its citizens. Under Assembly Bill No. 2847 (AB 2847), the state now mandates the removal of three of the "grandfathered" or "noncompliant" handguns already on the Roster for every new "compliant" handgun added to the Roster. Pen. Code § 31910(b)(7). Defendants portray AB 2847 as a gift of leniency resulting in a "more reasonable fit" with the law's purpose, because the bill also scales back the number of required microstamps from two to one. MTD 8, 21-22. The reality is, whatever small token California claims to be giving with one hand, it is *taking away* far more with the other hand through the new removal rule.

As the FAC alleges, again without dispute, the Roster has already been under a precipitous decline due to the natural forces of the burdens it imposes. FAC ¶¶ 49-51. Forcing the manufacturers to pay fees every year simply to maintain Roster status and to go through the recertification process all over again just because of a simple upgrade

---

[3]  As the FAC alleges, Ruger, an industry leader, has not only publicly attested to the general difficulties of complying with the microstamping requirement but also that microstamping is an "unreliable," "unproven technology" in advancing the state's alleged interests of fighting gun violence because it "can be easily defeated in mere seconds using common household tools" to disable the engraved firing pin. FAC ¶ 72.

21

or alteration that the state considers to be more than "cosmetic" will inevitably shrink the number of manufacturers willing and able to participate in this hostile marketplace. Defendants attempt to minimize the significance of the Roster's strictures with arguments like the annual fee "reasonably facilitates the roster's maintenance and administration." MTD 21-22. This underscores just how far off-base they are trying to defend the UHA against Plaintiffs' righteous challenge: obviously, "[a] law's existence can't be the source of its own constitutional validity." *Duncan*, 970 F.3d at 1147.

Now, under AB 2847's new three-for-one removal rule, it is inevitable that the *already* constitutionally intolerable burdens of the Roster will increase. The rule guarantees it: Again, the "grandfathered" handguns subject to this removal rule are among the millions of handguns protected under the Second Amendment as arms commonly used for lawful purposes. Thus, the removal of *each one* directly implicates the Second Amendment right and unquestionably violates that right, even under intermediate scrutiny, unless the state "affirmatively establish[es] the reasonable fit we require," *Rhode*, 455 F.Supp.3d at 938, which the state has not even tried to do here. And the rule removes *three* such handguns for each newly added Roster handgun. Defendants once again obfuscate the real issue here in emphasizing that the removal rule only applies to non-complaint handguns, permitting all "compliant" handguns to remain, for purposes of advancing the goal of achieving "full compliance" MTD 11-12. It is the existence of *the Roster* itself that creates the unconstitutional burden because its effect

is to *ban* all sales, manufacturing, importation, giving, or lending of *protected* arms *without* the required fit. Again, the issue is not what portion of the right the state chooses to dispense based on its unsupported policy judgments about "safety." *See Duncan*, 970 F.3d at 1155 (self-defense is not "a dispensation granted at the state's mercy"). The concern is what the state *takes away*—and that is the true evil of the UHA. Viewing the UHA from the right end of the slight-glass, California's push towards "full compliance" through the UHA is designed as a death march for the Second Amendment right.

The UHA is unconstitutional under any measure and must be struck down.

## VII.  Plaintiffs' Righteous Challenge to the UHA is Fully Ripe and Justiciable

Defendants challenge the justiciability of Plaintiffs' challenge to the new removal provision of the UHA—and *only* the justiciability of that dimension of the claim—arguing Plaintiffs lack standing to complain about it and that their concerns are not yet ripe anyway. MTD 11-12. Defendants concede the effect of the new removal rule, in that it "caus[es] other handguns to be removed" from the Roster, but they claim this effect does not form a redressable injury because *just how much* the Roster will decline is yet to be seen. *Id.* This is the genesis of Defendants' contention that Plaintiffs cannot demonstrate an "injury in fact" for standing purposes and that their claim not "ripe" for adjudication. But, the *certain* removal from the Roster—and therefore the certain *ban* of the sale, manufacturing, importation, giving, or lending—of *three* "grandfathered" handguns in common use for lawful purposes for *each and every* new handgun added to

23

the Roster certainly constitutes a "concrete and particularized," "actual or imminent" injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). For the same reason, it is a "definite and concrete" injury so as to be constitutionally ripe. *Oklevueha Native American Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012).

And, as with the challenge to the FAC under Rule 12(b)(6), Plaintiffs must be given the benefit of any possible doubt under the lenient applicable standards of review. *Warth v. Seldin*, 422 U.S. at 501; *accord Maya v. Centex Corp.*, 658 F.3d at 1068.

## VIII.  The Equal Protection Claim Also Easily Survives the MTD

In seeking to dispense with Plaintiffs' equal protection challenge to the UHA based on the arbitrary exemption it grants the movie industry, Defendants again hang their hats on the opinion of the *Pena* majority. MTD 22-23. There, however, the majority essentially incorporated its analysis of the UHA under the Second Amendment in rejecting the similar equal protection claim there. *Pena*, 898 F.3d at 986 (finding the equal protection challenge "subsumed in the Second Amendment inquiry"). As we have seen, this Second Amendment analysis rested on a fundamentally flawed standard of review. Beyond that, in addressing the equal protection challenge to the "Hollywood" exemption, the *Pena* majority quickly relegated the claim to mere "rational basis" review on the basis that this classification does not "infringe[] fundamental constitutional rights," clearly inspired by its conclusion that the UHA as a whole poses no constitutional problem. *Id.* at 986. Having placed the burden squarely on the plaintiffs

24

"to negative every conceivable basis which might support it," rejection of the claim was a virtual certainty. *Id.* at 986-87. Indeed, the majority was able to rest its entire analysis of the claim on a single sentence—"the video-production exemption is rational because those weapons, one anticipates, are not intended to be used for live fire." *Id.* at 987.

As with the analysis of the Second Amendment claim, the right answer starts with the right standards, and those standards, emanating from *Heller* and as reaffirmed in *Duncan* and *Rhode*, dictate that the bans enacted under the UHA blatantly and significantly "infringe constitutional rights" of the highest order and cannot stand. It necessarily follows that any purported classification drawn in favor of movie producers, exempting them from these bans with no showing whatsoever that doing so advances any state interest—even "public safety" concerns at the greatest level of generality— cannot withstand scrutiny under any serious constitutional inquiry. And, again, the case for such a violation need only be "plausible" on its face to survive this motion to dismiss.

## IX. Conclusion

Plaintiffs plead a strong case ripe for the judicial relief they seek and require against the UHA. Defendants' motion to dismiss the FAC must therefore be denied.

Respectfully submitted this 15th day of February 2021.

*/s/Raymond M. DiGuiseppe*
Raymond M. DiGuiseppe
Attorneys for Plaintiffs

25