Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com

Michael P. Sousa
Law Offices of Michael P. Sousa, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
Tel.: 858-453-6122
Email: msousa@msousalaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LANA RAE RENNA, an individual, et al., | Case No. 20-cv-2190 DMS DEB |
| Plaintiffs, | |
| vs. | **DECLARATION OF GEORGE A. MOCSARY** |
| XAVIER BECERRA, in his official capacity as Attorney General of California, et al., | |
| Defendants. | |

**DECLARATION OF GEORGE A. MOCSARY**

I, George A. Mocsary, declare as follows:

1.      I am not a party to the above-captioned action, I am over the age of 18, I have personal knowledge of the facts stated herein, and I am competent to testify as to the matters stated and the opinions rendered below.

2.      I graduated from the Cooper Union School of Engineering with a bachelor's degree in engineering in 1995. I earned a master's degree in business administration from the University of Rochester in 1997. And I received my Juris Doctor degree in 2009 from Fordham Law School, where I graduated first in my class and summa cum laude. I served as Notes and Articles Editor of the Fordham Law Review and was the recipient of the Fordham Law Alumni Association Medal in Constitutional Law.

3.      I am currently a Professor of Law at the University of Wyoming College of Law. I previously taught at the Southern Illinois University School of Law as an Associate Professor and at the University of Connecticut School of Law as a Visiting Assistant Professor.

4.      Prior to entering academia, I practiced corporate and bankruptcy law at Cravath, Swaine and Moore in New York. And before that, I clerked for the Honorable Harris L Hartz of the U.S. Court of Appeals for the Tenth Circuit.

5.      I co-authored the first law school textbook on the Second Amendment, entitled *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (2nd ed. 2017) (with Nicholas J. Johnson, David B. Kopel, and Michael P. O'Shea).

6.      I have also published several scholarly research articles on the right to keep and bear arms, which have been published in the Connecticut Law Review, Duke Law Journal Online, Fordham Law Review, George Mason Law Review, and other journals.

7.      My scholarship has been cited by the Supreme Court of the United States

1    in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court of Illinois,

2    and in several opinions by the U.S. Courts of Appeals.

3         8.    I taught a course on the Second Amendment at Southern Illinois

4    University School of Law, and will likely teach it again at the University of Wyoming

5    College of Law.

6         9.    Attached hereto as **Exhibit 1** is a true and correct copy of my Curriculum

7    Vitae. It describes my education, employment background, career experience, and

8    publications.

9         10.   My opinions expressed here are formed in light of my scholarship and

10   study of the current legal landscape of the Second Amendment.

11        11.   Based on my education, work experience, research, publications, and

12   review of the research of others, in my opinion, the arms that California prohibits are

13   protected by the Second Amendment.

14                              COMMONALITY

15        12.   The Supreme Court has made clear that the Second Amendment protects

16   "common" arms. In *District of Columbia v. Heller*, the Supreme Court held that the

17   Second Amendment protects arms that are "typically possessed by law-abiding citizens

18   for lawful purposes." 554 U.S. 570, 625 (2008). Put differently, "the sorts of weapons

19   protected [a]re those 'in common use at the time.'" *Id.* at 627 (quoting *United States v.*

20   *Miller*, 307 U.S. 174, 179 (1939)). In adjudicating a firearms prohibition, therefore,

21   "the pertinent Second Amendment inquiry is whether [the arms] are commonly

22   possessed by law-abiding citizens for lawful purposes today." *Caetano v.*

23   *Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., concurring) (emphasis omitted).

24        13.   The Supreme Court has not expressly defined "common use." The Court's

25   clearest indication of the criteria that determine "common use" appears in Justice

26   Samuel A. Alito, Jr.'s concurrence, which Justice Clarence Thomas joined, in *Caetano*

27   *v. Massachusetts*, 136 S. Ct. 1027 (2016), *viz.*, the number in existence of the type of

28   arm in question, and the number of jurisdictions in which the type of arm is lawful.

14.    *Caetano* summarily reversed and remanded an opinion of the Massachusetts Supreme Judicial Court upholding a stun gun prohibition. Although the Court's per curiam opinion focused on the lower court's violations of Supreme Court precedent, Justices Alito and Thomas's concurrence explained, inter alia, that stun guns are, indeed, common.

15.    In reaching this determination, the concurrence elucidated that "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States." *Id.* (quotation omitted).

16.    The raw number of arms and the number of jurisdictions in which those arms are available are, therefore, the only specific commonality factors that any Justices have provided to date.

17.    In referring to both stun guns and Tasers, the *Caetano* concurrence applied its commonality analysis to bearable—carryable, *Heller*, 554 U.S. at 584—handheld electroshock weapons as a "class of arms," *Caetano*, 136 S. Ct. at 1031, rather than to a subset of those weapons defined by certain features.

