Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

Michael P. Sousa
LAW OFFICES OF MICHAEL P. SOUSA, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
P: 858-453-6122
E: msousa@msousalaw.com

William A. Sack
FIREARMS POLICY COALITION
426 Campbell Avenue
Havertown, PA 19083
P: 916-596-3492
E: Wsack@fpclaw.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lana Rae Renna; Danielle Jaymes; Laura Schwartz; Michael Schwartz; Robert Macomber; Clint Freeman; John Klier; Justin Smith; John Phillips; Cheryl Prince; Darin Prince; Ryan Peterson; Leonard Ruebe; PWGG, L.P.; North County Shooting Center, Inc.; Gunfighter Tactical, LLC; Firearms Policy Coalition, Inc.; San Diego County Gun Owners PAC; Citizens Committee for the Right to Keep and Bear Arms; and Second Amendment Foundation, <div align="center">Plaintiffs,</div> vs. <br> Robert Bonta, Attorney General of California; and Luis Lopez, Director of the California Department of Justice Bureau of Firearms, <div align="center">Defendants.</div> | Case No.: 20-cv-2190-DMS-DEB <br><br> **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1    Plaintiffs Lana Rae Renna, Danielle Jaymes, Laura Schwartz, Michael
2 Schwartz, Robert Macomber, Clint Freeman, John Klier, Justin Smith, John Phillips,
3 Cheryl Prince, Darin Prince, Ryan Peterson, and Leonard Ruebe (collectively the
4 "Individual Plaintiffs"), PWGG, L.P., North County Shooting Center, Inc., and
5 Gunfighter Tactical, LLC, (collectively, the "Retailer Plaintiffs"), Firearms Policy
6 Coalition, Inc., San Diego County Gun Owners PAC, Citizens Committee for the
7 Right to Keep and Bear Arms, and Second Amendment Foundation (collectively the
8 "Institutional Plaintiffs") (altogether collectively "Plaintiffs"), by and through
9 counsel of record, bring this complaint for injunctive and declaratory relief against
10 Individual Defendants California Attorney General Robert Bonta and California
11 Department of Justice Bureau of Firearms Director Luis Lopez (collectively
12 "Defendants"), and allege as follows:

13                              **INTRODUCTION**

14    1.    The Second Amendment to the United States Constitution guarantees
15 "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. Plaintiffs,
16 and all similarly situated members of Institutional Plaintiffs, who are all eligible to
17 exercise their Second Amendment rights, wish to keep and bear constitutionally
18 protected arms for self-defense and other lawful purposes.

19    2.    But because of Defendants' enforcement of the laws, regulations,
20 policies, practices, and customs underlying the State of California's ban on the
21 purchase (Cal. Penal Code §§ 31900, *et seq*. and 32000, *et seq*.)[1] of common and
22 constitutionally protected handguns that the State deems presumptively "unsafe" and
23 thus illegal for commercial sale under its "roster" of "Handguns Certified for Sale"
24 ("Handgun Roster"), Plaintiffs, and all similarly situated members of Institutional
25 Plaintiffs, cannot purchase new constitutionally protected arms without suffering

26 _____

27 [1] All Penal Code references are to the California Penal Code except where otherwise
28 indicated.

criminal liability (the "Handgun Ban"), all while Defendants exempt politically-favored categories of persons, including those under the State's "Hollywood" exemption for those in the motion picture, television, and video production industry—in violation of the Second and Fourteenth Amendments to the United States Constitution.

3.     Further, under Assembly Bill No. 1621, the State recently enacted a series of additional constraints on the ability of ordinary law-abiding citizens to lawfully self-manufacture or assemble constitutionally protected arms, by expressly prohibiting the self-manufacture or assembly handguns that the State deems presumptively "unsafe" for inclusion on its Handgun Roster (§§ 29180, *et seq.*, 32000(a)(1)) and by expressly prohibiting lawful access to the parts and components generally necessary to construct one's own firearm for such purposes, and by outright banning the acquisition, use, and ultimately the mere possession of Computerized Numerical Code ("CNC") milling machines commonly used in the process of self-manufacturing or assembling constitutionally protected arms for lawful purposes ("AB 1621 Prohibitions").[2]

4.     The State has also recently enacted Senate Bill No. 1327 under which it has created a statute designed to suppress and chill legitimate challenges to firearms regulations regardless of how unconstitutional the regulation or how righteous the challenge (Code of Civil Procedure section 1021.11 under section 2 of SB 1327). It does so by imposing joint and several liability on all the plaintiffs, their attorneys, and their attorneys' law firms for the attorney's fees and court costs of the government defendants or private actors invoking and defending state gun laws, with such liability triggered by the dismissal of *any* claim for *any* reason.

5.     CCP section 1021.11 seeks to impose such liability regardless of fault

_____

[2]   When referenced collectively, the firearms regulations referenced in paragraphs 1 through 3 are referred to as the "Challenged Laws."

or bad behavior, regardless of whether a plaintiff succeeded on multiple other claims and obtained relief, and regardless whether a claim was dismissed for reasons such as mootness or lack of necessity in the case of, for example, alternative pleading. The statute specifically and *only* targets challenges to laws regulating *firearms*, demonstrating an undeniable animus against the rights secured under the Second Amendment to the United States Constitution.

6.      In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, the United States Supreme Court expressly rejected all interest balancing and the Ninth Circuit's prior "two-step" approach in the context of Second Amendment claims.

7.      Indeed, "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Ultimately, "*Heller* … demands a test rooted in the Second Amendment's text, as informed by history." *Id*.

8.      *Bruen* did not create a new test but instead applied the very test the Court established in *Heller* in 2008. "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id*., at 2131.

9.      "*Heller*'s methodology centered on constitutional text and history. Whether it came to defining the character of the right (individual or militia dependent), suggesting the outer limits of the right, or assessing the constitutionality of a particular regulation, *Heller* relied on text and history. It did not invoke any means-end test such as strict or intermediate scrutiny." *Id*. at 2128-29.

10.     The plain text of the Second Amendment covers the conduct Plaintiffs, and all similarly situated members of Institutional Plaintiffs, wish to engage in ("keep and bear arms") and the arms they wish to keep and bear. *Id*. at 2132 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable

arms").

11.    Since the conduct is covered by the Second Amendment's plain text, the government must justify its regulations as consistent with this Nation's tradition of firearm regulation.

12.    "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

13.    *Heller* has already established the relevant contours of the tradition: Bearable arms that are presumptively protected by the Second Amendment cannot be banned unless they are both dangerous *and* unusual. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008).

14.    And the Second Amendment's "reference to 'arms' does not apply 'only [to] those arms in existence in the 18th century.' " *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (citations omitted).

15.    "Semiautomatic weapons," such as those proscribed under the Handgun Ban, "traditionally have been widely accepted as lawful possessions." *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022) (*quoting Staples v. United States*, 511 U.S. 600, 612 (1994)) (cleaned up) (*pet. for reh'g en banc pending*).

16.    And "[w]hatever the likelihood that handguns were considered dangerous and unusual during the colonial period, they are indisputably in common use for self-defense today. They are, in fact, the quintessential self-defense weapon." *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 629) (cleaned up).

17.    "Thus, even though the Second Amendment's definition of 'arms' is

fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-412 (2016) (*per curiam*), concerning stun guns).

18. In *Bruen*, the Supreme Court made clear that the Ninth Circuit's former two-step approach and interest-balancing applied in *Peña v. Lindley*, 898 F.3d 969 (9th Cir. 2018), which previously upheld a prior version of some of the laws challenged herein, are inapplicable and improper in Second Amendment cases.

19. In this case, the analysis is straightforward: Plaintiffs, and all similarly situated members of Institutional Plaintiffs, are not prohibited from exercising their right to keep and bear arms. The Second Amendment's text covers the conduct Plaintiffs, and all similarly situated members of Institutional Plaintiffs, wish to engage in and the arms they wish to acquire and/or self-manufacture and possess. The arms Plaintiffs, and all similarly situated members of Institutional Plaintiffs, wish to acquire and/or self-manufacture, with the precursor parts and CNC machines that the State seeks to ban, are not dangerous and unusual today and are in fact in common use for lawful purposes. There is no analogous history supportive of the State's ban. Under the Supreme Court's precedents, the constitutionally relevant history, and the proper analysis, Plaintiffs, and all similarly situated members of Institutional Plaintiffs, must prevail.

20. The State's attempt under SB 1327 to suppress and chill legitimate actions like this seeking redress for challenges to firearms regulations is patently improper if and as applied to this pre-existing case. While Plaintiffs contend that it should only be read to apply to cases filed after the January 1, 2023 effective date of the statute, to the extent Defendants here clam retroactive application to this case, that would be unconstitutional and should be enjoined for the reasons set forth in Counts 4 through 7 of this Complaint.

**PARTIES**

**Individual Plaintiffs**

*Plaintiff Renna*

21.     Plaintiff Lana Rae Renna is a natural person and a citizen of the State of California, residing in San Diego County, California. Plaintiff Renna is not disqualified from exercising Second Amendment rights nor prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff Renna is a member and supporter of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

22.     Plaintiff Renna has a damaged tendon in her right thumb that impacts her ability to apply physical force. The Smith & Wesson M&P® 380 SHIELD™ EZ® is specifically designed for those with limited hand strength. On the website for the Smith & Wesson M&P® 380 SHIELD™ EZ®, online at https://www.smith-wesson.com/firearms/mp-380-shield-ez-0, it states that the firearm is "Built for personal protection and every-day carry, the M&P380 Shield EZ is chambered in 380 Auto and is designed to be easy to use, featuring an easy-to-rack slide, easy-to-load magazine, and easy-to-clean design. Built for personal and home protection, the innovative M&P380 Shield EZ pistol is the latest addition to the M&P M2.0 family and provides an easy-to-use protection option for both first-time shooters and experienced handgunners alike." The Smith & Wesson M&P® 380 SHIELD™ EZ® that Plaintiff Renna wishes to purchase is a constitutionally protected handgun that is in common use for self-defense and other lawful purposes and widely sold and possessed outside of California.

23.     But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiff Renna would, for self-defense and other lawful purposes, purchase new from a licensed retailer a constitutionally protected handgun not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster, including but not limited to a Smith & Wesson M&P® 380 SHIELD™ EZ®.

*Plaintiff Jaymes*

24.    Plaintiff Danielle Jaymes is a natural person and a citizen of the State of California, residing in San Diego County, California. Plaintiff Jaymes is not disqualified from exercising Second Amendment rights nor prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff Jaymes possesses a valid COE issued by the Defendants' Department of Justice Bureau of Firearms. Plaintiff Jaymes is a member and supporter of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

25.    But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiff Jaymes would, for self-defense and other lawful purposes, purchase new from a licensed retailer a constitutionally protected handgun not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster, including but not limited to a Sig 365, G43X, Glock 19 Gen5, Sig P320, and/or Nighthawk Lady Hawk, which is a constitutionally protected handgun in common use for self-defense and lawful purposes.

26.    But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiff Jaymes would self-manufacture for her own possession and lawful use semiautomatic handguns that are constitutionally protected but not on Defendants' Handgun Roster or eligible to be self-manufactured under the Handgun Ban.

*Plaintiff L. Schwartz*

27.    Plaintiff Laura Schwartz ("L. Schwartz") is a natural person and a citizen of the State of California, residing in San Diego County, California. Plaintiff L. Schwartz is not disqualified from exercising Second Amendment rights nor prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff L. Schwartz holds an active license to carry a concealed weapon ("CCW") issued by her county sheriff, after proving "good cause" and "good moral character" to her licensing authority, successfully completing a course of training on the law and firearms proficiency under California Penal Code

section 26165, and passing an extensive Live Scan-based background check and placement into the State's system for monitoring law enforcement contact, arrests, and criminal convictions ("Rap Back"). Plaintiff L. Schwartz is a member and supporter of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

28. But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiff L. Schwartz would, for self-defense and other lawful purposes, purchase new from a licensed retailer a constitutionally protected handgun not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster, including but not limited to a Glock 19 Gen5 and/or Springfield Armory Hellcat, which are constitutionally protected handguns in common use for self-defense and lawful purposes.

*Plaintiff M. Schwartz*

29. Plaintiff Michael Schwartz ("M. Schwartz") is a natural person and a citizen of the State of California, residing in San Diego County, California. Plaintiff M. Schwartz is not disqualified from exercising Second Amendment rights nor prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff M. Schwartz holds an active license to carry a concealed weapon ("CCW") issued by his county sheriff, after proving "good cause" and "good moral character" to his licensing authority, successfully completing a course of training on the law and firearms proficiency under California Penal Code section 26165 and passing an extensive Live Scan-based background check and placement into the State's system for monitoring law enforcement contact, arrests, and criminal convictions ("Rap Back"). Plaintiff M. Schwartz is the Executive Director of Plaintiff San Diego County Gun Owners PAC. Plaintiff M. Schwartz is a member and supporter of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

30. But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiff M. Schwartz would, for self-defense and other lawful purposes, purchase new from a licensed retailer a constitutionally protected handgun not currently on or

eligible under the Handgun Ban to be added to Defendants' Handgun Roster, including but not limited to a Glock 19 Gen5 and/or Springfield Armory Hellcat, which are constitutionally protected handguns in common use for self-defense and other lawful purposes.

31.    But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiff M. Schwartz would self-manufacture for his own possession and lawful use semiautomatic handguns that are constitutionally protected but not on Defendants' Handgun Roster or eligible to be self-manufactured under the Handgun Ban.

***Plaintiff Macomber***

32.    Plaintiff Robert Macomber is a natural person and a citizen of the State of California, residing in San Diego County, California. Plaintiff Macomber is not disqualified from exercising Second Amendment rights nor prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff Macomber holds an active license to carry a concealed weapon ("CCW") issued by his county sheriff, after proving "good cause" and "good moral character" to his licensing authority, successfully completing a course of training on the law and firearms proficiency under Penal Code section 26165 and passing an extensive Live Scan-based background check and placement into the State's system for monitoring law enforcement contact, arrests, and criminal convictions ("Rap Back"). Plaintiff Macomber is a member and supporter of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

33.    But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiff Macomber would self-manufacture for his own possession and lawful use semiautomatic handguns that are constitutionally protected but not on Defendants' Handgun Roster or eligible to be self-manufactured under the Handgun Ban.

