1
2
3

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

4
5
6
7

Michael P. Sousa
LAW OFFICES OF MICHAEL P. SOUSA, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
P: 858-453-6122
E: msousa@msousalaw.com

8

*Attorneys for Plaintiffs*

9
10

# UNITED STATES DISTRICT COURT

11

## SOUTHERN DISTRICT OF CALIFORNIA

12
13
14

Lana Rae Renna, et al.,

              Plaintiffs,

15
16
17

    v.

Robert Bonta, Attorney General of
California, et al.,

18
19

            Defendants.

20
21
22
23
24
25
26
27
28

Case No.: 20-cv-2190-DMS-DEB

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

Date:  October 7, 2022
Time:  1:30 p.m.
Department: 13A
Hon.: Dana M. Sabraw

1

<u>**Table of Contents**</u>

2  **Introduction**…………………………………………………………**1**

3  **Background**…………………………………………………………**2**

4      **A.**   **SB 1327 creates a fee-shifting penalty to insulate firearms**

5            **restrictions from judicial review**……………………………...**2**

6      **B.**   **AB 1621 bans tools used for the self-manufacture of constitutionally**

7            **protected arms**…………………………………………………**3**

8  **Legal Standard**……………………………………………………...**5**

9  **Argument**

10      **I.**   **Plaintiffs are likely to succeed on the merits of their § 1021.11**

11         **claims**…………………………………………………………...**5**

12         **A.**   **CCP § 1021.11's one-way fee-shifting regime violates**

13            **Plaintiffs' First Amendment rights to free speech, petitioning,**

14            **and association**………………………………………………**5**

15            **1.**   **CCP § 1021.11 violates the right to petition for a redress**

16                 **of grievances against gun control laws**…………………**6**

17            **2.**   **CCP § 1021.11 discriminates based on viewpoint, in**

18                 **violation of the First Amendment**………………………**8**

19         **B.**   **Section 1021.11 is preempted by 42 U.S.C. §§ 1983, 1988, and**

20            **the Federal Rules of Civil Procedure**…………………………**10**

21            **1.**   **Sections 1983 and 1988 preempt CCP § 1021.11**……..**11**

22            **2.**   **The Federal Rules of Civil Procedure preempt**

23                 **§ 1021.11**……………………………………………...**15**

24         **C.**   **CCP § 1021.11 violates the Equal Protection Clause**………...**17**

25         **D.**   **CCP § 1021.11 violates the Due Process Clause**……………...**18**

26            **1.**   **Retroactively applying § 1021.11 would violate Due**

27                 **Process**…………………………………………………...**18**

28

1

## Table of Contents (continued)

2 **Argument I.D. (continued)**

3         **2.     CCP § 1021.11 damages the attorney-client relationship**

4             **in violation of Due Process………………………………..19**

5     **II.    Plaintiffs are likely to succeed on their claims against the**

6         **CNC Ban…………………………………………………………...21**

7     **III.   Plaintiffs will suffer immediate, irreparable harm absent an**

8         **injunction……………………………………………………………23**

9     **IV.   The remaining factors support an injunction………………………24**

10     **V.    This Court should issue the requested injunction without**

11         **Security……………………………………………………………….24**

12 **Conclusion…………………………………………………………………….25**

13

## Table of Authorities

14 *Cases*

15 *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)……………5

16 *Barry v. Fowler*, 902 F.2d 770 (9th Cir. 1990)……………………………………14

17 *Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1 (1964)…………7

18 *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011)………………………………6

19 *Buster v. Greisen*, 104 F.3d 1186 (9th Cir. 1997)……………………………………17

20 *California Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)……………6

21 *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)…………………………9

22 *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003)………8

23 *City of Riverside v. Rivera*, 477 U.S. 561 (1986)……………………………………13

24 *Clark v. Jeter*, 486 U.S. 456 (1988)…………………………………………………17

25 *Coffey v. Cox*, 234 F. Supp. 2d 884 (C.D. Ill. 2002)…………………………………12

26 *Coleman v. McCormick*, 874 F.2d 1280 (9th Cir. 1989)……………………………21

27 *Cooter & Gell v. Harmax Corp.*, 496 U.S. 384 (1990)………………………………15

28 *Detraz v. Fontana*, 416 So.2d 1291 (La. 1982)……………………………………..9, 15

**Table of Authorities (continued)**

*Cases*

*Evangelatos v. Superior Court*, 44 Cal.3d 1188 (1988)……………………………..19

*Evans v. Jeff D*, 475 U.S. 717 (1986)…………………………………………………..13

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978)………………………....8, 23

*Fox v. Vice*, 563 U.S. 826 (2011)…………………………………………...12, 13, 14, 16

*Harris v. Maricopa Cty. Super. Ct.*, 631 F.3d 963 (9th Cir. 2011)…………………15

*Hensley v. Eckerhart*, 461 U.S. 424 (1983)……………………………………..3, 11, 12, 15

*Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997)…………………19

*Hurd v. Ralphs Grocery Co.*, 824 F.2d 806 (9th Cir.1987)………………………..17

*In re Primus*, 436 U.S. 412 (1978)……………………………………………………5, 6

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.)* 959 F.3d 1201 (9th Cir. 2020)…………………………………………………..11

*In re Workers Comp. Refund*, 842 F. Supp. 1211 (D. Minn. 1994)………………..7, 9

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022)……………………………………19, 24

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003)……………………………24

*Kay v. Ehrler*, 499 U.S. 432 (1991)…………………………………………...13, 15

*Landgraf v. USI Film Prod.*, 511 U.S. 244 (1994)……………………………18, 20

*La Raza Unida v. Volpe*, 545 F. Supp. 36 (N.D. Cal. 1982)…………………………12

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012)……………………………17

*Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001)…………………………7, 8

*Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011)……………………………5

*Matter of U. S. Fin., Inc.*, 594 F.2d 1275 (9th Cir. 1979)……………………………20

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)……………………………24

*Myers v. Philip Morris Companies, Inc.*, 28 Cal.4th 828 (2002)……………………19

*NAACP v. Button*, 371 U.S. 415 (1963)……………………………………5, 6, 7, 8

*Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968)………………………13

*NYSRPAss'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)………………1, 9, 15, 21, 22, 23

**<u>Table of Authorities (continued)</u>**

*Cases*

*Nken v. Holder*, 556 U.S. 418 (2009)……………………………………………..24

*Operating Eng'rs Pension Trust v. A-C Co.*, 859 F.2d 1336 (1988)…………………16

*Paradis v. Arave*, 130 F.3d 385 (9th Cir. 1997)…………………………………...20

*R.J. Reynolds Tobacco Co. v. Ciy. Of L.A.,* 29 F.4th 542 (9th Cir. 2022)……….11, 14

