Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

Michael P. Sousa
LAW OFFICES OF MICHAEL P. SOUSA, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
P: 858-453-6122
E: msousa@msousalaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lana Rae Renna, et al., | Case No.: 20-cv-2190-DMS-DEB |
| Plaintiffs, | **PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION** |
| v. | |
| Robert Bonta, Attorney General of California, et al., | Date:   October 7, 2022<br>Time:  1:30 p.m.<br>Department: 13A<br>Hon.: Dana M. Sabraw |
| Defendants. | |

## Table of Contents

I.      Introduction…………………………………………………………...1

II.     The Plain Text Unquestionably Covers the Conduct at Issue………………1

III.    Defendants Could Not Carry Their Burden Even If They Tried……………4

IV.     Defendants' Fundamentally Misguided Litigation Strategy Underscores the Need for Immediate Relief to Arrest the Ongoing Irreparable Harm……...6

## Table of Authorities

**Cases**

*Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656 (2004)……………………………...8

*Citizens United v. Federal Election Com'n*, 558 U.S. 310 (2010)……………………..4

*District of Columbia v. Heller*, 554 U.S. 570 (2008)………………………………*passim*

*Drummond v. Robinson Township*, 9 F.4th 217 (3d Cir. 2021)………………………...2

*Ezell v. City of Chicago*, 651 F.3d 684 (9th Cir. 2011)……………………………………7

*Frein v. Penn. State Police*, 47 F.4th 247 (3d Cir. 2022)…………………………...8, 9

*Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239 (9th Cir. 2013)……………………………………………………………...5, 9

*Illinois Association of Firearm Retailers v. City of Chicago*, 961 F. Supp.2d 928 (N.D. Ill. 2014)……………………………………………………………………………..2

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)…………..2

*Luis v. United States*, 136 S.Ct. 1083 (2016)…………………………………………..2

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)……………………………………..1

*Minn. Star & Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575 (1983)……..3

*Moran v. State of Wash.*, 147 F.3d 839 (9th Cir. 1998)………………………………...4

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022)..*passim*

*Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730 (2017)…………………...4

*Rhode v. Becerra*, 445 F.Supp.3d 902, 953 (S.D. Cal. 2020)…………………...7, 8, 10

*Rigby v. Jennings*, __ F.Supp.3d __, 2022 WL 4448220 (D. Del. 2022)………………..2

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013)…………………………………9

## Table of Authorities (continued)

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 64 (2020)……………………7

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017)…………………...1, 2, 4

*Thunder Studios v. Kazal*, 13 F.4th 736 (9th Cir. 2021)………………………………..4

*U.S. v. Quiroz*, __ F.Supp.3d__, 2022 WL 4352482 (W.D. Texas 2022)………………2

*University of Texas v. Camenish*, 451 U.S. 390, 395 (1981)…………………………...9


*Statutes*

18 U.S.C § 922(n)…………………………………………………………………...3


*United States Constitution*

    First Amendment ………………………………………………………..*passim*

    Second Amendment…………………………………………………………*passim*


*Publications*

    *5 American Archives, Fourth Series*, 1418 (Peter Force ed. 1844)……………...5

    11A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2948.1 (3d ed. 2013)……………………………………………………………………………7

    JOSEPH G.S. GREENLEE, *The American Tradition of Self-Made Arms*, (published Nov. 10, 2021; last edited April 11, 2022) …………………...6

    Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 THE WRITINGS OF THOMAS JEFFERSON 325 (Paul Ford ed., 1904)………………………..5

    M. L. BROWN, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980).......5


**Other Sources**

https://www.merriam-webster.com/dictionary............................................................3

## I. Introduction

Defendants have not only failed to carry their burden to demonstrate that the CNC Ban is consistent with this Nation's historical tradition of firearm regulation in any way, but they have actively *refused* to do anything of the sort. Instead, they have spent their time attempting to develop a litigation strategy that purportedly shifts the burden onto Plaintiffs and allows them to do nothing absent an order from this Court directing them to undertake the historical analysis required under *Bruen*. Defendants' pursuit of a tortured analysis disingenuously alleviating them of any obligation to justify the CNC Ban underscores the need for the immediate relief Plaintiffs seek here.

