| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | FOR THE SOUTHERN DISTRICT OF CALIFORNIA |
| 3 | BEFORE THE HONORABLE DANA M. SABRAW |
| | DISTRICT JUDGE PRESIDING |

4

_____

5

LANA RAE RENNA, ET AL.,          )   20-CV-2190-DMS

6                                 )
                 PLAINTIFFS,      )   MOTION HEARING
7                                 )
          V.                      )
8                                 )
ROB BONTA, ATTORNEY GENERAL       )
9   OF CALIFORNIA, ET AL.,        )
                                  )
10                DEFENDANTS.      )
                                  )

11

_____

12                REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                  FRIDAY; OCTOBER 7, 2022

14                      PAGES 1 - 43

15   APPEARANCES:

16   FOR THE PLAINTIFF:      THE DIGUISEPPE LAW FIRM, P.C.
                             BY:  RAYMOND MARK DIGUISEPPE, ESQ.
17                           4320 SOUTHPORT-SUPPLY ROAD, SUITE 300
                             SOUTHPORT, NORTH CAROLINA  28461

18

FOR THE DEFENDANT:      U.S. ATTORNEY'S OFFICE,
19                           SOUTHERN DISTRICT OF CALIFORNIA
                             BY:  GABRIELLA D. BOUTIN, ESQ.
20                           880 FRONT STREET, SUITE 6253
                             SAN DIEGO, CALIFORNIA  92101

21

22

23

COURT REPORTER:         VANESSA EVANS, CSR, RPR, FCRR
24                           UNITED STATES DISTRICT COURT
                             SOUTHERN DISTRICT OF CALIFORNIA
25                           333 WEST BROADWAY, SUITE 420
                             SAN DIEGO, CALIFORNIA 92101

FRIDAY, OCTOBER 7. 2022; 1:48 P.M.

1                   P R O C E E D I N G S

2                        -- O0O --

3          THE CLERK:  CALLING MATTER 13 ON THE CALENDAR,

4    20-CV-2190, RENNA, ET AL. VERSUS BECERRA, ET AL.

5          MR. DIGUISEPPE:  GOOD AFTERNOON, YOUR HONOR.  RAY

6    DIGUISEPPE ON BEHALF OF THE PLAINTIFFS.

7          MS. BOUTIN:  GOOD AFTERNOON, YOUR HONOR.  GABRIELLE

8    BOUTIN ON BEHALF OF DEFENDANTS.

9          THE COURT:  GOOD AFTERNOON.  WE HAVE NOT MET IN

10   PERSON, HAVE WE?

11         MS. BOUTIN:  THAT'S RIGHT.

12         MR. DIGUISEPPE:  WE HAVEN'T, YOUR HONOR.

13         THE COURT:  I THINK THE LAST WE VISITED WITH A

14   TELEPHONIC CONFERENCE CALL IN THE MIDDLE OF THE PANDEMIC.

15         MR. DIGUISEPPE:  THAT'S RIGHT, YOUR HONOR.

16         MS. BOUTIN:  AND I THINK THAT WAS PROBABLY MY

17   COLLEAGUE SINCE I -- WE HAD THE PANDEMIC.  I HAVE GONE OUT ON

18   EIGHT MONTHS OF PARENTAL LEAVE AND NOW COME BACK AGAIN.

19         THE COURT:  VERY GOOD.  WELCOME BACK.

20         MS. BOUTIN:  THANK YOU.  A LOT'S HAPPENED.

21         THE COURT:  SO, MR. DIGUISEPPE, YOU ARE ALL OVER THE

22   COUNTRY.

23         MR. DIGUISEPPE:  THAT'S RIGHT, YOUR HONOR.  RIGHT.  I

24   HAVE LICENSES IN FOUR STATES; SO I HAVE A LOT GOING ON PRETTY

25   MUCH ANY TIME.

1          BUT I WANT TO THANK THE COURT AGAIN ON THE

2   ACCOMMODATION ON THE BRIEFING SCHEDULE.  THANK YOU VERY MUCH.

3          THE COURT:  YOU'RE WELCOME.  AND I'M ALWAYS CONTENT

4   TO -- ALMOST ALWAYS CONTENT TO HANDLE THESE LAW AND MOTION

5   MATTERS TELEPHONICALLY TOO.  SO IF YOU HAVE THAT NEED, YOU CAN

6   ALWAYS AVAIL YOURSELF OF THAT OPPORTUNITY AS WELL.  BUT IT'S

7   NICE TO SEE YOU BOTH.

8          MR. DIGUISEPPE:  AGREED.

9          THE COURT:  I WANT TO THANK YOU FOR THE BRIEFING.  I

10  READ EVERYTHING.  THESE ARE REALLY INTERESTING ISSUES, AND SO I

11  WANT TO THANK YOU FOR THE BRIEFING.

12         I DO HAVE QUESTIONS, NOT IN ANY PARTICULAR ORDER.  I

13  THINK I'LL JUST GO BACK AND FORTH BETWEEN YOU.  SOME OF THIS IS

14  JUST FOR MY OWN CLARIFICATION.

15         SO MAYBE I CAN START WITH THE STATE AND, AS YOU ARGUE

16  IT, THE AB 1621 IS NOT A BAN ON THE MANUFACTURING OF

17  SELF-ASSEMBLED FIREARMS.  PEOPLE CAN STILL LAWFULLY PRODUCE AND

18  ASSEMBLE SERIALIZED GUN PARTS.

19         SO IT'S ONLY A BAN ON THE CNC MILLING MACHINE AND THE

20  MANUFACTURE OF UNSERIALIZED RECEIVERS AND GUN PARTS.

21         MS. BOUTIN:  THE TEXT OF THE LAW -- DO YOU MIND IF I

22  SIT, YOUR HONOR?

23         THE COURT:  YES.  THAT WOULD BE FINE.

24         SAME TO YOU, YOU CAN HAVE A SEAT.

25         MR. DIGUISEPPE:  THANK YOU.

```
 1          MS. BOUTIN:  YES, YOUR HONOR.  THE TEXT OF THE BILL IS
 2    SPECIFIC TO THE CNC MILLING MACHINES.  IT DOES NOT REFER TO
 3    OTHER TOOLS.  IT DOES NOT REFER -- IT DOES NOT BAN
 4    MANUFACTURING IN GENERAL.  IT IS VERY SPECIFIC ONLY TO THESE
 5    MACHINES.
 6          THE COURT:  NOW THE MACHINE GENERALLY IS USED TO
 7    PRODUCE RECEIVERS OR FRAMES.  AM I CORRECT?
 8          MS. BOUTIN:  THAT'S MY UNDERSTANDING, ALTHOUGH I DON'T
 9    KNOW IF THERE ARE OTHER PARTS IT ALSO COULD BE USED FOR.
10          THE COURT:  YES.  AND AM I CORRECT THAT, GENERALLY,
11    THE ONLY -- I GUESS THE STATE'S POSITION WOULD BE THE ONLY WAY
12    TO GET A SERIALIZED RECEIVER OR GUN PART WOULD BE FROM A
13    LICENSED FIREARMS MANUFACTURER?
14          MS. BOUTIN:  NOT NECESSARILY.  MY UNDERSTANDING OF THE
15    PROCESS IS THAT ONE CAN SELF-MANUFACTURE A FIREARM THAT
16    COMPLIES WITH THE REQUIREMENTS OF CALIFORNIA LAW AND THEN APPLY
17    FOR -- TO THE STATE FOR A SERIAL NUMBER AND THEN GO THROUGH THE
18    PROCESS THAT COMMERCIAL MANUFACTURERS ALSO WOULD HAVE TO GO
19    THROUGH TO HAVE IT BE RECOGNIZED AS A LEGAL FIREARM.
20          THE COURT:  SO THAT WOULD BE THE OTHER WAY.  SO IT'S
21    EITHER MANUFACTURED BY A LICENSED MANUFACTURER, OR IT CAN BE
22    MADE AT HOME THROUGH A MACHINE LIKE THE CNC MILLING MACHINE,
23    AND THEN YOU COULD LATER APPLY FOR A SERIAL NUMBER THROUGH THE
24    STATE?
25          MS. BOUTIN:  YES.  THAT'S MY UNDERSTANDING.
```

```
 1              I THINK AN IMPORTANT POINT IS THAT IT'S -- THE CNC
 2   MILLING MACHINE, MY UNDERSTANDING, IS NOT ESSENTIAL TO THIS
 3   PROCESS OF MANUFACTURING.  WE DON'T HAVE A FACTUAL RECORD AT
 4   THIS POINT TO ESTABLISH, YOU KNOW, WHAT THE VARIOUS WAYS OF
 5   SELF-MANUFACTURE ARE.  I THINK THAT'S IMPORTANT TO KEEP IN MIND
 6   AT THIS STAGE FOR A PRELIMINARY INJUNCTION.  WE DON'T HAVE A
 7   FACTUAL RECORD THAT ESTABLISHES WHAT ROLE IT DOES PLAY, IF
 8   THERE ARE OTHER MEANS OF SELF-MANUFACTURE.
 9              SO IF WE ARE GOING TO ASSUME THAT MANUFACTURING IS A
10   RIGHT -- WHICH I THINK IS A PRETTY BIG ASSUMPTION -- THERE IS
11   CERTAINLY NO FACTUAL RECORD AT THIS STAGE TO SAY, YOU KNOW,
12   THERE'S NO OTHER WAY TO DO IT OR -- SO, FOR EXAMPLE, I KNOW
13   THAT THESE GHOST GUN KITS EXIST AND THERE IS FEDERAL LAW
14   REGULATING THOSE WHERE SOME TOOLS ARE PROVIDED AND THEY ARE
15   KIND OF IN VARIOUS STATES OF COMPLETION.
16              SO AS I SAID, I THINK MY POINT IS WE DON'T HAVE A
17   FACTUAL RECORD.  AND SO I THINK, YOU KNOW, THE FIRST STEP
18   OBVIOUSLY IS:  DOES THE SECOND AMENDMENT APPLY?
19              AND, YOU KNOW, WE THINK THERE'S A PLAIN TEXT READING
20   IT DOESN'T APPLY HERE.  THERE ARE -- AND I COULD KIND OF GO
21   INTO MY SPIEL.  I'M HAPPY TO DO THAT.  BUT I KNOW YOU HAVE
22   QUESTIONS.
23              BUT THE POINT IS I DON'T THINK THERE IS A FACTUAL
24   RECORD IN TERMS OF IS THIS TOOL IS ESSENTIAL TO ANY SECOND
25   AMENDMENT RIGHT.
```

