Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

Bradley A. Benbrook
Stephen M. Duvernay
Benbrook Law Group, PC
701 University Avenue, Suite 106
Sacramento, CA 95825
P: 916-447-4900
E: brad@benbrooklawgroup.com

Michael P. Sousa
Law Offices of Michael P. Sousa, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
P: 858-453-6122
E: msousa@msousalaw.com

William A. Sack
Firearms Policy Coalition
426 Campbell Avenue
Havertown, PA 19083
P: 916-596-3492
E: Wsack@fpclaw.org

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Lana Rae Renna; Danielle Jaymes; Laura Schwartz; Michael Schwartz; Robert Macomber; Clint Freeman; John Klier; Justin Smith; John Phillips; Cheryl Prince; Darin Prince; Ryan Peterson; PWGG, L.P.; North County Shooting Center, Inc.; Gunfighter Tactical, LLC; Firearms Policy Coalition, Inc.; San Diego County Gun Owners PAC; Citizens Committee for the Right to Keep and Bear Arms; and Second Amendment Foundation, <br><br> Plaintiffs, <br><br> v. <br><br> Robert Bonta, Attorney General of California; and Allison Mendoza,[1] Director of the California Department of Justice Bureau of Firearms, <br><br> Defendants. | Case No.: 20-cv-2190-DMS-DEB <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT** <br><br> Date: February 10, 2023 <br> Time: 1:30 p.m. <br> Courtroom 13A (13th Floor) <br> Hon. Dana M. Sabraw |

---

[1]    Allison Mendoza is substituted for former Bureau of Firearms Director Luis Lopez and former Acting Director Blake Graham. Fed. R. Civ. P. 25(d).

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................. 1

II.   BACKGROUND .............................................................................. 2

    A.   California's "Unsafe Handgun Act" Creates A Limited "Roster" Of Handguns That May Lawfully Be Purchased In California ................ 2

    B.   The Roster Operates As A Ban On The Acquisition Of Hundreds Of Handgun Models In Common Use In The United States ..................... 4

    C.   Plaintiffs Brought This Case To Enjoin Enforcement Of The Roster's Handgun Ban ...................................................................... 6

III.  ALTERNATIVE MOTIONS ........................................................... 8

IV.  ARGUMENT ................................................................................ 10

    A.   Plaintiffs Will Prevail On The Merits Because The Handgun Ban Violates The Second Amendment ...................................... 10

       1.   Under *Bruen*, The Government Bears The Burden Of Justifying The Roster's Handgun Ban ........................................ 10

       2.   The Roster's Ban Has No Historical Analogue ....................... 12

    B.   Plaintiffs Will Be Irreparably Harmed Without A Preliminary Injunction ........................................................................ 15

    C.   The Balance Of Equities And Public Interest Both Favor Plaintiffs .. 16

    D.   The Court Should Waive Bond Or Require Only Nominal Security . 17

V.   CONCLUSION ............................................................................ 17

1

# TABLE OF AUTHORITIES

2

## Cases

3

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................ 8

4

*Am. Trucking Ass'ns v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) .......................................................... 15

5

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................ 9

6

7

*Arizona Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) .......................................................... 16

8

*Ashcroft v. Am. Civil Liberties Union*,
  542 U.S. 656 (2004) ............................................................................ 9

9

*Barahona-Gomez v. Reno*,
  167 F.3d 1228 (9th Cir. 1999) .......................................................... 17

10

11

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) .................................................................... 11, 14

12

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
  563 F.3d 847  (9th Cir. 2009) ........................................................... 16

13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................ 9

14

*Craig v. Boren*,
  429 U.S. 190 (1976) ........................................................................ 7, 8

15

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................ 10, 11, 13, 14

16

17

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) .......................................................... 16

18

*Duncan v. Becerra*,
  265 F. Supp. 3d 1106 (S.D. Cal. 2017) ............................................ 16

19

*Elrod v. Burns*,
  427 U.S. 347 (1976) .......................................................................... 15

20

*Ezell v. Chicago*,
  651 F.3d 684 (7th Cir. 2011) ............................................................ 15

21

22

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
  618 F.3d 1025 (9th Cir. 2010) ............................................................ 9

23

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006) ............................................................................ 9

24

*Granata v. Healy*,
  2022 WL 2236350 (D. Mass. May 19, 2022) ................................... 12

25

*Holt v. Noble House Hotels & Resort, Ltd.*,
  370 F.Supp.3d 1158 (S.D. Cal. 2019) ............................................... 15

26

*Konigsberg v. State Bar of Cal.*,
  366 U.S. 36 (1961) ............................................................................ 11