18.    Handguns are the most popular arms in the country. Data show that over 122,812,270 have been produced for the United States market since 1986. **Exhibit 2** (page 16). This is nearly equivalent to the number of rifles (81,903,534) and shotguns (43,527,894) produced during that period, combined. *Id.* Over the last five full years for which data are available, 2014–2018, an average of 7,581,792 have been produced for the United States market annually.

19.    An examination of state laws reveals that handguns are legal in every state and the District of Columbia.

20.    Compared to the hundreds of thousands of hand-held electrical weapons that were lawfully possessed in 45 states, and thus in common use according to the *Caetano* concurrence, over 100 million handguns are lawfully possessed in all 50 states and the District of Columbia.

21.     The firearms prohibited in California are therefore widely owned and accepted as a legitimate means of self-defense across the country.

22.     Moreover, when it comes to handguns, the Supreme Court has already explicitly completed, and reaffirmed, this analysis. In *Heller*, the Court explained that "[i]t is enough to note . . . that the American people have considered the handgun to be the quintessential self-defense weapon." 554 U.S. at 629. Although there were many reasons why Americans might favor handguns, what mattered is that Americans *do* favor handguns: "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* Because handguns are "overwhelmingly chosen by American society for" self-defense, their prohibition fails "[u]nder any of the standards of scrutiny." *Id.* at 628.

23.     The Court reaffirmed this approach in *McDonald v. City of Chicago*, 561 U.S. 742 (2010). *McDonald* explained that "we found that this [Second Amendment] right applies to handguns because they are 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family.'" *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 628). The Court, again, found no need to conduct a statistical analysis because handguns are so popular in America.

24.     The Supreme Court did not consider what specific make and model of handgun was at issue in *Heller* or *McDonald*. Nor did the *Caetano* concurrence focus on the specific model of stun gun. The particular arms that Dick Heller, Otis McDonald, or Jaime Caetano sought to own were never mentioned. It mattered only that the specific arm was among "the sorts of weapons," or "of the kind," or among a "class of arms" that are in common use. *Heller*, 554 U.S. at 624, 627; *Caetano*, 136 S. Ct. at 1031. The specific features, make, or model, of the arm in question need not be common. If a class (or sort or kind) of arms is common, all arms encompassed by that class is common.

25.     California thus bans arms that are common, and thus protected by the

1  Second Amendment.

2                    HISTORY OF ROSTERS

3       26.    Because *Heller* suggested that some laws may be constitutional on

4  account of their being "longstanding," 554 U.S. at 626–27, I conducted research on and

5  reviewed the various state roster laws throughout the United States to determine

6  whether such laws may be considered longstanding.

7       27.    Only two other states and the District of Columbia have a roster of

8  approved handguns.

9       28.    **Maryland** uses a handgun roster established and maintained by the

10 Maryland State Police's Handgun Roster Board. Md. Code Ann., Pub. Safety § 5-405

11 (**Exhibit 3**). "[A] person may not manufacture for distribution or sale a handgun that

12 is not included on the handgun roster in the State." *Id.* § 5-406 (**Exhibit 4**). Maryland's

13 handgun roster law was first enacted in 1988. *See* **Exhibit 5.**

14      29.    **Massachusetts** has a firearm roster that includes only firearms that meet

15 or exceed certain testing criteria. The Secretary of Public Safety both establishes the

16 criteria—which are provided in Mass. Gen. Laws Ann. ch. 140, § 123—and maintains

17 the roster. 501 Mass. Code Regs. 7.02–03. Massachusetts's firearms roster law was

18 established in 1998.

19      30.    Attached hereto as **Exhibit 6** and **Exhibit 7** are true and correct copies of

20 501 Mass. Code Regs. 7.02–03 and Mass. Gen. Laws Ann. ch. 140, § 123.

21      31.    The **District of Columbia** has a firearm roster that is based on each of the

22 above rosters as well as California's: any firearm approved in Maryland,

23 Massachusetts, or California as of January 1, 2009, are approved in the District of

24 Columbia. D.C. Mun. Regs. tit. 24, § 2323.2. Some firearms, however, will not be

25 approved in the District, regardless of approval in other states: sawed-off shotguns,

26 machine guns, short-barreled rifles, improperly registered pistols, assault weapons, and

27 .50 BMG rifles. D.C. Code Ann. § 7-2502.02. Handguns owned prior to January 1,

28 2009, that are not on California's roster may be owned only if they were lawfully

owned and registered before that date. D.C. Code Ann. § 7-2505.04(b). Any change to California's roster is reviewed by the District Chief of Police, who may then revise the District's list as well. D.C. Code Ann. § 7-2505.04. The District's roster was established in 2009.