***Plaintiff Freeman***

34.    Plaintiff Clint Freeman is a natural person and a citizen of the State of California, residing in San Diego County, California. Plaintiff Freeman is not

1  disqualified from exercising Second Amendment rights nor prohibited under state or

2  federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff

3  Freeman is a firearms instructor. Plaintiff Freeman is a member and supporter of

4  Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

5      35.    But for the Handgun Ban and Defendants' active enforcement thereof,

6  Plaintiff Freeman would self-manufacture for his own possession and lawful use

7  semiautomatic handguns that are constitutionally protected but not on Defendants'

8  Handgun Roster or eligible to be self-manufactured under the Handgun Ban.

9  ***Plaintiff Klier***

10      36.    Plaintiff John Klier is a natural person and a citizen of the State of

11  California, residing in San Diego County, California. Plaintiff Klier is not

12  disqualified from exercising Second Amendment rights nor prohibited under state or

13  federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff

14  Klier is a veteran of the Navy, having been disabled and honorably discharged after

15  serving in Iraq as a "Seabee" member of the United States Naval Construction

16  Battalions. Plaintiff Klier is a trained firearms instructor who owns and operates

17  Active Shooter Defense School ("ASDS"), which "employs the best instructors in

18  the industry," with "former [Navy] SEALs, Rangers, engineers, SWAT officers,

19  combatives instructors and current top performing competitive shooters on staff to

20  ensure students master each technique being taught." ASDS's "mission is to provide

21  the most up to date tactical weapons training available to the public, law enforcement

22  and military."[3] Plaintiff Klier is a member and supporter of Plaintiffs FPC, SDCGO,

23  CCRKBA, and SAF.

24      37.    But for Handgun Ban and Defendants' active enforcement thereof,

25  Plaintiff Klier would, for self-defense and other lawful purposes, purchase new from

26

27  _____

28  [3] *See* "Meet our Team" on ASDS's website, online at https://asdschool.com/asds-instructors.

1   a licensed retailer a constitutionally protected handgun not currently on or eligible

2   under Handgun Ban to be added to Defendants' Handgun Roster, including but not

3   limited to a Glock 19 Gen5, which is a constitutionally protected handgun in

4   common use for self-defense and other lawful purposes.

5       38.    But for the Handgun Ban and Defendants' active enforcement thereof,

6   Plaintiff Klier would self-manufacture for his own possession and lawful use

7   semiautomatic handguns that are constitutionally protected but not on Defendants'

8   Handgun Roster or eligible to be self-manufactured under the Handgun Ban.

9   ***Plaintiff Smith***

10       39.    Plaintiff Justin Smith is a natural person and a citizen of the State of

11   California, residing in San Diego County, California. Plaintiff Justin Smith is not

12   disqualified from exercising Second Amendment rights nor prohibited under state or

13   federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff

14   Smith is a member and supporter of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

15       40.    But for the Handgun Ban and Defendants' active enforcement thereof,

16   Plaintiff Smith would, for self-defense and other lawful purposes, purchase new

17   from a licensed retailer a constitutionally protected handgun not currently on or

18   eligible under the Handgun Ban to be added to Defendants' Handgun Roster,

19   including but not limited to a CZ P10, Walther Q5 SF, and/or Glock 19 Gen4 and/or

20   Gen5, which are constitutionally protected handguns in common use for self-defense

21   and other lawful purposes.

22       41.    But for Handgun Ban and Defendants' active enforcement thereof,

23   Plaintiff Smith would self-manufacture for his own possession and lawful use

24   semiautomatic handguns that are constitutionally protected but not on Defendants'

25   Handgun Roster or eligible to be self-manufactured under Handgun Ban .

26   ***Plaintiff Phillips***

27       42.    Plaintiff John Phillips is a natural person and a citizen of the State of

28   California, residing in San Diego County, California. Plaintiff Phillips is not

1  disqualified from exercising Second Amendment rights nor prohibited under state or
2  federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff
3  Phillips possesses a current COE issued by the Defendants' Department of Justice
4  Bureau of Firearms. Plaintiff Phillips is the President of Plaintiff PWG, a proprietor
5  of the business, and the individual licensee associated with the dealership and range
6  facility, including by and through Defendants and their Bureau of Firearms. Plaintiff
7  Phillips holds an active license to carry a concealed weapon ("CCW") issued by his
8  county sheriff, after proving "good cause" and "good moral character" to his
9  licensing authority, successfully completing a course of training on the law and
10  firearms proficiency under Penal Code section 26165, and passing an extensive Live
11  Scan-based background check and placement into the State's system for monitoring
12  law enforcement contact, arrests, and criminal convictions ("Rap Back"). Plaintiff
13  Phillips is a trained firearms instructor. Plaintiff Phillips is a member and supporter
14  of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

15      43.    But for the Handgun Ban and Defendants' active enforcement thereof,
16  Plaintiff Phillips would, for self-defense and other lawful purposes, purchase new
17  from a licensed retailer a constitutionally protected handgun not currently on or
18  eligible under the Handgun Ban to be added to Defendants' Handgun Roster,
19  including but not limited to a Sig Sauer P365, Sig Sauer P320 M17, Glock 17 Gen5
20  MOS, Fabrique National Herstal 509, and/or Fabrique National Herstal  FNX-9,
21  which are constitutionally protected handguns in common use for self-defense and
22  other lawful purposes.

23  ***Plaintiff C. Prince***

24      44.    Plaintiff Cheryl Prince ("C. Prince") is a natural person and a citizen of
25  the State of California, residing in San Diego County, California. Plaintiff C. Prince
26  is not disqualified from exercising Second Amendment rights nor prohibited under
27  state or federal law from possessing, receiving, owning, or purchasing a firearm.
28  Plaintiff C. Prince holds an active license to carry a concealed weapon ("CCW")

1   issued by her county sheriff, after proving "good cause" and "good moral character"

2   to her licensing authority, successfully completing a course of training on the law

3   and firearms proficiency under Penal Code section 26165, and passing an extensive

4   Live Scan-based background check and placement into the State's system for

5   monitoring law enforcement contact, arrests, and criminal convictions ("Rap Back").

6   Plaintiff C. Prince is a member and supporter of Plaintiffs FPC, SDCGO, CCRKBA,

7   and SAF.

8       45.    But for the Handgun Ban and Defendants' active enforcement thereof,

9   Plaintiff C. Prince would, for self-defense and other lawful purposes, purchase new

10   from a licensed retailer a constitutionally protected handgun not currently on or

11   eligible under the Handgun Ban  to be added to Defendants' Handgun Roster,

12   including but not limited to a Sig Sauer P365, which is a constitutionally protected

13   handgun in common use for self-defense and other lawful purposes.

14   ***Plaintiff D. Prince***

15       46.    Plaintiff Darin Prince ("D. Prince") is a natural person and a citizen of

16   the State of California, residing in San Diego County, California. Plaintiff D. Prince

17   is not disqualified from exercising Second Amendment rights nor prohibited under

18   state or federal law from possessing, receiving, owning, or purchasing a firearm.

19   Plaintiff D. Prince possesses a current COE issued by the Defendants' Department

20   of Justice Bureau of Firearms. Plaintiff D. Prince is an owner and manager of

21   Plaintiff NCSC, the proprietor of the business, and the individual licensee associated

22   with the dealership, including by and through the Defendants and their Bureau of

23   Firearms. Plaintiff D. Prince holds an active license to carry a CCW issued by his

24   county sheriff under Penal Code section 26150, *et seq.*, after proving "good cause"

25   and "good moral character" to that licensing authority, successfully completing a

26   course of training on the law and firearms proficiency under section 26165, passing

27   an extensive Live Scan-based Department of Justice background check, and

28   placement into the "Rap Back" system for monitoring law enforcement contact,

1    arrests, and criminal convictions. Plaintiff D. Prince is a member of Plaintiffs FPC,

2    SDCGO, CCRKBA, and SAF.

3         47.    But for the Handgun Ban and Defendants' active enforcement thereof,

4    Plaintiff D. Prince would, for self-defense and other lawful purposes, purchase new

5    from a licensed retailer a constitutionally protected handgun not currently on or

6    eligible under the Handgun Ban to be added to Defendants' Handgun Roster,

7    including but not limited to a Sig Sauer P320 AXG Scorpion, which is a

8    constitutionally protected handgun in common use for self-defense and other lawful

9    purposes.

10   ***Plaintiff Peterson***

11        48.    Plaintiff Ryan Peterson is a natural person and a citizen of the State of

12   California, residing in San Diego County, California. Plaintiff Peterson is not

13   disqualified from exercising Second Amendment rights nor prohibited under state or

14   federal law from possessing, receiving, owning, or purchasing a firearm. Plaintiff

15   Peterson possesses a current COE issued by the Defendants' Department of Justice

16   Bureau of Firearms. Plaintiff Peterson is the proprietor of and an individual licensee

17   associated with Plaintiff Gunfighter Tactical. Plaintiff Peterson is a DOJ Certified

18   Instructor. Plaintiff Peterson is a member and supporter of Plaintiffs FPC, SDCGO,

19   CCRKBA, and SAF.

20        49.    Ironically, Plaintiff Peterson, who owns and operates a gun store

21   (Plaintiff Gunfighter Tactical), is highly trained in the safe handling of firearms, is a

22   DOJ Certified Instructor, sells handguns not on the Defendants' Roster to those who

23   can lawfully purchase them (which excludes Individual Plaintiffs), and keeps for

24   lawful purposes including self-defense a Fabrique Nationale 509 Tactical handgun

25   while physically inside Gunfighter Tactical. However, he cannot lawfully transfer

26   that same firearm to himself—or to any other law-abiding citizen not exempt from

27   the Handgun Ban —even for self-defense in the home.

28        50.    But for the Handgun Ban and Defendants' active enforcement thereof,

1  Plaintiff Peterson would, for self-defense and other lawful purposes, purchase new

2  from a licensed retailer a constitutionally protected handgun not currently on or

3  eligible under the Handgun Ban to be added to Defendants' Handgun Roster,

4  including but not limited to a Fabrique National Herstal 509 Tactical, Sig Sauer P220

5  Legion (10mm), Staccato 2011, Glock 19 Gen5, Glock 17 Gen5 MOS, and Wilson

6  Combat Elite CQB 1911 (9mm), which are constitutionally protected handguns in

7  common use for self-defense and other lawful purposes.

8      51.    But for the Handgun Ban and Defendants' active enforcement thereof,

9  Plaintiff Peterson would, for self-defense and other lawful purposes, self-

10 manufacture for his own possession and lawful use semiautomatic handguns that are

11 constitutionally protected but not on Defendants' Handgun Roster or eligible to be

12 self-manufactured under the Handgun Ban.

13 ***Plaintiff Ruebe***

14     52.    Plaintiff Leonard Ruebe is a natural person who resides in Los Angeles

15 County, California and is a member of FPC. Plaintiff Ruebe is a peaceable person

16 not prohibited from exercising his right to keep and bear arms. He is an IT

17 professional. Plaintiff Ruebe lawfully owns multiple traditionally manufactured

18 firearms, for self-defense and other lawful purposes. For these purposes, he

19 possesses a CNC machine, which he previously purchased to undertake multiple

20 home-based CNC manufacturing projects including the self-manufacture of

21 firearms, specifically a handgun.

22     53.    A Ghost Gunner CNC machine gives purchasers the ability to finish

23 80%-complete frames and receivers for various types of firearms, which are neither

24 "dangerous" nor "unusual" and which are in common use for self-defense and other

25 lawful purposes, including the AR-15, AR-308, M1911, Polymer 80, and AK-47.

26     54.    Plaintiff Ruebe desires and intends to use his Ghost Gunner home CNC

27 to self-manufacture a handgun which he will use for all lawful purposes, including

28 self-defense. He desires to manufacture his own handgun because he enjoys the

1    hobbyist pursuits of building and customizing things for his personal use, including

2    firearms. Plaintiff Ruebe additionally desires to continue to own and possess his

3    Ghost Gunner home CNC for all lawful purposes including, but not limited to, its

4    use to self-manufacture constitutionally protected firearms.

5        55.    But for California's ban on CNCs under AB 1621's Prohibitions

6    targeting self-manufacturing or assembling firearms, Plaintiff Ruebe would continue

7    to own and possess his home CNC for all lawful purposes including, but not limited

8    to, its use to self-manufacture constitutionally protected firearms.

9        56.    But for California's ban on the self-manufacture or assembly of

10   firearms the State deems "unsafe" handguns, Plaintiff Ruebe would use his CNC

11   machine in the process of manufacturing or assembling one or more of those arms.

12

13                                **Retailer Plaintiffs**

14   ***Plaintiff PWG***

15       57.    Plaintiff PWGG, L.P. ("PWG"), a California limited partnership doing

16   business as "Poway Weapons & Gear" and "PWG Range," is a licensed firearms

17   retailer, shooting range, and training facility in the City of Poway, within San Diego

18   County, California. Plaintiff PWG is a member and supporter of Plaintiffs FPC,

19   SDCGO, CCRKBA, and SAF.

20       58.    Plaintiffs Phillips and PWG are a firearms dealer in Defendants'

21   Department of Justice Centralized List of Firearms Dealers, and are federally

22   licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as

23   a Federal Firearms Licensee ("FFL").

24       59.    Many customers and prospective customers of Plaintiffs Phillips and

25   PWG are interested in, have, and continue to seek to purchase for self-defense and

26   other lawful purposes constitutionally protected handguns not currently on or

27   eligible under the Handgun Ban to be added to Defendants' Handgun Roster.

28       60.    But for the Handgun Ban and Defendants' active enforcement thereof,

Plaintiffs Phillips and PWG would make available for sale to their adult customers all of the constitutionally protected new handguns on the market that are available outside of California but not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster, and sell and transfer them to their adult customers who are not disqualified from exercising Second Amendment rights.

***Plaintiff NCSC***

61. Plaintiff North County Shooting Center, Inc. ("NCSC"), a California corporation, is a licensed firearms retailer, shooting range, and training facility in the City of San Marcos, within San Diego County, California. Plaintiff NCSC is a federally and state-licensed firearms retailer in San Marcos, California. Plaintiff NCSC is a member of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

62. Plaintiffs D. Prince and NCSC are a firearms dealer in Defendants' Department of Justice Centralized List of Firearms Dealers, and are federally licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as a Federal Firearms Licensee ("FFL").

63. Many customers and prospective customers of Plaintiffs D. Prince and NCSC are interested in, have, and continue to seek to purchase for self-defense and other lawful purposes constitutionally protected handguns not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster.

64. But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiffs D. Prince and NCSC would make available for sale to their adult customers all of the constitutionally protected new handguns on the market that are available outside of California but not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster, and sell and transfer them to their adult customers who are not disqualified from exercising Second Amendment rights.

***Plaintiff Gunfighter Tactical***

65. Plaintiff Gunfighter Tactical, LLC ("Gunfighter Tactical"), a California limited liability corporation doing business as "Gunfighter Tactical," is a licensed

firearms retailer in the City of San Diego within San Diego County, California. Plaintiff Gunfighter Tactical is a member of Plaintiffs FPC, SDCGO, CCRKBA, and SAF.

66.    Plaintiffs Peterson and Gunfighter Tactical are a firearms dealer in Defendants' Department of Justice Centralized List of Firearms Dealers, and are federally licensed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") as a Federal Firearms Licensee ("FFL").