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013)………………………………24

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020)…………………23

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995)…………..8

*Schroeder v. Irvine City Council*, 118 Cal. Rptr. 2d 330 (Cal. Ct. App. 2002)………10

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010)……16

*Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1989)…………………….6

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011)…………………………………...8

*Turner v. Ass'n of Am. Med. Colls.*, 193 Cal.App.4th 1047 (2011)…………………..9

*United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*
389 U.S. 217 (1967)………………………………………………………..7

*United States v. Irwin*, 612 F.2d 1182 (9th Cir. 1980)………………………………20

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000)…………………....10

*United States v. Stevens*, 559 U.S. 460 (2010)………………………………………9

*Ventress v. Japan Airlines*, 747 F.3d 716 (9th Cir. 2014)……………………………11

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973)………………………………10

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)………………………...5

*Statutes*

Cal. Code of Civ. Proc. § 1021.11……………………………………*passim*

Cal. Bus. & Prof. Code §§ 22949.60–.71……………………………………2

Cal. Pen. Code § 29185……………………………………………*passim*

Title 28 of the United States Code § 2072……………………………15

1

**<u>Table of Authorities (continued)</u>**

2

*Statutes*

3

    Title 42 of the United States Code § 1983……………………………….*passim*

4

    Title 42 of the United States Code § 1983……………………………….*passim*

5

6

*United States Constitution*

7

    Article VI………………………………………………………………11

8

    First Amendment ……………………………………………………….*passim*

9

    Second Amendment………………………………………………………*passim*

10

    Fourteenth Amendment……………………………………………*passim*

11

12

*Federal Rules of Civil Procedure*

13

    Rule 11…………………………………………………………………16

14

15

*Legislative History*

16

    H.R. Rep. No. 94–1558 (1976)………………………………………………15

17

    S. Rep. No. 94-1011 (1976)……………………………………………12, 15

18

    Cal. Assembly Comm. On Judiciary, Analysis of SB 1327 (6/14/22)………...17

19

20

*Publications*

21

22

    11A Charles Alan Wright, et al., *Federal Practice & Procedure*
    § 2948.1 (3d ed. 2013)

23

    *Governor Newsom Responds to Supreme Court Decision on*
    *Concealed Carry*, Office of Governor Gavin Newsom

24

    (June 23, 2022), https://tinyurl.com/NewsomBruen.......................................23

25

26

    JOSEPH G.S. GREENLEE, *The American Tradition of Self-Made*
    *Arms*, (published Nov. 10, 2021; last edited April 11, 2022), available

27

    online at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566)
    (to be published in Volume 54 of ST. MARY'S LAW JOURNAL in 2022)…22

28

## <u>Table of Authorities (continued)</u>

*Publications*

Letter from Sec'y of State Thomas Jefferson to George Hammond,
British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS
OF THOMAS JEFFERSON 325 (Paul Ford ed., 1904)..........................22

Lindsay Schakenbach Regele, *Industrial Manifest Destiny:*
*American Firearms Manufacturing and Antebellum Expansion*, 92 Bus.
Hist. Rev. 57 (May 2018)………………………………………………..21

M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE
IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980)...22

# **INTRODUCTION**

The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. CONST. AMEND. II. Plaintiffs, who are all eligible to exercise their Second Amendment rights and wish to keep and bear constitutionally protected arms for lawful purposes, filed this action in good faith. But California Code of Civil Procedure § 1021.11, enacted in Section 2 of Senate Bill 1327, punishes litigants and their attorneys for daring to challenge the State's unconstitutional restrictions on this fundamental right, and imposes onerous fee liability on all plaintiffs and attorneys who seek declaratory or injunctive relief against any state or local California gun law and who, for whatever reason, do not prevail on each and every claim they bring. That is an unconstitutional attempt to deter and punish those bringing non-frivolous claims to enforce the Second Amendment and other constitutional or statutory limits against California's onerous gun restrictions. Section 1021.11 indefensibly challenges the supremacy of federal law, trampling on the First and Fourteenth Amendments in its unprecedented effort to erase the Second from the Constitution. The statute will cause irreparable harm to Californians and should be immediately enjoined.

Case in point, recently enacted Assembly Bill 1621 imposes a total confiscatory ban on tools used for the lawful self-manufacture of constitutionally protected firearms (the "CNC Ban"). This law criminalizes the possession, transfer, and use of what are known as Computerized Numerical Code (CNC) milling machines that can be used to fabricate parts for the lawful construction of a common, constitutionally protected firearm. The CNC Ban cannot be defended under any historical understanding of the right to keep and bear arms—which is the controlling constitutional standard. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). Private gunsmithing and self-manufacture of arms were well accepted and affirmatively encouraged in colonial times and thereafter. Because the CNC Ban imminently will impose criminal liability for the mere possession of a CNC mill used for lawfully self-manufactured firearms, it should be immediately enjoined.

**BACKGROUND**

**A.    SB 1327 creates a fee-shifting penalty to insulate firearms restrictions from judicial review.**

On July 22, 2022, California Governor Gavin Newsom signed SB 1327 into law. The bulk of SB 1327 is devoted to creating a private right of action to allow and incent private parties to enforce state laws restricting certain firearms. 2022 Cal. Stat. ch. 146, § 1 (adding Bus. & Prof. Code §§ 22949.60–.71). This case challenges only SB 1327's radical effort to suppress pro-Second Amendment litigation by putting civil rights litigants *and their attorneys* on the hook for the government's attorney's fees if a case results in anything short of victory on each and every claim alleged in a complaint. The bill provides, in relevant part:

> Notwithstanding any other law, any person, including an entity, attorney, or law firm, who seeks declaratory or injunctive relief to prevent this state, a political subdivision, a governmental entity or public official in this state, or a person in this state from enforcing any statute, ordinance, rule, regulation, or any other type of law that regulates or restricts firearms, or that represents any litigant seeking that relief, is jointly and severally liable to pay the attorney's fees and costs of the prevailing party.