## II. The Plain Text Unquestionably Covers the Conduct at Issue

Again, the test is a simple one: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022). Then, the government must "justify its regulation" of the conduct. *Id.* To carry this burden, it is not enough to "simply posit that the regulation promotes an important interest." *Id.* "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Supreme Court's opinions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) held that "the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *Bruen* at 2126. And *Bruen* held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. These cases also all make clear that "'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Id.* 2132 (quoting *Heller* at 582).

And, well before *Bruen*, the federal courts, including the Ninth Circuit, recognized that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County*

*of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 136 S.Ct. 1083, 1097 (2016) (Thomas, J., concurring). Thus, the right to keep and bear arms "'implies a corresponding right to obtain the bullets necessary to use them,'" *id.* (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)), as well as the ability to engage in "the training and practice that make it effective," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011). And, even more fundamentally, the Second Amendment necessarily must secure the right to *acquire* constitutionally protected arms in the first instance: "The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." *Teixeira* at 677; *accord Illinois Association of Firearm Retailers v. City of Chicago*, 961 F. Supp.2d 928, 930 (N.D. Ill. 2014) ("This right must also include the right to *acquire* a firearm."); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (the right 'implies a corresponding right to acquire and maintain proficiency' with common weapons") (quoting *Ezell* at 704). Logically, there are two ways to *acquire* a firearm—to obtain one (by purchase or other transfer) or to make one through self-manufacture or self-assembly. Just as the "right to acquire and maintain proficiency" in the use of protected arms is implied, "the right to keep and bear arms implies a corresponding right to manufacture arms." *Rigby v. Jennings*, __ F.Supp.3d __, 2022 WL 4448220, *7 (D. Del. Sept. 23, 2022). "Indeed, the right to keep and bear arms would be meaningless if no individual or entity could manufacture a firearm." *Id.*

Defendants devise a tortured textual analysis here, arguing "the plain text of the Second Amendment *does not address* the ownership of CNC milling machines at all" and "*says nothing* about self-manufacture or assembly of one's own firearms." Opp. 8, 9 (italics added). Absent *literal* inclusion of the conduct, so the argument goes, the government is free to regulate it unchecked. Opp. 1-2, 8-9. The United States government recently tried a similar ploy in *U.S. v. Quiroz*, __ F.Supp.3d __, 2022 WL 4352482 at *3 (W.D. Texas 2022) (appealed filed September 21, 2022), arguing that

the prohibition under 18 U.S.C § 922(n)—barring anyone under a felony indictment from "receiv[ing]" firearm or ammunition shipped or transported in commerce—fell outside the scope of the Second Amendment's protection because the text doesn't *expressly* include "buying a gun *while under felony indictment*." *Id.* *3. But, as the court observed, *Bruen's* test "requires only that 'the Second Amendment's plain text cover the conduct.'" *Id.* "And the prohibited conduct under § 922(n) is 'receipt' of a firearm—nothing more," which *is* covered. *Id.* at *4. Similarly, Defendants cannot demand that the Second Amendment *expressly* declare a right to "self-manufacture or assemble one's own firearms," a right to "the ownership of CNC milling machines," or a right to the ownership or use of precursor parts and tools commonly needed and used in the process of constructing protected arms. The conduct at issue is the ability of law-abiding citizens to *self-manufacture or assemble constitutionally protected arms*. The plain text covers this conduct, just as the right to keep and bear arms "*covers* modern instruments that *facilitate* armed self-defense," *Bruen*, 142 S.Ct. at 2132 (italics added), and '"the right to possess and carry weapons in case of confrontation,'" *id.* at 2134 (quoting *Heller*, 554 U.S. at 2134), without *literally* saying so.