1          THE COURT:  IT SEEMS LIKE IT'S THE BIG TOOL.  IT'S THE

2     ONE THAT'S GENERATING MOST OF THESE RECEIVERS THAT ARE NOT

3     SERIALIZED.

4          BUT YOUR POINT IS THAT THERE MAY BE OTHER MACHINES OR

5     TOOLS TO MANUFACTURE UNSERIALIZED FIREARMS OR GUN PARTS.

6          MS. BOUTIN:  YEAH.  I THINK -- THAT IS THE POINT.

7     AGAIN, I THINK THE REASON THAT'S IMPORTANT IS BECAUSE THE

8     JACKSON CASE -- WHICH IS A NINTH CIRCUIT CASE INVOLVING

9     AMMUNITION -- MAKES THE POINT THAT THE PLAIN TEXT OF THE SECOND

10    AMENDMENT, WHICH IS, YOU KNOW, THE FIRST STEP IN THE ANALYSIS.

11    IS THERE A PLAIN TEXT COVERAGE OF THE CONDUCT BEING REGULATED?

12         THE PLAIN TEXT ARGUES THE KEEPING AND BEARING OF ARMS

13    AND INJECTS -- AND THEY NOTED THAT AMMUNITION IS NOT ARMS; SO

14    IT DOES NOT FALL UNDER THAT.

15         BUT THEN THEY SAID, IF THE LAW NEVERTHELESS REGULATES

16    CONDUCT THAT THEN MAKES IT IMPOS- -- THEY LITERALLY USE THE

17    WORD "IMPOSSIBLE" TO KEEP AND BEAR ARMS AND WOULD RENDER IT

18    MEANINGLESS, THEN THAT COULD PERHAPS BE CONSIDERED UNDER THE

19    KEEP AND BEAR ARMS.

20         BUT I THINK WHAT'S IMPORTANT HERE IS THAT THIS ONE

21    TOOL DOES NOT STOP YOU FROM KEEPING FIREARMS.  YOU CAN OBTAIN

22    THEM.  YOU CAN POSSESS THEM.  IT DOES NOT STOP YOU FROM BEARING

23    ARMS.  YOU COULD NOT -- IT'S NOT A WEAPON THAT COULD BE BORNE

24    ON THE PERSON.  IT'S NOT AN ARM AT ALL.

25         AND, AGAIN, THERE'S CERTAINLY, YOU KNOW, NO RECORD

1    THAT YOU CAN'T KEEP AND BEAR ARMS BECAUSE, AGAIN, YOU COULD

2    STILL GO PURCHASE AN ARM AND KEEP IT THAT WAY.  I THINK THAT'S

3    HOW A LOT OF PEOPLE OBTAIN THEIR ARMS.

4         THE COURT:  ISN'T THE LOGICAL EXTENSION OF THE STATE'S

5    ARGUMENT -- SO IF THE COURT WERE TO ENJOIN OR TO DENY THE

6    INJUNCTION AND TO ALLOW THIS STATUTE TO GO FORWARD BANNING THE

7    CNC MILLING MACHINES, PRESENTLY THE STATE ARGUES THAT THAT

8    WOULD BAN THE UNSERIALIZED MANUFACTURING OR SELF-MANUFACTURING

9    THROUGH THAT ONE MACHINE.

10        BUT ISN'T THE LOGICAL ARGUMENT OF THE STATE GOING TO

11   BE THAT INDIVIDUALS, LAW-ABIDING INDIVIDUALS, HAVE A RIGHT TO

12   ACQUIRE ARMS, BUT THEY HAVE TO BE SERIALIZED OR PURCHASED FROM

13   A LICENSED MANUFACTURER?

14        MS. BOUTIN:  CERTAINLY -- I THINK THE SHORT ANSWER --

15   I DON'T WANT TO OVERGENERALIZE.  I THINK THE SHORT ANSWER TO

16   YOUR QUESTION IS:  YES, THAT'S NOT SOMETHING I SPECIFICALLY

17   CONSIDERED.  BUT CERTAINLY WE DO BELIEVE THAT THE STATE'S LAWS

18   DO NEED TO BE COMPLIED WITH AND THAT THEY ARE VALID UNDER THE

19   CONSTITUTION.

20        SO IF THAT -- I THINK MAYBE THAT ANSWERS YOUR

21   QUESTION.  SO TO THE EXTENT THEY ARE REQUIRED TO BE -- YOU

22   KNOW, YES, THEY MUST BE SERIALIZED, AND THEREFORE WE DO BELIEVE

23   THAT THAT IS VALID.

24        THE COURT:  SO IF YOU'RE TALKING ABOUT SOME OF THE

25   ANCILLARY RIGHTS THAT ARE EMBEDDED WITHIN THE SECOND AMENDMENT

1    TO KEEP AND BEAR ARMS -- AND THE SUPREME COURT SEEMS TO BE

2    SAYING THAT WHAT'S EMBEDDED WITHIN THAT TECHNOLOGY IS THE RIGHT

3    TO POSSESS AND CARRY OR POSSESS AND USE FIREARMS FOR

4    SELF-PROTECTION INSIDE AND OUTSIDE THE HOME.

5         SO LEGISLATION CANNOT PROHIBIT, FOR EXAMPLE, MAKING OF

6    BULLETS OR TRAINING WITH FIREARMS OR ACQUIRING FIREARMS.

7    OTHERWISE THAT WOULD RUN AFOUL OF THE SECOND AMENDMENT.

8         DOES THAT SOUND FAIR?

9         MS. BOUTIN:  I BELIEVE SO.  I KNOW IN THE NINTH -- SO

10   SOME OF THOSE ISSUES HAVE BEEN TAKEN HEAD ON IN VARIOUS

11   JURISDICTIONS.  CERTAINLY IN THE NINTH CIRCUIT JACKSON

12   ESTABLISHES THAT FOR BULLETS -- I SHOULDN'T SAY ESTABLISHES

13   THAT.  IT DISCUSSES THAT WITH REFERENCE TO BULLETS.  IT DID NOT

14   COME TO A HOLDING ON THAT ISSUE, BUT IT DISCUSSED IT WITH

15   REFERENCE TO BULLETS.  AND THE TEXT IN THEIR CASE I BELIEVE

16   THAT WAS --

17        THE COURT:  THE GUN STORE?

18        MS. BOUTIN:  THAT WAS WITH PERMIT USE; THAT WAS A

19   PERMIT.  SO, YES, THAT HAD TO DO WITH ACQUIRING FIREARMS.

20   AGAIN, IT WAS NOT A HOLDING, BUT IT WAS IN THE COURT'S

21   DISCUSSION.

22        SO THOSE ARE -- THOSE ARE THE AREAS THAT HAVE BEEN

23   CONSIDERED TO BE ENCOMPASSED WITHIN KEEP AND BEAR ARMS WITHIN

24   THE NINTH CIRCUIT, YES, YOUR HONOR.

25        THE COURT:  ALL RIGHT.  SO IT SEEMS TO ME IN FOLLOWING

1   THIS ARGUMENT THROUGH -- WHETHER IT'S THIS CASE OR THE NEXT

2   ITERATION OF THIS CASE -- IF THIS PRELIMINARY INJUNCTION IS

3   DENIED IS THE STATE WOULD BE ARGUING LAW-ABIDING CITIZENS DO

4   HAVE A RIGHT TO ACQUIRE FIREARMS.  BUT ON THE ISSUE OF FROM

5   WHOM, FROM WHOM DO THEY ACQUIRE THE FIREARMS?  IT WOULD HAVE TO

6   COME FROM A LICENSED MANUFACTURER.

7           MS. BOUTIN:  YOUR HONOR, I DON'T KNOW THE SPECIFIC

8   LAWS ON LICENSING FOR THE SALE OF GUNS, FOR WHO CAN SELL A GUN.

9   I DON'T KNOW THE SPECIFIC LAWS ON THAT.  I'M SURE THAT THEY

10  EXIST, AND THERE IS -- PROBABLY HAVE TO, YOU KNOW, COMPLY WITH

11  CERTAIN REGULATIONS AND, YOU KNOW, PERFORM THE BACKGROUND

12  CHECKS, ET CETERA.  BUT I BELIEVE THAT IS THE STATE'S POSITION.

13          BUT I DO THINK SOMETHING THAT IS ALSO IMPORTANT HERE

14  IS JUST THE CONTEXT OF THE SUPREME COURT CASES THAT HAVE COME

15  DOWN AND THAT ARE REALLY SPEAKING TO WHAT'S GOING ON, AND

16  THAT'S HELLER, MCDONALD, AND BRUEN.

17          AND I THINK -- KEEPING THIS CASE IN PERSPECTIVE, IN

18  THIS CASE WE ARE TALKING ABOUT ONE TOOL TO SELF-MANUFACTURE.

19  SO THERE ARE TWO LEVELS HERE THAT HAVE NOT BEEN ESTABLISHED IN

20  PREVIOUS CASES.  ONE IS THE LEVEL OF WHETHER "KEEP AND BEAR

21  ARMS" MEANS CAN YOU MANUFACTURE?  BUT ANOTHER ONE IS:  DO YOU

22  HAVE THE RIGHT TO EVERY POSSIBLE TOOL FOR MANUFACTURING, RIGHT?

23          SO AND THEN, AGAIN, OUTSIDE OF ALL OF THAT IS THERE

24  ARE PLENTIFUL WAYS TO ACQUIRE FIREARMS IN ADDITION TO THOSE.

25          AND WHEN YOU ARE LOOKING AT HELLER, MCDONALD, AND

1  BRUEN, THOSE STATES INVOLVED COMPLETE BANS ON EITHER

2  POSSESSING -- I.E., KEEPING -- OR CARRYING -- I.E., BEARING --

3  FIREARMS.  THERE WERE NOT ALTERNATIVES FOR WHICH THEY COULD

4  EXERCISE THOSE RIGHTS.

5         HERE, THERE ARE PLENTY OF ALTERNATIVES.  AND WE'RE

6  ONLY TALKING ABOUT ONE SPECIFIC TOOL.

7         SO FOR THE SAKE OF ARGUMENT, EVEN IF IN THEORY, AGAIN,

8  MANUFACTURING -- LET'S SAY, YOU KNOW, EVEN IF THIS WERE THE

9  ONLY WAY TO SELF-MANUFACTURE, WHICH I DON'T THINK IT IS.

10  THERE'S NO RECORD OF THAT.  THERE ARE STILL PLENTIFUL OTHER

11  MEANS TO KEEP AND BEAR ARMS.  IT'S NOT A COMPLETE BAN LIKE IN

12  THOSE CASES.

13         THE COURT:  YES.  AND SO I DO UNDERSTAND YOUR ARGUMENT

14  TO BE ON THE FIRST PRONG.  THAT'S THE FOCUS, OF COURSE, UNDER

15  BRUEN FROM THE STATE'S POSITION IN OPPOSING THIS PARTICULAR

16  MOTION.

17         SO PERHAPS I CAN TURN TO MR. DIGUISEPPE.  DO YOU --

18  WELL, FIRST, IT SEEMS CLEAR TO ME THAT THE SUPREME COURT WHEN

19  IT'S FOCUSING ON KEEP AND BEAR ARMS, IT'S TALKING ABOUT

20  POSSESSION AND USE AND THAT YOU CAN'T -- IF LEGISLATION IMPACTS

21  POSSESSION OR USE, IT'S GOING TO RUN AFOUL OF THE PLAIN

22  LANGUAGE OF KEEP AND BEAR ARMS UNDER THE SECOND AMENDMENT.