27

28

*McDonald v. Chicago*,
  561 U.S. 742 (2010) .......................................................................... 10

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ...................................................................... 15, 16

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S.Ct. 2111 (2022) ................................................................................ passim

*Pena v. Lindley*,
  898 F.3d 969 (9th Cir. 2018) ...................................................................... 2, 10

*Preminger v. Principi*,
  422 F.3d 815 (9th Cir. 2005) ............................................................................ 16

*Reliable Consultants, Inc. v. Earle*,
  517 F.3d 738 (5th Cir. 2008) .............................................................................. 7

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) .......................................................................... 16

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) .......................................................................... 17

*Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*,
  4 F.4th 747 (9th Cir. 2021) ................................................................................ 9

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
  809 F.2d 626 (9th Cir. 1987) .............................................................................. 9

*United States v. California*,
  921 F.3d 865 (9th Cir. 2019) ............................................................................ 16

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................ 8

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................................ 8

*Zepeda v. U.S. I.N.S.*,
  753 F.2d 719 (9th Cir. 1983) ............................................................................ 16

**Statutes**

11 CCR § 4059 .......................................................................................................... 3
11 CCR § 4070 .......................................................................................................... 3
11 CCR § 4070(a)–(b) .............................................................................................. 4
11 CCR § 4072(b) ..................................................................................................... 4
Cal. Penal Code § 16380 .......................................................................................... 3
Cal. Penal Code § 16900 .......................................................................................... 3
Cal. Penal Code § 31910 .......................................................................................... 2
Cal. Penal Code § 31910 (6)(A) .............................................................................. 3
Cal. Penal Code § 31910(b)(4) ................................................................................ 3
Cal. Penal Code § 31910(b)(5) ................................................................................ 3
Cal. Penal Code § 31910(b)(6) ................................................................................ 3
Cal. Penal Code § 31910(b)(7) ................................................................................ 3
Cal. Penal Code § 32000 .......................................................................................... 2

Cal. Penal Code § 32010(d)(1)–(3) ................................................................. 3

Cal. Penal Code § 32015 ................................................................................. 3

Cal. Penal Code § 32015(a) ............................................................................. 2

Cal. Penal Code § 32015(b)(1)–(3) ................................................................ 4

Cal. Penal Code § 32030 ................................................................................. 3

Cal. Penal Code §§ 31900–32110 ................................................................... 1

D.C. Mun. Regs. tit. 24, § 2323 ................................................................ 2, 12

Fed. R. Civ. P. 56(a) ................................................................................... 9, 15

Fed. R. Civ. P. 65(a)(2) ......................................................................... 2, 9, 17

Fed. R. Civ. P. 65(c) ..................................................................................... 17

Mass. Gen. Laws Ann. ch. 140, 123 & 501 ............................................. 2, 12

Mass. Code Regs. 7.02–03 ........................................................................ 2, 12

Md. Code Ann., Pub. Safety § 5-405 ....................................................... 2, 12

**Other Authorities**

*California's Handgun Roster: How big is it, really?*, online at
    https://www.firearmspolicy.org/california-handgun-roster ................................... 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.  INTRODUCTION

This case now involves just a single claim whose resolution is straightforward after the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). Plaintiffs challenge California's novel ban on hundreds of models of handguns commonly used for lawful purposes throughout the United States. California's "Unsafe Handgun Act" (the "UHA") requires the Defendants to maintain a "Roster" of handguns that may lawfully be sold by licensed firearms dealers. Cal. Penal Code §§ 31900–32110.[2] Handguns deemed "unsafe" under the UHA's various technical and other requirements are excluded from the Roster and therefore banned for sale, even though they are commonly used—entirely lawfully—throughout the rest of the nation. This ban violates the Second Amendment.

Under *Bruen*, Plaintiffs' claim boils down to two simple yet fundamental points. *First*, the "conduct" that Plaintiffs wish to engage in—purchasing handguns currently banned for sale in California to keep and bear for their self-defense—is covered by the Second Amendment's plain text, so it is "presumptively protect[ed]" by the Constitution. *Bruen*, 142 S.Ct. at 2126.