32.    Attached hereto as **Exhibit 8**, **Exhibit 9**, and **Exhibit 10**, are true and correct copies of District of Columbia. D.C. Mun. Regs. tit. 24, § 2323.2; D.C. Code Ann. § 7-2502.02; and D.C. Code Ann. § 7-2505.04.

<u>HOME MANUFACTURING FIREARMS</u>

33.    Americans have always been free to manufacture their own firearms for private use. They have never needed a federal license to do so.

34.    From the sixteenth through eighteenth centuries, firearms manufacture was primarily artisanal. Johnson et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy 140 (2d ed. 2017). Those who had the skill could build firearms, and sometimes did. For example, Daniel Boone and his father could both build firearms, and it is believed that Daniel's father built Daniel the first firearm he owned. Robert Morgan, BOONE 14 (2007) (Squire's "skill at making and repairing guns was passed down to his fourth son [Daniel]. It would be an essential, lifesaving skill in later years.").

35.    Americans were often able to make repairs on their own. *See id.* at 238. And they were also able to create their own bullets—most firearm owners during the seventeenth and eighteenth centuries created their own bullets by pouring molten lead into molds. *Id.* at 193.

36.    Native Americans quickly acquired gunsmithing skills as well. They had

"screw-plates to make screwpins" necessary for replacing screws on firearms. They could "mend and new stock their pieces . . . as in most things as an Englishman." Patrick A. Malone, The Skulking Way of War: Technology and Tactics 70 (1991). And Native Americans manufactured gunflints and could resharpen them when necessary. *Id.* They could also make their own bullets. Johnson et al., *supra*, at 193.

37.    That home manufacturing was unregulated was not an indication that it was uncommon or unknown. When the Massachusetts Provincial Congress sought additional firearms in 1774, it solicited home-manufactured firearms. Specifically, the congress urged American gunsmiths and other "such persons, as are skilled in the manufacturing of fire arms and bayonets, diligently to apply themselves thereto, for supplying such of the inhabitants as shall be deficient." The Journals of each Provincial Congress of Massachusetts in 1774 and 1775, at 103 (1838). From these "persons . . . skilled in the manufacturing" of arms, the Congress offered to purchase ''so many effective arms and bayonets as can be delivered in a reasonable time upon notice given to this congress at its next session.'' *Id.*

38.    After the British disarmed Boston, Connecticut responded by with legislation encouraging its residents to manufacture firearms. 15 Pub. Recs. of Conn., supra, at 17, 291, 451 et seq. (Charles Hoadley ed., 1890). Johnson et al., *supra*, at 296.

39.    During the first half of the nineteenth century, firearms production began to take place more often in factories with the use of machine tools. But the home manufacturing of firearms continued and remains a fairly common activity today. *Id.*

at 394–95.

40.    Indeed, while technology drove a great deal of firearm manufacturing out of home workshops in the nineteenth century, *see id.* at 395–99, newer technology has helped home manufacturing regain some of its popularity. Present-day home firearm manufacturers are capable of using machine tools with Computer Numerical Control. This makes tasks such as cutting metal more precise. *Id.* at 140 n.66.

41.    Additionally, 3-D printing has gained popularity among hobbyists, continuing the American tradition that artisans began centuries ago. *Id.*

42.    Presently, private persons generally are not required to possess a license to build their own firearms, as long as the individual is not prohibited from possessing arms. Johnson et al., *supra*, at 646.

43.    One exception is a statute from 1989 that forbids the manufacture of ''non-sporting semi-automatic rifles or non-sporting shotguns'' from imported parts. 18 U.S.C. § 922(r). Under the ATF's definition, "manufacture" includes assembly. So adding some foreign accessories or replacement parts (e.g., a new barrel) to an existing firearm might be illegal under some circumstances. Johnson et al., *supra*, at 646–47.

44.    Most home-manufactured firearms are modern replicas of antique guns.

### CONCLUSIONS

45.    My research leads me to the following conclusions:

46.    Based on production figures since 1991, the arms prohibited in California belong to a class of arms that is owned by the American citizenry on the order of

1    hundreds of millions.

2        47.    Arms rosters are a recent creation, the first being enacted a decade before

3    *Heller* was decided.

4        48.    Personal firearm manufacture was a noncontroversial practice since the

5    founding, and at times it was encouraged. Even since the era of mass firearm

6    production, personal firearm manufacture has remained almost entirely unregulated.

7        I declare under penalty of perjury that the foregoing is true and correct to the

8    best of my knowledge. Executed within the United States on January 14, 2021.

9

10   _____

11   George A. Mocsary

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28