67.    Many customers and prospective customers of Plaintiffs Peterson and Gunfighter Tactical are interested in, have, and continue to seek to purchase for self-defense and other lawful purposes constitutionally protected handguns not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster.

68.    But for the Handgun Ban and Defendants' active enforcement thereof, Plaintiffs Peterson and Gunfighter Tactical would make available for sale to their adult customers all of the constitutionally protected new handguns on the market that are available outside of California but not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster, and sell and transfer them to their adult customers who are not disqualified from exercising Second Amendment rights.

## Institutional Plaintiffs

*Plaintiff FPC*

69.    Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a nonprofit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada. The purposes of FPC include defending and promoting the People's rights, especially First and Second Amendment rights, advancing individual liberty, and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. FPC has members in the State of California, including Individual Plaintiffs who desire to purchase new, or self-

manufacture or assemble, constitutionally protected arms for self-defense or other lawful purposes which are not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster or eligible to be lawfully self-manufactured; Retailer Plaintiffs who desire to sell the same to their eligible law-abiding customers; and Individual Plaintiff Ruebe who desires to possess and use the CNC machine he previously lawfully acquired, and to acquire additional such machines and similar products in the future, for purposes of self-manufacturing or assembling constitutionally protected arms for self-defense and lawful purposes. These members would each undertake the desired and protected activity but for the criminal liability that they face under the laws, regulations, policies, practices, and customs being challenged in this action. The interests that FPC seeks to protect in this lawsuit are germane to the organization's purposes.

***Plaintiff SDCGO***

70.     Plaintiff San Diego County Gun Owners PAC ("SDCGO") is a local political organization whose purpose is to protect and advance the Second Amendment rights of residents of San Diego County, California, through their efforts to support and elect local and state representatives who support the Second Amendment right to keep and bear arms. SDCGO's membership and donors consist of Second Amendment supporters, people who own guns for self-defense and sport, firearms dealers, shooting ranges, and elected officials who want to restore and protect the right to keep and bear arms in California. SDCGO's members include Individual Plaintiffs who desire to purchase new, or self-manufacture or assemble, constitutionally protected arms for self-defense or other lawful purposes which are not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster or eligible to be lawfully self-manufactured; Retailer Plaintiffs who desire to sell the same to their eligible law-abiding customers; and Individual Plaintiff Ruebe who desires to possess and use the CNC machine he previously lawfully acquired, and to acquire additional such machines and similar products in

1   the future, for purposes of self-manufacturing or assembling constitutionally
2   protected arms for self-defense and lawful purposes. These members would each
3   undertake the desired and protected activity but for the criminal liability that they
4   face under the laws, regulations, policies, practices, and customs being challenged
5   in this action. The interests that SDCGO seeks to protect in this lawsuit are germane
6   to the organization's purposes.

7   ***Plaintiff CCRKBA***

8       71.     Plaintiff Citizens Committee for the Right to Keep and Bear Arms
9   ("CCRKBA") is a nonprofit organization incorporated under the laws of Washington
10  with its principal place of business in Bellevue, Washington. CCRKBA is dedicated
11  to promoting the benefits of the right to bear arms. CCRKBA has members and
12  supporters nationwide, including thousands of members in California and in the
13  County of San Diego, California. CCRKBA's members include Individual Plaintiffs
14  who desire to purchase new, or self-manufacture or assemble, constitutionally
15  protected arms for self-defense or other lawful purposes which are not currently on
16  or eligible under the Handgun Ban to be added to Defendants' Handgun Roster or
17  eligible to be lawfully self-manufactured; and Individual Plaintiff Ruebe who desires
18  to possess and use the CNC machine he previously lawfully acquired, and to acquire
19  additional such machines and similar products in the future, for purposes of self-
20  manufacturing or assembling constitutionally protected arms for self-defense and
21  lawful purposes. These members would each undertake the desired and protected
22  activity but for the criminal liability that they face under the laws, regulations,
23  policies, practices, and customs being challenged in this action. The interests that
24  CCRKBA seeks to protect in this lawsuit are germane to the organization's purposes.

25  ***Plaintiff SAF***

26      72.     Plaintiff Second Amendment Foundation ("SAF") is a nonprofit
27  educational foundation incorporated under the laws of Washington with its principal
28  place of business in Bellevue, Washington. SAF seeks to preserve the effectiveness

of the Second Amendment through education, research, publishing, and legal action programs focused on the Constitutional right to possess firearms, and the consequences of gun control. SAF has over 650,000 members and supporters nationwide, including thousands of members in California and in the County of San Diego, California. SAF's members include Individual Plaintiffs who desire to purchase new, or self-manufacture or assemble, constitutionally protected arms for self-defense or other lawful purposes which are not currently on or eligible under the Handgun Ban to be added to Defendants' Handgun Roster or eligible to be lawfully self-manufactured; Retailer Plaintiffs who desire to sell the same to their eligible law-abiding customers; and Individual Plaintiff Ruebe who desires to possess and use the CNC machine he previously lawfully acquired, and to acquire additional such machines and similar products in the future, for purposes of self-manufacturing or assembling constitutionally protected arms for self-defense and lawful purposes. These members would each undertake the desired and protected activity but for the criminal liability that they face under the laws, regulations, policies, practices, and customs being challenged in this action. The interests that SAF seeks to protect in this lawsuit are germane to the organization's purposes.

### Defendants

***Defendant Bonta***

73.     Defendant Robert Bonta is the Attorney General of the State of California, and is sued herein in his official capacity. Under Article 5, § 13 of the California Constitution, Attorney General Bonta is the "chief law officer of the State," with a duty "to see that the laws of the state are uniformly and adequately enforced." Defendant Bonta is the head of the California Department of Justice ("DOJ"). Defendant Bonta's DOJ and its Bureau of Firearms regulate and enforce state law related to the sales, transfer, possession, manufacture, and ownership of firearms. The Attorney General and DOJ maintain an office in San Diego, California.

74.     Defendant Bonta also qualifies as a prospective "prevailing party"

under CCP 1021.11 who, effective January 1, 2023, may be entitled to bring an action for the recovery of fees and costs, in actions like this where a party "seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms."

***Defendant Lopez***

75.     Defendant Luis Lopez is the Director of the DOJ's Bureau of Firearms. On information and belief, Defendant Lopez reports to Attorney General Bonta, and he is responsible for the various operations of the Bureau of Firearms, including the implementation and enforcement of the statutes, regulations, and policies regarding firearm and ammunition sales, possession, transfers, as well as the manufacture of firearms. Defendant Lopez is sued in his official capacity.

76.     Defendant Lopez also qualifies as a prospective  "prevailing party" under CCP 1021.11 who, effective January 1, 2023, may be entitled to bring an action for the recovery of fees and costs, in actions like this where a party "seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms."

## JURISDICTION AND VENUE

77.      This Court has jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. §§ 1983 and 1988, as this action seeks to redress the deprivation under color of the laws, statutes, ordinances, regulations, customs, and usages of the State of California, of the rights, privileges, or immunities secured by the United States Constitution.

78.     Venue lies in this Court under 28 U.S.C. § 1391, as the events giving rise to Plaintiffs' causes of action arose or exist in this District in which the action is

brought. Further, the venue rules of this State specifically would permit this action to be filed in San Diego, since the Attorney General and California Department of Justice maintain an office within this District; Cal. Code of Civ. Pro. § 401(1).

## STATEMENT OF FACTS

### I.     California's Bans on Handguns and Self-Manufacturing

79.     The Handgun Ban, the AB 1621 Prohibitions imposing further constraints on the lawful self-manufacturing or assembling of firearms, and Defendants' regulations, policies, and practices enforcing the same, individually and collectively prevent Plaintiffs, and all similarly situated members of Institutional Plaintiffs, who are not prohibited from possessing or acquiring firearms, from purchasing and/or self-manufacturing or assembling handguns, including with CNC machines, that are categorically in common use for self-defense and other lawful purposes, and thus violate the Second and Fourteenth Amendments to the United States Constitution.

### A.     The General Regulatory Scheme

80.     In California, individuals are required to purchase and transfer firearms and ammunition through state and federally licensed dealers, like Retailer Plaintiffs, in face-to-face transactions, or face serious criminal penalties.

81.     Because of an onerous regulatory scheme, which is designed to deny, chill, suppress, and/or burden the exercise of fundamental, individual rights (as poignantly illustrated by the State's enactment of CCP § 1021.11, specifically designed to not only prevent but penalize legitimate efforts to vindicate such rights under 42 U.S.C. sections 1983 and 1988), people in California cannot exercise their Second Amendment right to keep and bear arms without going in person to retailers that must comply with the State's regulatory scheme on pain of criminal liability— a misdemeanor at a minimum, Pen. Code, § 19.4 (providing that, unless otherwise specified, a violation of a criminal statute constitutes a misdemeanor)—as well as

1    loss of the necessary licenses to engage in any lawful firearm-related business.

2        82.    "Where neither party to [a] [firearm] transaction holds a dealer's license

3    issued pursuant to Sections 26700 to 26915, inclusive, the parties to the transaction

4    shall complete the sale, loan, or transfer of that firearm through a licensed firearms

5    dealer pursuant to Chapter 5 (commencing with Section 28050)." Pen. Code §

6    27545.

7        83.    A license to transact in firearms "is subject to forfeiture for a breach of

8    any of the prohibitions and requirements of [Article 2, Penal Code §§ 26800 –

9    26915]" (with some exceptions that do not apply in the instant matter). Pen. Code §

10   26800.

11       84.    Penal Code § 28220(a) states: "Upon submission of firearm purchaser

12   information, the Department of Justice shall examine its records, as well as those

13   records that it is authorized to request from the State Department of State Hospitals

14   pursuant to Section 8104 of the Welfare and Institutions Code, in order to determine

15   if the purchaser is a person described in subdivision (a) of Section 27535, or is

16   prohibited by state or federal law from possessing, receiving, owning, or purchasing

17   a firearm."[4]

18       85.    Defendants' Department of Justice participates in the National Instant

19   Criminal Background Check System (NICS). Pen. Code § 28220(a).

20       86.    A "Certificate of Eligibility" ("COE") "means a certificate which states

21   that the Department has checked its records and the records available to the

22   Department in the National Instant Criminal Background Check System and

23   determined that the applicant is not prohibited from acquiring or possessing firearms

24   pursuant to Penal Code sections 18205, 29800, 29805, 29815 through 29825, and

25   29900, or Welfare and Institutions Code sections 8100 and 8103, or Title 18, sections

26   _____

27   [4]   The DOJ's multi-step, acronym-heavy background check process for firearms is
28   detailed in *Silvester v. Harris*, 41 F.Supp.3d 927, 947–952 (E.D. Cal. 2014).

921 and 922 of the United States Code, or Title 27, Part 478.32 of the Code of Federal Regulations at the time the check was performed and which ensures that a person who handles, sells, delivers, or has under his or her custody or control any ammunition, is eligible to do so pursuant to Penal Code section 30347." 11 CCR § 4031(d). *See also* Pen. Code § 26710 and 11 CCR § 4030, *et seq.*

87.    "The initial COE application process includes a firearms eligibility criminal background check and issuance of a certificate, which is valid for one year. Thereafter, the COE must be renewed annually. A COE can be revoked, at any time, if the COE holder becomes prohibited from owning/possessing firearms and ammunition." *See* Defendants' website at https://oag.ca.gov/firearms/cert-eligibility.

88.    On information and belief, a COE issued by Defendants' Department of Justice Bureau of Firearms places the certificate holder in their "Rap Back" file, which would notify them immediately should the certificate holder be arrested or otherwise prohibited from purchasing or possessing firearms.

**B.    The Handgun Ban and "Roster"**

89.    Defendants' California Department of Justice compiles, publishes, and maintains "a roster listing all of the handguns that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold in this state pursuant to this part." Pen Code § 32015.

90.    Additional information on the Handgun Roster  can be found in Defendants' regulations at California Code of Regulations, title 11, section 4070.

91.    On information and belief, Defendants' Roster of Certified Handguns available for sale to law-abiding citizens not exempt from the Handgun Purchase Ban is a small fraction of the total number of handgun makes and models commercially available throughout the vast majority of the United States, all of which are constitutionally protected arms in common use for lawful purposes.

92.     On information and belief, at the end of 2013, there were 1,273 makes and models of approved handguns, including 883 semiautomatics, on Defendants' Roster. Since then, the Defendants' Roster has continued to shrink because of the Defendants' enforcement of the Handgun Purchase Ban.

93.     As of August 22, 2022, there were only "808 handguns found"—*total*, of all makes, models, and permutations—on Defendants' Roster.

94.     Inevitably hastening the rate of shrinkage, effective January 1, 2021, the State amended California's Handgun Ban under Assembly Bill No. 2847 (2019 – 2020 Reg. Sess.) ("AB 2847"), which now expressly requires that, for every single new firearm added to the Roster, Defendants' Department of Justice must *remove* three firearms added before July 1, 2022, that are not compliant with its current requirements.[5] Pen. Code. § 31910(b)(7).

95.     Moreover, of the handguns "certified" for Roster inclusion, on information and belief, "about one-third of the Roster's total listings are comprised of makes and models that do not offer consumers substantive and material choices in the physical attributes, function, or performance of a handgun relative to another listing (*i.e.*, a base model)," because many of the approved handguns are merely the same handgun make and model as another approved model with cosmetic difference(s). *See*, *e.g.*, *California's Handgun Roster: How big is it, really?*, online at https://www.firearmspolicy.org/california-handgun-roster (showing the results of a detailed analysis of the Roster as of January 30, 2019).

---

[5] *See* Alexei Koseff, "Bullet-tracing bill by [California Assembly-member] David Chiu aims to force issue on gunmakers," San Francisco Chronicle (March 16, 2020), at https://www.sfchronicle.com/politics/article/Assemblyman-Chiu-pushes-firearms-industry-to-15132278.php.

*See also* Alexei Koseff, "[California Governor] Newsom signs bill that compels gunmakers to adopt bullet-tracing technology," San Francisco Chronicle (Sept. 29, 2020), at https://www.sfchronicle.com/politics/article/Newsom-signs-bill-that-compels-gunmakers-to-adopt-15607657.php.

96.     The Handgun Ban, as it stands today, not only forces and requires the Handgun Roster to virtually shrink into oblivion, but, on information and belief, even minor changes to manufacturing processes, materials, and suppliers will cause a previously certified handgun to be removed from the Handgun Roster by Defendants under the State's laws and Defendants' policies and enforcement practices.