2022 Cal. Stat. ch. 146, § 2 (adding CCP § 1021.11(a)).

Unlike any other "fee shifting" statutes, however, SB 1327 says a "prevailing party" *cannot be a plaintiff* who challenges a state or local firearm regulation. § 1021.11(e). And it says a government defendant in a firearms case will be treated as a "prevailing party" if the court either "[d]ismisses *any* claim or cause of action" in the case, "regardless of the reason for the dismissal," or "[e]nters judgment in favor of the [government] party" "on *any* claim or cause of action." § 1021.11(b) (emphasis added). In simple terms, government defendants will be able to recover fees if a firearms plaintiff loses *on any claim for any reason* while the plaintiff can only avoid liability for fees if it prevails on *every claim* in the case.

SB 1327 further gives these "prevailing" government defendants three years to bring a fee recovery action in state court, § 1021.11(c), even though the vast majority of firearm-rights litigation is brought in federal court under 42 U.S.C. § 1983, and

even though 42 U.S.C. § 1988(b) already provides that "prevailing part[ies]" in such actions may recover "a reasonable attorney's fee as part of [their] costs." Under Section 1988, "a prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). By contrast, prevailing governmental *defendants* may only recover fees when "where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Id.* n.2 (citations omitted).

SB 1327 remarkably asserts that it applies regardless of what any federal court does in an underlying Section 1983 case, and regardless whether "*[t]he court in the underlying action held that any provision of this section is invalid, unconstitutional, or preempted by federal law*, notwithstanding the doctrines of issue or claim preclusion." § 1021.11(d)(3) (emphasis added).

Injunctive relief is needed to ensure that Plaintiffs (and their lawyers) can proceed with this action without facing the threat of liability for significant fees and costs if this litigation is unsuccessful in any, even minor, respect. Before filing the Second Amended Complaint, Plaintiffs' counsel asked the Defendants' counsel if they would agree not to enforce § 1021.11. Defendants declined to do so. Second Am. Compl. ¶¶ 185–188. Consequently, Plaintiffs, Plaintiffs' counsel, and counsels' firms face an ominous threat if they proceed with the case absent injunctive relief.

## B.   AB 1621 bans tools used for the self-manufacture of constitutionally protected arms.

AB 1621 bans the acquisition, use, and mere possession of CNC milling machines commonly used in the process of self-manufacturing or assembling constitutionally protected arms for lawful purposes. Enacted as an "urgency" statute, AB 1621's provisions took effect immediately. AB 1621 § 41.

CNC milling is a standard machining process that employs computerized controls and cutting tools to precisely remove material from a workpiece to produce

all manner of custom-designed parts or products. CNC milling machines are also commonly used to manufacture a wide variety of firearm frames and receivers. Penal Code § 29185, as added by AB 1621, § 25, imposes sweeping restrictions that criminalize this process. It provides, in relevant part, that:

> No person, firm, or corporation, other than a federally licensed firearms manufacturer or importer, shall use a computer numerical control (CNC) milling machine to manufacture a firearm, including a completed frame or receiver or a firearm precursor part[;]
>
> It is unlawful to sell, offer to sell, or transfer a CNC milling machine that has the sole or primary function of manufacturing firearms to any person in this state, other than a federally licensed firearms manufacturer or importer[; and]
>
> It is unlawful for any person in this state other than a federally licensed firearms manufacturer or importer to possess, purchase, or receive a CNC milling machine that has the sole or primary function of manufacturing firearms.

Penal Code § 29185(a)–(c).

To avoid violating § 29185, any individual in California who possessed a prohibited CNC machine before the effective date of AB 1621 (June 30, 2022) must, within 90 days after that date, sell, transfer, relinquish possession, or otherwise remove from the State any such device in their possession or face a misdemeanor charge. Penal Code § 29185(d)(3)(E), § 29185(f).

Plaintiff Ruebe possesses a CNC machine which he purchased for multiple home CNC projects, including the lawful self-manufacture of firearms. Plaintiff Ruebe desires to continue to own, possess, and use his CNC for all lawful purposes including, but not limited to, its use to self-manufacture constitutionally protected firearms, and he would do so but for the CNC Ban. However, on or before September 28, 2022, Plaintiff Ruebe will be forced to dispossess himself of his CNC machine or face criminal liability.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011). Under the Ninth Circuit's sliding-scale approach, a strong showing on one element will compensate for a weaker showing on another element and still support injunctive relief. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## ARGUMENT

**I.      Plaintiffs are likely to succeed on the merits of their § 1021.11 claims.**

**A.      CCP § 1021.11's one-way fee-shifting regime violates Plaintiffs' First Amendment rights to free speech, petitioning, and association.**

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. 1. CCP § 1021.11 violates Plaintiffs' rights to petition, to speak, and to associate for those purposes.

This is not the first time a state has erected and enforced regulatory barriers to thwart civil rights litigation. The Supreme Court rebuffed Virginia's attempt to keep the NAACP out of court in *NAACP v. Button*, 371 U.S. 415 (1963) (ban on "improper solicitation" of legal business used to thwart civil rights suits), and struck down South Carolina's efforts to punish the ACLU's counsel in *In re Primus*, 436 U.S. 412 (1978) (prohibition of solicitating prospective litigants). But with Section 1021.11, California has taken an unusually brazen approach: It targets only plaintiffs challenging firearm regulations, encourages state and local governments to push the constitutional envelope on those regulations, and dares would-be plaintiffs to sue under threat of a ruinous fee award. The First Amendment forbids this gambit.

### 1. CCP § 1021.11 violates the right to petition for a redress of grievances against gun control laws.

The First Amendment right to petition the government for redress of grievances includes the right of access to the courts. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition") (internal quotation omitted); *California Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (same); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (same). Indeed, the Supreme Court has long held that public-interest litigation is a protected "form of political expression" that is essential to secure civil liberties, particularly for groups and rights that are politically unpopular: groups "unable to achieve their objectives through the ballot frequently turn to the courts . . . . [U]nder the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances." *Button*, 371 U.S. at 429–30.[1]

First Amendment "freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." *Button*, 371 U.S. at 433. "[A] statute broadly curtailing group activity leading to litigation may easily become a weapon of oppression . . . . Its mere existence could well freeze out of existence" the targeted civil litigation. *Id.* at 435–36. Unlike the selective enforcement of general laws to suppress litigation by the NAACP, *id.* at 423–25, California makes no attempt to conceal its true purpose and targets firearms litigants on the face of CCP § 1021.11.

---

[1] The organizational plaintiffs in this case in part exist to support gun owners in asserting their constitutional rights in litigation against governments. The right to petition is closely connected with freedom of association, and "association for litigation may be the most effective form of political association." *Button*, 371 U.S. at 431. *See also*, *In re Primus*, 436 U.S. at 426 ("collective activity undertaken to obtain meaningful access to the courts is a fundamental right").