When it comes to the First Amendment right of "free speech," to which the Supreme Court has "repeatedly compared the right to keep and bear arms," *Bruen*, 142 S.Ct. at 2130, we would never require as a condition to protection that the First Amendment *expressly* enumerate each of the numerous forms of media and platforms through which people commonly exercise their expressive rights; nor would we ever say the government may regulate unchecked any device or implement necessary or commonly used in facilitating such speech—press machines, printers, paper, ink, etc.— unless the text *expressly* declares that item "covered" under the "free speech" protections. *See Minneapolis Star & Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575, 592-93 (1983) (holding that a tax on paper and ink used by newspapers violated the First Amendment). Generally, to "cover" means "to have sufficient scope to include or take into account" or "to afford protection or security to."

https://www.merriam-webster.com/dictionary/cover. Thus, the First Amendment's text has been interpreted to *cover* numerous forms of expressions not literally spelled out in the text. *See Thunder Studios v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021) ("emails and tweets"); *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 393 (2010) ("core political speech"); *Moran v. State of Wash.*, 147 F.3d 839, 848 (9th Cir. 1998) (speech "related to a matter of public concern"); *Teixeira*, 873 F.3d at 688-69 (expression of views "through the distribution of written material"); *Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730, 1735 (2017) (the "exchange of views" in "cyberspace" and "the vast democratic forums of the Internet"). So it is with the Second Amendment and the many sticks within the bundle of rights necessarily implicit and ancillary to the express right to "keep and bear arms," which *plainly* include the right to self-manufacture or assemble protected arms.

### III.   Defendants Could Not Carry Their Burden Even If They Tried

Because Defendants' "textual analysis" purports to find the "plain text" does not cover the conduct at issue, they conclude that neither AB 1621 generally nor the CNC Ban itself "implicate[s] Plaintiffs' Second Amendment rights under *Bruen*." Opp. at 2. Thus, Defendants say, "*if* the Court were to determine that AB 1621 does implicate the text of the Second Amendment," then they would be required to undertake "the historical analysis that *Bruen* contemplates," but it "would require time for Defendants to develop the record to establish that AB 1621 is 'consistent with the Nation's historical tradition of firearm regulation.'" *Id.* at 2 (quoting *Bruen*, 142 S. Ct. at 2133).

So, Defendants have done nothing to date in terms of developing such a record in support of the regulation they wish to defend and, again, they are wrong that they can avoid the work by claiming the Second Amendment isn't implicated here. While Plaintiffs certainly bear no burden to "justify" the regulation by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 142 S.Ct. at 2126, the evidence that they have proffered illustrates that Defendants could not carry this burden even if they tried, because it shows no

"relevantly similar" regulation, i.e., "well-established and representative historical *analogue*" exists, *id.* at 2132-33.[1]  To the contrary, "[t]he influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era." *M. L. Brown, Firearms in Colonial America: The Impact on History and Technology 1492-1792*, at 149 (1980), *see* https://www.jstor.org/stable/3104465.  In March 1776, a committee of New York's Provincial Congress actively sought to enlist and reward all those "'willing to engage in *manufacturing* good Muskets, or the Locks, Barrels, or any necessary parts thereof.'" *5 American Archives, Fourth Series*, 1418 (Peter Force ed. 1844) (italics added), *see* https://onlinebooks.library.upenn.edu/webbin/book/lookupid?key=olbp70176.

Around the same time, the North Carolina Provincial Congress called for "'all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in *making* Muskets.'" *Id.* at 1338. Thomas Jefferson summed it up in 1793 saying, "Our citizens have always been free to *make*, vend, and export arms. It is the constant occupation and livelihood of some of them." Secretary of State Thomas Jefferson, letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in *7 The Writings of Thomas Jefferson* at 325, 326 (Paul Ford ed., 1904) (italics added), *see* https://oll.libertyfund.org/title/ford-the-works-of-thomas-jefferson-12-vols.

Again, this is consistent with the plain text of the Second Amendment under which the "general definition" of the "arms" protected under the Amendment "covers

---

[1]      In a footnote, Defendants complain that "most" of this evidence is "not readily accessible," it is "hearsay," and that "Plaintiffs have provided no evidence, such as expert testimony, to assist the court's determination of how much weight [it] should be given." Opp. 13, n. 6. Again, Plaintiffs have *no* burden to provide *any* evidence. Further, each of the cited sources is readily available online, and, at any rate, it's settled that this Court may properly consider any "hearsay" evidence at this preliminary stage. *See Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1250, n. 5 (9th Cir. 2013) (it is "within the discretion of the district court to accept ... hearsay for purposes of deciding whether to issue the preliminary injunction"). What is more, the demand for experts and the like is refuted by *Bruen* itself, which was decided by the U.S. Supreme Court on a *motion-to-dismiss* record.