23         AND WITH THE FOCUS ON POSSESSION AND USE OR POSSESSION

24  AND CARRY, ISN'T THAT DISTINGUISHABLE FROM DISTRIBUTION AND

25  MANUFACTURING?  AREN'T THOSE DIFFERENT CONCEPTS THAT ARE

1    TREATED DIFFERENTLY WHEN ONE LOOKS AT THE PLAIN TEXT OF THE

2    SECOND AMENDMENT?

3            MR. DIGUISEPPE:  I THINK, YOUR HONOR, WE'RE STILL

4    FOCUSED PRIMARILY ON ACQUISITION, THE ABILITY TO ACQUIRE.

5    PROBABLY GO -- THAT QUESTION PROBABLY GOES MORE TO FROM WHOM

6    AND IN WHAT WAY YOU COULD ACQUIRE IT.

7            THE COURT:  YES.

8            MR. DIGUISEPPE:  AND IT MIGHT BE DISTRIBUTION OR

9    MANUFACTURE.

10           BUT IF IT'S ABOUT ACQUISITION, THAT WOULD CLEARLY BE

11   AN ANCILLARY NECESSARILY IMPLIED RIGHT ARISING OUT OF

12   POSSESSION AND USE AND THOSE RECOGNITIONS IN THE TEXT ITSELF.

13           THE COURT:  ACQUISITION FROM WHOM?

14           SO IF YOU CAN ACQUIRE VIRTUALLY ANY FIREARM THAT'S IN

15   COMMON USE, NOT DANGEROUS, THAT VERBIAGE, FROM A LICENSED

16   MANUFACTURER, IS THAT SUFFICIENT OR NOT?

17           MR. DIGUISEPPE:  IT'S NOT SUFFICIENT BECAUSE THERE IS

18   A RECOGNIZABLE RIGHT TO SELF-MANUFACTURE.

19           AND I THINK THAT THAT'S CLEARLY COVERED UNDER THE TEXT

20   ITSELF WHEN YOU READ IT THE WAY THAT I THINK BRUEN INTENDS IT

21   TO BE READ.

22           WHEN BRUEN TALKS ABOUT WHAT IS PROTECTED OR NOT, IT'S

23   USING BROAD TERM LIKE "COVER."  IT GOES FURTHER THAN JUST

24   POSSESSION, USE, AND SAYS THAT IT PROTECTS -- EVEN THOUGH IT

25   DOESN'T SPECIFICALLY SAY ALL MODERN INSTRUMENTS THAT FACILITATE

1    ARMED SELF-DEFENSE, IT'S ALSO THE SAME THAT A PRINTER IS NOT

2    NECESSARY TO CONDUCT SPEECH.  A PRINTING PRESS ISN'T NECESSARY

3    TO PRODUCE NUMEROUS FLYERS SO THAT YOU CAN DISTRIBUTE YOUR

4    SPEECH EFFECTIVELY.  BUT WE WOULDN'T SAY THE GOVERNMENT COULD

5    OUTLAW THOSE DEVICES JUST BECAUSE YOU INSTEAD MAKE YOUR MESSAGE

6    ON FACEBOOK OR WRITE IT ON A PIECE OF PAPER.

7              SO I THINK WE HAVE TO FOCUS ON, YOU KNOW, WHAT'S BEING

8    TAKEN AWAY, NOT WHAT'S LEFT.

9              ON THE TEXTUAL ARGUMENT, I THINK IT'S VERY DIFFICULT

10   AND DANGEROUS TO ACCEPT THE KIND OF NOTION THAT THE

11   GOVERNMENT'S PUTTING FORWARD HERE.  THAT HAS TO LITERALLY BE

12   EXPRESSED.  THAT'S THE ARGUMENT.  THE ARGUMENT IS IT HAS TO BE

13   LITERALLY STATED IN THERE?

14             AND WE SEE THROUGH THE SUPREME COURT'S CONSTANT

15   COMPARISON TO THE FIRST AMENDMENT THAT YOU CANNOT HAVE AN

16   INTERPRETATION OF THE CONSTITUTION THAT WAY, LITERALLY HAVING

17   TO STATE THAT A CNC MACHINE IS PROTECTED OR A PARTICULAR FORM

18   OF SPEECH OR WHATNOT IS PROTECTED IN ORDER TO BE COVERED.

19             ALSO, TOO, REMEMBER THAT IT SAYS:  TEXT AS INFORMED BY

20   HISTORY.  SO THERE'S A HISTORICAL COMPONENT TO IT AS WELL.

21   IT'S NOT CLEAR NECESSARILY WHO HAS THE BURDEN ON THAT PRONG OF

22   THE ANALYSIS, BUT IT IS TEXT AS INFORMED BY HISTORY.

23             AND ALSO WE CERTAINLY HAVE TO PAY ATTENTION TO HOW THE

24   COURT HAS READ THE TEXT, RIGHT?  THE COURT ITSELF HAS STATED

25   VARIOUS INTERPRETATIONS OF IT.  IT DOES NOT SPECIFICALLY SAY,

1    FOR EXAMPLE, THAT YOU HAVE THE RIGHT TO CARRY IN CASE OF

2    CONFRONTATION, BUT IT'S CLEARLY IMPLIED IN THERE.  SO IT

3    BECOMES PROTECTED WHETHER IT'S EXPRESSLY STATED OR NOT.

4         AND SO, FROM OUR POSITION, I THINK IT'S ONLY

5    REASONABLE TO SAY THAT THE ANALYSIS THAT'S BEING USED BY THE

6    GOVERNMENT IS JUST NOT ACCEPTABLE.  IT'S UNTENABLE IN TERMS OF

7    WHAT'S COVERED OR WHAT'S NOT COVERED TO SAY IT HAS TO LITERALLY

8    BE STATED.

9         AND THEN MOVING FROM BRUEN TO THE EXTENT THAT THE

10   NINTH CIRCUIT CASE LAW WAS NOT -- IS NOT INCONSISTENT WITH

11   BRUEN, IT STILL APPLIES AND IT'S CONTROLLING.  AND I THINK THAT

12   TEIXEIRA MAKES A VERY GOOD BASELINE AS FAR AS ACQUISITION GOES,

13   ESTABLISHING THAT THERE IS A RIGHT TO ACQUIRE.

14        AND BEYOND THAT, FROM ACQUISITION PURPOSES, AS I NOTED

15   IN THE BRIEF, THERE ARE TWO WAYS TO ACQUIRE:  MAKE IT OR BUY IT

16   OR GET IT TRANSFERRED TO YOU.

17        IS MAKING PROTECTED?  I THINK IT CERTAINLY CAN BE

18   FOUND AS SUCH, ESPECIALLY WHEN WE THINK ABOUT WHAT WAS

19   INTENDED -- WHAT'S THE INTENDED MEANING OF THE TEXT AT THE TIME

20   OF THE FOUNDING, THE RELEVANT HISTORICAL PERIODS, RIGHT?

21        IT IS, AGAIN, TEXT AND INFORMED BY HISTORY.  AND YOU

22   HAVE THE RIGBY CASE THAT I CITED OUT OF DELAWARE RECENTLY WHERE

23   THEY FOUND THAT IT WAS EXPRESSLY IMPLIED.  JUST SEEMS NATURAL

24   AND LOGICAL TO SAY THAT IT IS JUST FOCUSING ON THE LANGUAGE AND

25   THE ACQUISITION RIGHTS WHICH ARE ESTABLISHED.

1    WHY WOULD IT BE THE CASE THAT ONLY ONE CHANNEL WOULD

2  BE AVAILABLE FOR ACQUISITION AND THAT IS TO PURCHASE FROM, FROM

3  SOMEONE?

4    THE COURT:  SO I -- YOU SET OUT -- AND I THINK THE

5  CASE LAW IS CLEAR ON THIS -- THAT THERE'S A RIGHT TO ACQUIRE,

6  BUT IT'S NOT ADDRESSING FROM WHOM AND WHETHER THE GOVERNMENT

7  CAN LIMIT SOME OF THE SOURCE -- SOURCES OF THAT.

8    SO YOU CAN BUY IT FROM A LICENSED MANUFACTURER.

9  THAT'S NOT IN DISPUTE.  BUT CAN YOU ACQUIRE IT FROM AN

10  UNLICENSED SOURCE?

11    SO THE -- YOUR ARGUMENT LEADS, I THINK, INEXORABLY TO

12  THE ABILITY OF INDIVIDUALS TO SELF-MANUFACTURE UNSERIALIZED

13  FIREARMS AND FIREARM PARTS.

14    MR. DIGUISEPPE:  WELL, IT HAS TO, TO THE EXTENT THAT

15  IF A SERIALIZATION REQUIREMENT MAKES IT IMPOSSIBLE TO ENGAGE IN

16  THE CONDUCT, THEN THERE'S GOING TO BE AN ISSUE WITH THE

17  SERIALIZATION REQUIREMENT.  BUT THAT'S NOT WHAT'S REALLY AT

18  ISSUE HERE, WHETHER IT HAS TO BE SERIALIZED OR NOT.

19    I MEAN, REMEMBER WITH AB 1621, THE CHALLENGE THAT WE

20  HAVE THERE WAS BROADER THAN THE CHALLENGE THAT'S CURRENTLY

21  BEFORE THIS COURT WITH RESPECT TO THE MPI THAT RELATES TO THE

22  CNC BAN.

23    THE 1621 CHALLENGE TAKES ISSUE WITH THOSE CHANGES TO

24  THE LAW INSOFAR AS OUR POSITION IS THAT ESSENTIALLY THOSE

25  REGULATIONS MAKE IT VIRTUALLY IMPOSSIBLE OR VERY DIFFICULT TO

1   ENGAGE IN SELF-MANUFACTURE AT ALL BECAUSE OF THEIR STIPULATIONS

2   NOW THAT EVERYTHING HAS TO BE SERIALIZED.

3           JUST TRYING TO CONTEXTUALIZE THINGS BETTER WITH THE

4   DISCUSSION YOU WERE HAVING PREVIOUSLY WITH THE STATE'S

5   ATTORNEY, WHEN IT COMES TO THE SERIALIZATION ISSUE AND BEING

6   ABLE TO ACQUIRE PARTS TO MANUFACTURE WITH, YOU CAN'T

7   MANUFACTURE SOMETHING THAT'S ALREADY BEEN MADE.  SO IF A

8   RECEIVER OR A FRAME IS ONLY PERMISSIBLE FOR SALE OR TRANSFER TO

9   A LAW ABIDING -- NORMAL, LAW-ABIDING PERSON IF IT'S ALREADY

10  SERIALIZED, THEN YOU CAN'T MAKE IT YOURSELF.  YOU HAVE TO BUY

11  IT.  AND THEREFORE YOU HAVE NO RIGHT TO SELF-MANUFACTURE IT.

12  THAT'S THE PROBLEM WITH THE ARGUMENT OF, WELL, YOU CAN JUST USE

13  SERIALIZED PARTS.

14          THE PARTS THAT ARE CONSIDERED FIREARMS FOR PURPOSES OF

15  LAWFUL SALE ARE COMPLETED BECAUSE THOSE ARE THE ONLY ONES THAT

16  CAN BE SERIALIZED.

17          SO THE RIGHT TO SELF-MANUFACTURE STARTING WITH THE

18  RUDIMENTARY PARTS LEADING UP TO THESE 80-PERCENT RECEIVERS, AS

19  THEY ARE CALLED, UNFINISHED RECEIVERS, THAT RIGHT IS

20  ESSENTIALLY BEING STRIPPED BY VIRTUE OF THE WAY THE 1820 --

21  1621 PROVISIONS ARE WORKING.