*Second*, the Defendants bear the burden of justifying the Roster's ban by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. This showing cannot be made, however, as there is no historical tradition whatsoever of allowing some commonly used handguns to be sold while banning other models of handguns in common use on the theory that those banned are "unsafe." The UHA was enacted in 1997, and the only two comparable laws in the nation's history were enacted in 1988 (Maryland) and 1998 (Massachusetts). *Bruen* likewise foreclosed any opportunity to analogize the UHA to any Founding-era prohibitions on the carrying of "dangerous and unusual" weapons. The Supreme Court stated repeatedly that modern regulators cannot ban firearms "in

---

[2]    All further undesignated statutory references are to the California Penal Code.

common use" today by analogizing to colonial restrictions on carrying dangerous and unusual weapons. *See id.* at 2128, 2143. Because Defendants cannot satisfy their burden, the Roster's ban on handguns in common use throughout the nation violates the Second Amendment and can no longer be enforced.

This motion is brought alternatively as a motion for preliminary injunction (with a request to advance the trial on the merits to the time of the motion hearing under Fed. R. Civ. P. 65(a)(2)) or as a motion for summary judgment. Either form of motion is appropriate, as the questions here turn on legal issues that *Bruen* itself dictates must be resolved in Plaintiffs' favor.

## II.  BACKGROUND

**A.  California's "Unsafe Handgun Act" Creates A Limited "Roster" Of Handguns That May Lawfully Be Purchased In California.**

The UHA was enacted in 1997 and mandates that DOJ maintain "a roster listing all of the handguns that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold" in California. § 32015(a). As the Ninth Circuit has put it, "[e]ffectively, the Act <u>presumes all handguns are unsafe</u> unless the [DOJ] determines them 'not to be unsafe.'" *Pena v. Lindley*, 898 F.3d 969, 973–74 (9th Cir. 2018) (emphasis added). To that end, the UHA prohibits the retail sale of any "unsafe" handgun. § 32000. The UHA defines an "unsafe handgun" as "any pistol, revolver, or other firearm capable of being concealed upon the person" and that does not have certain statutorily enumerated safety devices, meet firing requirements, or satisfy drop safety requirements. § 31910.

Only two other states and the District of Columbia have similar restrictive purchasing regimes. Maryland enacted the nation's first handgun roster in 1988; California followed suit with the UHA nine years later; Massachusetts enacted a handgun roster in 1998; and D.C. established a roster based on California's in 2009.[3]

---

[3]    Md. Code Ann., Pub. Safety § 5-405; Mass. Gen. Laws Ann. ch. 140, § 123 & 501 Mass. Code Regs. 7.02–03; D.C. Mun. Regs. tit. 24, § 2323.

The UHA's most significant burden on Californians' right to bear arms is its mandate that new models of handguns possess particular features, ostensibly for safety or law enforcement purposes, in order to be added to the Roster so they may be sold in California. Starting in 2007, the UHA required that semiautomatic pistols generally have both a chamber load indicator ("CLI") and a magazine disconnect mechanism ("MDM"), which the State claims will reduce the likelihood of accidental discharge. § 31910(b)(4), (5); *see* § 16380 (defining chamber load indicator); § 16900 (defining magazine disconnect mechanism).[4] Starting in 2013, the UHA required pistols to include a "microstamping" feature that imprints the make, model, and serial number of the firearm onto the shell casing when a round is fired. § 31910(b)(6).

The microstamping feature in particular reveals how far removed this regulatory scheme is from the mainstream: No commercially available semiautomatic handguns manufactured in the United States have the microstamping technology and the two additional features required under the UHA. As a result, literally no new models of guns have been added to the Roster since 2013. Phillips Decl., ¶ 9. Since *any* change whatsoever to an approved handgun subjects the changed design to new testing to appear on the Roster, *see* §§ 32015, 32030, 11 CCR §§ 4059, 4070, the few additions each year have consisted of slight (mostly cosmetic) changes to models of handguns that have already been approved. Phillips Decl., ¶ 9.

And while the UHA has generally exempted handguns that were "already listed on the roster" from the new technological requirements, *see* § 31910(b)(4), (b)(5), (6)(A), a 2020 law requires that the Department of Justice remove three "grandfathered" firearms from the Roster for each new handgun that the agency approves. § 31910(b)(7). Manufacturers must also pay an initial $200 testing fee for a handgun model to be considered for inclusion on the Roster; approval expires every

---

[4]    The UHA imposes different requirements on rimfire and centerfire semiautomatic pistols. Rimfire semiautomatic pistols must have an MDM, but are not required to have a CLI. Centerfire semiautomatic pistols must have both features. § 32010(d)(1)–(3).

year and manufacturers must pay an additional $200 annual "maintenance" fee for the continued privilege of having each firearm model remain on the list. § 32015(b)(1)–(3); 11 CCR §§ 4070(a)–(b); 4072(b).