97.     Worse, certified handgun models are removed from the Roster by Defendants if the manufacturer does not pay an annual fee to maintain the model on the Roster. Penal Code § 32015(b)(2). On information and belief, due to the Handgun Ban, just as hundreds of handgun makes and models have already been removed from Defendants' Roster, more handgun makes and models will "drop off" the Roster as manufacturers choose to update their products—as well as their materials, processes, and supply chains—to make them more competitive in the broader civilian market throughout the United States and/or refusing to continue to pay California's extortive annual renewal fees, making them ineligible to renew on the Roster, further reducing the availability of constitutionally protected arms that individual adults not disqualified from exercising Second Amendment rights have a fundamental right to acquire and possess.

98.     Indeed, Defendants' list of "De-Certified Handguns" shows hundreds of handgun models have been removed from the Roster since December of 2001, including 33 this year alone, https://oag.ca.gov/firearms/de-certified-handguns (last visited August 20, 2022), whereas just eight handgun models have been added according to Defendants' list of "Recently Added Handgun Models," https://oag.ca.gov/firearms/certified-handguns/recently-added (last visited August 20, 2022).

99.     Handguns that have passed California's tests and were certified by Defendants do not become "unsafe"—much less lose their constitutional protection—simply because a manufacturer does not pay an annual fee.

100.    Handguns that do not have one or all of the "safety" devices as required

under the Handgun Ban are neither "dangerous" nor "unusual" and are instead in common use for lawful purposes throughout the United States.

101. Handguns that do not have chamber load indicators are neither "dangerous" nor "unusual" and are instead in common use for lawful purposes throughout the United States.

102. Handguns that do not have magazine disconnect mechanisms are neither "dangerous" nor "unusual" and are instead in common use for lawful purposes throughout the United States.

103. Handguns that do not have "microstamping" technology are neither "dangerous" nor "unusual" and are instead in common use for lawful purposes throughout the United States.

104. Any of the attributes, systems, and "safety" devices required under the Handgun Ban can fail or be altered or removed by a handgun's possessor, and the absence of one or all of them does not strip the protection for otherwise constitutionally protected arms.

105. The attributes, systems, and "safety" devices required under California's Handgun Ban are not sufficient to guarantee a handgun's safe use.

106. The attributes, systems, and "safety" devices required under the Handgun Ban cannot replace safe and responsible gun handling.

107. Microstamping technology is not a safety device.

108. Microstamping technology has not been shown to viably support any law enforcement purpose.

109. On information and belief, as of November 8, 2020, there were no commercially available semiautomatic handguns manufactured in the United States that have the microstamping technology required under the Handgun Ban.

110. On information and belief, as of January 4, 2021, there are no commercially available semiautomatic handguns manufactured in the United States that have the microstamping technology required under the Handgun Ban.

111.   On information and belief, as of November 8, 2020, there were no commercially available semiautomatic handguns manufactured in the United States that met all of the requirements under the Handgun Ban.

112.   On information and belief, as of January 4, 2021, there were no commercially available semiautomatic handguns manufactured in the United States that meet all of the requirements under the Handgun Ban.

113.   On information and belief, as of August 22, 2022, there are still no commercially available semiautomatic handguns manufactured in the United States that meet all of the requirements under the Purchase Ban.

114.   California law requires that handgun purchasers successfully complete a test, pay a fee, and acquire a valid FSC before they purchase and take possession of any firearm, including handguns. Penal Code § 31610, *et seq.*[6]

115.   Defendants' publicly available Firearms Safety Certificate ("FSC") Study Guide, a document published by the Office of the Attorney General and California Department of Justice Bureau of Firearms, Defendants' Spanish-language version of the FSC Study Guide, and Defendants' FSC "MANUAL for California Firearms Dealers and DOJ Certified Instructors" are available on Defendants' website at https://oag.ca.gov/firearms/fsc.

116.   In their publicly available FSC Study Guide, Defendants state, in red type: "REMEMBER: Ignorance and carelessness can result in firearm accidents. Basic gun safety rules must be applied ALL OF THE TIME." (Color and capitalization in original.)

117.   In the first section of Chapter 1 of Defendants' FSC Study Guide (captioned "THE SIX BASIC GUN SAFETY RULES"), the Guide states: "There are six basic gun safety rules for gun owners to understand and practice at all times:

---

[6]   *See also* 11 CCR § 4250, *et seq.*, and Defendants' website at https://oag.ca.gov/firearms/fscfaqs.

1. Treat all guns as if they are loaded. 2. Keep the gun pointed in the safest possible direction. 3. Keep your finger off the trigger until you are ready to shoot. 4. Know your target, its surroundings, and beyond. 5. Know how to properly operate your gun. 6. Store your gun safely and securely to prevent unauthorized use. Guns and ammunition should be stored separately." (Line breaks removed.)

118.   Under common rules of firearm safety, and within the knowledge required for the State's FSC and safe handling demonstration, is the fundamental rule that all firearms must always be treated as though they are loaded.

119.   It is irresponsible and unsafe to rely on "safety" devices required under the Handgun Ban.

120.   Additionally, Defendants' require firearm purchasers, the retailer, and the DOJ Certified Instructor licensed and permitted to proctor the test, to conduct, successfully pass, and certify in a "Safe Handling Demonstration Affidavit" (online at https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/hscaff.pdf) signed under penalty of perjury, that the purchaser or transferee "performed the safe handling demonstration as required in Penal Code sections 26850, 26853, 26856, 26859, or 26860, as applicable, with the firearm (or one of the same make and model) referenced" on the Dealer's Record of Sale (DROS) number associated with the purchase or transfer.

121.   Notwithstanding the Handgun Ban's general prohibition against ordinary law-abiding citizens acquiring new, constitutionally protected handguns from licensed dealers, Defendants' ban has consistently exempted all motion picture, television, and video producers, individuals participating in entertainment events, actors, and all employees and agents of any entity involved the production of such entertainment, Pen. Code, § 32110(h), without any demonstrated or other conceivably legitimate basis for favoring this subset of individuals and entities over the millions of ordinary law-abiding citizens seeking to exercise their fundamental, individual right to keep and bear the same arms.

122. Defendants have also employed the Handgun Ban to purportedly prohibit the self-manufacture or assembly of any firearm classified by the State as an "unsafe" handgun.

123. On Defendants' Roster of Handguns Certified for Sale website, https://oag.ca.gov/firearms/certified-handguns/search, in a section captioned "IMPORTANT INFORMATION" (*see* Figure 1, below), Defendants state (and have stated since at least the time this action was filed in November of 2020) that:

> Aftermarket changes or modifications made to certain single shot pistols (i.e. changing upper receivers, connecting gas tubes) may be considered manufacturing these pistols into assault weapons. See California Penal Code section 30515, subdivision (a)(1), for a list of assault weapon characteristics. The purchaser could be in violation of Penal Code section 30600, prohibiting the manufacture of assault weapons, and Penal Code section 30605(a), prohibiting the possession of unregistered assault weapons.

**[Figure 1]**

---

**IMPORTANT INFORMATION:**

- All handguns listed are approved with or without night sights.
- Aftermarket changes or modifications made to certain single shot pistols (i.e. changing upper receivers, connecting gas tubes) may be considered manufacturing these pistols into assault weapons. See California Penal Code section 30515, subdivision (a)(1), for a list of assault weapon characteristics. The purchaser could be in violation of Penal Code section 30600, prohibiting the manufacture of assault weapons, and Penal Code section 30605(a), prohibiting the possession of unregistered assault weapons.
- Alterations of a single shot pistol (i.e. changing upper receivers, connecting gas tubes) may also be considered manufacturing an unsafe handgun. See California Penal Code sections 31900-31910 for the definition of unsafe handguns and 32000(a) for more information on illegal acts involving unsafe handguns.

---

124.   Defendants' website also states (and has stated since at least November 2020) that: "Alterations of a single shot pistol (i.e. changing upper receivers, connecting gas tubes) may also be considered manufacturing an unsafe handgun. *See* California Penal Code sections 31900-31910 for the definition of unsafe handguns and 32000(a) for more information on illegal acts involving unsafe handguns." *Id.*

125.   Further, Defendants' "Legal Requirements for Self-made Firearms" publication[7] states (and has stated throughout all times relevant to this action) in pertinent part that: "If you intend to manufacture or assemble your own firearm— including through the use of 3D printing—you must ensure that the firearm is legal to possess or manufacture in California."

126.   Defendants' "Legal Requirements for Self-made Firearms" publication further states that: "Additionally, California law generally prohibits the manufacture of unsafe handguns. A self-manufactured handgun must meet certain design features under state law. A self-manufactured semiautomatic handgun, even if temporarily altered for single-shot firing, must include safety and security features, including: The firearm must incorporate a manually-operated safety device. The firearm must meet California's drop safety requirements. The firearm must be able to imprint certain identifying information on two locations on each cartridge case when fired." (Bullets and line breaks omitted.)

127.   The statutory basis for Defendants' warnings and admonishments about self-manufacturing is the general criminal prohibition under Penal Code § 32000(a)(1), which provides (and has provided at all times relevant here) that, "[a] person in [California] who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends an unsafe handgun shall be punished by imprisonment in a county jail not exceeding one year."

---

[7]   Available online at https://oag.ca.gov/system/files/attachments/press-docs/consumer-alert.pdf.

**C.    The AB 1621 Prohibitions**

128.   On June 30, 2022, California Governor Gavin Newsom signed AB 1621 into law (2021 – 2022 Reg. Sess.). AB 1621 amended or added multiple provisions of the Penal Code, including sections 29180, 29185, 30400, 27530(a), and 18010(d), imposing additional significant burdens on the ability of ordinary law-abiding Californians to engage in the lawful self-manufacture or assembly of constitutionally protected arms in common use for lawful purposes around the country.

129.   AB 1621 was enacted as an "urgency" statute, meaning that these provisions took effect immediately. *See* AB 1621, § 41.

**1.    The Prohibition Against Self-Manufacture of "Unsafe" Handguns**

130.   AB 1621 amended Penal Code § 29182 to *expressly* prohibit the self-manufacturing of constitutionally protected semi-automatic firearms that the State deems to be "unsafe handguns" or an "assault weapons." § 29182(c)(3)(A, B).

131.   Section 29182, as amended, also expressly states that the statutes do "not authorize a person to manufacture or assemble an unsafe handgun, as defined in Section 31910." § 29182(e)(2).

132.   Thus, while the State's regulatory scheme contains a mechanism for Californians to apply for and obtain approval to self-manufacture or assemble their own firearms, *see* Pen. Code §§ 29180(b) & 29182(a)-(b), AB 1621 now makes clear that Californians who, like Plaintiffs, and all similarly situated members of Institutional Plaintiffs, are not disqualified from exercising the right to keep and bear arms cannot apply for or receive from Defendants approval to self-manufacture or assemble any of the many common, constitutionally protected semi-automatic firearms used for lawful purposes that the State deems "unsafe."

1

2.     **The Prohibitions Against Firearm Precursor Parts**

2       133.   Further, AB 1621 adds significant restraints on the ability of ordinary

3   law-abiding Californians to access, lawfully possess, and use the parts and

4   components necessary and commonly used to self-manufacture constitutionally

5   protected firearms widely used for lawful purposes.

6       134.   Under Penal Code § 29180, *et seq*., as amended by AB 1621, California

7   now defines the scope of regulation on "manufacturing" or "assembling" a firearm

8   more broadly, as capturing the use of any "means to fabricate or construct a firearm,

9   including through additive, subtractive, or other processes, or to fit together the

10   component parts of a firearm to construct a firearm." Pen. Code, § 29180(a)(1).

11      135.   Under Section 10 of AB 1621, the Attorney General is specifically

12   permitted to "bring an action to enjoin the importation into the state or sale or transfer

13   of any firearm precursor part that is unlawfully imported into this state or sold or

14   transferred within this state."

15      136.   Penal Code section 29180(f), as added by AB 1621, § 22, provides

16   (italics added) that "[a] person, corporation, or firm shall not knowingly manufacture

17   or assemble, or *knowingly cause, allow, facilitate, aid, or abet the manufacture or*

18   *assembling of*, a firearm that is not imprinted with a valid state or federal serial

19   number or mark of identification."

20      137.   A violation of Section 29180(f) "is punishable by imprisonment in a

21   county jail not to exceed one year, or by a fine not to exceed one thousand dollars

22   ($1,000), or by both that fine and imprisonment" if the firearm at issue is a handgun.

23   Penal Code § 29180(g). For all other firearms, a violation of section 29180(f) "is

24   punishable by imprisonment in a county jail not to exceed six months, or by a fine

25   not to exceed one thousand ($1,000), or by both that fine and imprisonment." *Id.*

26      138.   Penal Code section 30400, as added by AB 1621, § 28, also criminalizes

27   the sale or transfer of federally unregulated firearm precursor parts.

28      139.   Specifically, section 30400(a) states, in relevant part, "it shall be

unlawful for a person to purchase, sell, offer to sell, or transfer ownership of any firearm precursor part in this state that is not a federal regulated firearm precursor part."

140.   Penal Code section 16519, as added by AB 1621 § 5, defines a "federally regulated firearm precursor part" as "any firearm precursor part deemed to be a firearm pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and any regulations issued pursuant thereto, and, if required, *has been imprinted with a serial number* by a federal licensee authorized to serialized firearms in compliance with all applicable federal laws and regulations." (Emphasis added).

141.   Additionally, Penal Code section 27530(a), as added by AB 1621 § 17, prohibits the sale or transfer of "a firearm that is not imprinted with a serial number imprinted by a federal licensee authorized to serialize firearms."

142.   The federal definition of a "firearm" under the Gun Control Act of 1968 includes "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

143.   Until up April 21, 2022, ATF regulations had defined "frames" and "receivers" as firearm components that are readily operational without any additional modification. *See* 27 C.F.R. §§ 478.11, 479.11 (defining a "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel").

144.   However, on April 22, 2022, ATF issued a Final Rule expanding the definition of a "frame" and "receiver," and in turn a "firearm," to include a "partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designated to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24735, 24739 (Apr. 26, 2022) (to be codified at 27 C.F.R. §§ 478.11 and 478.12).

145.   The Final Rule is schedule to take effect on August 24, 2022. *Id.* at 24652.

146.   On information and belief, the Final Rule is currently the subject of one or more legal challenges seeking to enjoin it from going into effect or being enforced.

147.   Unless and until the Final Rule comes into effect, California's de facto ban on the self-manufacture or assembly of constitutionally protected arms will continue to directly affected Plaintiffs, and all similarly situated members of Institutional Plaintiffs, because any precursor parts falling outside the current federal definition of "frame or receiver" (which are therefore not considered "firearms") are not federally regulated nor required to have a serial number, and thus do not otherwise qualify as "federally regulated precursor parts" under Penal Code § 16519.