Since *Button*, the Supreme Court has consistently enjoined state action that could chill petitioning activity. *See, e.g.*, *Bhd. of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 7 (1964) (state cannot "handicap[]" "the right to petition the court" through indirect regulation that "infringe[s] in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest"); *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 222–23 (1967) (state cannot "erode [the First Amendment's] guarantees by indirect restraints" on citizens' ability to assert their legal rights).

As the Court explained in *United Mine Workers*, "[t]he First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such." 389 U.S. at 222. Indeed, "[d]eliberate retaliation by state actors against an individual's exercise of this right is actionable under [42 U.S.C.] section 1983." *Soranno's Gasco*, 874 F.2d at 1314.

The obvious and impermissible purpose of § 1021.11 is to give the State and political subdivisions a free hand to regulate firearms, even unconstitutionally, by suppressing litigation that challenges such regulations. In *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), the Supreme Court struck down a federal law that prohibited recipients of legal services funding from challenging the constitutionality of welfare laws. *Id.* at 547–49. The court found that "the restriction operates to insulate current welfare laws from constitutional scrutiny and certain other legal challenges, a condition implicating central First Amendment concerns." *Id.* at 547. It cautioned that "[w]e must be vigilant when Congress imposes rules and conditions which in effect insulate its own laws from legitimate judicial challenge." *Id.* at 548-49; *see also*, *In re Workers Comp. Refund*, 842 F. Supp. 1211, 1218–19 (D. Minn. 1994) (requiring challengers of statute to pay state's attorney fees "impermissibly burden[ed their] First Amendment right of access to the courts. . . . The legislature may not financially hobble an opponent to protect its enactment."), *aff'd* 46 F.3d 813, 822 (8th Cir. 1995).

As in *Velazquez*, so too here: § 1021.11 "is designed to insulate [California's] interpretation of the Constitution from judicial challenge," 531 U.S. at 548, and is "aimed at the suppression of ideas thought inimical to the Government's own interest," *id.* at 549. California has targeted "members of an unpopular minority" who seek to vindicate an "unpopular cause[ ]" by using fee-shifting as "a weapon of oppression" to "freeze out of existence" firearms-rights litigation. *Button*, 371 U.S. at 434–36. The state cannot "impose[ ] rules and conditions which in effect insulate its own laws from legitimate judicial challenge." *Velazquez*, 531 U.S. at 548.

### 2. CCP § 1021.11 discriminates based on viewpoint, in violation of the First Amendment.

CCP § 1021.11's fee-shifting regime imposes a one-sided burden on those who seek to vindicate their civil rights through firearms litigation. It is a modern-day anti-sedition law, punishing those who would dare challenge the government's views and actions regarding firearms. California targets no other sort of civil rights claim for such treatment. Laws that impose special burdens on disfavored speech and single out disfavored speakers are constitutionally suspect. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564–66 (2011). States are not permitted to advance their policy goals "through the indirect means of restraining certain speech by certain speakers," *id.* at 577, and "may not burden the speech of others in order to tilt public debate in a preferred direction," *id.* at 578–79. Indeed, "the First Amendment is plainly offended" when the government "attempt[s] to give one side of a debatable public question an advantage in expressing its views to the people." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785–86 (1978). Because the California legislature has "target[ed] . . . particular views taken by speakers on a subject" and based the fee provisions of § 1021.11 on the "motivating ideology . . . of the speaker," "the violation of the First Amendment is . . . blatant." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). "[A]ll citizens, regardless of the content of their ideas, have the right to petition their government." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*,

538 U.S. 188, 196 (2003). California has crossed the constitutional line by taking sides and suppressing firearms advocates' access to the courts.

Unsurprisingly, California's outlandish fee-shifting statute is without direct precedent.[2] Plaintiffs' research indicates that, before Texas passed its abortion-related Senate Bill 8 in fall 2021, there had never been a law imposing such viewpoint-discriminatory fees only on civil rights plaintiffs.[3] That alone shows that § 1021.11 falls outside any permissible historical limitation on the freedoms of speech, petitioning, and assembly. *Cf. United States v. Stevens*, 559 U.S. 460, 468–71 (2010) (placing the burden on the government to show that a type of speech belongs to one of the "historic and traditional categories" of constitutionally unprotected speech); *Bruen*, 142 S. Ct. at 2130 (arms restrictions allowed only if supported by "Nation's historical tradition of firearm regulation"). The lack of historical precedent alone should be sufficient to condemn § 1021.11 under the First Amendment.

But even under the more common First Amendment balancing tests, § 1021.11 cannot withstand scrutiny. For example, it is impossible to imagine any interest the government could assert as compelling, or even permissible, in support of this statute. As best we can tell, this law was acted as part of California's retaliation (by proxy) against Texas for enacting its own abortion restrictions under Texas's SB 8. Punishing Second Amendment litigants for their misperceived connection to anti-abortion politicians in Texas is absurd on its face. And, in any event, "a bare . . . desire to harm

---

[2] *In re Workers Comp. Refund*, *supra*, and *Detraz v. Fontana*, 416 So.2d 1291, 1293 (La. 1982), discussed below, are the closest cases we have found.

[3] Unilateral fee-shifting statutes almost uniformly allow fee awards only in favor of plaintiffs to *encourage* litigation seeking to vindicate important rights. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418–19 (1978) ("when a . . . court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law," but "these policy considerations . . . are not present in the case of a prevailing defendant"); *see also Turner v. Ass'n of Am. Med. Colls.*, 193 Cal.App.4th 1047, 1060 (2011) (unilateral fee shifting provisions "reflect the legislature's intent to encourage injured parties to seek redress—and thus simultaneously enforce public policy—in situations where they otherwise would not find it economical to sue") (internal quotation marks omitted).

a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

Even if the government could identify a compelling interest supporting the statute, less restrictive alternatives would serve those interests without imposing such severe burdens on core protected rights. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (requiring use of "less restrictive alternative"). For example, if the supposed purpose of the fee-shifting provision is the imagined public-safety value of the insulating gun restrictions, the State could instead focus on public safety measures with historical support, on addressing mental health issues or criminal justice failures that lead to more gun crime, or on increasing resources to enforce existing permissible laws that target actual criminals rather than law-abiding citizens seeking to protect themselves. But pursuing such an interest by attempting to insulate all gun laws from constitutional review is wholly illegitimate. Even under lesser forms of scrutiny, such burdens are valid only where such "restrictions are narrowly drawn to achieve a substantial governmental interest that is content neutral and unrelated to the suppression of the exercise of First Amendment rights." *Schroeder v. Irvine City Council*, 118 Cal. Rptr. 2d 330, 347 (Cal. Ct. App. 2002). But CCP § 1021.11 selectively penalizes and deters pro-Second Amendment civil rights litigants and favors those who defend government restraints on the right to keep and bear arms. And the state interest in this case is not merely related to suppressing the exercise of First Amendment rights—that is its very purpose.