modern instruments that facilitate armed self-defense," as *Bruen* just reaffirmed. *Bruen*, 142 S.Ct. at 2132. In fact, there were no restrictions *at all* on the ability of individuals to manufacture or assembly of arms for personal use in America until just the *last decade*. *See* Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, at 37 (published Nov. 10, 2021; last edited April 11, 2022), available online at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3960566). Such regulations are distinctly of the modern age, well beyond the relevant historical period, the scope of which the Supreme Court has "generally assumed" is pegged to the time period of the Bill of Rights' adoption in 1791. *Bruen* at 2137. Indeed, even historical evidence from the late 19th and 20th centuries is of little to no relevance when it contradicts either the plain text of the Second Amendment or any earlier evidence, *id.* at 2135, n. 28, 2137—to say nothing of the *21st* century, when the sort of regulations at issue here first surfaced. Moreover, *Bruen* made clear that regardless of its provenance along the historical timeline, even if a regulation may otherwise be "relevantly similar" for all intents and purposes, it cannot justify the challenged regulation when it is an "outlier" or an exception to the contemporaneously prevailing traditions, *see Bruen*, 142 S.Ct. at 2142, 2144, 2147, n. 22, 2153, 2154, 2155 (disregarding regulations from various periods based on their "outlier" status in contravening the prevailing traditions), like the modern-day CNC Ban and related prohibitions against self-manufacturing and self-assembly under AB 1621, which find counterparts in only a miniscule number of states.

## IV.   Defendants' Fundamentally Misguided Litigation Strategy Underscores the Need for Immediate Relief to Arrest the Ongoing Irreparable Harm

Not only do Defendants present no evidence and make no effort to address, much less counter, any of the historical evidence that Plaintiffs have proffered, but they claim they have no burden to present any such evidence *even if* the conduct at issue is protected. They declare *Plaintiffs* must "demonstrate[] that AB 1621 is not consistent with historical tradition" Opp. 11, in direct contravention of *Bruen's* repeated instruction that "the government must demonstrate that the regulation is consistent with

this Nation's historical tradition of firearm regulation," *Bruen*, 142 S.Ct. at 2126, 2135. Beyond this, as noted, Defendants simply say that *if* they have such a burden here, they could *possibly* develop evidence of a relevantly similar analogue, but they must be afforded "additional time to conduct the research and briefing necessary to perform the historical analysis called for by *Bruen*." Opp. at 12. In fact, it appears that Defendants hope to just sit idly by while *Plaintiffs* gather historical evidence unless and until the Court *directs* them to take action here. But they can't have their cake and eat it too—*refusing* to "perform the historical analysis called for by *Bruen*" and then expecting the Court to find in their favor by denying this motion or holding the matter open for some indefinite period of time while Defendants *then* do their work. Having elected to *abandon* this duty in pursuit of the disingenuous litigation strategy that the Second Amendment isn't even "implicated," Defendants should be precluded from conducting any further "research and briefing" that delays adjudication of this motion.

Indeed, as no party disputes, the CNC Ban is *already* in place, having become effective on September 28, 2022. As is also undisputed, the effect of the Ban is to force all ordinary, law-abiding citizens with CNC milling machines to dispossess themselves of the machines that they lawfully acquired for lawful purposes, like Plaintiffs Ruebe, who was just required to do so within the last few days. *See* Exh. A (Dec. of Plaintiff Ruebe). Drawing again from the First Amendment context to which the Supreme Court has "repeatedly compared the right to keep and bear arms," 142 S.Ct. at 2130, the "loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 64, 67 (2020) (per curiam); *see also Ezell*, 651 F.3d at 699-700 (applying this principle in Second Amendment context); 11A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2948.1 (3d ed. 2013) ("When an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary."). "The same is true for Second Amendment rights." *Rhode v. Becerra*, 445 F.Supp.3d 902, 953 (S.D. Cal. 2020). The forced dispossession and prohibition against

the use of such devices for the constitutionally protected conduct of self-manufacturing or assembling firearms in common use for lawful purposes should not be allowed to persist another moment.