22          THE COURT:  COULDN'T YOU MANUFACTURE THESE

23  UNSERIALIZED RECEIVERS AND THEN APPLY TO THE STATE FOR A SERIAL

24  NUMBER SO THAT WOULD BE --

25          MR. DIGUISEPPE:  THAT'S THE THING.  I MEAN, HOW CAN

```
 1   YOU LAWFULLY ACQUIRE AN UNSERIALIZED OR CREATE AN UNSERIALIZED

 2   RECEIVER AND THEN APPLY FOR SERIALIZATION AFTER THE FACT?

 3   IT -- ONE THING TO KEEP IN MIND IS, UNDER 29810, THE NEW ONE,

 4   THE AMENDED VERSION OF THAT, IT HAS EXPANDED THE DEFINITION OF

 5   MANUFACTURING AND ASSEMBLING.  IT BASICALLY MEANS ANY MEANS OF

 6   FABRICATING A FIREARM.

 7         WELL, THERE ARE A LOT OF MEANS TO FABRICATE A FIREARM

 8   THAT ARE SHORT OF A RECEIVER, AND THERE ARE PARTS MORE

 9   RUDIMENTARY THAT WOULD NOT BE SUBJECT TO ANY KIND OF

10   SERIALIZATION OR APPLICATION FOR PERMISSION TO APPLY SERIAL

11   NUMBER TO THEM.  SO --

12         THE COURT:  IS THE CNC MILLING MACHINE THE ONLY WAY TO

13   SELF-MANUFACTURE, OR ARE THERE OTHER DEVICES?

14         MR. DIGUISEPPE:  I'M SURE THAT THERE ARE OTHER

15   DEVICES.  I DON'T KNOW WHAT -- I THINK -- I THINK THAT IT'S

16   KIND OF LIKE WHAT YOU INDICATED BEFORE, YOUR HONOR, IN THAT

17   IT'S -- THESE ARE SOME OF THE MOST COMMONLY USED, AND THAT'S

18   FOR A REASON.

19         JUST LIKE PRINTING PRESSES AND PRINTING MACHINES ARE

20   MOST COMMONLY USED TO PRINT FLYERS.  YOU CAN CERTAINLY WRITE

21   OUT ALL OF YOUR NOTES ON A PIECE OF PAPER IF YOU WANTED TO, BUT

22   IT'S A LOT EASIER, AND IT'S A FACILITATIVE PROCESS.

23         I THINK THAT --

24         THE COURT:  SO THIS STATUTE WOULDN'T BE A BAN ON

25   SELF-MANUFACTURE OF FIREARMS OR FIREARM PARTS, BUT IT MAYBE
```

```
 1    HITS TO THE HEART OF IT BECAUSE IT'S THE KEY WAY OF MAKING

 2    FIREARM PARTS THROUGH THIS PARTICULAR MACHINE?

 3         MR. DIGUISEPPE:  IT'S A PARTICULAR DEVICE THAT

 4    FACILITATES THE PROCESS, AND I THINK ONE THING TO KEEP IN MIND

 5    ABOUT BRUEN WHEN YOU GO TO THE TEXT, FOR EXAMPLE, BRUEN WAS

 6    OBVIOUSLY DESIGNED TO RAISE THE BAR, TO MAKE IT MORE DIFFICULT

 7    FOR THE GOVERNMENT TO REGULATE FIREARM RIGHTS BY TYING IT TO

 8    HISTORY AND BEING MORE PROTECTIVE.  NOT LESS OR MORE

 9    RESTRICTIVE, WHICH IS WHAT'S THE STATE'S ARGUMENT BASICALLY

10    CHARACTERIZES IT AS.

11         AND SO WHEN YOU THINK ABOUT IT IN THAT PERSPECTIVE,

12    FOR EXAMPLE, THE LANGUAGE THAT IN BRUEN -- AGAIN, RESTATED FROM

13    HELLER -- THAT THE SECOND AMENDMENT PROTECTS ALL MODERN

14    INSTRUMENTS THAT FACILITATE ARMED SELF-DEFENSE, THAT'S PRETTY

15    BROAD LANGUAGE, AND IT'S AN INSTRUMENT.  IT DOESN'T EVEN SAY IT

16    HAS TO BE A FIREARM ITSELF, JUST FACILITATES ARMED

17    SELF-DEFENSE.

18         ARGUABLY IN READING BRUEN IN TERMS OF ITS INTENT TO

19    PROVIDE GREATER PROTECTION THAN HAD BEEN GIVEN IN THE PAST, I

20    THINK, AND THEN YOU PUT THE WORD "COVER" AND THEN THE

21    COMPARISON TO FIRST AMENDMENT AND THE BROAD RIGHTS THAT ARE

22    GRANTED THERE WITHOUT EXPRESS INCLUSION, THIS IS A DEVICE THAT

23    FACILITATES THE PRODUCTION OF OR THE CONDUCT OF AN ACTIVITY

24    WHICH ITSELF IS PROTECTED.

25         OBVIOUSLY WE HAVE A DISPUTE OVER WHETHER THAT CONDUCT
```

```
 1    IS PROTECTED.  THAT'S ANOTHER QUESTION TO ANSWER, BUT I THINK

 2    WE CAN'T REST THIS ANALYSIS ON THE FIRST PRONG OF TEXT.  IT

 3    WOULD BE ABSURD TO DO SO.

 4         ALSO WE, AT THIS STAGE, FOR AN MPI ONLY HAVE TO SHOW

 5    REASONABLE -- OR LIKELIHOOD OF SUCCESS.  WE DON'T HAVE TO SHOW

 6    THAT WE WOULD PREVAIL ON THE MERITS.  WE HAVE TO SHOW IT WOULD

 7    LIKELY WE WOULD PROCEED ON THE RELEVANT PARTS OF THE ANALYSIS.

 8         IT IS LIKELY, MOST LIKELY -- I THINK INEVITABLE, BUT

 9    CERTAINLY AT LEAST LIKELY -- WE WILL PREVAIL ON THIS TEXTUAL

10    COMPONENT, WHICH PUTS US DOWN TO THE HISTORICAL QUESTION.

11         AND THAT'S WHY I THINK THE GOVERNMENT WANTS TO GET

12    AWAY FROM THAT, BECAUSE THERE'S NOT MUCH SUPPORT -- OR THERE'S

13    REALLY NO SUPPORT FOR ITS POSITION UNDER BRUEN WITH RESPECT TO

14    THE HISTORICAL PRONG.

15         THE COURT:  BUT WE ONLY GET THAT IF WE GET PAST THE

16    FIRST PRONG.  DO YOU AGREE?

17         MR. DIGUISEPPE:  THAT'S RIGHT, YOUR HONOR.  BUT I

18    THINK, GIVEN THE NINTH CIRCUIT LAW THAT ESTABLISHES ACQUISITION

19    RIGHTS -- IT'S CLEARLY CONSISTENT WITH BRUEN, BRUEN'S OWN

20    LANGUAGE ABOUT THE PROTECTIVE NATURE OF THE SECOND AMENDMENT --

21    AND THAT ACQUISITION CLEARLY CAN BE CONDUCTED IN THOSE TWO

22    DIFFERENT WAYS, ACQUISITION OF PURCHASE OR MAKING.

23         THEN THAT LEAVES US WITH A SITUATION WHERE, EVEN IF WE

24    IGNORE THE HISTORICAL PART OF IT, IT WOULD BE --

25         THE COURT:  THE CASE LAW IS CLEAR OF BRUEN, HELLER,
```