Each layer of regulation under the UHA has thus hastened the dramatic shrinkage of handguns available for purchase in California. As of 2013, there were nearly 1,300 makes, models, and permutations of approved handguns on the Roster, but the list has steadily declined over the past decade. Phillips Decl., ¶ 10. The total number of approved handguns now stands at just over 800. *Id.* But even this total is misleading: Approximately "one-third of the Roster's total listings are comprised of makes and models that do not offer consumers substantive and material choices in the physical attributes, function, or performance of a handgun relative to another listing (*i.e.*, a base model)," because, as noted above, many of the approved handguns are in reality the same handgun make and model as another approved model, but with merely cosmetic differences. *See, e.g., California's Handgun Roster: How big is it, really?*, online at https://www.firearmspolicy.org/california-handgun-roster (showing the results of a detailed analysis of the Roster as of January 30, 2019).

## B. The Roster Operates As A Ban On The Acquisition Of Hundreds Of Handgun Models In Common Use In The United States.

The UHA bans the sale of at least hundreds of models of constitutionally protected handguns in common use throughout the United States. For example, many of the nation's best-selling firearms are either excluded from the Roster or the Roster-approved models are outdated. California has not approved a single Generation 4 (first brought to market in 2010) or Generation 5 Glock handgun. As a result, the Roster-approved model of the Glock 19 (Generation 3) dates to late 1990s. *See* Phillips Decl., ¶ 12. The Glock G43, SIG Sauer 320, and Springfield Armory Hellcat—three of the best-selling firearms designed for concealed carry—do not appear on the Roster. *See* Roster listings, lasted visited November 22, 2022: https://oag.ca.gov/firearms/certified-handguns/search?make=150972 (Glock),

https://oag.ca.gov/firearms/certified-handguns/search?make=150970 (Sig Sauer), https://oag.ca.gov/firearms/certified-handguns/search?make=150975 (Springfield Armory). Each of these handguns is available for sale and in common use throughout the rest of the nation. Phillips Decl., ¶¶ 12–13.

Handgun manufacturers have been making improvements in design, safety, reliability, and ergonomics with new models over the past 10 years. Yet while those new models are in common use throughout the country, California consumers are not able to benefit from them because these guns are banned for sale to common, law-abiding Californians under the Handgun Ban and Roster. Phillips Decl., ¶¶ 11–15.

In addition to California's failure to add new handguns to the Roster, several hundred makes and models of firearms have fallen off the Roster over the past several years. Phillips Decl., ¶¶ 9–10. The net result is that Californians' ability to purchase the firearm of their choice continues to contract; and Assembly Bill 2847's mandate that DOJ remove three models from the Roster for every new approval guarantees the problem will only get worse. While gun manufacturers innovate and release newer firearm models with improved features that are freely purchased throughout the country, Californians are left to choose from a shrinking list of aging handgun models that may not be suitable for their self-defense needs. *Id.*, ¶ 11; *see* Renna Decl., ¶¶ 4–5, and M. Schwartz Decl., ¶ 8.

Although it is neither relevant nor necessary to Plaintiffs' claim in light of the constitutional test set out in *Bruen*, it is worth emphasizing that citizens generally need access to a wide array of firearms for self-defense. People come in all shapes and sizes and have innumerable individualized limitations, strengths, and weaknesses; they therefore have different needs when it comes to choosing the appropriate firearm for self-defense. Plaintiff Renna is one example: she has a particular need for a firearm specifically designed for people with limited hand strength, but California's handgun Roster removes that option for her. Renna Decl., ¶¶ 5–8. The Roster likewise excludes newer models of semiautomatic handguns that have ambidextrous configurations,

which make them more suitable for left-handed customers. Phillips Decl., ¶ 15; ECF No. 13-22, M. Schwartz Decl., ¶ 8, in support of Plaintiffs' opposition to Defendants' Motion to Dismiss ("ISO MTD. Opp."); M. Schwartz Decl., ¶ 8 (explaining how his ability to acquire a Glock 19 Gen5 with an ambidextrous slide release and adjustable backstraps is "crucial to [his] gun safety training" due to his "unusually shaped hands," but this is yet another handgun banned from California's Roster). The Roster's restrictions pose particular constraints for females, who are the fastest-growing demographic of new gun purchasers but are unable to purchase new models designed primarily for females. Phillips Decl., ¶ 15; *see also* ECF No. 13-15, Jaymes Decl., ¶ 10, ISO MTD. Opp.

## C. Plaintiffs Brought This Case To Enjoin Enforcement Of The Roster's Handgun Ban.

The single claim remaining in Plaintiffs' Third Amended Complaint is a claim that the UHA, through the Roster's ban on handguns in common use, violates the Second Amendment. Plaintiffs are individuals, firearms dealers, and firearms-related advocacy and public policy organizations that have been harmed by Defendants' enforcement of the UHA and will continue to be absent injunctive relief.