148.   However, the California DOJ Bureau of Firearms has taken the position that until August 24, 2022, no firearm precursor part as defined by Penal Code section 16519 may be purchased, sold, offered for sale, or transferred in California unless an exception applies. https://oag.ca.gov/firearms (last visited August 21, 2022) ("Accordingly, from today [June 30, 2022] through August 23, 2022, the purchase, sale, offer to sell, or transfer of any firearm precursor part (as defined in Pen. Code §16531, subd. (a)) or federally regulated firearm precursor part (as defined in Pen. Code § 16519) is prohibited in California unless one of the exceptions below applies. Also, from today through August 23, 2022, California residents may not import, bring, or transport into California a firearm precursor part that the resident purchases from outside of this state unless an exception in Penal Code section 27585 applies. (Pen. Code §§ 16520, subd. (b)(15), 27585, subd. (a).")).

149.   This delay, according to the DOJ, bans *any* manufacture or commerce involving firearm precursor parts until the Final Rule goes into effect because no firearm precursor parts are "deemed to be a firearm pursuant to pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and any

regulations issued pursuant thereto." https://oag.ca.gov/firearms (last visited August 21, 2022); *see* Pen. Code § 16519.

150.   Further, the California DOJ Bureau of Firearms has taken the position that after August 24, 2022, only federally regulated firearm precursor parts may be purchased, sold, offered for sale, or transferred in California, unless a limited exception applies. https://oag.ca.gov/firearms (last visited August 21, 2022); *see* Pen. Code § 30400(b).

151.   Due to ATF's new and expansive definition of "firearm" in its Final Rule, this regulation works in conjunction with section 30400 to effectively ban the sale, transfer, or import into California of all incomplete frames, receivers, and other precursor parts required to self-manufacture a firearm.

152.   To enforce these new restrictions on the sale, transfer, or import of firearm precursor parts, Penal Code section 18010(d)(1), as added by AB 1621 § 10, empowers the Attorney General, a district attorney, or a city attorney to "enjoin the importation into the state or sale or transfer of any firearm precursor part that is unlawfully imported into [California] or sold or transferred within" California.

### 3.    The Ban on CNCs

153.   In addition, through AB 1621, the State has criminalized the use, sale, and ultimately the mere possession of CNC machines under a new ban.

154.   CNC milling is a standard machining process that employs computerized controls and rotating cutting tools to precisely remove material from a workpiece to produce a custom-designed part or product.

155.   The CNC milling begins with a virtual design of the final component, which the machine reads to generate coded instructions, and it then removes material from the workpiece using a series of precise movements along different paths and axes to produce the final design shape.

156.   This process can be used with a variety of materials, including plastic,

metal, wood, and glass, and it can create products for use in a wide range of industries, including aerospace, automotive, commercial, electronics, maintenance, medical, telecommunications, and transportation.

157.   CNC milling machines are also commonly used to manufacture a wide variety of firearm frames and receivers.

158.   CNC milling machines are the modern-day manifestation of firearm milling technology, which dates back to the early nineteenth century. *See, e.g.*, Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 92 Bus. Hist. Rev. 57, 64 (May 2018) (explaining that "Federal support of small arms manufacturing has been well documented," and that federal funds supported the development of the first firearm milling machine in the 1810s).

159.   However, Penal Code section 29185, as added by AB 1621, § 25, imposes sweeping restrictions that criminalize this process.

160.   Penal Code section provides, in relevant part, that:

> No person, firm, or corporation, other than a federally licensed firearms manufacturer or importer, shall use a computer numerical control (CNC) milling machine to manufacture a firearm, including a completed frame or receiver or a firearm precursor part[;]
> It is unlawful to sell, offer to sell, or transfer a CNC milling machine that has the sole or primary function of manufacturing firearms to any person in this state, other than a federally licensed firearms manufacturer or importer[; and]
> It is unlawful for any person in this state other than a federally licensed firearms manufacturer or importer to possess, purchase, or receive a CNC milling machine that has the sole or primary function of manufacturing firearms.

Penal Code § 29185(a)–(c).

161.   To avoid violating § 29185, any individual in California who possesses a CNC machine "that has the sole or primary function of manufacturing firearms"

before the effective date of AB 1621 (June 30, 2022) must, within 90 days after the effective date, take one of the following actions:

- Sell or transfer the machine to a federally licensed firearms manufacturer or importer;

- Sell or transfer the machine to a person described in paragraph (1) of § 29185(d);

- Remove the machine from the state;

- Relinquish the machine to a law enforcement agency; or,

- Otherwise lawfully terminate possession of the machine.

Penal Code § 29185(d)(3)(A)–(E).

162.   A violation of section 29185 "is punishable as a misdemeanor." Pen. Code § 29185(f).

163.   The Ghost Gunner is a general-purpose CNC milling machine that assists users in the manufacture or assembly of their own firearms through finishing 80%-complete frames and receivers of some of the most popular firearms in the United States, which are constitutionally protected arms, including the AR-15, AR-308, M1911, Polymer 80 and AK-47.

164.   Plaintiff Ruebe possesses a "Ghost Gunner" which he previously purchased to undertake multiple home-based CNC manufacturing projects, including the self-manufacture of firearms and specifically a handgun.

165.   Plaintiff Ruebe desires to continue to own, possess, and use his Ghost Gunner home CNC for all lawful purposes including, but not limited to, its use to self-manufacture constitutionally protected firearms.

166.   But for the ban on CNCs, Plaintiff Ruebe would continue to own, possess, and use his CNC machine for such purposes.

## II.   Senate Bill 1327 (2022)—California's Unconstitutional Suppression and Chilling of Legitimate Attempts to Challenge Unconstitutional Regulations

167.   On July 22, 2022, California Governor Gavin Newsom signed into law Senate Bill 1327 (2021 – 2022 Reg. Sess.) ("SB 1327").

168.   Among other changes to the State's laws, Section 2 of SB 1327 adds Section 1021.11 to the Code of Civil Procedure, which provides:

(a) Notwithstanding any other law, any person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms, or that represents any litigant seeking that relief, is jointly and severally liable to pay the attorney's fees and costs of the prevailing party.

(b) For purposes of this section, a party is considered a prevailing party if a court does either of the following: (1) Dismisses any claim or cause of action brought by the party seeking the declaratory or injunctive relief described by subdivision (a), regardless of the reason for the dismissal. (2) Enters judgment in favor of the party opposing the declaratory or injunctive relief described by subdivision (a), on any claim or cause of action.

(c) Regardless of whether a prevailing party sought to recover attorney's fees or costs in the underlying action, a prevailing party under this section may bring a civil action to recover attorney's fees and costs against a person, including an entity, attorney, or law firm, that sought declaratory or injunctive relief described by subdivision (a) not later than the third anniversary of the date on which, as applicable: (1) The dismissal or judgment described by subdivision (b) becomes final upon the conclusion of appellate review. (2) The time for seeking appellate review expires.

(d) None of the following are a defense to an action brought under subdivision (c): (1) A prevailing party under this section failed to seek recovery of attorney's fees or costs in the underlying action. (2) The court in the underlying action declined to recognize or enforce the

requirements of this section. (3) The court in the underlying action held that any provision of this section is invalid, unconstitutional, or preempted by federal law, notwithstanding the doctrines of issue or claim preclusion.

(e) Any person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief as described in subdivision (a), shall not be deemed a prevailing party under this section or any other provision of this chapter.

SB 1327, Sec. 2 (emphasis added).

169.   Section 2 of SB 1327 becomes effective on January 1, 2023.

170.   In the State's view, any party, and all lawyers and/or law firms representing their clients, who dares challenge a firearm regulation must subject themselves to significant joint and several liability under Section 2 of SB 1327.

171.   Section 2 of SB 1327 is a one-way ratchet—always in the government's favor—because "[a]ny person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief as described in subdivision (a)" of Cal. Code. Civ. Pro. Section 1021.11 "shall not be deemed a prevailing party under this section or any other provision of this chapter."

172.   And the liability is *strict* because the statute by its terms purports to cut off any conceivable defense, in expressly eliminating any defense on the basis that "[a] prevailing party under this section failed to seek recovery of attorney's fees or costs in the underlying action," "[t]he court in the underlying action declined to recognize or enforce the requirements of this section," and even that ["t]he court in the underlying action held that any provision of this section is invalid, unconstitutional, or preempted by federal law, notwithstanding the doctrines of issue or claim preclusion."

173.   And the government is considered the "prevailing party" if a court "[d]ismisses *any* claim or cause of action brought by the party seeking the declaratory or injunctive relief described by subdivision (a), regardless of the reason for the dismissal," or "[e]nters judgment in favor of the party opposing the

declaratory or injunctive relief described by subdivision (a), on *any* claim or cause of action." *Id.* (italics added).

174.   Under Section 2 of SB 1327, defendants can seek to recover their fees and costs from Plaintiffs, Plaintiffs' counsel, and Plaintiffs' counsels' respective firms even if, for example, Plaintiffs *prevail* on one or more claims but the Court dismisses any other claims as moot because Plaintiffs have already won and been afforded relief on one or more other counts, rendering decision of further counts unnecessary even if such counts are also meritorious, or based on later changes in circumstances *over which the Plaintiffs had no control* (such as repeal or other voluntary cessation), or even if one or more of the other claims is dismissed as part of a *voluntary* settlement or mutual agreement between the parties absent an express waiver of liability from all defendants under this statute.

175.   And the government defendants may seek to recover their fees and costs up to three years after the litigation concludes in a different state-court venue of their own choosing, notwithstanding that such liability is being imposed for entirely proper actions taken in federal court.

176.   Under Section 2 of SB 1327, the only way for a plaintiff, plaintiff's counsel, or plaintiff's counsel's firm to avoid liability for all of a defendant's attorney's fees and costs is to prevail *on all claims*.

177.   Indeed, because liability under Section 2 of SB 1327 attaches upon a dismissal for *any* reason, theoretically, the government could claim that the dismissal of the claims on behalf of former Plaintiff Spousta (because she moved out of the State while this case was pending) or the dismissal of the claims on behalf of former Plaintiff Richard Bailey (for failure to prosecute the claims) renders them, all the rest of the Plaintiffs, and all their attorneys liable under this law. To whatever extent the law could be construed to apply to a dismissal of claims under such circumstances, the absurdity of such results punctuates its absurdly unconstitutional nature.

178.   Moreover, while "there is no constitutional right to counsel in a civil

case," in the sense of being entitled to "*subsidized* access" to counsel as in the Sixth Amendment context, if a civil litigant "*hires* a lawyer, then certain protections kick in." *Adir International LLC v. Starr Indemnity and Liability Company*, 994 F.3d 1032, 1038-39 (9th Cir. 2021) (internal quotation marks omitted). This stems from "'[t]he fundamental requisite of due process of law is the opportunity to be heard.'" *Id.* at 1040 (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). "'Historically and in practice, [a hearing] has always included the right to the aid of counsel *when desired and provided by the party asserting the right*.'" *Id.* (quoting *Powell v. Alabama*, 287 U.S. 45, 68 (1932)). This protection prevents the government from "substantially interfer[ing] with a party's ability to communicate with his or her lawyer or actively prevent[ing] a party who is willing and able to obtain counsel from doing so." *Id.* at 1039-40.

179.   By threatening not only the individual litigants with the strict liability for raising legitimate challenges to firearms regulations but also any attorney and any associated law firm, this law "substantially interferes" with the litigants' due process rights.

180.   This action seeks "declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms," and will likely require years to litigate all claims in all courts after SB 1327 takes effect.

181.   And although Plaintiffs will dispute that this law may be applied retroactively to cases filed prior to the effective date of SB 1327, they face a genuine and serious risk that Defendants here will contend otherwise, either now or later, and that a state court could agree with them, at least through the initial stages of any subsequent fee litigation. Such risk alone imposes a present injury and chill on Plaintiffs' litigation choices in this case, both now and as the January 1, 2023 effective date approaches, and potentially chills and burdens their ability to obtain

the advice and assistance of legal counsel.

182.   To any extent Defendants may seek to apply SB 1327 retroactively, that would burden other aspects of due process as well. A California court would presumably agree if it addressed the question. "Just as federal courts apply the time-honored legal presumption that statutes operate prospectively 'unless Congress has clearly manifested its intent to the contrary' (*Hughes Aircraft Co. v. U.S. ex rel. Schumer* [520 U.S. , 939,  946 (1997)]), so too California courts comply with the legal principle that unless there is an 'express retroactivity provision, a statute will *not* be applied retroactively unless it is *very clear* from extrinsic sources that the Legislature ... must have intended a retroactive application (*Evangelatos* [v. *Superior Court*, 44 Cal.3d 1188, 1209 (1988)])." *Myers v. Philip Morris Companies, Inc.*, 28 Cal.4th 828, 841 (2002).

183.   "Retroactive laws are generally disfavored because the parties affected have no notice of the new law affecting past conduct. '[S]uch laws disturb feelings of security in past transactions.'" *Russell v. Superior Court*, 185 Cal.App.3d 810, 814 (1986) (quoting 2 Sutherland, Statutory Construction (4th ed. 1973) § 41.01, p. 253)). The presumption of prospective-only application ensures that courts avoid imposing "unexpected and potentially unfair consequences for all parties who acted in reliance on the then-existing state of the law" unless a legislative intent to apply the law retroactively "clearly appears." *Evangelatos*, 44 Cal.3d at 1217-18.

184.   Here, there is no "express retroactivity provision" and no indication in the legislative history of a "very clear" intent to rebut the presumption of prospective application and apply this law to cases like this, where the action was brought long before SB 1327's enactment (November of 2020) when the parties "acted in reliance on the then-existing state of the law." *Evangelatos*, 44 Cal.3d at 1217. Thus, the usual presumption holds and the law applies prospectively only.

185.   However, On August 17, 2022, the undersigned counsel for the former and current Plaintiffs sent counsel for Defendants a letter requesting to stipulate or

otherwise agree to waive enforcement of Section 2 of SB 1327 against the Plaintiffs in this case as well as Plaintiffs' attorneys and Plaintiffs' attorneys' respective firms, on the basis that the law does not retroactively apply to the claims in this case.

186.   This letter advised that if "we do not receive from defendants by no later than **12 p.m. Pacific time on Monday, August 22, 2022**, an agreement to stipulate to unconditional waiver and non-enforcement of CCP § 1021.11 in the manner stated above or an unequivocal statement otherwise making clear that defendants (and any officers, agents, servants, employees, or others acting in concert or participation with them in enforcing or implementing the laws at issue) will not enforce CCP § 1021.11 against any person with respect to this case, we will be forced to assume that defendants will not agree to a stipulation of waiver and non-enforcement of CCP § 1021.11 and that defendants do intend to enforce CCP § 1021.11 against one or more such persons with respect to this case."

187.   The letter further advised that "any statement that does not unequivocally stipulate to waiver and non-enforcement of CCP § 1021.11 on behalf of all defendants, such as a suggestion of a 'reservation of rights' or other equivocation as to waiver/non-enforcement, will be deemed to be confirmation that one or more defendants intend to seek remedies under CCP § 1021.11."