In sum, Plaintiffs are highly likely to prevail on the merits because § 1021.11 blatantly violates the First Amendment.

**B.    Section 1021.11 is preempted by 42 U.S.C. §§ 1983, 1988, and the Federal Rules of Civil Procedure.**

Plaintiffs are further likely to prevail on the merits because § 1021.11 is preempted by Congress's statutory scheme to enforce constitutional rights, including the well-balanced provision (42 U.S.C. § 1988) establishing when and under what

circumstances attorney's fees may be awarded in cases, such as this one, challenging enforcement of unconstitutional laws. Additionally, § 1021.11 undermines the well-ordered procedures for bringing claims in federal court, specifically when it comes to bringing alternate legal theories to defend constitutional freedoms.

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land." U.S. Const. Art. VI, Cl. 2. State laws that conflict with federal law, or encroach upon a field occupied by federal law, are preempted. "[C]onflict preemption" applies "when a state law 'actually conflicts with federal law.'" *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.)* 959 F.3d 1201, 1212 (9th Cir. 2020) (citation omitted). "Obstacle preemption occurs when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *R.J. Reynolds Tobacco Co. v. Ciy. Of L.A.,* 29 F.4th 542, 561 (9th Cir. 2022) (citation omitted. "[F]ield preemption" applies "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation." *In re Volkswagen*, at 1211 (citation omitted). "Field preemption" can be inferred either where there is a regulatory framework 'so pervasive . . . that Congress left no room for the States to supplement it' or where the 'federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Ventress v. Japan Airlines*, 747 F.3d 716, 720-21 (9th Cir. 2014) (citation omitted).

### 1.   Sections 1983 and 1988 preempt CCP § 1021.11.

CCP § 1021.11 upends Congress's comprehensive instructions about when and to whom attorney's fees are available in suits to vindicate constitutional rights. Section 1988 provides that, in most categories of federal civil-rights litigation, the court "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs" of the case. 42 U.S.C. § 1988(b). "[A] prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" *Hensley v. Eckerhart*, 461 U.S. at 429. By contrast, the Supreme

Court has repeatedly held that, given the purposes of Section 1988, prevailing *defendants* may recover fees only when "where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Id*. at 429 n.2 (citations omitted).[4] Moreover, § 1988 doesn't require a plaintiff to win every claim in order to be a "prevailing party." The Court has "made clear that plaintiffs may receive fees under § 1988 even if they are not victorious on every claim. A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Fox v. Vice*, 563 U.S. 826, 834 (2011).

**a.** The balance struck by Congress is thus comprehensive and complete: Congress has occupied the field of federal civil rights litigation, and the allocation of attorney's fees is a critical part of that comprehensive statutory scheme, leaving no room for state manipulation. Yet § 1021.11 establishes a wholly separate fee regime that alters the careful balance struck by § 1988. Section 1021.11:

- redefines what constitutes a "prevailing party" to favor the government even where it has been found to violate the Constitution, § 1021.11(e);

- requires a plaintiff to win *every* claim to avoid paying the government's fees, § 1021.11(b);

- sets up a second track of state-court fee litigation and overrides issue and claim preclusion exclusively in the government's favor, § 1021.11(d)(3); and

- deters litigants and their attorneys from bringing civil rights suits, § 1021.11(a), despite Congress's express intent to encourage citizens and counsel to take such suits. *See Coffey v. Cox*, 234 F. Supp. 2d 884, 891 (C.D. Ill. 2002) ("Defendants' attorneys' fees imposed against Plaintiff may chill a future meritorious plaintiff from pursuing his civil rights action for fear of having to pay his opponent's attorney's fees should he ultimately be unsuccessful."); *cf. La Raza Unida v. Volpe*,

---

[4] Section 1988's legislative history confirms that Congress intended to incorporate Supreme Court precedent regarding fee awards under the Civil Rights Act. S. Rep.No. 94-1011, at 4 (1976); *see Hensley*, 461 U.S. at 433 n.7.

545 F. Supp. 36, 39 (N.D. Cal. 1982) (§ 1988 preempted state law requiring legislative appropriation before state defendants would satisfy a judgment).

This scheme by California not only tries to regulate an area completely governed by federal law but turns the entire statutory scheme on its head to discourage a plaintiff from pursuing the vindication of constitutional rights, a pursuit Congress deemed of the "highest priority." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968). Section 1021.11 threatens to bankrupt any plaintiff challenging state or local firearm regulations if they don't achieve complete victory in the litigation.

**b.** Even if Congress had not occupied the field, § 1021.11 conflicts with the specific statutes Congress enacted. Where § 1988 generally allows plaintiffs to recover fees if they prevail on any claim, § 1021.11 forces them to prevail on every claim in order to avoid liability for the government's fees. Where § 1988 allows the government defendants to recover fees only in exceptional circumstances for frivolous claims, § 1021.11 allows them to recover fees if *any* claim is dismissed for *any* reason, and regardless whether plaintiffs vindicated their rights by prevailing on any or every other claim. *Fox*, 563 U.S. at 836 ("Section 1988 allows a defendant to recover reasonable attorney's fees incurred because of, but *only because of, a frivolous claim*.") (emphasis added). For example, suppose a plaintiff wins on one of two alternative theories in a Second Amendment case. The plaintiff would be a prevailing party entitled to fees under § 1988. The government defendant would pay the plaintiff's fees under § 1988, but, because one of the plaintiff's alternative theories wasn't successful in the federal litigation, the government would recover all its fees from the plaintiff under § 1021.11. It is no answer to say the plaintiff's award in the federal action might offset the liability under § 1021.11. The point of awarding fees to plaintiffs who are "prevailing parties" under § 1988 is to incentivize lawyers—by paying them out of plaintiff's fee recovery—to bring civil rights cases. *E.g.*, *City of Riverside v. Rivera*, 477 U.S. 561, 576 (1986), *Kay v. Ehrler*, 499 U.S. 432, 436 (1991), and *Evans v. Jeff D*, 475 U.S. 717, 741 (1986). But under § 1021.11, plaintiffs

would be deterred by potential fee liability, and attorneys might recover their fees in federal court only to turn around and have to pay government fees in a later state court fee recovery action.