Defendants' contradictory and misdirected arguments for keeping the Ban in place pending the litigation underscore the need for immediate relief. Defendants claim on the one hand there's no possibility of irreparable harm because nothing about AB 1621 could violate any rights secured under the Second Amendment, Opp. at 13, only to then turn around and say there's no irreparable harm because people could "obtain a replacement machine if the prohibition is ultimately deemed unconstitutional," *id.* It's either unconstitutional or it's not. Defendants' ambivalence tellingly suggests that they themselves have doubts about the Ban's legitimacy. *See Rhode*, 445 F.Supp.3d at 953 (quoting *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664-65 (2004) ("'[i]f the underlying constitutional question is close... we should uphold the injunction and remand for trial on the merits'"). And the rest of their arguments seek to justify keeping the law in force based on the *legislature's* judgments about the potential dangers of "ghost guns" in the hands of *murderers and criminals* bent on evading detection with "untraceable guns." *Id.* at 1, 3, 14. That focus is entirely wrong and thus carries no weight. This case is about the right of *law-abiding* citizens to exercise conduct *covered* under the Second Amendment according to "the balance struck by the founding generation," which "demands our unqualified deference" unless the government *justifies* the restriction as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126, 2133, n. 7.

Similarly, Defendants cannot sweep aside the concerns of irreparable harm by claiming the Ban imposes only a "small" burden on Plaintiffs because they may have *other* means to acquire and/or construct firearms. Opp. at 14. As the Third Circuit recently put it in *Frein v. Penn. State Police*, 47 F.4th 247 (3d Cir. 2022), "[w]ith other constitutional rights, we scrutinize not only total bans but also lesser restrictions and burdens." *Id.* at 254. "Even if the government has not entirely prevented citizens from

speaking or worshipping, its burdens on speech and worship may violate the First Amendment." *Id.* "Thus, we may be skeptical of public-health rules that cap how many people may physically attend church, even if the rules do not ban them from worshipping." *Id.* The government cannot defend a restriction on the exercise of constitutional rights by pointing to the existence of *other* channels through which the same rights might be exercised. It must *justify* cutting off the channel it has foreclosed. *Bruen*, 142 S.Ct. 2130 ("[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions"); *Frein* at 256 (rejecting the argument that "seizures do not burden Second Amendment rights as long as citizens can 'retain[ ] or acquir[e] other firearms'"); *id.* ("We would never say the police may seize and keep printing presses so long as newspapers may replace them, or that they may seize and keep synagogues so long as worshippers may pray elsewhere.").

Finally, Defendants cannot tip back the scales by claiming Plaintiffs haven't adequately *proved* the existence of irreparable harm with declarations or expert reports. Opp. at 13. The relevant facts are undisputed, leaving purely legal questions about the constitutionality of the law. *Rodriguez v. Robbins*, 715 F.3d 1127, 1133, n. 6 (9th Cir. 2013) (finding "the relevant facts [we]re inherently undisputed" where the "case present[ed], at its core, a question of statutory and constitutional interpretation that d[id] not turn on the facts of any individual Petitioner"). Anyway, "the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed*, 736 F.3d at 1250, n. 5. The movant is not "required to prove his case in full at a preliminary-injunction hearing," *University of Texas v. Camenish*, 451 U.S. 390, 395 (1981); nor is the court limited to "rely[ing] only on admissible evidence to support its finding of irreparable harm," as it may consider other materials, *Herb Reed* at 1250, n. 5.

With Defendants having elected a litigation strategy based on a tortured reading of the Second Amendment's plain text that enables them to avoid to "perform[ing] the historical analysis called for by *Bruen*," and with the law and relevant factors so heavily on Plaintiffs' side, this motion should be granted without further delay. Moreover, any

further delay in its adjudication occasioned by additional research or briefing should be strictly limited in mitigating against the irreparable harm. *See Rhode*, 445 F.Supp.3d at 954 ("The right to keep and bear arms protects both tangible and intangible interests which cannot be compensated by damages.").

Dated:  October 3, 2022                        The DiGuiseppe Law Firm, P.C.
                                               *By /s/ Raymond M. DiGuiseppe*
                                               Raymond M. DiGuiseppe
                                               Attorneys for Plaintiffs