1   AND MCDONALD THAT THERE CAN, OF COURSE, BE LIMITATIONS ON THE

2   SECOND AMENDMENT, AND THEY POINT TO FELONS, CERTAIN MISDEMEANOR

3   CONVICTIONS, MENTALLY ILL, SENSITIVE PLACES -- SCHOOLS, COURTS,

4   AIRPORTS, THAT KIND OF THING.

5        SO WHAT ARE THE LIMITS AFTER BRUEN?  CAN YOU -- OTHER

6   THAN THE ONES I JUST MENTIONED, WHAT OTHER LIMITS?

7        DO YOU, FOR EXAMPLE, ARGUE THAT REQUIREMENT BY THE

8   STATE TO REGISTER OR TO HAVE SERIALIZED FIREARMS IS NO LONGER

9   CONSTITUTIONAL?

10       MR. DIGUISEPPE:  WELL, YOUR HONOR, IF WE'RE TO

11  COMPLETE THE ANALYSIS, WE HAVE TO GO TO THE HISTORICAL PRONG.

12  RIGHT?  IF WE GET PAST THIS TEXTUAL QUESTION?

13       TO ANSWER YOUR QUESTION COMPLETELY, IF WE CONSIDER THE

14  HISTORY AT ALL, THAT'S THE QUESTION.  THE ANSWER -- THE DIRECT

15  ANSWER TO YOUR QUESTION IS:  IT DEPENDS.  IS THERE A

16  RELATIVELY -- OR RELEVANTLY SIMILAR HISTORICAL ANALOGUE?  IS

17  THERE, OR IS THERE NOT?

18       THE COURT:  ISN'T THAT STARTING WITH THE SECOND PRONG?

19       MR. DIGUISEPPE:  THAT STARTS WITH THE SECOND PRONG.

20       THE COURT:  FIRST?

21       MR. DIGUISEPPE:  I DON'T KNOW THAT YOUR QUESTION CAN

22  BE ANSWERED COMPLETELY WITHOUT GETTING THERE BECAUSE, IF YOUR

23  QUESTION IS:  WHAT CAN THE GOVERNMENT PROHIBIT BUT WE DON'T

24  TALK ABOUT THE SECOND PRONG YET, THEN YOU ARE SAYING:  WHAT CAN

25  IT PROHIBIT IN LIGHT OF THE TEXTUAL LANGUAGE?

1        BRUEN DIDN'T COMPLETELY ANSWER THAT QUESTION.  IT

2   STILL HELD ON TO THOSE EXCEPTIONS, AS THEY CALL THEM, LIKE FOR

3   PRESUMPTIVELY LAWFUL COMMERCIAL REGULATIONS.

4        THAT DOES NOT APPLY.  THAT'S THE CLOSEST THING TO SOME

5   KIND OF EXCEPTION THAT WOULD POTENTIALLY BE ARGUABLE BY THE

6   STATE, BUT THEY HAVEN'T EVEN ARGUED THAT.  AND I HAVE LOTS OF

7   REASONS TO CITE AS TO WHY IT WOULDN'T BE APPLICABLE.

8        I THINK, TO ANSWER THAT QUESTION, WE'D HAVE TO LOOK AT

9   THOSE.  WE'D HAVE TO LOOK AT THOSE POTENTIAL CATEGORIES, THE

10  EXTENT TO WHICH THEY MIGHT APPLY OUTSIDE OF THE -- HOW DO YOU

11  MARRY THE TEXTUAL QUESTION WITH THOSE EXCEPTION CATEGORIES?

12  IT'S NOT TOTALLY CLEAR, RIGHT?

13       THE COURT:  WHAT ABOUT RIGBY?  DOESN'T RIGBY ACTUALLY

14  CONCLUDE THAT THE SECOND AMENDMENT PROTECTS ONE'S ABILITY TO

15  POSSESS UNSERIALIZED FIREARMS AND TO MAKE THEM?

16       MR. DIGUISEPPE:  RIGHT.  ALSO RIGBY, IF YOU LOOK -- I

17  THINK IT'S FOOTNOTE 13 IN THE OPINION, THEY ADDRESS THE

18  GOVERNMENT'S ARGUMENT THAT THERE'S NO TEXTUAL COVERAGE BASED

19  UPON THIS LITERAL READING OF IT.  AND THEY REJECT THAT IN PART

20  BY SAYING, NO, YOU HAVE TO LOOK AT THE TEXTUAL MEANING BASED

21  UPON ITS ORIGINAL UNDERSTANDING.

22       SO YOU HAVE COURTS THAT ARE ALSO ACTUALLY PULLING IN

23  THE HISTORY TO THE QUESTION OF TEXT.

24       WHETHER YOU DO THAT OR NOT IS OBVIOUSLY UP TO YOU,

25  YOUR HONOR.  BUT THAT'S WHAT RIGBY IS DOING, IN PART.  AND

1   THAT'S ANOTHER WAY OF LOOKING AT THIS TEXTUAL QUESTION.

2         CAN IT BE COMPLETELY DIVORCED FROM HISTORY?  YOU MIGHT

3   BE ABLE TO READ BRUEN THAT WAY.  YOU MIGHT ALSO BE ABLE TO READ

4   IT LIKE RIGBY TO SAY THAT YOU CAN'T LEAVE HISTORY COMPLETELY

5   OUT OF THIS, AND YOU HAVE TO LOOK AT WHAT WAS THE HISTORICAL

6   UNDERSTANDING.

7         WELL, HOW DO YOU KNOW WHAT THE HISTORICAL

8   UNDERSTANDING IS UNLESS YOU LOOK AT THE HISTORY BACK IN THE

9   RELEVANT TIME PERIOD?

10         THE COURT:  RIGBY, THOUGH, IF I HAVE IT CORRECT, IF IT

11   STANDS AND IT BECAME THE LAW OF THE LAND, WE WOULD HAVE A -- WE

12   WOULD LIVE IN A SOCIETY WHERE THE GOVERNMENT COULD NO LONGER

13   REQUIRE REGISTRATION OR SERIALIZATION OF FIREARMS?

14         MR. DIGUISEPPE:  WELL, I DON'T REALLY THINK THAT

15   THAT'S TRUE NECESSARILY.  ALL RIGBY IS SAYING I THINK

16   ESSENTIALLY -- OR THE FUNDAMENTAL PART OF IT -- WHICH IS THE

17   PART THAT SHOULD STAND -- IS THAT THERE IS A RIGHT TO

18   SELF-MANUFACTURE, THAT IT'S IMPLIED.  NOT THAT THE GOVERNMENT

19   COULD NEVER REGULATE OR PLACE SOME KIND OF REGULATIONS ON THAT.

20   IT'S THAT THERE IS A RIGHT, AT THE OUTSET, TO ENGAGE IN

21   SELF-MANUFACTURE.

22         SO THE GOVERNMENT CANNOT CREATE REGULATIONS THAT

23   ESSENTIALLY ELIMINATE ONE'S ABILITY TO ENGAGE IN THAT ACTIVITY.

24         I DON'T THINK IT NECESSARILY HAS TO BE READ TO THAT

25   EXTENT.  I'M NOT SAYING THE COURT HAS TO ADOPT IT IN WHOLESALE

1   FOR WHAT IT MEANS.

2        THE COURT:  IN RIGBY, THE DISTRICT JUDGE HERE DOES SAY

3   THE SECOND AMENDMENT PROTECTS THE POSSESSION OF UNTRACEABLE

4   FIREARMS AND UNFINISHED FIREARMS AND RECEIVERS --

5        MR. DIGUISEPPE:  UH-HUH.

6        THE COURT:  -- BECAUSE IT TEXT COVERS THE POSSESSION

7   OF FIREARMS.  SO --

8        MR. DIGUISEPPE:  WELL, I THINK -- RIGHT.  BUT THAT

9   WOULD BE, FOR EXAMPLE, AT THE BEGINNING OR PART OF THE PROCESS.

10  WE ARE TALKING ABOUT EARLIER, ONE OF THE DIFFICULTIES WITH

11  CALIFORNIA LAW AND REGULATORY SCHEMES LIKE THIS IS, CAN YOU

12  REALLY ACTUALLY CREATE THE INITIAL PARTS YOURSELF WITHOUT BEING

13  BARRED BY REGULATION THAT SAYS THAT THAT PART HAS TO BE

14  SERIALIZED TO LAWFULLY SELL IT TO YOU?

15       SO I THINK THAT LOGIC, WHAT IT JUST ENSURES AT A

16  MINIMUM AS A BASELINE IS THAT, TO THE EXTENT THAT ONE MIGHT

17  NEED TO POSSESS THOSE THINGS IN ORDER TO ENGAGE IN

18  SELF-MANUFACTURE, COMPARE IT TO CALIFORNIA, MAYBE YOU CAN

19  LAWFULLY POSSESS THOSE.  YOU CAN'T BE PREVENTED FROM POSSESSING

20  THEM AT THE OUTSET.

21       BUT THEN YOU APPLY FOR A SERIAL NUMBER FROM -- UNDER

22  29180, THAT WHOLE SCHEME WOULD APPLY.