*Individual Plaintiffs*. Each of the individual plaintiffs is a law-abiding Californian who is constitutionally entitled to purchase and possess firearms under state and federal law, and who desires to purchase off-Roster pistols that are in common use for self-defense and other lawful purposes. For example, Plaintiff Renna has an injury to her right thumb that impacts her ability to apply physical force and therefore desires to purchase an off-Roster pistol specifically designed for people with limited hand strength. TAC, ¶¶ 17–19; Renna Decl., ¶¶ 4–5. Plaintiffs Laura Schwartz, Michael Schwartz, Cheryl Prince, Danielle Jaymes and John Phillips each hold an active license to carry a concealed weapon; Plaintiffs Phillips, Ryan Peterson, and John Klier are each trained firearm instructors. TAC, ¶¶ 20–38; ECF No. 13-21, L. Schwartz Decl., ¶ 4, ISO MTD. Opp.; ECF No. 13-22, M. Schwartz Decl., ¶ 4, ISO

MTD Opp.; ECF No. 13-14, C. Prince Decl, ¶ 5, ISO MTD Opp.; ECF No. 13-15, Jaymes Decl, ¶ 6, ISO MTD Opp.; ECF No. 13-19, Phillips Decl., ¶¶ 7–9, ISO MTD Opp.; ECF No. 13-18, Klier Decl., ¶ 5, ISO MTD Opp.; ECF No. 13-25, Peterson Decl., ¶ 7, ISO MTD Opp.

*Retailer Plaintiffs*. Plaintiffs PWGG, L.P. (operating as Poway Weapons & Gear and PWG Range), North County Shooting Center, Inc., and Gunfighter Tactical, LLC are licensed firearms retailers in San Diego County. TAC, ¶¶ 39, 43, 47. Each of these retailer Plaintiffs has customers who are interested in purchasing off-Roster handguns; but for the UHA, these firearms dealers would sell off-Roster handguns to eligible customers. TAC, ¶¶ 40–42, 44–46, 48–50; ECF No. 13-19, Phillips Decl., ¶¶ 4–5, 16, ISO MTD Opp.; ECF No. 13-16, D. Prince Decl., ¶¶ 4, 11, ISO MTD Opp.; ECF No. 13-25, Peterson Decl., ¶¶ 4, 17, ISO MTD Opp.

The ban not only violates the *individual* Second Amendment rights of the individual Plaintiffs and all those similarly situated to them, but it also upsets the necessary balance on the other side of the transaction: "restricting the ability to purchase an item is tantamount to restricting that item's use," and "Supreme Court cases hold that businesses can assert the rights of their customers" impacted by the restriction. *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 743 (5th Cir. 2008); *see also Craig v. Boren*, 429 U.S. 190, 195 (1976) ("As a vendor with standing to challenge the lawfulness of [the challenged law], appellant Whitener is entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should her constitutional challenge fail and the statutes remain in force."). California's ban has this very effect on Plaintiffs PWGG, L.P., North County Shooting Center, Inc., and Gunfighter Tactical, LLC and all similarly situated licensed vendors prohibited from selling or transferring the banned handguns.[5]

---

[5]    "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function," for otherwise "the threatened imposition

*Organizational Plaintiffs.* Plaintiffs Firearms Policy Coalition, Inc., San Diego County Gun Owners PAC, Citizens Committee for the Right to Keep and Bear Arms, and Second Amendment Foundation are each public policy organizations that exist to promote, protect, and defend the right to keep and bear arms secured by the Second Amendment. TAC, ¶¶ 51–54; *see* M. Schwartz Decl. ISO Prelim. Inj., ¶ 4; Combs Decl. ISO Prelim. Inj., ¶¶ 4-5; Gottlieb Decl. ISO Prelim. Inj., ¶¶3–4. These organizations' members—including the individual plaintiffs and retailer plaintiffs in this case—desire to purchase (or, in the case of retailers, sell) constitutionally protected arms for self-defense or other lawful purposes are not currently on, or are not eligible to be added to, the Roster. *Id.*

Plaintiffs now bring this motion to enjoin further enforcement of the Roster's prohibition on handguns that are in common use throughout the nation.