188.   Counsel for Defendants replied by email at 3:58 PM Pacific time (after the deadline of noon), saying, "We are in receipt of your letter dated August 17, 2022 in which you request we stipulate that CCP § 1021.11 does not apply to the Renna case. We take no position at this time, and nothing in this response should be construed as a position of any kind."

189.   In having taken no "position of any kind," effectively, Defendants have refused to agree to non-enforcement as to Plaintiffs, Plaintiffs' counsel, and Plaintiffs' counsels' firms, for any period of time, including prior to the statute's enactment, and they have further refused to agree that the statute does not retroactively apply to fees and costs that defendants incurred prior to the statute's

enactment or its enforcement on January 1, 2023.

190.   Consequently, Plaintiffs, Plaintiffs' counsel, and Plaintiffs' counsels' firms are faced with a credible threat and reasonable fear of joint and several liability for significant costs and fees and a credible threat and reasonable fear of enforcement as soon as January 1, 2023, or anytime thereafter within the statute of limitations period during which Defendants may seek to bring a fee-recovery action, on the basis that the court has dismissed any of Plaintiffs' claims seeking any declaratory or injunctive relief against any of Defendant for *any* reason.

191.   This threat necessitates the declaratory, preliminary, and permanent injunctive relief requested herein.

192.   Therefore, the Court should find this law is unenforceable to any extent that it may apply retroactively based on the challenges to its enforceability that Plaintiffs raise in Counts 4 through 7.

**COUNT ONE**
**42 U.S.C. § 1983**
**RIGHT TO KEEP AND BEAR ARMS**
**U.S. CONST., AMENDS. II AND XIV**
***The Purchase Ban***

193.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

194.   There is an actual and present controversy between the parties.

195.   The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. Plaintiffs, and all similarly situated members of Institutional Plaintiffs, who are all eligible to exercise their Second Amendment rights, wish to keep and bear constitutionally protected arms for self-defense and other lawful purposes.

196.   The Fourteenth Amendment to the United States Constitution provides in pertinent part:

1
2
3
4

No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

5    197.   The Second Amendment is fully applicable to the States through the
6    Fourteenth Amendment's Due Process and Privileges or Immunities Clauses.
7    *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id.* at 805 (Thomas, J.,
8    concurring).

9    198.   Because of the Defendants' enforcement of the laws, regulations,
10   policies, practices, and customs underlying the purchase prohibitions of the Handgun
11   Ban, Plaintiffs, and all similarly situated members of Institutional Plaintiffs, cannot
12   purchase new constitutionally protected arms without suffering criminal liability.

13   199.   Nothing in the "Nation's historical tradition of firearm regulation"
14   supports the heavy-handed purchase restrictions here. *Bruen*, 142 S. Ct. at 2130.

15   200.   Individuals in California have a right to keep and bear arms, including
16   but not limited to, buying, selling, transferring, self-manufacturing or assembling,
17   transporting, carrying, and practicing safety and proficiency with, firearms,
18   ammunition, magazines, and appurtenances, under the Second and Fourteenth
19   Amendments to the United States Constitution.

20   201.   This fundamental, individual right to keep and bear firearms includes
21   the right to acquire modern handguns in common use for lawful purposes—indeed,
22   arms that are lawfully sold and possessed throughout the United States—such as
23   those the Handgun Ban prevents common law-abiding citizens from purchasing at a
24   licensed retailer.

25   202.   The text of the Second Amendment, which guarantees "the right of the
26   people to keep and bear Arms," implicitly includes the right to so acquire firearms.
27   Further, the "right to keep arms, necessarily involves the right to purchase them, to
28   keep them in a state of efficiency for use, and to purchase and provide ammunition

1   suitable for such arms." *See Andrews v. State*, 50 Tenn. 165, 178 (1871); *accord*

2   *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (2017).

3       203.   Further, without constitutional protections for the acquisition as well as

4   the manufacturing of firearms, the "right of the people to keep and bear Arms" would

5   be in jeopardy. *See Ezell*, 651 F.3d at 704 (clarifying that "[t]he right to possess

6   firearms for protection implies a corresponding right to acquire and maintain

7   proficiency in their use; the core right wouldn't mean much without the training and

8   practice that make it effective."); *Ill. Ass'n of Firearms Retailers v. City of Chicago*,

9   961 F. Supp. 2d 928, 930, 938 (N.D. Ill. 2014) (holding that "the right to keep and

10  bear arms for self-defense under the Second Amendment . . . must also include the

11  right to acquire a firearm . . .").

12      204.   Contrary to the regulations like those in Penal Code sections 31900, *et*

13  *seq.* and 32000, *et seq.*, underlying the Handgun Ban and related Handgun Roster,

14  no founding era precedent exists for declaring "unsafe" and prohibiting the

15  commercial sale of firearms otherwise widely available and in common use for

16  lawful purposes among ordinary law-abiding citizens; such regulations only exist in

17  a handful of jurisdictions and all of them are of recent origin—the *earliest* was

18  Maryland's, enacted in 1988. Md. Code Ann., Pub. Safety § 5-405.

19      205.   The purchase prohibitions of the Handgun Ban prevent law-abiding

20  citizens, like and including Plaintiffs, and all similarly situated members of

21  Institutional Plaintiffs, from acquiring and thus possessing for lawful purposes

22  "instruments that constitute bearable arms" protected under the Second Amendment.

23      206.   These unprecedented regulations are plainly inconsistent with the

24  "Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130.

25  Accordingly, these restrictions on the purchase and acquisition of firearms fall

26  directly within—and are proscribed by—the Second Amendment's "unqualified

27  command." *Bruen*, 142 S. Ct. at 2130 (quoting *Konigsberg*, 366 U.S. at 50, n.10).

28      207.   The Handgun Ban's prohibition on the purchase of constitutionally

1  protected arms and maintenance of the Roster for purposes of enforcing this
2  proscription in the absence of the necessary historical precedent fails full stop under
3  *Bruen*, rendering them unconstitutional both facially and as applied in this case.

4      208.   "The very enumeration of the [Second Amendment] right takes out of
5  the hands of government . . . the power to decide on a case-by-case basis whether
6  the right is *really worth* insisting upon." *Heller*, 554 U.S. at 635 (emphasis in
7  original).

8      209.   The Second Amendment is not a "second-class right, subject to an
9  entirely different body of rules than the other Bill of Rights guarantees," *McDonald*,
10  561 U.S. 742, 780, and it cannot "be singled out for special—and especially
11  unfavorable—treatment." *Id.* at 778–79.

12      210.   *Bruen*, 142 S. Ct. 2111, made this clear by expressly rejecting all
13  interest balancing and the Ninth Circuit's prior "two-step" approach in the context
14  of Second Amendment claims.

15      211.   "*Heller* and *McDonald* do not support applying means-end scrutiny in
16  the Second Amendment context. Instead, the government must affirmatively prove
17  that its firearms regulation is part of the historical tradition that delimits the outer
18  bounds of the right to keep and bear arms." 142 S. Ct., at 2127. Rather, "*Heller* …
19  demands a test rooted in the Second Amendment's text, as informed by history. *Id.*

20      212.   Thus, *Bruen* makes clear that the Ninth Circuit's former two-step
21  approach and interest-balancing applied in *Peña v. Lindley*, 898 F.3d 969 (9th Cir.
22  2018), which previously upheld a prior version of some of the laws challenged
23  herein, are inapplicable and improper in Second Amendment cases.

24      213.   *Bruen* did not create a new test but instead applied the very test the
25  Court established in *Heller* in 2008. "The test that we set forth in *Heller* and apply
26  today requires courts to assess whether modern firearms regulations are consistent
27  with the Second Amendment's text and historical understanding." *Id.*, at 2131.

28      214.   "*Heller*'s methodology centered on constitutional text and history.

1   Whether it came to defining the character of the right (individual or militia
2   dependent), suggesting the outer limits of the right, or assessing the constitutionality
3   of a particular regulation, *Heller* relied on text and history. It did not invoke any
4   means-end test such as strict or intermediate scrutiny." *Id.*, at 2128-29.

5       215.   The plain text of the Second Amendment covers the conduct the
6   Plaintiffs, and all similarly situated members of Institutional Plaintiffs, wish to
7   engage in ("keep and bear arms") and the arms they wish to keep and bear. "[T]he
8   Second Amendment extends, prima facie, to all instruments that constitute bearable
9   arms," *Bruen*, 142 S. Ct., at 2132 (quoting *Heller*, 554 U. S., at 582).

10      216.   Since the conduct is covered by the Second Amendment's plain text,
11  "the Constitution presumptively protects that conduct. To justify its regulation, the
12  government . . . must demonstrate that the regulation is consistent with this Nation's
13  tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

14      217.   *Heller* has already established the relevant contours of the tradition:
15  Bearable arms that are presumptively protected by the Second Amendment cannot
16  be banned unless they are both dangerous *and* unusual.

17      218.   The Second Amendment's "reference to 'arms' does not apply 'only
18  [to] those arms in existence in the 18th century.' " *Bruen*, 142 S. Ct., at 2132 (quoting
19  *Heller*, 554 U. S., at 582). "Just as the First Amendment protects modern forms of
20  communications, and the Fourth Amendment applies to modern forms of search, the
21  Second Amendment extends, prima facie, to all instruments that constitute bearable
22  arms, even those that were not in existence at the time of the founding." *Id.* (citations
23  omitted).

24      219.   And "[w]hatever the likelihood that handguns were considered
25  dangerous and unusual during the colonial period, they are indisputably in common
26  use for self-defense today. They are, in fact, the quintessential self-defense weapon."
27  *Bruen*, 142 S. Ct. 2111, at 2143 (quoting *Heller*, 554 U. S., at 629, 128 S. Ct. 2783,
28  171 L. Ed. 2d 637) (cleaned up).

220. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense. Cf. *Caetano v. Massachusetts*, 577 U. S. 411, 411-412, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016) (*per curiam*) (stun guns)." *Id.*

221. Millions of handguns prohibited for sale to the State's law-abiding citizens are commonly possessed and used for self-defense and other lawful purposes in the vast majority of states, securing their protection from such regulation.

222. In the approximately 400-year history of the colonies and later the United States, no regulations at all like the Handgun Ban appeared until recently in only a few states. That is hardly a historical tradition of such regulations.

223. To reiterate, the Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms *shall not* be infringed."

224. Defendants are individually and collectively responsible for the formulation, issuance, implementation, and/or enforcement of the laws, regulations, policies, practices, and customs underlying the purchase prohibitions of the Handgun Ban.

225. Defendants have enforced and will continue to enforce the purchase prohibitions under the Handgun Ban against Individual Plaintiffs, Retailer Plaintiffs and their customers, and similarly situated Institutional Plaintiffs' members.

226. Defendants' enforcement of the purchase prohibitions under the Handgun Ban has prevented and continues to prevent Individual Plaintiffs, Retailer Plaintiffs' customers, and similarly situated Institutional Plaintiffs' members from purchasing new constitutionally protected handguns in violation of their rights protected under the Second and Fourteenth Amendments to the United States Constitution.

227. Individual Plaintiffs, Retailer Plaintiffs and their customers, and

similarly situated Institutional Plaintiffs' members reasonably fear that Defendants will enforce the purchase prohibitions under the Handgun Ban, including associated criminal laws and civil penalties, against them should they violate the same.

228.   42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

229.   Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the State of California not disqualified from exercising their fundamental, individual right to keep and bear arms, including Individual Plaintiffs, Retailer Plaintiffs' customers, and similarly situated Institutional Plaintiffs' members, through Defendants' enforcement and implementation of the purchase prohibitions under the Handgun Ban, which has denied, and will continue to infringe upon and prevent by criminal sanction, the exercise of the fundamental right to keep and bear arms unless and until redressed through the relief Plaintiffs seek herein.

230.   For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

231.   Because Defendants' enforcement of the purchase prohibitions under the Handgun Ban violates Plaintiffs' rights under the Second and Fourteenth Amendments to the United States Constitution, Plaintiffs are entitled to declaratory and injunctive relief.

**COUNT TWO**
**42 U.S.C. § 1983**
**RIGHT TO KEEP AND BEAR ARMS**
**U.S. CONST., AMENDS. II AND XIV**
*The De Facto Ban on Self-Manufacture and Assembly*

232.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

233.   There is an actual and present controversy between the parties.

234.   Because of the Defendants' enforcement of the AB 1621 Prohibitions and related laws, regulations, policies, practices, and customs that prohibit the self-manufacture and assembly of otherwise constitutionally protected arms, Plaintiffs, and all similarly situated members of Institutional Plaintiffs, cannot self-manufacture or assemble constitutionally protected arms without suffering criminal liability.

235.   Nothing in the "Nation's historical tradition of firearm regulation" supports the heavy-handed restrictions on the self-manufacture or assembly of constitutionally protected arms. *Bruen*, 142 S. Ct. at 2130.

236.   The fundamental, individual right to keep and bear firearms includes not only the right to acquire, but to self-manufacture or assemble common, modern handguns in common use for lawful purposes—indeed, arms that are lawfully sold and possessed throughout the United States—such as those that the AB 1621 Prohibitions and related laws, regulations, policies, practices, and customs prohibit ordinary law-abiding citizens from manufacturing or assembling.

237.   Contrary to the regulations like those in Penal Code sections 29180(f), 29185, 30400(a), 27530(a), and 18010(d) underlying the AB 1621 Prohibitions and related laws, regulations, policies, practices, and customs that prohibit ordinary law-abiding citizens from manufacturing or assembling otherwise constitutionally protected arms, there was no governmental regulation at all on the self-manufacturing or assembly of firearms—state or federal—until *2016*.

238.   Nevertheless, Defendants not only heavily regulate this activity without the necessary historical precedent, but under Penal Code section 29185, they prohibit any private person or company (except a "federally licensed firearms manufacturer or importer") from using modern technology—a CNC milling machine—to manufacture or assemble their own weapons. Even the mere sale, offer to sell, transfer, possession, purchase, or receipt of this technology subjects an individual to criminal liability, establishing a *confiscatory* ban. Penal Code § 29185(b)–(c), (f).

239.   Section 29180(f) similarly prohibits any person or company from manufacturing or "caus[ing], allow[ing], facilitat[ing], or abet[ting] the manufacture of" firearms—a prohibition that appears to apply broadly to companies that sell CNC milling machines.

240.   Likewise, the regulatory scheme in Penal Code sections 30400, 27530(a), and 18010(d) directly undermines the right to self-manufacture and assemble firearms because it all but prohibits individuals from acquiring the precursor materials required to construct modern, commonly used firearms.

241.   These unprecedented regulations are plainly inconsistent with the "Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. Accordingly, these restrictions on the self-manufacture and assembly of firearms fall directly within—and are proscribed by—the Second Amendment's "unqualified command." *Bruen*, 142 S. Ct. at 2130 (quoting *Konigsberg*, 366 U.S. at 50, n.10).