Moreover, many constitutional challenges, particularly those under the oft-resisted jurisprudence of the Second Amendment, necessarily test unsettled areas of the law. When the law in an area is "not completely settled," claims that seek to shape new law are, by definition, not frivolous, making an award of attorney's fees to defendants improper. Yet, under § 1021.11, plaintiffs litigating in such uncertain areas face a high risk of punitive fee liability, in direct contravention of § 1988.

CCP § 1021.11(c)'s provision allowing the State to seek attorney's fees in a subsequent state-court action up to three years after the federal suit is resolved likewise conflicts with the congressional scheme. Under § 1988, attorney's fees may only be sought in the "action or proceeding to enforce" a federal civil rights statute, including Section 1983, and the fees, where assessed, are allowed only "as part of the costs." 42 U.S.C. § 1988(b). Thus, § 1021.11 does exactly what the Supreme Court has said a claim for attorney's fees should not do—generate "a second major litigation." *Fox*, 563 U.S. at 838.

**c.** Finally, § 1021.11 is preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *R.J. Reynolds*, 29 F.4th at 561. As the Ninth Circuit has explained:

> Congress and the courts have long recognized that creating broad compliance with our civil rights laws, a policy of the "highest priority," requires that private individuals bring their civil rights grievances to court. [citation omitted] Even when unsuccessful, such suits provide an important outlet for resolving grievances in an orderly manner and achieving non-violent resolutions of highly controversial, and often inflammatory, disputes. . . . Our system of awarding attorneys fees in civil rights cases is in large part dedicated "to encouraging individuals injured by . . . discrimination to seek judicial relief." *See id*.
>
> In accordance with this objective, courts are permitted to award attorneys fees to prevailing *plaintiffs* as a matter of course, but are permitted to award attorneys fees to prevailing *defendants* under 42 U.S.C. §§ 1988 and 2000e-5(k), … only "in exceptional circumstances," *Barry [v. Fowler]*, 902 F.2d [770,] 773 (9th Cir. 1990).

*Harris v. Maricopa Cty. Super. Ct.*, 631 F.3d 963, 971 (9th Cir. 2011). In short, "[t]he purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley*, 461 U.S. 424, 429 (1983) (quoting H.R. Rep. No. 94–1558 at 1 (1976)); *Kay v. Ehrler*, 499 U.S. at 436 (one specific purpose of § 1988 is "to enable potential plaintiffs to obtain the assistance of competent counsel in vindicating their rights").[5]

Yet where § 1988 encourages plaintiffs and lawyers to bring civil rights suits, § 1021.11 discourages them.  Not since the infamous resistance of the Jim Crow South has a state demonstrated such blatant disdain for supremacy of federal civil rights laws. Indeed, in open resistance to *Brown v. Board of Education*, Louisiana enacted a similar one-way fee-shifting law to penalize those suing state officials. That law was invalidated as an unconstitutional infringement on equal protection, due process, and access to the courts. *See Detraz v. Fontana*, 416 So.2d at 1293-97. Here, the constitutional rights being resisted have changed, but the contempt for federal Supremacy and the Constitution is the same. *See Governor Newsom Responds to Supreme Court Decision on Concealed Carry*, Office of Governor Gavin Newsom (June 23, 2022), https://tinyurl.com/NewsomBruen (describing *Bruen* as a "reckless" and "radical" decision). And the same legal principles govern, bolstered by contrary and preemptive federal legislation. Section 1021.11 should be enjoined.

### 2. The Federal Rules of Civil Procedure preempt § 1021.11.

The Supreme Court "promulgated the Federal Rules of Civil Procedure to 'govern the procedure in the United States district courts in all suits of a civil nature'" based on its authority under the Rules Enabling Act (28 U.S.C. § 2072). *Cooter &*

---

[5] *See also* S. Rep. No. 94-1011 at 2, 6 (June 29, 1976) ("If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases."); H.R. Rep. No. 94-1558 at 7 (unlike private plaintiffs, "governmental entities and officials have substantial resources available to them," such that awarding prevailing defendants fees "would exacerbate the inequality of litigating strength").

*Gell v. Harmax Corp.*, 496 U.S. 384, 391 (1990) (quoting Fed. R. Civ. P. 1). The Court has affirmed the validity of the rules permitting the joinder of parties and the joinder of claims so as to bring alternative claims seeking relief against different parties who may be liable for the challenged action. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) ("we think it obvious that Rules allowing multiple claims (and claims by or against multiple parties) to be litigated together are also valid"). Yet, § 1021.11 penalizes plaintiffs who bring alternate theories of recovery should any of those alternate theories be dismissed for any reason. § 1021.11(b).

In constitutional cases, complete victory on all claims is not common. In § 1983 cases, the Supreme Court has noted: "litigation is more complex [than a Hollywood movie's simplistic view of it], involving multiple claims for relief that implicate a mix of legal theories and have different merits. Some claims succeed; others fail. Some charges are frivolous; others (even if not ultimately successful) have a reasonable basis. In short, litigation is messy, and courts must deal with this untidiness in awarding fees." *Fox*, 563 U.S. at 833–34. The Court recognized that the "American Rule" of a party bearing its own fees continues to apply to defendants in civil rights cases because, consistent with § 1988 and Fed. R. Civ. P. 11, a defendant is only entitled to fees that result from a plaintiff filing a frivolous claim. *Id.* at 836.

Section 1021.11(b) penalizes a plaintiff for bringing alternative theories of recovery because at least one alternative claim will likely fail, even though it was neither frivolous nor in bad faith to argue competing scenarios based on uncertain predicates. That provision statute conflicts with the limitations in Rule 11.

It is also well-settled that Rule 11 sanctions "must not be construed so as to conflict with the primary duty of an attorney to represent his or her client zealously." *Operating Eng'rs Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (1988). "The simple fact that an attorney's legal theory failed to persuade the district court 'does not demonstrate that [counsel] lacked the requisite good faith in attempting to advance the

law.'" *Id.* (quoting *Hurd v. Ralphs Grocery Co.*, 824 F.2d 806, 811 (9th Cir.1987) (abrogated on other grounds in *Buster v. Greisen*, 104 F.3d 1186, 1190 n. 4 (9th Cir. 1997)). Yet, § 1021.11 does precisely that by not only putting a plaintiff at risk for attorney's fees but also the attorney and the attorney's law firm. This creates an inherent conflict between an attorney and his client by deterring an attorney from zealously pursuing his client's claims out of fear that dismissal of a single claim will render the attorney and his law firm liable for the State's attorney's fees, even if the attorney's client ultimately prevails on other claims and obtains full vindication of the rights at stake.