23       AND THAT'S A LOT OF THE -- THAT'S WHERE WE'RE COMING

24  FROM AS WELL ON THIS IS JUST ENSURING THAT THERE'S THE ABILITY

25  TO ENGAGE IN THE ACTIVITY EFFECTIVELY.

1          THE COURT:  SHE ALSO SAYS THAT DELAWARE STATUTE IN

2    QUESTION, 463(A), CRIMINALIZES THE POSSESSION OF UNSERIALIZED

3    FINISHED FIREARM FRAMES AND UNTRACEABLE FIREARMS WITHOUT

4    PROVIDING ANY WAY FOR THE PLAINTIFFS TO KEEP FIREARMS THAT THEY

5    LAWFULLY MANUFACTURER.

6          SHE DISTINGUISHES CALIFORNIA, WHICH DOES HAVE A

7    MECHANISM.  THAT'S FOOTNOTE 12.

8          AND THEN SHE USES THE ARGUMENT FOR WHAT SHE CONCLUDES

9    IS A SECOND AMENDMENT RIGHT TO POSSESS UNSERIALIZED AND

10   UNTRACEABLE FIREARMS TO SAY THAT YOU CANNOT BAR THE

11   MANUFACTURING OF UNSERIALIZED OR UNTRACEABLE FIREARMS.

12         SHE INDICATES THAT THE RIGHT TO KEEP AND BEAR ARMS

13   IMPLIES A CORRESPONDING RIGHT TO MANUFACTURE ARMS.  INDEED, THE

14   RIGHT TO KEEP AND BEAR ARMS WOULD BE MEANINGLESS IF NO

15   INDIVIDUAL OR ENTITY COULD MANUFACTURE A FIREARM.

16         MR. DIGUISEPPE:  UH-HUH.

17         THE COURT:  BUT HERE, YOU WOULD AGREE THERE ARE MANY

18   INDIVIDUALS AND ENTITIES THAT CAN MANUFACTURE FIREARMS.  THEY

19   JUST, ARGUABLY, HAVE TO BE LICENSED MANUFACTURERS.

20         SO IT GOES BACK TO THE QUESTION OF:  WE HAVE A RIGHT

21   TO ACQUIRE, BUT FROM WHOM?

22         MR. DIGUISEPPE:  RIGHT.  RIGHT TO ACQUIRE, BUT FROM

23   WHOM?  AND, OF COURSE, THE "FROM" SUGGESTS IT'S FROM SOMEONE

24   OTHER THAN YOURSELF.

25         THE COURT:  YES.

1          MR. DIGUISEPPE:  SO I THINK THAT IT HAS TO BE SAID

2     THAT, TO THE EXTENT THAT POSSESSION OF UNSERIALIZED -- PARTS

3     THAT WOULD OTHERWISE REQUIRE A SERIAL NUMBER ON SOME SORT OF

4     REGULATORY SCHEME, TO THE EXTENT THAT THEIR POSSESSION IS

5     NECESSARY TO ENGAGE IN THE CONDUCT, THEN THAT COULDN'T BE

6     PROSCRIBED CONSTITUTIONALLY.

7          THE COURT:  YES.  THEN IF YOU COULD GIVE ME YOUR

8     INSIGHT ON THIS, BECAUSE I READ RIGBY CAREFULLY.  IT APPEARS TO

9     BE THE CLOSEST CASE ON POINT TO THE PRESENT CIRCUMSTANCE HERE

10    IN THIS COURT.  DO YOU AGREE?

11         MR. DIGUISEPPE:  I THINK SO.

12         THE COURT:  THE DISTRICT JUDGE IN RIGBY NOTES THAT THE

13    PARTIES, INCLUDING THE PLAINTIFF, DIDN'T CHALLENGE DELAWARE'S

14    BAN ON THE POSSESSION OR TRANSPORTATION OF FIREARMS WITH

15    OBLITERATED SERIAL NUMBERS.  SO -- AND SHE CONCLUDES THAT THE

16    SECOND AMENDMENT DOESN'T PROTECT THAT.  IN OTHER WORDS, THE

17    STATE CAN REGULATE AND CRIMINALIZE THE POSSESSION OF FIREARMS

18    WITH AN OBLITERATED SERIAL NUMBER.

19         SO IF THAT'S THE CASE, ISN'T THAT INCONSISTENT WITH

20    THEN HOLDING THAT THE SECOND AMENDMENT PROTECTS ONE TO MAKE AN

21    UNSERIALIZED FIREARM OR FIREARM PART?  YOU CAN MAKE IT AND

22    POSSESS IT, BUT YOU CAN'T POSSESS IT IF IT HAD A SERIAL NUMBER

23    AND THEN IT WAS OBLITERATED.

24         MR. DIGUISEPPE:  I THINK THAT THE POLICIES BEHIND THE

25    STATUTES WHICH PROHIBIT OBLITERATED SERIAL NUMBERS ON FIREARMS

1    ARE ARISING OUT OF THE FACT THAT VIRTUALLY ALL OF THOSE ARMS

2    ARE USED IN SOME KIND OF CRIME.  THEY'RE TYPICALLY USED BY

3    CRIMINALS FOR CRIMINAL PURPOSES, IF SOMEONE HAD BOUGHT OR

4    STOLEN OR HAD SOME KIND OF GUN AND THEN INTENTIONALLY REMOVED

5    THE SERIAL NUMBER IN ORDER TO RENDER IT UNTRACEABLE.

6              YOU KNOW, BUT --

7              THE COURT:  BUT WHAT WOULD BE WRONG WITH THAT IF YOU

8    HAVE A SECOND AMENDMENT RIGHT TO POSSESS A FIREARM WITH NO

9    SERIAL NUMBER?

10             SO IF YOU OBLITERATE IT, WHO CARES IF YOU CAN POSSESS

11   IT LAWFULLY IF IT HAS NO SERIAL NUMBER?

12             MR. DIGUISEPPE:  I THINK THAT WHAT WE'RE TALKING ABOUT

13   IS THE ABILITY TO MANUFACTURE THE ARM.  WE HAVEN'T CHALLENGED

14   THE REQUIREMENT FOR SERIALIZATION, IF AND WHEN YOU'VE

15   MANUFACTURED YOURSELF.

16             THE CONCERN HERE IS THE INABILITY TO ENGAGE IN

17   SELF-MANUFACTURE TO THE EXTENT SERIALIZATION REQUIREMENTS

18   PROHIBIT OR MAKE THAT IMPOSSIBLE.  THAT'S AN ISSUE WHEN IT

19   COMES TO THE CONSTITUTION.

20             BUT THE SERIALIZATION ITSELF IS NOT AN ISSUE IN THIS

21   CASE.  WE'RE NOT SAYING THAT SERIALIZATION ITSELF IS AN ISSUE.

22   IT'S THE ABILITY TO ENGAGE IN THE SELF-MANUFACTURE.

23             AND, SPECIFICALLY, TO THIS PARTICULAR QUESTION ABOUT

24   THE CNC BAN, THE ABILITY TO HAVE AND POSSESS AN ITEM THAT

25   FACILITATES THAT PROCESS, THAT HELPS FACILITATE IT IN A

1  MEANINGFUL WAY.

2          AT WHAT POINT AND WHEN THE GOVERNMENT CAN STEP IN AND

3  REQUIRE SERIALIZATION AFTER SOMETHING HAS BEEN CREATED, LIKE IF

4  YOU CAN CREATE YOUR OWN FRAME OR RECEIVER AND APPLY FOR A

5  SERIAL NUMBER, I DON'T THINK THAT'S THE SAME QUESTION.  THE

6  QUESTION IS THE ABILITY TO ENGAGE IN THE CONDUCT ITSELF.

7          THE COURT:  WHICH IS TO BE ABLE TO MAKE IT?

8          MR. DIGUISEPPE:  TO BE ABLE TO MAKE IT.

9          THE COURT:  ISN'T THAT DIFFERENT FROM ACQUIRING?

10          SO THE CASE LAW TALKS ABOUT YOU HAVE THE RIGHT TO

11  ACQUIRE THESE LAWFUL FIREARMS.

12          MR. DIGUISEPPE:  RIGHT.

13          THE COURT:  BUT DOES THE SECOND AMENDMENT SAY YOU HAVE

14  A RIGHT TO MAKE IT YOURSELF?

15          MR. DIGUISEPPE:  IT DOESN'T SAY THAT.

16          THE COURT:  CORRECT.  THANK YOU.

17          MR. DIGUISEPPE:  BUT I THINK IT'S NECESSARILY IMPLICIT

18  WITHIN ACQUISITION RIGHTS, THE ABILITY ACQUIRE AN ARM.

19          I MEAN, "ACQUIRE," IF WE LOOKED UP THE DICTIONARY

20  DEFINITION OF THAT, ACQUIRE WOULD BE TO COME INTO THE

21  POSSESSION OF.

22          I HAVEN'T LOOKED AT IT RECENTLY, BUT TO BE ABLE TO

23  COME INTO THE POSSESSION OF IN SOME WAY, SHAPE, OR FORM.

24          YOU CAN COME INTO THE POSSESSION OF SOMETHING BY

25  VIRTUE OF MAKING IT YOURSELF.

```
1              SO I THINK ACQUISITION, TO THE EXTENT THAT THAT IS

2    COVERED -- AND IT'S ALREADY ESTABLISHED UNDER THE NINTH CIRCUIT

3    LAW THAT IT IS -- IT WOULD INCLUDE THE ABILITY TO

4    SELF-MANUFACTURE.

5              AND I THINK AS WELL WITH THE TEXTUAL SIDE OF THINGS,

6    YOU KNOW -- ASIDE FROM RIGBY -- GIVEN THAT IT IS TEXT AS

7    INFORMED BY HISTORY, WE CAN'T JUST IGNORE WHAT THE --

8    COMPLETELY WHAT THE HISTORICAL MEANING OF IT WAS.

9              THE COURT:  OKAY.  LET ME --

10             MS. BOUTIN:  YOUR HONOR, MAY I ADDRESS A FEW OF THOSE

11   POINTS?

12             THE COURT:  YES.  AND WHILE I'M LISTENING, BUT I WANT

13   TO CHECK MY NOTES AND MAKE SURE I'VE ASKED ALL OF THE

14   QUESTIONS, OR MY LAW CLERK WILL BE VERY UPSET.

15             MS. BOUTIN:  FEEL FREE TO FINISH UP WITH YOUR

16   QUESTIONS FIRST, BUT IF YOU DON'T MIND ALSO INDULGING ME, I

17   APPRECIATE IT.

18             THE COURT:  YES.

19             MS. BOUTIN:  OKAY.  JUST TO TAKE A MOMENT AND STEP

20   BACK, I THINK OBVIOUSLY THERE ARE A LOT OF QUESTIONS.  AND I

21   THINK THAT INCLUDES A LOT OF FACTUAL QUESTIONS ABOUT

22   SELF-MANUFACTURING.

23             OBVIOUSLY FIRST THERE'S AN ASSUMPTION ABOUT WHETHER

24   THAT'S COVERED, RIGHT?  BUT THEN IF WE WERE TO ASSUME IT'S

25   COVERED, THERE ARE QUESTIONS ABOUT THE EXTENT TO WHICH THIS LAW
```

```
 1    AFFECTS THE ABILITY TO SELF-MANUFACTURE, RIGHT?

 2            EVEN IF THE EVIDENTIARY REQUIREMENTS AT THIS STAGE ARE

 3    NOT AS HIGH AS THEY WOULD BE AT TRIAL, THERE'S -- IT'S STILL

 4    PLAINTIFFS' BURDEN ON THIS MOTION TO SHOW LIKELIHOOD OF

 5    SUCCESS.  AND WITH ALL OF THESE FACTUAL QUESTIONS GOING ON

 6    ABOUT MANUFACTURING, I JUST DON'T THINK THEY'VE MET THAT BURDEN

 7    TO ESTABLISH, AS I THINK THEY WOULD HAVE TO, THAT IT WOULD BE

 8    IMPOSSIBLE.

 9            LET'S ASSUME THAT YOU HAVE A RIGHT TO

10    SELF-MANUFACTURE -- WHICH I DON'T THINK HAS BEEN ESTABLISHED --

11    BUT IF YOU DID, THAT IT WOULD BE IMPOSSIBLE TO DO SO WITHOUT --

12    WE DON'T KNOW TO WHAT EXTENT A CNC IS NECESSARY.  IS IT THE

13    MAJORITY OF CASES?  SOME CASES?  WE DON'T HAVE THAT IN THE

14    RECORD.  WE JUST DON'T KNOW.

15            WE ALSO DON'T -- YOU KNOW, I REALIZE PLAINTIFFS' CITED

16    SOME ACADEMIC SOURCES IN HIS MOTION.  AGAIN, THERE'S NO

17    ADMISSIBLE EVIDENCE.

18            IF WE ARE GOING TO USE HISTORY TO INFORM PLAIN TEXT,

19    WE DON'T HAVE EVIDENCE OF THAT.  WE'VE GOT SOME CITATIONS, BUT

20    WE DON'T HAVE ANY ADMISSIBLE EVIDENCE ON THAT.

21            ON THE FIRST AMENDMENT QUESTION, I BELIEVE THE ONLY

22    PLACE IN THE REPLY -- IN BRUEN THAT WAS CITED IN THE REPLY

23    BRIEF ON THAT COMPARISON WAS IN THE CONTEXT OF THE COURT

24    DISCUSSING WHOSE BURDEN IT IS TO ESTABLISH THE NEXT STEP AFTER

25    THE CONSTITUTIONAL -- AFTER IT'S BEEN DETERMINED THAT THE
```

```
 1    CONSTITUTION DOES COVER THAT CONDUCT.  AND THAT'S NOT WHERE WE

 2    ARE IN THIS ANALYSIS.

 3            SO WHEN WE ARE TALKING ABOUT THE PLAIN TEXT ANALYSIS,

 4    THE FIRST AMENDMENT CASES JUST DON'T APPLY.  BRUEN ITSELF

 5    PROVIDES AN EXAMPLE OF HOW YOU CONDUCT THE PLAIN TEXT ANALYSIS

 6    ON PAGE 2134.  I MEMORIZED IT BECAUSE I HAVE LOOKED AT IT MANY

 7    TIMES.  IT GOES STEP BY STEP THROUGH EACH OF THE TERMS.

 8            IT STARTS WITH PEOPLE.  IT MOVES ON TO KEEP AND BEAR

 9    ARMS.  IT SAYS, HOW DO YOU DECIDE WHETHER IT AFFECTS KEEP AND

10    BEAR ARMS?  YOU LOOK AT THE CONDUCT COVERED.

11            AND IT GOES THROUGH EACH OF THOSE STEPS, AND THEN

12    DEFINES.  IT USES A DICTIONARY-TYPE DEFINITION TO DEFINE WHAT

13    IT MEANS TO "BEAR ARMS," TALKS ABOUT WEARING IT ON THE BODY.

14            IF YOU DO THAT SAME STEP-BY-STEP PROCESS HERE, YOU

15    JUST DON'T GET TO A POINT OF THEIR -- OF THE SECOND AMENDMENT

16    APPLYING BECAUSE, AGAIN, IF YOU TALK ABOUT KEEPING ARMS, A CNC

17    MACHINE IS NOT AN ARM.  THERE ARE OTHER WAYS TO KEEP ARMS.

18            AGAIN, HELLER, MCDONALD, BRUEN, THEY WERE COMPLETE

19    BANS.  THAT'S NOT THE SITUATION HERE.  IT'S NOT -- THE RIGHT IS

20    NOT ANY MEANS TO KEEP.  YOU KNOW, THE PRECEDENT THAT'S BEEN SET

21    IS:  ARE THEY FULL-ON BANS?

22            AND, AGAIN, WE KNOW THAT BEARING ARMS ISN'T AT ISSUE

23    HERE.

24            THE COURT:  THOSE ARGUMENTS ALL GO TO THE STATE'S

25    POSITION THAT THE RIGHT DOESN'T INCLUDE THE RIGHT TO ACQUIRE BY
```

```
 1   MAKING YOUR OWN FIREARM, PARTICULARLY IF IT'S NOT SERIALIZED.

 2            MS. BOUTIN:  THAT'S RIGHT, YOUR HONOR.  THAT'S RIGHT,

 3   YOUR HONOR.

 4            AND I THINK -- AND I THINK WHEN THERE'S TALK -- I'M

 5   GENUINELY -- I DON'T KNOW THE PLACE THAT'S BEING QUOTED BY

 6   OPPOSING COUNSEL REGARDING FACILITATION OF THE RIGHT TO KEEP

 7   AND BEAR ARMS, BUT I JUST DON'T THINK THAT'S THE TEST HERE.

 8            IF WE ARE TALKING ABOUT HOW YOU DO A PLAIN TEXT

 9   ANALYSIS, I THINK YOU DO HAVE TO GO BACK TO NINTH CIRCUIT

10   CASES.  AND UNDER JACKSON AND -- I DON'T KNOW HOW IT'S

11   PRONOUNCED, BUT I'LL SAY "TEIXEIRA" --

12            MR. DIGUISEPPE:  "TEIXEIRA."

13            MS. BOUTIN:  "TEIXEIRA."  IT IS -- IT'S THAT

14   IMPOSSIBLE TEST.  DOES IT RENDER IT IMPOSSIBLE?

15            AND THE LANGUAGE DOESN'T SOUND QUITE SO STRONG

16   INITIALLY IN TEIXEIRA, BUT IT DOES SAY THAT -- IT TALKS

17   ABOUT -- IT SAYS, THIS IS A QUOTE, SECOND AMENDMENT PROTECTS

18   ANCILLARY RIGHTS NECESSARY TO THE REALIZATION OF THE CORE RIGHT

19   TO POSSESS A FIREARM FOR SELF-DEFENSE.  NECESSARY.

20            THERE HAS BEEN NO SHOWING THAT A CNC MACHINE IS

21   NECESSARY TO ACQUIRE -- LET'S ASSUME AGAIN ACQUIRE FIREARMS

22   HERE.

23            THE COURT:  OR MORE BROADLY, THAT IT'S NECESSARY TO

24   ALLOW ANYONE TO MAKE A FIREARM.

25            MS. BOUTIN:  RIGHT.  EXACTLY.
```