### III. ALTERNATIVE MOTIONS

Plaintiffs move in the alternative for a preliminary injunction with an expedited trial on the merits or a motion for summary judgment.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction, but a court may employ a "sliding scale" approach in weighing the four factors. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). "[T]he burdens at the preliminary injunction stage track the

---

of governmental sanctions might deter [the vendor] and other similarly situated vendors from selling [the prohibited items], thereby ensuring that 'enforcement of the challenged restriction against the (vendor) would result indirectly in the violation of third parties' rights.'" *Craig*, 429 U.S. at 195 (quoting *Warth v. Seldin*, 422 U.S. 490, 510 (1975)). The two-dimensional impact of the ban, represented by Plaintiffs on both sides of the transaction with standing to challenge it, underscores its injurious effect and the need for the judicial relief that Plaintiffs seek through this action.

burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). So where, as here, the non-moving party bears the burden of persuasion at trial, the moving party "must be deemed likely to prevail" if the non-movant fails to make an adequate showing. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004).

If the Court treats the motion as a motion for preliminary injunction, Plaintiffs request that the Court advance the trial on the merits and consolidate it with the preliminary injunction hearing. Fed. R. Civ. P. 65(a)(2). An expedited merits hearing is appropriate because Plaintiffs' challenge raises only issues of law such that discovery and additional factual development is unnecessary. *See Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*, 4 F.4th 747, 760 (9th Cir. 2021).

Alternatively, Plaintiffs are entitled to summary judgment under Federal Rule of Civil Procedure 56. Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010) (internal quotation marks and citations omitted). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Where the party moving for summary judgment does not bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

# IV.  ARGUMENT

**A.  Plaintiffs Will Prevail On The Merits Because The Handgun Ban Violates The Second Amendment.**

    **1.  Under *Bruen*, The Government Bears The Burden Of Justifying The Roster's Handgun Ban.**

In a prior challenge to the Roster brought in 2009, the Ninth Circuit acknowledged in that case that the Roster implicated the Second Amendment rights of California gun owners. *Pena*, 898 F.3d at 977–79. But the Ninth Circuit balanced away those Second Amendment rights by employing a two-step, intermediate-scrutiny test that *deferred* to the State's bald assertion of "public safety" interests. *Id.* at 980–81 (deferring to State's "represent[ations]" about the legislature's public safety goals in requiring CLIs and MDMs and concluding that such requirements "reasonably fit with California's interest in public safety"); *id.* at 981–86 (deferring to State's representations about public safety interest behind microstamping requirement and finding a "'reasonable fit' between these substantial interests and the microstamping requirement").

*Bruen* abrogated *Pena* by expressly and emphatically rejecting the "consensus" "two-step" approach used by the Ninth Circuit to evaluate Second Amendment cases. 142 S.Ct. at 2125–30. Since *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010), "do not support applying means-end scrutiny in the Second Amendment context," the "two-step approach" is "one step too many." *Id.* at 2127. The Court in *Bruen* stated—and then repeated for clarity and emphasis—that lower courts must instead use the following test to evaluate Second Amendment Claims:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)); *see id.* at 2129–30 (restating the same standard).

Here, the conduct that Plaintiffs wish to engage in (keeping and bearing arms not listed on the Roster for self-defense) is covered by the Second Amendment's text. And the "arms" they seek are likewise covered by the text. "The Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms." *Bruen*, 142 S.Ct. at 2132 (emphasis added). So "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Id.* (citation omitted); *see also Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring) (the Second Amendment "guarantees the right to carry weapons 'typically possessed by law-abiding citizens for lawful purposes'") (citation omitted). Because the handguns California bans are bearable arms, they presumptively are covered by the Second Amendment's plain text.

California will not be able to demonstrate a historical tradition supporting its ban. The Supreme Court has already done the historical work and determined that only "dangerous and unusual" arms are unprotected—a category that necessarily does not include arms in common use by law-abiding citizens. Plaintiffs seek access to modern makes and models of handguns that are commercially available and in common use for self-defense. Handguns are the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. *Heller* confirmed that the Second Amendment's protection extends to firearms that are in "common use," *id.* at 627, and *Bruen* reaffirmed that "handguns . . . are indisputably in 'common use' for self-defense today." 142 S.Ct. at 2143; *see also Caetano*, 577 U.S. at 411–12 (per curiam) (the Second Amendment's protection of arms in "common use" includes "arms" "that were not in existence at the time of the founding'") (citation omitted). Accordingly, a firearm that is in common use for lawful purposes cannot be banned because there is no historical justification for such a prohibition. *See Bruen*, 142 S.Ct. at 2143.