242.   Because Penal Code sections 29180(f), 29185, 30400, 27530(a), and 18010(d) underlying the AB 1621 Prohibitions and related laws, regulations, policies, practices, and customs that prohibit the self-manufacture and assembly of otherwise constitutionally protected arms, including but not limited to the confiscatory ban on CNCs, violate the Individual Plaintiffs', Retailer Plaintiffs' customers', and similarly situated Institutional Plaintiffs' members' rights under the Second and Fourteenth Amendments to the United States Constitution, they are invalid—both facially and as applied against the Plaintiffs in this action.

243.   Again, there were no restrictions on the manufacture or assembly of arms for personal use in America during the seventeenth, eighteenth, or nineteenth centuries. All such restrictions have been enacted in the last decade.[8]

244.   Self-manufactured and assembled arms were legal and commonplace at the time of the Founding and the ratification of the Second Amendment, and they clearly fall within the scope of "arms" that Americans have a right to keep and bear.

245.   While a handful of states have enacted anomalous laws concerning the self-manufacture and assembly of firearms, as noted, they date back only as early as 2016 and are plainly not indicative of any historical tradition.

246.   As with the ban on the purchase of constitutionally protected handguns, in the approximately 400-year history of the colonies and later the United States, no regulations at all like the California's de facto ban on the self-manufacture or assembly of firearms appeared until recently in only a few states. That is hardly a historical tradition of such regulations.

247.   Millions of handguns that the State prohibits ordinary law-abiding citizens from self-manufacturing or assembling are commonly possessed and used for self-defense and other lawful purposes in the vast majority of states.

248.   Moreover, the handgun designs and platforms concomitantly banned from personal manufacture and/or assembly by the State's citizens under the AB 1621 Prohibitions, and related laws, regulations, policies, practices, and customs that prohibit the self-manufacture and assembly of otherwise constitutionally protected arms, are commonly possessed and used for self-defense and other lawful purposes in the vast majority of states.

249.   Defendants' enforcement of the AB 1621 Prohibitions and related laws,

---

[8] *See* JOSEPH G.S. GREENLEE, *The American Tradition of Self-Made Arms*, 37 (published Nov. 10, 2021; last edited April 11, 2022), available online at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566) (to be published in Volume 54 of the ST. MARY'S LAW JOURNAL in 2022).

regulations, policies, practices, and customs that prohibit the self-manufacture and assembly of otherwise constitutionally protected arms, including associated criminal laws and civil penalties, has prevented and continues to prevent Individual Plaintiffs, Retailer Plaintiffs' customers, and similarly situated Institutional Plaintiffs' members from self-manufacturing or assembling constitutionally protected handguns, in violation of their rights protected under the Second and Fourteenth Amendments to the United States Constitution.

250.   Defendants' enforcement of the AB 1621 Prohibitions and related laws, regulations, policies, practices, and customs that prohibit the self-manufacture and assembly of otherwise constitutionally protected arms, including associated criminal laws and civil penalties against Individual Plaintiffs, Retailer Plaintiffs' customers, and similarly situated Institutional Plaintiffs' members, prevent all law-abiding people from lawfully self-manufacturing or assembling virtually all handguns, including semiautomatic handguns without microstamping technology, on pain of criminal sanction.

251. Individual Plaintiffs, Retailer Plaintiffs and their customers, and similarly situated Institutional Plaintiffs' members reasonably fear that Defendants will enforce the AB 1621 Prohibitions and related laws, regulations, policies, practices, and customs that prohibit the self-manufacture and assembly of otherwise constitutionally protected arms, including associated criminal laws and civil penalties, against them should they violate California's self-manufacture and assembly prohibitions.

252.   42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under color of state law.

253.   Defendants, individually and collectively, and under color of State law at all relevant times, have deprived the fundamental constitutional rights, privileges, and immunities of citizenship of adult persons in the State of California not disqualified from exercising their fundamental, individual right to keep and bear

arms, including Individual Plaintiffs, Retailer Plaintiffs' customers, and similarly situated Institutional Plaintiffs' members, through Defendants' enforcement and implementation of the AB 1621 Prohibitions and related laws, regulations, policies, practices, and customs that prohibit the self-manufacture and assembly of otherwise constitutionally protected arms, including associated criminal laws and civil penalties, which has denied, and will continue to infringe upon and prevent by criminal sanction, the exercise of the fundamental right to keep and bear arms unless and until redressed through the relief Plaintiffs seek herein.

254.   For all the reasons asserted herein, Defendants have acted in violation of, and continue to act in violation of, 42 U.S.C. § 1983, compelling the relief Plaintiffs seek.

255.   Because Defendants' enforcement of the AB 1621 Prohibitions and related laws, regulations, policies, practices, and customs that prohibit the self-manufacture and assembly of otherwise constitutionally protected arms, including associated criminal laws and civil penalties violates Plaintiffs' rights under the Second and Fourteenth Amendments to the United States Constitution, Plaintiffs are entitled to declaratory and injunctive relief.

**COUNT THREE**
**42 U.S.C. § 1983**
**RIGH TO EQUAL PROTECTION**
**U.S. CONST., AMEND. XIV**

256.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

257.   The Fourteenth Amendment to the United States Constitution provides in relevant part that no State shall deny to any person the equal protection of the laws.

258.   Among other exemptions, Penal Code section 32110 enumerates eleven (11) different exceptions to the Handgun Ban.

259.   Indeed, Cal. Penal Codes section 32110(h) completely exempts from the Handgun Ban "[t]he sale, loan, or transfer of any semiautomatic pistol that is to be used solely as a prop during the course of a motion picture, television, or video production by an authorized participant therein in the course of making that production or event or by an authorized employee or agent of the entity producing that production or event."

260.   Defendants' "Hollywood exemption" and numerous other exceptions to the Handgun Ban—*see*, *e.g.*, Cal. Penal Code. § 32110—further undermine the validity of any interested claimed by the Defendants, especially given the ban's burden and impact upon millions of ordinary law-abiding citizens whose rights are certainly not less important than those of "an authorized participant" of an entertainment production or event, or "authorized employee or agent of the entity producing that production or event." Indeed, those not subject to the Handgun Ban under the Defendants' "Hollywood exemption," for example, are not required to be any more or differently trained than the average law-abiding citizen.

261.   The State of California, through many elected members of the Legislature and governors, has a history of catering to its privileged and politically powerful friends in Hollywood by exempting them from gun control laws that would otherwise apply to them. *See*, *e.g.*, "The 'Hollywood' Gun Control Loophole," online at https://www.firearmspolicy.org/the-hollywood-gun-control-loophole (describing more than a dozen such exemptions).

262.   The Handgun Ban, and its exception that applies to participants in entertainment events, such as, but not limited to, actors and actresses, and other studio employees and contractors, provides just such an example.

263.   The Penal Code section 32110(h) exception to the Handgun Ban cannot survive scrutiny under any standard of review. There is no rational basis to allow a Hollywood actor, temporarily or otherwise, to take possession of and use an off-Roster handgun, merely by virtue of his or her status as a contractor or employee of

1  a movie or television production studio, while denying the same to millions of law-
2  abiding California citizens who have a fundamental, individual right to keep and
3  bear modern, off-Roster handguns for self-defense.

4     264.  Because the Handgun Ban implicates the Second Amendment rights of
5  law-abiding people, this Court must apply heightened scrutiny in its review of the
6  ban's unequal application to law-abiding adults, such as Individual Plaintiffs,
7  similarly situated members of Institutional Plaintiffs, and the customers of Retailer
8  Plaintiffs, who are in all relevant ways similarly situated to those who are exempted
9  from Defendants' enforcement of the Handgun Ban.

10     265.  Defendants' policies that they seek to enforce are discriminatory,
11  favoring through exemption a selected group of politically favored citizens while
12  against the great majority of law-abiding California citizens who have a need,
13  demonstrable utility for, and a constitutional right to acquire and use all legal
14  firearms, including handguns excluded from the Defendants' handgun Roster, for
15  self-defense and other lawful purposes.

16     266.  Defendants, individually and collectively, and under color of State law
17  at all relevant times, have deprived the fundamental constitutional rights, privileges,
18  and immunities of citizenship of adult persons in the State of California not
19  disqualified from exercising their fundamental, individual right to keep and bear
20  arms, including Individual Plaintiffs, Retailer Plaintiffs' customers, similarly
21  situated Institutional Plaintiffs' members, through Defendants' enforcement and
22  implementation of the Handgun Ban, which has denied, and will continue to infringe
23  upon and prevent by criminal sanction, the exercise of the fundamental right to keep
24  and bear arms through the ban's prohibition against the sale and transfer of off-
25  Roster handguns to some individuals while allowing others, including but not limited
26  to "an authorized participant [of an entertainment production or event] in the course
27  of making that production or event or by an authorized employee or agent of the
28  entity producing that production or event," in violation of the right to equal

protection of the laws, and are thus causing injury and damage that is actionable under 42 U.S.C. § 1983.

267.   Because Defendants' enforcement of the Handgun Ban violates Plaintiffs' rights, and those of Retailer Plaintiffs' customers and all similarly situated members of Institutional Plaintiffs, under the Fourteenth Amendment to the United States Constitution, Plaintiffs are entitled to declaratory and injunctive relief.

**COUNT FOUR**
**42 U.S.C. § 1983**
**RIGHT TO FREE SPEECH/PETITION/REDRESS**
**U.S. CONST., AMENDS. I, XIV**

268.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

269.   Again, this Court should find that to any extent section 2 of SB 1327 and specifically CCP 1021.11 may be enforceable in cases like this commenced before the effective date, it is unenforceable based on the challenges to the enforceability of the law under Counts 4 through 7.

270.   The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

271.   "Among other rights essential to freedom, the First Amendment protects "the right of the people ... to petition the Government for a redress of grievances." U.S. Const., Amdt. 1." *Borough of Duryea, Pa. v. Guarnier*, 564 U.S. 379, 382 (2011). "The right of access to the courts is subsumed under the first amendment right to petition the government for redress of grievances." *Soranno's Gasco, Inc. v. Morgan*, 874 F.3d 1310, 1314 (9th Cir. 1989).

272.   "The Framers envisioned the rights of speech, press, assembly, and petitioning as interrelated components of the public's exercise of its sovereign authority." *McDonald v. Smith*, 472 U.S. 479, 489 (1985) (Brennan, J., concurring).

273.   Defendants' refusal to agree to non-enforcement as to Plaintiffs, Plaintiffs' counsel, and Plaintiffs' counsels' firms, for any period of time, including prior to the statute's enactment, and their further refusal to agree that the statute does not retroactively apply to fees and costs that defendants incurred prior to the statute's enactment or its enforcement on January 1, 2023, leaves Plaintiffs, Plaintiffs' counsel, and counsels' firms under a credible threat and with a reasonable fear of facing an enforcement action under the statute, now or later, in which Defendants seek to recover from them potentially significant attorney's fees and costs on account of any dismissal of any claim for any reason.

274.   Thus, Plaintiffs are forced to seek relief against from this Court.

275.   Section 2 of SB 1327 violates Plaintiffs' rights, and the rights of Retailer Plaintiffs' customers and all similarly situated members of Institutional Plaintiffs, protected under the First Amendment.

276.   The right of access to the courts is one aspect of the right of petition that "cannot be impaired, either directly . . . or indirectly, by threatening or harassing [an individual] in retaliation for filing lawsuits," and "state officials may not take retaliatory action against an individual designed either to punish him for having exercised his constitutional right to seek judicial relief or to intimidate or chill his exercise of that right in the future." *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1427 (8th Cir. 1986). "Deliberate retaliation by state actors against an individual's exercise of this right is actionable under [42 U.S.C.] section 1983." *Morgan*, 874 F.3d. 1314.

277.   Section 2 of SB 1327, which imposes liability upon any party— including attorneys and law firms—who seeks declaratory or injunctive relief in a challenge to California's incredible number of unconstitutional and historically

1  unsupported restrictions on their Second Amendment rights is plainly intended to
2  suppress and chill challenges to unconstitutional legislation.

3      278.   The legal services and litigation covered by Section 2 of SB 1327 are a
4  means for Plaintiffs and their attorneys to achieve lawful objectives through the court
5  system, and they serve as a form of political expression.

6      279.   Under Section 2 of SB 1327, only litigants motivated to seek
7  declaratory or injunctive relief "to prevent this state, a political subdivision, a
8  governmental entity or public official in this state, or a person in this state from
9  enforcing any statute, ordinance, rule, regulation, or any other type of law that
10 regulates or restricts firearms," are punished for their advocacy in litigation.

11     280.   In contrast, Section 2 of SB 1327 does not impose a penalty on litigants
12 whose goal is to uphold such laws, or to challenge laws that expand restrictions or
13 regulations on firearms.

14     281.   Section 2 of SB 1327 directs the liability for fees and costs only at those
15 with a pro-right to keep and bear arms viewpoint who file claims having the content
16 of challenges seeking declaratory and injunctive relief against governmental
17 restrictions on the fundamental right to keep and bear arms.

18     282.   In both its purpose and effect, Section 2 of SB 1327 is a viewpoint- and
19 content-based restriction on Plaintiffs' arms-related advocacy, including their
20 petitioning activity. By threatening Plaintiffs and their attorneys with massive
21 liability for fees and costs, Section 2 of SB 1327 will necessarily chill the exercise
22 of rights to free speech and to petition activity protected by the First Amendment.

23     283.   Section 2 of SB 1327 violates the First Amendment right to petition the
24 government for a redress of grievances. *See In re Workers Comp. Refund*, 842 F.
25 Supp. 1211, 1218–19 (D. Minn. 1994), *aff'd sub nom. In re Workers' Comp. Refund*,
26 46 F.3d 813 (8th Cir. 1995) (finding that a similar fee shifting provision
27 unconstitutional because "[i]t is obvious to the Court that [the provision] was
28 purposefully inserted because the legislature knew [the statute] would incite a

challenge. This section can only be seen as an unconstitutional effort to forestall and encumber this predictable lawsuit. The legislature may not financially hobble an opponent to protect its enactment."); *see also United States v. Jackson*, 390 U.S. 570, 582 (1968) ("Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights."); *Coffey v. Cox*, 234 F. Supp. 2d 884, 891 (C.D. Ill. 2002) ("[A]n award of Defendants' attorneys' fees imposed against Plaintiff [under section 1988] may chill a future meritorious plaintiff from pursuing his civil rights action for fear of having to pay his opponent's attorney's fees should he ultimately be unsuccessful.").

284. *Bruen* holds that "[m]uch like we use history to determine which modern arms are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." 142 S. Ct. 2111, at 2132.