Section 1021.11 conflicts with the Federal Rules of Civil Procedure and blatantly undermines the federal scheme for the orderly proceeding of cases in federal court under those Rules.  Section 1021.11 is accordingly preempted under principles of both conflict and obstacle preemption.

### C.    CCP § 1021.11 violates the Equal Protection Clause.

For the many reasons described above with respect to discrimination against federal constitutional rights, gun-rights plaintiffs in particular, and pro-gun viewpoints, *supra* at I.A., § 1021.11 also violates the Equal Protection Clause. While such forms of discrimination prejudicing First and Second Amendment rights would be subject to, and plainly fail, "the most exacting scrutiny," *Clark v. Jeter*, 486 U.S. 456, 461 (1988), the classifications at issue here could not survive any level of scrutiny given their improper purpose to burden the exercise of such rights. *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 922 (9th Cir. 2012) (an "improper purpose" under the Equal Protection Clause includes discrimination "on the basis of an impermissible ground such as race, religion or exercise of ... constitutional rights") (cleaned up). The scheme seems to have been adopted as retaliation for—or perhaps an homage to—a similar scheme, including fee shifting shenanigans adopted by Texas's SB 8 in connection with abortion statutes. *See* Mark Stone, Chairman, Assembly Comm. On Judiciary, Analysis of SB 1327 (June 14, 2022), at 2, 8, 13 (acknowledging SB 1327's

"author's and sponsor's intent to turn the table on Texas and enact a law just like SB 8 that deals with firearms"; "It's a lose-lose scenario for plaintiffs who challenge the bill or a gun law; and a win-win scenario for the government. … This language appears to be unprecedented in California law and likely would not be endorsed by this Committee but for the fact that it is included in this bill and modeled on Texas law."). But the desire to punish a conservative state and its supporters by taking aim at gun rights advocates, or to keep up with Texas in a race to the bottom, is not a rational justification for the classifications in this case and is, in fact, an utterly impermissible justification for such tit-for-tat classifications.

### D.   CCP § 1021.11 violates the Due Process Clause.

Were that not enough, CCP § 1021.11 also violates the Due Process Clause by imposing enormous penalties on anyone who seeks to vindicates their rights in federal courts while being ambiguous about whether the statute is meant to apply only to those cases initiated *after* it goes into effect. Beyond that, it impermissibly and unconstitutionally creates a conflict between clients and their attorneys by chilling the attorney/client relationship and the duty to zealously pursue claims.

### 1.   Retroactively applying § 1021.11 would violate Due Process.

"[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. . . . In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 256–66 (1994). The Due Process Clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Id.* at 266. Those concerns are implicated where a "new provision attaches new legal consequences to events completed before its enactment." *Id.* Even if a law is constitutionally valid when applied prospectively, the State's interests "may not suffice" to warrant retroactive application. *Id.* (citation omitted). Laws whose retroactive effects are "so wholly unexpected and disruptive

that harsh and oppressive consequences follow" fail to provide the requisite notice necessary to satisfy the demands of Due Process. *Matter of U. S. Fin., Inc.*, 594 F.2d 1275, 1281 (9th Cir. 1979).

"Just as federal courts apply the time-honored legal presumption that statutes operate prospectively 'unless Congress has clearly manifested its intent to the contrary' (*Hughes Aircraft Co. v. U.S. ex rel. Schumer* [520 U.S. 939, 946 (1997)]), so too California courts comply with the legal principle that unless there is an 'express retroactivity provision, a statute will *not* be applied retroactively unless it is *very clear* from extrinsic sources that the Legislature ... must have intended a retroactive application (*Evangelatos v. Superior Court*, 44 Cal.3d 1188, 1209 (1988)])." *Myers v. Philip Morris Companies, Inc.*, 28 Cal.4th 828, 841 (2002)). As under federal law, this presumption of prospective-only application prevents imposing "unexpected and potentially unfair consequences for all parties who acted in reliance on the then-existing state of the law" absent a "clear" legislative intent for retroactive application, as a matter of fundamental fairness and due process. *Evangelatos*, at 1217-18.

There is no express retroactivity provision and no indication in the legislative history of a "very clear" intent to rebut the presumption of prospective application and apply this law to cases like this, where the action was brought well before SB 1327's enactment in reliance on the then-existing state of the law. Yet, any application of § 1021.11 in pending litigation would unquestionably entail untenable retroactive effects. "California regulates the acquisition, possession, and ownership of firearms with a multifaceted scheme." *Jones v. Bonta*, 34 F.4th 704, 710 (9th Cir. 2022). Various aspects of that scheme have been challenged in litigation. Several are currently pending in the district courts of California. These challenges were brought with the understanding that the traditional fee provisions of 42 U.S.C. § 1988 would govern. CCP § 1021.11 turns that presumption on its head. And it does so in a way that puts plaintiffs *and* their attorneys on the hook should a particular claim fail even

if the plaintiffs obtain the ultimate relief they sought—invalidation of a California "law that regulates or restricts firearms."

The effective date of January 1, 2023, coupled with the absence of an intent for retroactive application further precludes a finding a legislative intent to "ha[ve] any application to conduct that occurred at an earlier date." *Landgraf*, 511 U.S. at 257. Given such doubts, any attempt by Defendants to apply the fee shifting provisions to this or other cases pending before January 1, 2023 would be "so wholly unexpected and disruptive that harsh and oppressive consequences [would] follow" in violation of the Due Process Clause. *Matter of U. S. Fin., Inc.*, 594 F.2d at 1281. Accordingly, this Court should enjoin Defendants from invoking § 1021.11 in any such cases.

### 2. CCP § 1021.11 damages the attorney-client relationship in violation of Due Process

As addressed previously, the fee-shifting provision also imposes significant burdens on the attorney-client relationship that themselves violate the Due Process Clause. The Sixth Amendment right to counsel necessarily includes the right to a "conflict-free attorney." *Paradis v. Arave*, 130 F.3d 385, 391 (9th Cir. 1997). A conflicted attorney can, of course, "affect[] the attorney's performance." *Id.* In that context, "government interference with a defendant's relationship with his attorney may render counsel's assistance so ineffective as to violate his Sixth Amendment right to counsel and his Fifth Amendment right to due process of law." *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980).