1    AND SO I THINK FOR PURPOSES TODAY OF THIS MOTION, IF

2  YOU FOLLOW THE PLAIN NEXT ANALYSIS AS IT'S DONE IN BRUEN, YOU

3  FOLLOW THE NINTH CIRCUIT PRECEDENT WITH RESPECT TO, OKAY, IS

4  THERE ANY WIGGLE ROOM FOR PLAIN TEXT ANALYSIS?  YES.

5    AND IT GIVES YOU THE TEST FOR HOW TO DO THAT IN

6  JACKSON.  IT'S WHETHER IT RENDERS THE RIGHTS IMPOSSIBLE OR

7  RENDERS THEM MEANINGLESS.

8    AND THEN IF I COULD JUST ADDRESS THE OTHER CASES THAT

9  HAVE BEEN BROUGHT UP, I THINK THAT'S IMPORTANT AS WELL,

10 PARTICULARLY THE RIGBY CASE.

11    SO IN RIGBY, THEY TALK ABOUT IT AS CORRESPONDING

12 RIGHTS.  FIRST OF ALL, AS YOUR HONOR KNOWS, THIS IS THE

13 DISTRICT OF DELAWARE CASE AND, YOU KNOW, ONLY PERSUASIVE

14 AUTHORITY, NOT BINDING AUTHORITY.

15    BUT, YOU KNOW, I THINK TO THE EXTENT THAT JACKSON HAS

16 A DIFFERENT TEST -- AND I REPEATED JACKSON TEST MULTIPLE

17 TIMES -- SO THIS RIGBY TEST ISN'T APPLICABLE HERE IN TERMS OF

18 CORRESPONDING RIGHTS.  IT TAKES IT FURTHER THAN THE LAW OF THIS

19 CIRCUIT.

20    AND I THINK IT'S ALSO IMPORTANT TO POINT OUT THAT,

21 WITHOUT THAT JACKSON LIMITATION, THERE'S NOT REALLY A LIMIT --

22 CERTAINLY NOT AN OBVIOUSLY WORKABLE LIMIT TO:  WHAT IS THE

23 PLAIN TEXT ANALYSIS?

24    AS THE SUPREME COURT SAID IN BRUEN, YOU ARE SUPPOSED

25 TO TAKE WORDS FOR THEIR ORDINARY MEANING.  BUT IF THEY ARE

1   CORRESPONDING RIGHTS, HOW MANY THINGS -- I MEAN, CERTAINLY WE

2   ARE NOT SAYING THAT THE WORD "CNC MILLING MACHINE" WOULD HAVE

3   TO BE IN THE SECOND AMENDMENT.  BUT YOU STILL HAVE TO TAKE THE

4   ORDINARY MEANING OF THE TERMS IN THE SECOND AMENDMENT.

5          AND I THINK THE JACKSON CASE GETS IT RIGHT WHEN IT

6   TALKS ABOUT YOU DO A PLAIN TEXT READING, AND THEN YOU CAN ALSO

7   LOOK AT LAWS THAT MAKE THE KEEPING AND BEARING OF ARMS

8   MEANINGLESS.

9          BUT I THINK, TO BE FRANK, RIGBY DOES NOT FOLLOW THAT

10  TEST.  AND I THINK IF IT HAD BEEN DECIDED IN THE CIRCUIT, IT

11  COULD NOT HAVE BEEN A CORRECT DECISION.

12         IF I CAN JUST CHECK MY NOTES QUICKLY?

13         I THINK THOSE OF THE MAJOR POINTS I WANT TO ADDRESS.

14         THE COURT:  THIS IS A LITTLE OFF TOPIC, BUT AS I WAS

15  GOING THROUGH THE BRIEFING, I WAS WONDERING WHAT DOES IT TAKE

16  TO BECOME A LICENSED FIREARMS MANUFACTURER?  DO YOU KNOW?  I

17  ASSUME IT'S QUITE A PROCESS.

18         MR. DIGUISEPPE:  YES.  IT'S QUITE A PROCESS.  IT'S

19  QUITE A PROCESS.

20         THE COURT:  AND THE TYPICAL LICENSED FIREARM

21  MANUFACTURERS ARE SMITH AND WESSON, COLT, REMINGTON,

22  WINCHESTER, THOSE TYPES?

23         MR. DIGUISEPPE:  THAT'S RIGHT, YOUR HONOR.  AND, I

24  MEAN, JUST TO ADDRESS SOME OF THOSE POINTS, I WOULD DISAGREE

25  THAT IT NEEDS TO BE ABSOLUTELY NECESSARY FOR THE MACHINE FOR

1    PURPOSES OF SELF-MANUFACTURING IN ORDER TO BE PROTECTED.

2         YOU KNOW, I THINK THAT THE OTHER LANGUAGE IN CASES

3    LIKE THE CONCURRING OPINION OF THOMAS AND LUIS WHERE HE SAYS

4    IT'S REALLY JUST ANCILLARY RIGHTS, RIGHTS THAT ARE IMPLIED OR

5    ANCILLARY TO.

6         AGAIN, TO SAY ABSOLUTE IS JUST AS SIMILAR.  IT'S LIKE

7    SAYING YOU HAVE TO HAVE LITERAL COVERAGE IN THE SENSE YOU WOULD

8    HAVE TO HAVE THE FIRST AMENDMENT SAY THAT EMAILS AND THE

9    INTERNET AND ALL OF THOSE VARIOUS THINGS, WHICH ARE CLEARLY

10   RECOGNIZED AS PROTECTED FORMS OF SPEECH, ARE NECESSARY.  THAT

11   YOU DON'T NEED -- AGAIN, IT MAY SOUND SILLY, BUT THERE'S REALLY

12   NO REASON TO DISTINGUISH.  YOU DON'T NEED A PRINTER.  YOU DON'T

13   NEED A PRINTING PRESS TO ENGAGE IN SPEECH.

14        BUT YOU WOULDN'T SAY THAT IT'S NOT PROTECTED IN TERMS

15   OF THE EXTENT TO WHICH IT FACILITATES THINGS.

16        BRUEN DOES SPECIFICALLY SAY, COVERAGE EXTENDS TO

17   MODERN INSTRUMENTS THAT FACILITATE ARMED SELF-DEFENSE.  THAT'S

18   NOT IN THE TEXT OF THE SECOND AMENDMENT.

19        I THINK THAT, TO THE EXTENT IT BECOMES AN ISSUE UNDER

20   THIS TEXTUAL QUESTION, I THINK GIVEN THAT THE SUPREME COURT

21   TIES THE TEXT TO THE HISTORY MEANS THAT A FAIR WAY OF LOOKING

22   AT IT IS TO CONSIDER THE HISTORICAL UNDERSTANDING OF IT.

23        AND WE CAN'T GET AWAY FROM THE FACT THAT, AT THE TIME

24   OF THE FOUNDING THAT AS NOTED IN THE SOURCES WE CITED -- AND

25   THERE'S NOTHING ELSE TO SUGGEST DIFFERENTLY --

1    SELF-MANUFACTURING WAS FULLY PERMISSIBLE, NOT RESTRAINED IN ANY

2    WAY, UNTIL 2016.

3          BUT, AGAIN, LOOKING AT IT INDEPENDENT OF HISTORY AND

4    JUST LOOKING AT THE MEANING OF THE TEXT AND CONSIDERING WHAT

5    THE INTENTION OF BRUEN IS -- TO COVER CONDUCT AND TO BE MORE

6    PROTECTIVE OF THE SECOND AMENDMENT, THE LANGUAGE -- IT DOES NOT

7    LIMIT THE SCOPE IN THE SENSE OF SAYING THAT THIS IS EXCLUDED.

8    I THINK IT WOULD BE TOO NARROW OF A READING AND INCONSISTENT

9    WITH BRUEN'S INTENT TO READ THE TEXT TO SAY, X, Y, Z IS

10   EXCLUDED.

11         I THINK THAT THE COVERAGE IS THERE IN LIGHT OF THE

12   ACQUISITION RIGHTS THAT ARE ASSOCIATED WITH IT AND THE LANGUAGE

13   IN BRUEN THAT DISCUSSES THE SECOND AMENDMENT IN TERMS THAT IT

14   DOES.

15         YOU DON'T HAVE, AGAIN, EXPRESS LANGUAGE ABOUT CASE OF

16   CONFRONTATION.

17         THE COURT:  THE HISTORICAL, KIND OF THE PRONG TWO

18   DISCUSSION, MUCH OF THE INFORMATION YOU CITE DATING BACK TO

19   JEFFERSON AND OTHERS, THAT, OF COURSE, GOES BACK TO THE DAYS OF

20   BLACK POWDER AND MUSKETS AND THE REVOLUTIONARY WAR.

21         SO WE WERE A BRAND-NEW COUNTRY, AND WE NEEDED ARMS.

22   AND SO IT STANDS TO REASON THAT THE GOVERNMENT WOULD ENCOURAGE

23   EVERYONE TO MAKE MUSKETS IN ORDER TO FIGHT THE BRITISH, BUT

24   THAT'S KIND OF THE HISTORICAL BACK DROP.

25         MR. DIGUISEPPE:  RIGHT.  BUT THE TEST IN THE

1   HISTORICAL PRONG IN BRUEN DOESN'T LOOK AT HOW WOULD THE MODERN

2   GOVERNMENT LOOK AT IT?

3        THE COURT:  AND WE DID NOT REGULATE THE

4   SELF-MANUFACTURE OF FIREARMS OR FIREARM PARTS UNTIL, YOU SAY,

5   2016?