In short, the conduct Plaintiffs wish to engage in is "presumptively" constitutional and the Roster's prohibition of such conduct is presumptively unconstitutional. *Bruen*, 142 S.Ct. at 2126. And, under *Bruen*, the Defendants cannot meet the burden of "justifying" the Roster's ban by "demonstrat[ing] that [the Roster's ban] is consistent with this Nation's historical tradition of firearm regulation." *Id.* That is because the Supreme Court has already established the relevant historical tradition—restrictions on dangerous and unusual arms—and California's ban is inconsistent with that tradition.

### 2. The Roster's Ban Has No Historical Analogue.

Even if the contours of the historical tradition remained an open question, Defendants could not meet their burden under *Bruen* because nothing in the "Nation's historical tradition of firearm regulation" could support the Roster's broad ban on the purchase of handguns in common use throughout the United States. There is no analogous history to support such restrictions.

There is no founding era precedent for declaring "unsafe" and prohibiting the commercial sale of firearms otherwise widely available and in common use for lawful purposes among ordinary law-abiding citizens. Such regulations only exist now in three states, and all of these laws are of very recent origin—the *earliest* was Maryland's, enacted in 1988.[6] California followed suit with the UHA in 1997; Massachusetts enacted a handgun roster in 1998 (which is currently the subject of a similar challenge);[7] and D.C. established a roster based on California's in 2009.[8] *Bruen* rejected the argument that early 20th century regulations inconsistent with founding-era history are relevant under the historical-tradition test, 142 S.Ct. at 2153–

---

[6]   Md. Code Ann., Pub. Safety § 5-405.

[7]   Mass. Gen. Laws Ann. Ch. 140, § 123 & 501 Mass. Code Regs. 7.02–03; *see Granata v. Healy*, 2022 WL 2236350, at *1–2 (D. Mass. May 19, 2022).

[8]   D.C. Mun. Regs. tit. 24, § 2323.

56 & n.28, so these *late* 20th century laws plainly cannot establish a historical tradition.

There is no constitutionally relevant difference between a handgun that is available for sale under the Roster and one that is not. While some physical attributes may differ—materials used in construction, ergonomics, and the like—they are, in all relevant respects, the same. Indeed, they are all common firearms that use cartridges inserted into a firing chamber, burn powder to expel projectiles through barrels, and function in a semiautomatic or revolver mode of operation. They are all common firearms that have the same cyclical rate of fire, firing one round for every pull of the trigger. The fact that the Handgun Ban may act to ban hundreds of discrete designs and configurations of common handguns held in respectively smaller numbers than the over-arching category of "handguns" as a whole is irrelevant to the constitutional inquiry under *Bruen* and *Heller*.

Defendants cannot analogize the UHA's Roster scheme to Founding-era restrictions on carrying "dangerous and unusual" weapons. *Bruen*, 142 S.Ct. at 2143. Indeed, *Bruen* forecloses the possibility that a state may rely on this historical regulation to justify banning handguns in common use throughout the United States by simply declaring them "unsafe" based on their own policy judgments. The Court reiterated that *Heller* "found it fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use *at the time*.'" 142 S.Ct. at 2128 (quoting *Heller*, 554 U.S. at 627) (emphasis added) (cleaned up). And the Court reiterated for good measure that the defenders of for-cause carry requirements in *Bruen* could not rely on Founding-era restrictions on the carrying of arms that may have then been considered dangerous and unusual but are now in common use:

> [E]ven if respondents' reading of these colonial statutes were correct, it would still do little to support restrictions on the public carry of handguns *today*. At most, respondents can show that colonial legislatures

1
2
3
4
5
6
7

sometimes prohibited the carrying of "dangerous and unusual weapons"—a fact we already acknowledged in *Heller*. *See* 554 U.S. at 627. Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those <u>"in common use at the time,"</u> as opposed to those that <u>"are highly unusual in society at large."</u> *Ibid*. Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." *Id*. at 629. Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, <u>they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today</u>.

8

*Bruen*, 142 S.Ct. at 2143 (cleaned up) (italics in original, underlining added).

9
10
11
12
13
14
15
16

    *Bruen* thus confirmed repeatedly that *Heller* already conducted the relevant historical analysis for determining whether particular arms fall within the Second Amendment's protection: those "in common use at the time" cannot be banned. 142 S.Ct. at 2128, 2143; *accord Caetano*, 577 U.S. at 417 (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual."). Put simply, where a type of arm is in "common use," the government cannot establish a historical tradition of banning it—by definition, a handgun that is in common use for lawful purposes cannot be "unusual." *Bruen*, 142 S.Ct. at 2143.