285. But because of Section 2 of SB 1327, parties are either chilled from seeking declaratory or injunctive relief against California's state or local gun control laws using such analogical reasoning or subjected to expansive liability for so doing.

286. Indeed, under California's regime, the only way to avoid the fee and liability-shifting SB 1327 would be to either not seek relief against potentially unconstitutional laws or seek declaratory or injunctive relief against a law with precisely the same terms and effects as one already expressly held to be unconstitutional by the U.S. Supreme Court, gaining nothing with respect to relief against potentially or likely unconstitutional laws.

287. California's chilling statutes are a retaliatory measure designed to conflict with, frustrate, and/or usurp the federal fee, cost, and liability arrangement for federal civil rights claims under 42 U.S.C. §§ 1983 and 1988.

288. Section 2 of SB 1327 limits the rights of Plaintiffs, Retailer Plaintiffs'

customers, and all similarly situated members of Institutional Plaintiffs, to speak freely and to petition the courts for relief, violates the First Amendment, and should be declared invalid and unenforceable.

289.   Because Section 2 of SB 1327 violates Plaintiffs' rights, and those of Retailer Plaintiffs' customers and all similarly situated members of Institutional Plaintiffs, under the First and Fourteenth Amendments to the United States Constitution, Plaintiffs are entitled to declaratory and injunctive relief.

**COUNT FIVE**
**42 U.S.C. § 1983**
**RIGHT TO EQUAL PROTECTION**
**U.S. CONST., AMEND. XIV**

290.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

291.   The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

292.   Under this Clause, statutes that create "classifications affecting fundamental rights" must be "given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

293.   SB 1327's fee-shifting provisions distinguish between plaintiffs seeking to vindicate their fundamental Second Amendment rights and all other plaintiffs seeking redress for violations of other rights, thereby burdening only Second Amendment plaintiffs' fundamental right to petition the government for a redress of grievances and thereby interfering with their ability to enjoy their Second Amendment rights.

294.   These provisions are therefore subject to strict scrutiny.

295.   SB 1327's fee-shifting provisions cannot satisfy strict scrutiny and indeed lack even a rational basis. Deterring plaintiffs from seeking judicial review

of any firearm regulation serves no legitimate rationale. Accordingly, SB 1327's fee-shifting provisions are facially unconstitutional.

296.   Because SB 1327 violates Plaintiffs' rights, and those of Retailer Plaintiffs' customers and all similarly situated members of Institutional Plaintiffs, under the Fourteenth Amendment to the United States Constitution, Plaintiffs are entitled to declaratory and injunctive relief.

<div align="center">

**COUNT SIX**
**PREEMPTION**
**U.S. CONST., ARTICLE VI – SUPREMACY CLAUSE**

</div>

297.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

298.   Article VI of the United States Constitution provides in pertinent part: "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

299.   Section 2 of SB 1327 would allow defendants in Section 1983 litigation to recover attorney's fees and costs if a court dismisses or rejects any claim against them in cases where a party seeks declaratory or injunctive relief "to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms."

300.   Section 2 of SB 1327 applies to "any person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief" and makes such parties "jointly and severally liable to pay the attorney's fees and costs of the prevailing party."

301.   The defendants could seek to recover their fees and costs from parties

and their attorneys in an entirely new proceeding before a different judge within three years of the resolution of the substantive claim. No showing of frivolousness, vexatiousness, or any other sanctionable conduct on the part of Plaintiffs would be required, because the statute imposes *strict* liability triggered by nothing more than a dismissal for *any* reason. CCP § 1021.11 (b)(1).

302. Section 2 of SB 1327 is preempted by 42 U.S.C. § 1988(b), which permits federal courts to award the prevailing party in a § 1983 action "a reasonable attorney's fee as part of the costs." *Cf. La Raza Unida v. Volpe*, 545 F. Supp. 36, 39 (N.D. Cal. 1982) (finding that § 1988 preempted conflicting state law requiring legislative appropriation before the California state defendants would satisfy a judgment).

303. 42 U.S.C. § 1988 sets out a comprehensive fee-shifting regime applicable to Section 1983 and certain other federal civil-rights claims, regardless of whether those claims are raised in state or federal court.

304. Section 1988 provides civil-rights plaintiffs with a clear right to recover their fees for covered claims where they are "prevailing parties." It also provides such plaintiffs with a clear right *not* to be liable for the fees and costs of a prevailing defendant unless a district court finds that the plaintiff's action was frivolous, unreasonable, or without foundation.

305. Section 1988 further delineates civil-rights plaintiffs' rights by instructing that a request for attorney's fees must be made in the "action or proceeding to enforce" a federal civil rights statute, including Section 1983, and that the fees, where assessed, are allowed only "as part of the costs." 42 U.S.C. § 1988(b).

306. Any sanctions under Rule 11 of the FRCP, for example, are to be "reserve[d] … for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988). ""Frivolous' filings are those that are 'both baseless and made without a

reasonable and competent inquiry."' *Buster v. Greisen*, 104 F.3d 1186, 1190 (9th Cir. 1997) (quoting *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir.1990)).

307.   It is also well-settled that this sanctioning power of the courts "must not be construed so as to conflict with the primary duty of an attorney to represent his or her client zealously." *A-C Co.*, 859 F.2d at 1344. "The simple fact that an attorney's legal theory failed to persuade the district court 'does not demonstrate that [counsel] lacked the requisite good faith in attempting to advance the law."' *Id.* (quoting *Hurd v. Ralphs Grocery Co.*, 824 F.2d 806, 811 (9th Cir.1987) (abrogated on other grounds in *Buster*, 104 F.3d at 1190, n. 4).

308.   This interpretation and application of Rule 11 is directly relevant here because the Supreme Court "promulgated the Federal Rules of Civil Procedure to 'govern the procedure in the United States district courts in all suits of a civil nature'" based on its authority under the Rules Enabling Act (28 U.S.C. § 2072). *Cooter & Gell v. Harmax Corp.*, 496 U.S. 384, 391 (1990) (quoting Fed.Rule Civ.Proc. 1).

309.   Because Section 2 of SB 1327 directly conflicts with Section 1988, frustrates Congress's objective in adopting it, violates the rights conferred on Plaintiffs by that federal statute, and contravenes the rules promulgated by the federal courts specifically designed to regulate the conduct of parties and their attorneys who bring lawsuits in federal court, it is preempted and may not be applied to Plaintiffs in this case or in any future Section 1983 litigation.

310.   Section 2 of SB 1327 is in conflict with and/or frustrates accomplishment of the core objectives of 42 U.S.C. §§ 1983 and 1988, and is thus preempted by federal law.

311.   Because SB 1327 preempted by federal law, Plaintiffs are entitled to declaratory and injunctive relief.

**COUNT SEVEN**
**42 U.S.C. § 1983**
**RIGHT TO DUE PROCESS**
**U.S. CONST., AMENDS. V, XIV**

312.   Plaintiffs incorporate herein by reference the foregoing paragraphs as if fully set forth herein.

313.   The Fifth Amendment to the United States Constitution provides that: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

314.   The Fourteenth Amendment to the United States Constitution provides in relevant part that: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

315.   This case was filed on November 10, 2020.

316.   SB 1327 was not even introduced in its initial form until February 18, 2022, was not passed by the State Legislature until June 29, 2022, and was not signed by Governor Newsom until July 22, 2022, nearly two years after this case was filed.

317.   Although Plaintiffs will contend that the fee-shifting statute under CCP 1021.11 does not apply retroactively and is thus completely unenforceable in this case and in any case commenced before the effective date of the law, Defendants' refusal to so stipulate or agree leaves Plaintiffs, their attorney, and their attorney's law firms under a credible threat and with a reasonable fear of facing an enforcement

1    under the law, as alleged herein.

2        318.   Section 2 of SB 1327 violates the due process clause of the Fifth

3    Amendment to whatever extent it may be interpreted apply retroactively.

4        319.   This law imposes liability and financial harm against all plaintiffs,

5    plaintiffs' lawyers, and the lawyers' firms who initiate actions seeking declaratory

6    or injunctive relief against government actors enforcing any and all gun control laws.

7        320.   The Plaintiffs, Plaintiffs' lawyers, and the Plaintiffs' lawyers' firms in

8    the instant case could not have known that they could be subjected to SB 1327's fee

9    and cost-shifting and one-way-ratchet liability scheme when they filed the case

10   seeking declaratory and injunctive relief.

11       321.   To the extent SB 1327 is construed to impose liabilities and penalties

12   retroactively to costs and fees incurred before its effective date, it is inconsistent with

13   the federal guarantee of due process because it fails to provide fair warning of its

14   prohibitions so that ordinary people may conform their conduct accordingly. Indeed,

15   Plaintiffs cannot retroactively conform their conduct to the terms of the statute.

16       322.   Moreover, the law contravenes the right to counsel of the plaintiffs in

17   this case and in every such case, in further violation of due process. *Adir*

18   *International LLC*, 994 F.3d at 1038-39 (9th Cir. 2021)

19       323.   Accordingly, to the extent SB 1327 applies retroactively and therefore

20   violates Plaintiffs' rights, and those of Retailer Plaintiffs' customers and all similarly

21   situated members of Institutional Plaintiffs, under the Fifth and Fourteenth

22   Amendments to the United States Constitution, Plaintiffs are entitled to declaratory

23   and preliminary and permanent injunctive relief.

24

25

26

27

28

**PRAYER FOR RELIEF**

1    WHEREFORE, Plaintiffs pray for the following relief:

2    1.    A declaratory judgment that Defendants' enforcement of the laws, regulations, policies, practices, and customs underlying the purchase prohibitions of the Handgun Ban prevent Individual Plaintiffs, Retailer Plaintiffs' customers, and similarly situated Institutional Plaintiffs' members who are not disqualified from exercising Second Amendment rights from purchasing new constitutionally protected arms, in violation of their right to keep and bear arms protected under the Second and Fourteenth Amendments to the United States Constitution;

3    2.    A declaratory judgment that Defendants' enforcement of the laws, regulations, policies, practices, and customs underlying the AB 1621 Prohibitions and related prohibitions against the self-manufacture and assembly of constitutionally protected arms prevent Individual Plaintiffs, Retailer Plaintiffs' customers, and similarly situated Institutional Plaintiffs' members who are not disqualified from exercising Second Amendment rights from self-manufacturing and assembling constitutionally protected arms, including through the possession and use of CNC machines, in violation of their right to keep and bear arms protected under the Second and Fourteenth Amendments to the United States Constitution;

4    3.    A declaratory judgment that Defendants' laws, regulations, policies, practices, and customs enforcing the Handgun Ban prevent Individual Plaintiffs, Retailer Plaintiffs' customers, and similarly situated Institutional Plaintiffs' members who are not disqualified from exercising Second Amendment rights from purchasing new, constitutionally protected handguns that are not on Defendants' Handgun Roster, while establishing exemptions for statutorily-created classes of individuals arbitrarily favored by the State of California, are in violation of the right to equal protection of the laws guaranteed under the Fourteenth Amendment to the United States Constitution;

5    4.    A declaratory judgment that Section 1021.11 of California Code of

Civil Procedure (Section 2 of SB 1327), to the extent it may apply to cases filed before its effective date, violates the rights of Plaintiffs, and those of Retailer Plaintiffs' customers and all similarly situated members of Institutional Plaintiffs, who, by and through their counsel, seek to exercise the speech and petition guaranties under the First Amendment to the United States Constitution.

5.     To any extent it may apply to cases filed before its effective date, a declaratory judgment that because Institutional Plaintiffs' advocacy, education, organizing, and lobbying activities, petitioning of the courts for relief, and support for individuals' right to keep and bear arms is protected by the First Amendment, they cannot be the basis for liability under Section 1021.11 of the California Code of Civil Procedure (Section 2 of SB 1327);

6.     To any extent it may apply to cases filed before its effective date, a declaratory judgment that Section 1021.11 of the California Code of Civil Procedure (Section 2 of SB 1327) violates the right to equal protection of the laws guaranteed under the Fourteenth Amendment to the United States Constitution;

7.     To any extent it may apply to cases filed before its effective date, a declaratory judgment that Section 1021.11 of the California Code of Civil Procedure (Section 2 of SB 1327) violates the Supremacy Clause of, and the First, Fifth, and Fourteenth Amendments to, the United States Constitution, and is preempted by 42 U.S.C. §§ 1983 and 1988, the authoritative rulings of the United States Supreme Court regarding the right to keep and bear arms, the Federal Rules of Civil Procedure promulgated to control the conduct of parties and their attorneys in federal lawsuits, and the res judicata effect and binding nature of federal court judgments and injunctions;

8.     To any extent it may apply to cases filed before its effective date, a declaratory judgment that Section 1021.11 of the California Code of Civil Procedure (Section 2 of SB 1327) violates the right to due process under the Fifth Amendment to the United States Constitution.

9.      An injunction restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them, and all persons who have notice of the injunction, from enforcing the purchase prohibitions of the Handgun Ban;

10.     An injunction restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them, and all persons who have notice of the injunction, from enforcing the AB 1621 Prohibitions and related prohibitions against the self-manufacture and assembly of constitutionally protected arms, including but not limited to the prohibitions against the possession and use of CNC machines;

11.     An injunction restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them, and all persons who have notice of the injunction, from enforcing the exemptions to the Handgun Ban and the AB 1621 Prohibitions;

12.     An injunction restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them, and all persons who have notice of the injunction, from enforcing against Plaintiffs, Retailer Plaintiffs' customers, and all similarly situated members of Institutional Plaintiffs, Section 1021.11 of the California Code of Civil Procedure (Section 2 of SB 1327);

13.     An injunction restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them, and all persons who have notice of the injunction, from enforcing Section 1021.11 of the California Code of Civil Procedure (Section 2 of SB 1327) against Plaintiffs' attorneys and each of their law firms;

14.     An injunction restraining Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them, and all persons who have notice of the injunction, from enforcing against Section 1021.11 of the California Code of Civil Procedure (Section 2 of SB 1327) against Plaintiffs'

1  attorneys and each of their law firms;

2      15.    Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other

3  applicable law;

4      16.    That this Court retain jurisdiction after judgment for the purposes of

5  resolving any future fee disputes between the parties and issuing further appropriate

6  injunctive relief if the Court's declaratory judgment(s) is/are violated; and,

7      17.    All other and further legal and equitable relief, including injunctive

8  relief, against Defendants as necessary to effectuate the Court's judgment, or as the

9  Court otherwise deems just and equitable.

10

11              Respectfully submitted this 22nd day of August 2022.

12

13                          /s/*Raymond M. DiGuiseppe*
                            Raymond M. DiGuiseppe
14                          The DiGuiseppe Law Firm, P.C.
                            4320 Southport-Supply Road, Suite 300
15                          Southport, NC 28461
16                          Tel.: 910-713-8804
                            Email: law.rmd@gmail.com
17                          Attorney for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28