Those same principles should govern here when, by force of law, a state effectively deprives those who would challenge its unconstitutional conduct of conflict-free counsel. If this law is not enjoined, then starting January 1, 2023, all Second Amendment cases in California will be brought by plaintiffs whose attorneys have the appearance of a conflict because the attorneys themselves—and their firms— will be on the hook for any failed claims. Undoubtedly, "the procedural component of the due process clause protects individuals' rights to fundamentally fair procedures

before they are deprived of their liberty rights." *Coleman v. McCormick*, 874 F.2d 1280, 1286 (9th Cir. 1989). And it is fundamentally *un*fair for California to place clients against their attorneys like it did with § 1021.11.

## II.    Plaintiffs are likely to succeed on their claims against the CNC Ban.

The constitutional infirmity of the CNC Ban is as simple as can be in the wake of *Bruen*. To sustain a firearm regulation against a Second Amendment challenge, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. CNC mills are used to help produce common arms plainly protected by the text of the Second Amendment, and hence it is the government's burden to demonstrate substantial and common historical analogues for its proposed limitation on the right to keep and bear arms. As there is no such historical support for the CNC Ban—and the relevant history in fact teaches quite the opposite—the government cannot possibly meet its burden and the CNC ban is unconstitutional. That is the entirety of the required analysis on the merits, and a preliminary injunction naturally follows from such an irreparable deprivation of constitutional rights.

CNC milling machines are the modern-day manifestation of firearm milling technology, which dates back to the early nineteenth century. *See, e.g.*, Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 92 Bus. Hist. Rev. 57, 64 (May 2018) (explaining that "Federal support of small arms manufacturing has been well documented," and that federal funds supported the development of the first firearm milling machine in the 1810s). Indeed, self-manufacture of firearms was not simply permitted through the relevant historical periods, it was applauded and encouraged. *See generally*, JOSEPH G.S. GREENLEE, *The American Tradition of Self-Made Arms*, (published Nov. 10, 2021; last edited April 11, 2022), available online at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566) (to be published in

Volume 54 of the ST. MARY'S LAW JOURNAL in 2022).

Plaintiffs are overwhelmingly likely to prevail on the merits of their challenge to the CNC Ban because the fundamental, individual right to keep and bear firearms includes not only the right to acquire, but to self-manufacture or assemble firearms in common use for lawful purposes. *Cf.* Second Am. Compl. ¶¶ 202-203 (citing cases supporting the right to keep and bear as subsidiary right to obtaining and maintaining arms). Self-manufactured and assembled arms were legal and commonplace when the Second Amendment was ratified, and they clearly fall within the scope of "arms" that Americans have a right to keep and bear.

Nothing in the "Nation's historical tradition of firearm regulation" supports the heavy-handed restrictions on the self-manufacture or assembly of constitutionally protected arms. *Bruen*, 142 S. Ct. at 2130. Indeed, there was no governmental regulation at all on the self-manufacturing or assembly of firearms—state or federal—until *2016*. Greenlee, *The American Tradition of Self-Made Arms*, at 37. Manufacturing of firearms was entirely unregulated during the colonial and founding eras in America, and there were no restrictions on who could be a gunsmith or make guns. *See, e.g.*, Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904) ("Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."); *see also* M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980) ("The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era."). In the nearly 400-year history of the colonies and the United States, California's de facto ban on self-manufacture or assembly of firearms is unprecedented until recently in only a few States.

Given the complete absence of any relevant historical tradition restricting the

scope of the right as defined when the Second (or even the Fourteenth) Amendment were adopted, the restrictions on the self-manufacture and assembly of firearms and the mere possession of a CNC milling machine for such purposes are proscribed by the Second Amendment's '"unqualified command."' *Bruen*, 142 S. Ct. at 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)).

### III.   Plaintiffs will suffer immediate, irreparable harm absent an injunction.

For purposes of preliminary relief, the "loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam); *see also* 11A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2948.1 (3d ed. 2013) ("When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary.").

As explained above, § 1021.11 and the CNC Ban violate numerous constitutional rights. If applied to Plaintiffs, they would impose immediate and *per se* irreparable harm that cannot be remedied later by damages. The irreparable harm from the denial of any one of those rights satisfies the irreparable harm part from itself. "In addition, the burden and expense of litigating the issue . . . would unduly impinge on the exercise of the constitutional right[s]." *Bellotti*, 435 U.S. at 786 n.21.

Furthermore, § 1021.11's chilling effect is evident in this very case. Absent a preliminary injunction, Plaintiffs will face the untenable choice whether to pursue their constitutional claims or to dismiss for fear of crippling fee liability if they don't run the table on all of their claims. And even the choice to go forward would impose added costs and burdens from the need to gather or divert additional resources to cover the potential liability, thus limiting the number of other cases they could bring in California or elsewhere. Forgoing claims and litigation are irreparable injuries that cannot later be undone or solved by (likely unavailable) damages.

**IV.   The remaining factors support an injunction.**

Both the balance of the equities and the public interest—which merge here, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—strongly support relief. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Those factors tip overwhelmingly in Plaintiffs' favor because California has no legitimate interest in enforcing laws like § 1021.11 and the CNC Ban that strip its citizens of multiple constitutional rights. A preliminary injunction, therefore, would *protect* Californians from harm.

In contrast, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *accord Jones v. Bonta*, 34 F.4th at 731 ("We note for the district court's reconsideration that 'the government suffers no harm from an injunction that merely ends unconstitutional practices.'") (cleaned up)). Accordingly, entering an injunction strikes the necessary balance by ensuring maintenance of the status quo.

**V.   This Court should issue the requested injunction without security.**

Although the Federal Rules generally require plaintiffs to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), there is no reason to do so here, as the requested injunction would not impose any costs or damages to the Defendants. In such circumstances, courts can "dispense with the filing of a bond." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

1

## <u>CONCLUSION</u>

2   CCP § 1021.11 and the CNC Ban are unconstitutional and impose enormous

3  and irreparable harms on the people of California. This Court should enter an

4  injunction now to prevent those harms from going into effect.

5   Dated:  September 8, 2022          The DiGuiseppe Law Firm, P.C.

6

7                                       By  /s/ *Raymond M. DiGuiseppe*

8                                          Raymond M. DiGuiseppe
                                           Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28