6        MR. DIGUISEPPE:  2016.

7        THE COURT:  IS THAT DUE PERHAPS IN LARGE PART BECAUSE

8   WE DIDN'T HAVE THE TECHNOLOGY?  THESE FANCY PRINTING KIND OF

9   MACHINES LIKE CNC MILLING MACHINES ARE RELATIVELY NEW.  AND SO

10  THIS PROLIFERATION OF MANUFACTURING RECEIVERS AND OTHER THINGS

11  FOR AR'S AND OTHER HANDGUNS AND THE LIKE, IT'S NEW DUE TO THE

12  TECHNOLOGY ADVANCEMENTS.  IS THAT FAIR?

13       MR. DIGUISEPPE:  I THINK THAT, AGAIN, WE HAVE TO LOOK

14  AT IT FROM THE PERSPECTIVE -- AND THIS IS WHAT BRUEN TEACHES --

15  WE HAVE TO LOOK AT IT THROUGH THE PRISM OF WHAT WAS PERMITTED

16  BACK THEN AND IS THERE ANY KIND OF ANALOGOUS PRECEDENT FOR

17  THAT?

18       I UNDERSTAND WHAT YOU ARE SAYING.  THAT COULD BE SAID

19  ABOUT MANY DIFFERENT THINGS WHEN IT COMES TO FIREARMS WITH THE

20  MODERN NATURE OF THEM WITH WHAT THEY CAN DO NOW VERSUS WHAT

21  THEY CAN DO THEN.

22       IF WE WERE TO LOOK AT IT THAT WAY, I THINK IT WOULD

23  DISTORT BRUEN'S TEST. I UNDERSTAND WHAT YOU MEAN.

24       BUT LOOKING AT IT FROM THE PERSPECTIVE OF BRUEN, I

25  THINK WE HAVE TO FOCUS ON WHETHER THERE IS A RELEVANTLY SIMILAR

1    HISTORICAL ANALOGUE.  AND THE ABSENCE OF THAT, THERE WOULD NOT

2    BE THE ABILITY OF THE GOVERNMENT TO REGULATE THAT AT LEAST IN

3    ANY GREATER DEGREE.  IT HASN'T BEEN REGULATED IN THE RELEVANT

4    TIME PERIOD.

5            AND WE ARE, WITH THAT AS WELL, TALKING ABOUT

6    LIKELIHOOD OF SUCCESS, NOT PREVAILING ON THE MERITS.

7            SO IT'S IMPORTANT TOO THAT WE KEEP THE FOCUS ON -- IF

8    WE ARE TALKING ABOUT THE HISTORICAL SIDE OF IT, IF WE KEEP THE

9    FOCUS ON -- ACTUALLY, THIS ISN'T ABOUT THE HISTORICAL SIDE.

10   THIS IS ABOUT MPI ELEMENTS.  AND WE TALK ABOUT BALANCING THE

11   EQUITIES OF THE PARTIES AND WHATNOT, THAT WE FOCUS ON NOT THE

12   POLICY JUDGMENTS OF CALIFORNIA, BUT THAT WE HAVE TO FOCUS ON

13   THE HISTORICAL UNDERSTANDING OF THE RIGHT.  THAT'S WHAT'S AT

14   FOCUS, NOT WHAT THE MODERN DAY GOVERNMENT IS CONCERNED ABOUT.

15           AS MUCH AS WE MAY WANT TO RESPECT THAT INSTEAD, WE'RE

16   SUPPOSED TO FOCUS ON WHAT THE UNDERSTANDING OF THE RIGHT WAS

17   BACK AT THE TIME OF THE FOUNDING.  BECAUSE THAT'S THE POLICY

18   JUDGMENT THAT'S SUPPOSED TO BE RESPECTED.

19           SO I DON'T THINK IT'S RIGHT TO GET INTO A GAME OF

20   WEIGHING THE MODERN DAY POLICY JUDGMENTS FOR PURPOSES OF THE

21   EQUITIES BETWEEN THE PARTIES.  THAT WOULD BE A WAY TO

22   CIRCUMVENT OR -- NOT INTENTIONALLY, BUT IT WOULD BE ESSENTIALLY

23   CIRCUMVENTING WHAT IS A FUNDAMENTAL TENANT IN BRUEN.

24           THE COURT:  AGREE.

25           WHILE I HAVE YOU HERE, TO SHIFT TO A DIFFERENT

1   SUBJECT -- AND I KNOW IT HASN'T BEEN BRIEFED IN THIS CONTEXT,

2   BUT IT WAS ON THE MOTION TO DISMISS ON THE ROSTER LIST.  ISN'T

3   BRUEN A GAME CHANGER ON THAT ONE?  BECAUSE ON THE ROSTER,

4   YOU'RE TALKING ABOUT POSSESSION OF CERTAIN HANDGUNS THAT ARE IN

5   COMMON USE IN THE VAST MAJORITY OF THE STATES.

6          AND SO IF WE USE THE SAME PRONG ONE AND LOOK AT THE

7   SECOND AMENDMENT UNDER THE BRUEN LENS, THE -- CAN YOU GIVE ME

8   AN OVERVIEW OF HOW THE ROSTER IS GOING TO STAND UP?

9          MS. BOUTIN:  SURE, YOUR HONOR.  I WILL BE FRANK AND

10  TELL YOU I DID NOT PREPARE TO DISCUSS THAT SUBJECT TODAY.  SO I

11  WOULD HOPE TO BE NOT BOUND BY ANY ANSWER I GIVE.

12         THE COURT:  WELL, THAT WAS A SURPRISE QUESTION.

13         MS. BOUTIN:  RIGHT.  BUT I CAN TELL YOU MY INITIAL

14  THOUGHTS ARE THE ROSTER HAS TO DO NOT WITH THE POSSESSION OF

15  HANDGUNS, BUT WITH THE COMMERCIAL SALE OF HANDGUNS.  AND

16  COMMERCIAL SALE OF FIREARMS IS STILL ONE OF THOSE AREAS WHERE

17  REGULATION IS VERY MUCH PERMITTED.

18         THE COURT:  DOESN'T THAT GO RIGHT INTO THE ACQUIRING?

19  IF YOU ARE GOING TO LIMIT THE SALES IN SUCH A WAY WHERE YOU

20  CAN'T ACQUIRE, THEN YOU CAN'T POSSESS.

21         MS. BOUTIN:  I THINK -- I THINK, YES.  BUT I THINK --

22  AS YOU SUGGESTED, I THINK IT WOULD HAVE TO GO TO THAT EXTREME

23  OF, AGAIN, A FULL-ON BAN OF ACQUIRING, WHICH THEN WOULD EQUATE

24  TO A BAN OF KEEPING AND BEARING, AS OPPOSED TO THESE REGULATORY

25  MEASURES THAT ARE SOME OF THOSE VARIETY OF GUN REGULATIONS THAT

1    JUSTICE CAVANAUGH, YOU KNOW, I THINK ASSURED THE COUNTRY, IT'S

2    STILL PERMISSIBLE UNDER BRUEN.

3         SO WITH RESPECT TO THE ROSTER, THAT IS A DIFFERENT

4    SITUATION BECAUSE THAT IS NOT ABOUT POSSESSION.  THAT IS ABOUT

5    SALES.

6         THE COURT:  DO YOU HAVE ANY -- I KNOW YOU WEREN'T

7    PREPARED ON THAT ONE.

8         MR. DIGUISEPPE:  WELL, I DID PREPARE ON THE NOTION OF

9    PRESUMPTIVELY LAWFUL COMMERCIAL REGULATIONS, TO THE EXTENT THAT

10   IT MIGHT BE RAISED HERE.

11        AND, YOU KNOW, YOUR HONOR HAD ALREADY HAD A VERY

12   ARTICULATE DECISION IN HIS OPINION REGARDING THE MOTION TO

13   DISMISS THE PRIOR ONE, AND I THINK YOU ACCURATELY ANALYZED IT.

14        BUT THE -- I MEAN, AFTER BRUEN, WHERE ARE WE LEFT?

15   WELL, I THINK WE'RE LEFT WITH, TO THE EXTENT THAT BRUEN IS

16   SILENT, WE LOOK BACK AT THE NINTH CIRCUIT.  THE NINTH CIRCUIT

17   SAID -- I THINK IN TEIXEIRA, IT SAID THERE AS WELL THAT THAT IS

18   TOO OPAQUE OF AN ANALYSIS TO RELY UPON, IN AND OF ITSELF -- NOT

19   THE ANALYSIS, A TEST, RIGHT?  SO INSTEAD YOU NEED TO CONDUCT A

20   FULL TEXTUAL HISTORICAL ANALYSIS OF THE PARTICULAR REGULATION.

21        WHICH IS INTERESTING BECAUSE THAT MAKES IT SOUND LIKE

22   YOU HAVE TO DO BOTH.  MAYBE THAT MEANS THE TWO STEPS, TEXT, AND

23   THEN HISTORY.  I'M NOT SURE.  OR MAYBE IT MEANS YOUR TEXTUAL

24   ANALYSIS HAS TO GET INTO THE HISTORY.

25        IN ANY EVENT, IT'S TOO OPAQUE TO RELY UPON ITSELF.  SO

```
1    YOU HAVE GOT TO GET INTO THIS UNDERSTANDING OF WHAT WAS

2    PROTECTED AT THE TIME, THE RELEVANT TIME.

3          AND WHEN WE ARE LOOKING AT IT FROM THAT PERSPECTIVE,

4    IT WOULDN'T BE ENTITLED TO A PRESUMPTION IN LIGHT OF THE WAY

5    THE HISTORICAL UNDERSTANDING OF IT IS.

6          PLUS, IT'S NOT JUST PRESUMPTIVELY LAWFUL; IT'S ALSO

7    LONG STANDING.  AND WE HAVE SEEN THE CASE LAW THAT ARTICULATES

8    WHAT "LONG STANDING" MEANS, AND IT MAY BE -- THEY GO BACK AND

9    FORTH ABOUT HOW LONG STANDING LONG STANDING MUST BE.  BUT IT'S

10   CLEAR WE ARE TALKING ABOUT, LIKE, EARLY, EARLY 20TH CENTURY AT

11   THE LATEST, RIGHT?  LIKE 1920, 1910, MAYBE.  ARGUABLY EARLIER

12   THAN THAT IS NECESSARY.  SO THAT'S NOT GOING TO HOLD WATER FROM

13   OUR PERSPECTIVE.

14         AND I THINK THAT YOUR HONOR ALSO POINTED OUT, WELL, IN

15   THIS PRIOR OPINION IT'S REBUTTABLE ANYWAY TO THE EXTENT THAT

16   YOU CAN SHOW THERE'S MORE THAN A DE MINIMUS EFFECT ON THE

17   RIGHT, THE RELEVANT RIGHTS, THEN IT WOULD BE REBUTTED AND BACK

18   TO THE GOVERNMENT TO SHOW -- I GUESS AFTER BRUEN WHAT THEY SHOW

19   IS HISTORICAL CONNECTION, THAT IT'S ROOTED IN SOME OF SORT OF

20   NATIONAL TRADITION WAY BACK AT THE RELEVANT TIME FRAME.  AND I

21   DON'T THINK THAT CAN BE SHOWN HERE.

22         THE COURT:  ALL RIGHT.  WELL, THANK YOU VERY MUCH.

23   IT'S NICE TO MEET YOU BOTH IN PERSON.

24         MR. DIGUISEPPE:  NICE TO MEET YOU TOO.

25         THE COURT:  LOOK FORWARD TO THIS LITIGATION.  THESE
```

```
 1   ARE VERY IMPORTANT ISSUES, VERY TIMELY ISSUES.  AND I WILL TAKE

 2   IT UNDER SUBMISSION AND ENDEAVOR TO ISSUE AN ORDER AS SOON AS I

 3   CAN.

 4          I DO UNDERSTAND THAT AB 1621 IS IN EFFECT AND THAT

 5   PLAINTIFF OR MR. RUBY, I BELIEVE, HAS ALREADY MOVED HIS MACHINE

 6   ALREADY OUT OF STATE.

 7          SO WITH THAT UNDERSTANDING, I'LL ENDEAVOR TO ISSUE AN

 8   ORDER AS QUICKLY AS I CAN, AND THEN I'LL LOOK FORWARD TO THE

 9   BRIEFING ON THE ROSTER.

10          WHERE ARE WE ON THAT, BY THE WAY?  THE DISCOVERY IS

11   NEARLY DONE?

12          MS. BOUTIN:  NO, YOUR HONOR.  THE SCHEDULING ORDER WAS

13   VACATED A COUPLE MONTH AGO I THINK AT THIS POINT.  SO

14   ESSENTIALLY WHAT HAPPENED IS THAT THE BRUEN DECISION ISSUED.

15   PLAINTIFFS WISHED TO AMEND THEIR COMPLAINT.  SO THE SCHEDULING

16   ORDER WAS VACATED, AND THEY FILED A SECOND-AMENDED COMPLAINT,

17   WHICH HAS GREATLY EXPANDED THE SCOPE OF THIS LITIGATION.

18          SO THE ROSTER IS ONE OF MANY ADDITIONAL PIECES NOW AT

19   THIS POINT.

20          SO WE WILL BE FILING -- AFTER A RULING ON OUR MOTION

21   TO DISMISS, WE WILL FILE AN ANSWER AND THEN GET INTO

22   SCHEDULING.

23          THE COURT:  OKAY.

24          MR. DIGUISEPPE:  MAYBE WE COULD MENTION, I THINK THE

25   MOTION TO DISMISS IS FOCUSED ON THE EQUAL PROTECTION CLAIM.
```

```
 1              THE COURT:  YES.

 2              MR. DIGUISEPPE:  RIGHT?  AND SO THE ANSWER WILL COME

 3   AS TO THE OTHER CLAIMS.

 4              AND I -- AND THIS IS UP TO YOUR HONOR, OBVIOUSLY.  WE

 5   COULD TALK ABOUT IT NOW TO SOME EXTENT, CLEARLY NOT ON A

 6   CALENDAR DAY, BUT THINKING WHILE WE ARE HERE.

 7              OUR PERSPECTIVE IS, IF YOU LOOK AT BRUEN, BRUEN WAS

 8   DECIDED IN A MOTION TO DISMISS CONTEXT.  SO THERE WAS BASICALLY

 9   NO DISCOVERY AT ALL.  I THINK THAT JUST JUDICIAL NOTICE OF

10   LEGISLATIVE FACTS IS -- WAS GOOD ENOUGH IN ORDER TO RESOLVE THE

11   LEGAL ISSUES HERE.

12              SO I DON'T KNOW WHAT YOUR HONOR THINKS ABOUT THAT.  I

13   CAN TALK ABOUT IT WITH STATE'S COUNSEL.

14              THE COURT:  SO YOU'RE SUGGESTING THAT PERHAPS THE

15   STATE COULD ADDRESS THE ROSTER ISSUE ON A MOTION TO DISMISS?

16              MR. DIGUISEPPE:  NO.  WHAT I'M SUGGESTING IS THAT WE

17   COULD PROPERLY MOVE INTO SUMMARY JUDGMENT.

18              THE COURT:  OH.  RIGHT AWAY?

19              MR. DIGUISEPPE:  WITHOUT ANY DISCOVERY.

20              THE COURT:  YES.

21              MR. DIGUISEPPE:  AND OF COURSE THE STATE MAY HAVE ITS

22   OWN POSITION.

23              THE COURT:  OR IT COULD BE A 12(C) MOTION, ANSWER, AND

24   DO A 12(C) MOTION ON THE ROSTER.

25              MS. BOUTIN:  YEAH.  I THINK THIS IS SOMETHING WE'RE
```

1    GOING TO HAVE TO -- I'M CERTAINLY NOT PREPARED TO GIVE ANY FIRM

2    ANSWER.  WE'LL HAVE TO GIVE A LOT OF CONSIDERATION TO --

3              MR. DIGUISEPPE:  HAVE TO TALK ABOUT IT.

4              THE COURT:  YES.  ASK YOU TO MEET AND CONFER ON THAT.

5    IT MAY BE THAT THE ROSTER ISSUE CAN BE TAKEN ON A 12(C) OR AN

6    EARLY RULE 56 MOTION, BUT I'LL ASK COUNSEL TO MEET AND CONFER

7    ON THAT.

8              I HOPE YOU ARE ABLE TO AT LEAST ENJOY THE WEATHER THIS

9    WEEKEND BEFORE YOU HEAD BACK TO -- IS IT NORTH CAROLINA?

10             MR. DIGUISEPPE:  NORTH CAROLINA.  YES, YOUR HONOR.  I

11   HAVE FAMILY OUT HERE.  I GET TO SEE THEM WHILE I'M HERE TOO.

12   SO IT WORKS OUT WELL.

13             THE COURT:  VERY GOOD.  THANK YOU VERY MUCH.

14             MS. BOUTIN:  THANK YOU, YOUR HONOR.

15             THE COURT:  HAVE A GOOD WEEKEND.

16             MR. DIGUISEPPE:  THANK YOU, YOUR HONOR.

17      (PROCEEDINGS CONCLUDED AT 2:47 P.M.)

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T E**

2        I, VANESSA EVANS, CERTIFY THAT I AM A DULY QUALIFIED
     AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES
3    DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND ACCURATE
     TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
4    ABOVE-ENTITLED MATTER ON OCTOBER 7, 2022; AND THAT THE FORMAT
     USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED
5    STATES JUDICIAL CONFERENCE.

6
                              DATED:  DECEMBER 5, 2022
7

8                              ___S/ VANESSA EVANS___

9                              VANESSA EVANS, CSR 12733.
                              U.S. OFFICIAL COURT REPORTER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25