17
18
19
20
21
22
23
24
25
26

    In any event, it would make no sense that California could analogize to historical prohibitions on carrying "dangerous and unusual" weapons by declaring handguns that have been used for generations are suddenly "unsafe" because they don't employ brand new (and in the case of microstamping, still-non-existent) technology. Nor, of course, could California render handguns in common use across the nation "unusual" simply by prohibiting their sale in the State. *Cf. Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("stun guns are widely owned and accepted as a legitimate means of self-defense *across the country*") (emphasis added).

27
28

    Here, there can be no dispute that off-Roster handguns are in common use for self-defense outside of California today. *See* Phillips Decl. ISO Prelim. Inj., ¶¶ 3–15;

ECF No. 13-12, Ostini Decl., ISO MTD. Opp.; ECF No. 13-13, Ex. 1 to Ostini Decl., ISO MTD. Opp. Thus, the Second Amendment prohibits California from banning them through the Roster's regulation. The Roster's unprecedented handgun ban is plainly inconsistent with the "Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130. Accordingly, the Roster's restriction on the purchase and acquisition of firearms falls directly within—and are proscribed by—the Second Amendment's "unqualified command." *Id.* (citation omitted). The UHA's prohibition on the purchase of constitutionally protected arms, as well as DOJ's maintenance of the Roster to enforce this proscription, fails the historical test mandated by *Bruen*.

\* \* \*

In short, Plaintiffs are likely to succeed on their claim that the UHA's Roster ban violates the Second Amendment. If the Court considers the motion as a motion for summary judgment, for all the same reasons, there are no material facts in dispute and Plaintiffs are entitled to summary judgment as a matter of law. *Holt v. Noble House Hotels & Resort, Ltd.*, 370 F.Supp.3d 1158, 1162 (S.D. Cal. 2019) ("'The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'") (quoting Fed. R. Civ. P. 56(a)).

**B.     Plaintiffs Will Be Irreparably Harmed Without A Preliminary Injunction.**

Plaintiffs are irreparably harmed by the Roster's violation of their Second Amendment rights. As the Ninth Circuit has repeatedly emphasized, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted); *see also Ezell v. Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (Second Amendment deprivation is "irreparable" because there is

"no adequate remedy at law"); and *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1135 (S.D. Cal. 2017) ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury."). Indeed, in the absence of any material facts in dispute, Plaintiffs are entitled to a permanent injunction under the summary judgment standards.

**C.     The Balance Of Equities And Public Interest Both Favor Plaintiffs.**

When the government is a party, the balance-of-equities and public-interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). And by establishing a likelihood that California has violated the Constitution, Plaintiffs have "also established that both the public interest and the balance of the equities favor a preliminary injunction." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). This is because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (citation omitted); *accord Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). Likewise, as the Ninth Circuit has put it, "it is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available. . . . In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 853 (9th Cir. 2009), reiterated in *United States v. California*, 921 F.3d 865, 893–94 (9th Cir. 2019).

Conversely, the government "cannot suffer harm from an injunction that merely ends an unlawful practice . . . ." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983) (the State "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations"). The public interest is unquestionably served by preserving Californians' Second Amendment right to purchase handguns that are in common use for lawful purposes. Any claims to the contrary would be based on the

*legislature's* judgments about the potential dangers of "unsafe" handguns. This case is about the right of law-abiding citizens to exercise conduct *covered* under the Second Amendment according to "the balance struck by the founding generation," which "demands our unqualified deference" unless the government *justifies* the restriction as "consistent with the Nation's historical tradition of firearm regulation" *Bruen*, 142 S.Ct. at 2126, 2133, n.7, which California simply cannot do.

**D.    The Court Should Waive Bond Or Require Only Nominal Security.**

Because the State will not suffer monetary hardship and this mater involves a constitutional violation and the public interest, the Court should either waive Rule 65(c)'s bond requirement or impose only a nominal bond. *See, e.g.*, *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (district court has "discretion as to the amount of security required, if any"); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ("requiring nominal bonds is perfectly proper in public interest litigation").

## V.  CONCLUSION

For the reasons set forth above, the Court should consolidate the preliminary injunction hearing with the trial on the merits under Fed. R. Civ. P. 65(a)(2) and issue an order declaring unconstitutional and restraining Defendants from enforcing the Handgun Ban. Alternatively, it should enter summary judgment in Plaintiffs' favor.

Dated:  December 22, 2022

The DiGuiseppe Law Firm, P.C.          Benbrook Law Group, PC


By  s/ Raymond M. DiGuiseppe          By  s/ Bradley A. Benbrook
   Raymond M. DiGuiseppe                 Bradley A. Benbrook
   Attorneys for Plaintiffs              Attorneys for Plaintiffs