ROB BONTA
Attorney General of California
ANTHONY R. HAKL
Supervising Deputy Attorney General
GABRIELLE D. BOUTIN
Deputy Attorney General
State Bar No. 267308
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-6053
 Fax: (916) 324-8835
 E-mail: Gabrielle.Boutin@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his
official capacity as California Attorney
General, and Allison Mendoza, in her official
capacity as Acting Director of the
Department of Justice Bureau of Firearms*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

# CIVIL DIVISION

| | |
|---|---|
| **LANA RAE RENNA et al.,** | 3:20-cv-02190-DMS-DEB |
| Plaintiffs, | **OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT; DEFENDANTS' APPLICATION PURSUANT TO FED. R. CIV. P. 56(d)** |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of California; and ALLISON MENDOZA, in her official capacity as Acting Director of the Department of Justice Bureau of Firearms,** | |
| Defendants. | Date: February 10, 2023<br>Time: 1:30 p.m.<br>Dept: 13A (13th Floor)<br>Judge: The Honorable Dana M. Sabraw<br>Trial Date: None set<br>Action Filed: 11/10/2020 |

1

**TABLE OF CONTENTS**

2

**Page**

Introduction ...........................................................................................................1

Background...........................................................................................................2

I.     California's Unsafe Handgun Act .............................................2

II.    The Second Amendment and the Supreme Court's Decisions in *Heller* and *McDonald* ......................................................................6

III.   The Ninth Circuit Upholds the UHA's Chamber Load Indicator, Magazine Disconnect Mechanism, and Microstamping Requirements in *Pena v. Lindley*..................................................9

IV.   The Supreme Court Decision in *Bruen*...............................................10

Legal Standards .................................................................................................13

Argument............................................................................................................14

I.     Plaintiffs Cannot Show That Their Challenge Is Likely to Succeed on the Merits................................................................17

A.   Plaintiffs' Challenge to the Roster Removal Provision Fails for Lack of Standing and Ripeness ...............................17

B.   Under *Bruen*'s Plain Text Analysis, the Second Amendment Does Not Protect a Right to Purchase Particular Handgun Models That Do Not Meet One or More of the UHA's Requirements .........................................19

1.    The chamber load indicator, magazine disconnect mechanism, and microstamping requirements do not prevent plaintiffs from keeping handguns in the home or carrying them in public for self-defense .........19

2.    Plaintiffs have not demonstrated that the chamber load indicator, magazine disconnect mechanism, and microstamping requirements prevent them from purchasing weapons in "common use" .................23

3.    The roster fees, safety mechanism requirement, and lab testing requirements do not implicate the plain text of the Second Amendment .....................................25

4.    The roster removal provision does not prevent Plaintiffs from keeping handguns in the home or carrying them in public for self-defense........................26

C.   Under *Bruen*, The Challenged UHA Provisions are Consistent with the Nation's History of Regulating Firearm Safety ..............................................................27

D.   If the Court Does Not Outright Deny the Motion, Defendants Request Additional Time to Further Develop the Historical Record .............................................................30

II.    Plaintiffs Cannot Establish Irreparable Harm Absent an Injunction.................................................................................32

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**
(continued)

**Page**

III.    The Balance of the Equities and Public Interest Weigh Against
        an Injunction .......................................................................................32

Conclusion ..........................................................................................................34

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011).................................................................14, 16

*Baird v. Bonta*
    No. 2:19-CV-00617-KJM-AC, 2022 WL 17542432 (E.D. Cal. Dec.
    8, 2022).................................................................................... 14, 16, 32

*Boardman v. Pac. Seafood Grp.*
    822 F.3d 1011 (9th Cir. 2016).........................................................................13

*Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort
    Peck Reservation*
    323 F.3d 767 (9th Cir. 2003)...........................................................................2

*Caetano v. Massachusetts*
    577 U.S. 416-47 (2016) ..................................................................................22

*California v. Azar*
    911 F.3d 558 (9th Cir. 2018)..........................................................................14

*Clark v. Cmty. for Creative Non-Violence*
    468 U.S. 288 (1984).........................................................................................20

*Defense Distributed v. Bonta*
    2022 WL 15524977 (C.D. Cal. Oct. 21, 2022)...........................................21, 26

*District of Columbia v. Heller*
    554 U.S. 570 (2008)...............................................................................*passim*

*Doe v. Snyder*
    28 F.4th 103 (9th Cir. 2022)...........................................................................14

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014).........................................................................14

*Fiscal v. City and County of San Francisco*
    158 Cal. App. 4th 895 (Cal. Ct. App. 2008) ...........................................3, 5, 34

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*
  528 U.S. 167 (2000)................................................................17, 18

*FTC. v. Affordable Media*
  179 F.3d 1228 (9th Cir. 1999)..................................................32

*Harper v. City of Los Angeles*
  533 F.3d 1010 (9th Cir. 2008)..................................................26

*Kennedy v. Bremerton Sch. Dist.*
  142 S. Ct. 2407 (2021)............................................................20

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017) ...................................................7

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*
  941 F.2d 970 (9th Cir. 1991)....................................................15

*Maryland v. King*
  133 S. Ct. 1 (2012)..................................................................34

*McDonald v. City of Chicago*
  561 U.S. 742 (2010)...........................................................*passim*

*Miller v. Bonta*
  No. 3:19-cv-1537-BEN-JLB (S.D. Cal. Aug. 29, 2022) ...................31

*Multistar Industries, Inc. v. U.S. Dept. of Transp.*
  707 F.3d 1045 (2013)..............................................................17

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
  No. 22-cv-501-BLF, __ F. Supp. 3d __ (N.D. Cal. Aug. 3, 2022) ...................19

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*
  538 U.S. 803 (2003)...........................................................18, 19

*Nat'l Shooting Sports Foundation, Inc. v. State of California*
  5 Cal.5th 428 (2018), 2017 WL 4541977 .....................................5

iv

1

2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3

4

*New York State Rifle & Pistol Association, Inc., v. Bruen*
   __ U.S. __ (2022)....................................................................*passim*

5

6

*Oklevueha Native Am. Church of Haw., Inc. v. Holder*
   676 F.3d 829 (9th Cir. 2012)............................................18

7

8

*Orantes-Hernandez v. Thornburgh*
   919 F.2d 549 (9th Cir. 1990)............................................15

9

*Pena v. Lindley*
   898 F.3d 969 (2018)..................................................*passim*

10

11

*Pena v. Lindley*
   No. 2:09-cv-01185-KJM-CKDECF (E.D. Cal. Dec. 9, 2013) ..........................31

12

13

*Spokeo, Inc. v. Robins*
   578 U.S. 330 (2016)............................................................17

14

15

*State v. Reid*
   1 Ala. 612 (1840)............................................................29

16

17

*United States v. Marzzarella*
   614 F.3d 85 (3d Cir. 2010)............................................31

18

19

*United States v. Tribunella*
   749 F.2d 104 (1984)..........................................................4

20

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008)..................................................*passim*

21

22

**S**TATUTES

23

Assembly Bill
   No. 1471 (Cal. 2007–2008 Reg. Sess.)........................................3, 5
   No. 2847 (Cal. 2019–2020 Reg. Sess.)..........................................5

24

25

26

California Code of Regulations, Title 11
   §§ 4070-4072................................................................4

27

28

v

**TABLE OF AUTHORITIES**
(continued)

Page

California Penal Code

§ 31900 .................................................................................................... 2, 4

§ 31905 ........................................................................................................... 4

§ 31905(a) ....................................................................................................... 4

§ 31910 .............................................................................................. 4, 14, 25

§ 31910(a) .......................................................................................... 4, 15, 25

§ 31910(b) ............................................................................................ *passim*

§ 32000 ............................................................................................... 14, 25

§ 32000(a) ....................................................................................................... 2

§ 32000(b) ....................................................................................................... 4

§ 32015 ............................................................................................... 14, 25

§ 32015(a) ................................................................................................ 3, 15

§ 32015(b) .......................................................................................... 4, 15, 25

§ 32030 ........................................................................................................... 3

§ 32100 ........................................................................................................... 4

§ 32105 ........................................................................................................... 4

§ 32110 ........................................................................................................... 4

§ 32110(a) ....................................................................................................... 4

§ 32110(g) ....................................................................................................... 4

§ 32110(h) ....................................................................................................... 4

California's Unsafe Handgun Act ................................................................. *passim*

Senate Bill

No. 15 (Cal. 1999–2000 Reg. Sess.) ..................................................... 3

No. 489 (Cal. 2003–2004 Reg. Sess.) .................................................... 3

No. 489 (Cal. 2003–2004 Reg. Sess.), § 1 .............................................. 5

No. 1080 (Cal. 2009–2010 Reg. Sess.), § 6 ........................................... 3

CONSTITUTIONAL PROVISIONS

First Amendment ........................................................................................ 20, 22

Second Amendment .................................................................................... *passim*

Fourteenth Amendment .................................................................................... 8

1

2

# TABLE OF AUTHORITIES
**(continued)**

**Page**

3

COURT RULES

4

Federal Rules of Civil Procedure

5

  56(a) ...........................................................................................2

6

  56(d) ...........................................................................................2

7

OTHER AUTHORITIES

8

Act of Mar. 1, 1783, Chapter XIII Exh. 4, 1783 Mass. Acts 37.............................28

9

An Act to Prevent the Storing of Gun Powder, Within Certain Parts of

10

  New York City, 2 LAWS OF THE STATE OF NEW-YORK, COMPRISING

  THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE

11

  REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION,

12

  INCLUSIVE 191 (Thomas Greenleaf, ed., 1792)..................................................29

13

Firepower, 31 McGeorge L. Rev. 293, 309 (2000)...................................................3

14

1805 Mass. Acts 588, An Act to Provide for the Proof of Fire Arms

15

  Manufactured Within This Commonwealth, Chapter 35 ..................................28

16

1821 Me. Laws 98 Exh. 6, An Act for the Prevention of Damage by

17

  Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 ................................29

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction barring enforcement of California's Unsafe Handgun Act ("UHA"), a state law that has been in place for over twenty years.  The UHA is not a handgun ban.  Handguns, which include revolvers, non-semiautomatic pistols, and semiautomatic pistols, have long been and continue to be widely available for purchase and possession in California.  Plaintiffs do not allege that they cannot purchase a handgun suitable for self-defense, nor do they claim that they do not already own such handguns.  Rather, the UHA merely prohibits the manufacture and commercial sale of some handguns that do not meet certain safety requirements.

Plaintiffs have failed to—and cannot—meet their burden to make a "clear showing" that the *Winter* factors favor injunctive relief.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Plaintiffs cannot show that they are likely to succeed on their Second Amendment claim because, under the plain text analysis required by *New York State Rifle & Pistol Association, Inc., v. Bruen*, __ U.S. __, 142 S.Ct. 2111 (2022), the challenged provisions do not violate Plaintiffs' right to "keep" or "bear" arms.  Although the UHA requirements mean that not every model of handgun Plaintiffs desire is available for them to purchase in California on the primary market without adding certain features, that does not mean that the requirements prevent them from "'keep[ing]' firearms in their home, at the ready for self-defense," *id.* at 2135, or from carrying arms on one's person in and outside the home in case of confrontation, *id.* at 2136.  The challenged provisions are therefore entirely different than the total bans on handgun possession and carrying that have been struck down by the Supreme Court.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Bruen*, 142 S.Ct. 2111.

Because the challenged provisions do not violate Plaintiffs' Second Amendment rights, Plaintiffs have also failed to meet their burden to show that they will suffer irreparable harm absent a preliminary injunction.

Finally, the balance of the equities and the public interest strongly disfavor a preliminary injunction here. The status quo poses no threat of injury to Plaintiffs, and an injunction would seriously undermine California's considered effort to improve the safety of handguns sold in California.

The Court should deny Plaintiffs' motion for preliminary injunction.[1]

## BACKGROUND

### I.  CALIFORNIA'S UNSAFE HANDGUN ACT

The UHA prohibits the manufacture or sale of any "unsafe handgun" in California, making a violation punishable by imprisonment in a county jail for not more than one year. Cal. Penal Code § 32000(a).[2] The UHA does not prohibit the mere possession of any handgun or other firearm. *See* §§ 31900, *et seq.*

---

[1] Plaintiffs' alternative motion for summary judgment should be rejected out of hand. Having failed to show any likelihood of success on the merits, Plaintiffs have hardly shown with admissible evidence that there exists no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). However, if the Court is inclined to address the motion for summary judgment at this time, and disagrees that Plaintiffs' claims can be resolved at the textual stage of the *Bruen* analysis, Defendants hereby request time to take discovery related to analogous historical laws, the second stage of the *Bruen* inquiry. *See* Fed. Civ. Proc. 56(d); Decl. of Gabrielle Boutin in Support of Defendants' Application Pursuant to Fed. Civ. Proc. 56(d), filed herewith. This is necessary because no further discovery has occurred since *Bruen* reframed the issues in this action. And the Ninth Circuit has made clear that, in circumstances like this, Rule 56(d) requests are to be granted as a matter of course. *See Burlington N. Santa Fe R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003) ("before a party has had any realistic opportunity to pursue discovery relating to its theory of the case," Rule 56(d) requests should be granted "fairly freely"). Finally, there are currently no discovery deadlines following the vacating of the scheduling order. *See* ECF No. 46. Therefore, no prejudice will result if the parties are afforded a reasonable amount of time to pursue discovery related to the second prong of the *Bruen* analysis.

[2] Further statutory references are to the California Penal Code unless otherwise indicated.

---

2

California enacted the UHA in 1999 "in response to the proliferation of local ordinances banning low cost, cheaply made handguns known as 'Saturday Night Specials,'[3] which called to the Legislature's attention the need to address the issue of handguns sales in a more comprehensive manner." *See Fiscal v. City and County of San Francisco*, 158 Cal. App. 4th 895, 912 (Cal. Ct. App. 2008). The UHA was aimed at reducing handgun crime as well as promoting handgun consumer safety. *Id.* at 913–14. The UHA took effect on January 1, 2001, and has been subsequently amended. *See* Senate Bill No. 15 (Cal. 1999–2000 Reg. Sess.); *see also* Senate Bill No. 489 (Cal. 2003–2004 Reg. Sess.); Assembly Bill No. 1471 (Cal. 2007–2008 Reg. Sess.); Senate Bill No. 1080 (Cal. 2009–2010 Reg. Sess.), § 6 (nonsubstantive reorganization of statutes only); Assem. Bill No. 1023 (Cal. 2011–2012 Reg. Sess.); Assem. Bill No. 2847 (Cal. 2019–2020 Reg. Sess.).

The UHA directs that the California Department of Justice ("DOJ") "shall compile, publish, and thereafter maintain a roster listing all of the pistols, revolvers, and other firearms capable of being concealed upon the person that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold in this state pursuant to this title." § 32015(a). The DOJ maintains the roster in accordance with this directive. *See* Declaration of Salvador Gonzalez ("Gonzalez Dec."), ¶ 8.[4]

A firearm shall be deemed to satisfy the roster requirements if a manufacturer's similar firearm is already listed and the differences are "purely cosmetic." § 32030. The UHA allows DOJ to collect fees from manufacturers or

---

[3] "Saturday Night Specials are firearms characterized by 'short barrels, light weight, easy concealability, low cost, cheap quality materials, poor manufacture, inaccuracy, and unreliability.' . . . Saturday Night Specials are unsafe to the user and innocent bystanders because of their shoddy manufacture." Gun Control 2000: Reducing the Firepower, 31 McGeorge L. Rev. 293, 309 (2000) (quoting *Kelley v. R.G. Indus., Inc.*, 497 A.2d 1143, 1153 n.9 (Md. 1985)).

[4] The roster is posted at DOJ's website at https://oag.ca.gov/firearms/certified-handguns/search.

3

Oppo. to Pltfs.' Mtn. for Prelim. Inj. (3:20-cv-02190-DMS-DEB)

sellers to cover the costs of maintaining the roster and other costs necessary to implement the UHA ("roster fees"). § 32015(b)(1).  Under DOJ regulations, the roster fees include one $200 initial listing fee and one $200 annual maintenance fee.  Cal. Code Regs. tit. 11, §§ 4070-4072.  DOJ may exclude a firearm from the roster if the manufacturer or seller fails to pay the roster fees.  § 32015(b)(2).

Under the UHA, subject to specified exceptions,[5] an unsafe handgun is a revolver, semiautomatic pistol, or non-semiautomatic (aka "single-shot") pistol that fails to meet certain requirements.  *See* § 31910.

To avoid the "unsafe" designation, revolvers and non-semiautomatic pistols must have a safety mechanism, which is often referred to as a "safety." § 31910(a)(1), (b)(1).  A safety functions to prevent the accidental discharge of a firearm.  Gonzalez Dec., ¶ 20.  Revolvers and non-semiautomatic pistols must also meet certain firing and drop safety requirements as determined by an independent testing laboratory.  § 31910(a)(2), (3); § 31910(b)(2), (3); §§ 31905(a), 31900.  These tests ensure that handguns do not malfunction upon firing and do not discharge when dropped.  §§ 31905, 31900; Gonzalez Dec., ¶ 18.

Semiautomatic pistols must also meet the requirements above, as well as additional requirements.  § 31910(b)(1)-(6).  Since 2007, to be added to the roster, semiautomatic pistols not already on the roster must include a chamber load indicator (if it is a centerfire, rather than a rimfire pistol[6]) and a magazine disconnect mechanism (if the pistol has a detachable magazine).  § 31910(b)(4),

---

[5] Exceptions are set forth in sections 32000(b), 32105, 32110, and 32100.  They include firearms sold to law enforcement officials (§ 32000(b)(4), (6), (7)), certain curios or relics (§§ 32000(b)(3), 32110(g)), pistols used in Olympic target shooting (§ 32105), firearms transferred between private parties (§ 32110(a)), and firearms used solely as props in movie and television productions (§ 32110(h)).

[6] With center-fire ammunition, the primer that ignites the gunpowder and causes the cartridge to fire is located in the center of the base of the cartridge.  With rimfire ammunition, the primer is located inside a soft outer rim around the edge at the base of the cartridge.  Center-fire firearms are generally more powerful because centerfire cartridges are stronger and can withstand higher pressures than rimfire cartridges.  *See United States v. Tribunella*, 749 F.2d 104, 107 (2d Cir. 1984) (describing center-fire weapons).

4

(5); *see also* Sen. Bill 489 (Cal. 2003–2004 Reg. Sess.), § 1.  Since 2010, to be added to the roster, semiautomatic pistols not already on the roster must include microstamping.  § 31910(b) (6); *see also* Assem. Bill No. 1471 (Cal. 2007–2008 Reg. Sess.), § 2.  Chamber load indicators and magazine disconnect mechanisms are "safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber."  *Pena v. Lindley*, 898 F.3d 969, 974 (2018); Gonzalez Dec., ¶¶ 12–16.  The roster includes models of semiautomatic pistols with chamber load indicators and magazine disconnect mechanisms.  *See* Gonzalez Dec., ¶ 19.

Microstamping is the placement of "a microscopic array of characters used to identify the make, model, and serial number of the pistol . . . in one or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired." § 31910(b)(6).  Microstamping is intended to "provide important investigative leads in solving gun-related crimes by allowing law enforcement personnel to quickly identify information about the handgun from spent cartridge casings found at the crime scene."  *Fiscal*, 158 Cal. App. 4th at 914.

Although the UHA's initial microstamping requirement mandated two microstamping locations on each round of ammunition, in 2020, the Legislature amended the UHA so that it now requires only one microstamping location per round.  *Compare* Assem. Bill 2847 (Cal. 2019–2020 Reg. Sess), § 2 *with* Assem. Bill No. 1471 (Cal. 2007–2008 Reg. Sess.), § 6; *see also* § 31910(b)(6)(A).  The Legislature noted that while firearm manufacturers claimed that dual-location microstamping was impossible or impractical (an assertion that the Legislature expressly "rejected"), the industry had conceded that single-location microstamping, as required in the amended provision, is feasible.  AB 2847, §1 (h); *see also* Appellants' Answer Brief on the Merits at 16, *Nat'l Shooting Sports Foundation, Inc. v. State of California*, 5 Cal.5th 428 (2018) (No. S239397), 2017

5

WL 4541977 ("Microstamped characters that identify the make, model, and serial number of a semi-automatic pistol (a 'microstamped alpha numeric code') can be etched or imprinted on the tip of the pistol's firing pin").

Finally, since 2021, for each new semiautomatic pistol added to the roster, the UHA requires DOJ to remove from the roster three semiautomatic pistols that lack a chamber load indicator, magazine disconnect mechanism, or microstamping. § 31910(b)(7) ("roster removal provision").

## II.   THE SECOND AMENDMENT AND THE SUPREME COURT'S DECISIONS IN *HELLER* AND *MCDONALD*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In recent years, the Supreme Court has closely examined the Second Amendment in the cases of *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (plurality opinion), and*, most recently, New York State Rifle & Pistol Association, Inc., v. Bruen*, __ U.S.  __, 142 S.Ct. 2111 (2022).

In *Heller*, a District of Columbia special police officer sued to invalidate a District law completely banning the possession of a handgun in the home and requiring that any other lawfully owned firearm in the home, such as a registered long gun, be disassembled or otherwise rendered inoperable for immediate use. 554 U.S. at 574.

The Court held that the Second Amendment protects an individual right, not a collective one.  *Heller*, 554 U.S. at 595.  But the Court further held that "[l]ike most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id*. at 626 (citations omitted).  Thus, while *Heller* invalidated a very strict law that generally prohibited the

6

possession of handguns, *id.* at 576, 636, *Heller* also provided an expressly non-exhaustive list of "presumptively lawful regulatory measures," *id.* at 627 n.26, "a variety of tools" that "the Constitution leaves . . . for combating" the problem of firearm violence in the United States.  *Id.* at 636.  That list includes "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," as well as prohibitions on "dangerous [or] unusual weapons."[7]  *Id.* at 626–27.  In providing this list, the Court carefully qualified that "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment."  *Id.* at 626.

The Court also went on to explain:

> We also recognize another important *limitation* on the right to keep and carry arms.  *Miller* said, as we have explained, that the sorts of weapons protected were those "in common use at the time." 307 U.S., at 179, 59 S.Ct. 816.  We think that *limitation* is fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons."

*Id.* at 627 (emphases added).

Key to *Heller*'s analysis of the District's regulations was the observation that "the law totally bans handgun possession in the home.  It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable."  *Heller*, 554 U.S. at 628.  In finding the total ban on handguns unconstitutional, the Court explained:

---

[7] As the Fourth Circuit has observed, while *Heller* "invoked Blackstone for the proposition that 'dangerous and unusual' weapons have historically been prohibited, Blackstone referred to the crime of carrying 'dangerous or unusual weapons.'" *Kolbe v. Hogan*, 849 F.3d 114, 131 n.9 (4th Cir. 2017) (en banc) (quoting 4 Blackstone 148-49 (1769)).

7

> [T]he inherent right of self-defense has been central to the Second Amendment right. *The handgun ban amounts to a prohibition of an entire class of "arms"* that is overwhelmingly chosen by American society for that lawful purpose.  The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.  Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," would fail constitutional muster.

*Id.* at 628–29 (footnote and citation omitted)(emphasis added).  Addressing the requirement that firearms in the home be rendered and kept inoperable at all times, the Court similarly explained that the requirement was unconstitutional because "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense[.]"  *Id.* at 630.

In *McDonald*, the Supreme Court plurality held that the Second Amendment is fully incorporated against the States via the Fourteenth Amendment.  561 U.S. at 777–78 (plurality).  But the Court explained that "incorporation does not imperil every law regulating firearms."  *Id.* at 786 (plurality).  In doing so, the Court was careful to re-state the critical language from *Heller*:

> It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  [Citation.]  We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  [Citation.]  We repeat those assurances here.

*Id.* (plurality) (italics added).

8

1   The plurality also reassured that "[s]tate and local experimentation with

2   reasonable firearms regulations will continue under the Second Amendment."

3   *McDonald*, 561 U.S. at 785 (plurality).

4   **III.  THE NINTH CIRCUIT UPHOLDS THE UHA'S CHAMBER LOAD**

5          **INDICATOR, MAGAZINE DISCONNECT MECHANISM, AND
          MICROSTAMPING REQUIREMENTS IN *PENA V. LINDLEY***

6   Following *Heller* and *McDonald*, in the 2018 decision of *Pena v. Lindley*, the

7   Ninth Circuit affirmed the constitutionality of numerous UHA provisions, including

8   the requirements that semiautomatic pistols sold in California include chamber load

9   indicators, magazine disconnect mechanisms, and microstamping, and the roster-

10  fees requirements.[8]  *See* 898 F.3d 969, 973, 981 (9th Cir. 2018).  In rejecting the

11  plaintiffs' Second Amendment challenge, the court expressly dismissed plaintiffs'

12  assertion "that they have a constitutional right to purchase a particular handgun."

13  *Id.*

14  The Court's analysis involved a two-step inquiry for Second Amendment

15  challenges that it had adopted following *Heller*.  *Id.* at 975.  That inquiry asked (1)

16  whether the law "burdens conduct protected by the Second Amendment," and if so,

17  (2) whether the law withstands the appropriate level of scrutiny.  *Id.* at 976 (quoting

18  *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014)).

19  The Ninth Circuit panel bypassed step one of the analysis and declined to

20  determine whether the challenged UHA provisions burden Second Amendment

21  conduct.  *Id.* at 976.  The court explained that, regardless of whether the UHA

22  provisions burden Second Amendment conduct, they do not violate the Second

23  Amendment because they withstand the applicable level of scrutiny.  *Id.* at 976.

24  The court also recognized that the challenged provisions may *not* burden protected

25  activity, because they may constitute "laws imposing conditions and qualifications

26

27  _____

         [8] *Pena* was decided when the microstamping provision still required the

28  imprint of two sets of identifying information on each fired round, rather than one
    set.  *See Pena v. Lindley*, 898 F.3d 969, 974 (2018).

9

1  on the commercial sale of arms" that are permissible under *Heller*.  *Id.* at 975–76

2  (quoting *Heller*, 554 U.S. at 626–27).

3      At step two, the court held that the chamber load indicators, magazine

4  disconnect mechanisms, and microstamping requirements satisfy intermediate

5  scrutiny.  *Id.* at 977-86.  The Court concluded that the requirements "place almost

6  no burden on the physical exercise of Second Amendment rights," and that any

7  such burden is lessened by the UHA's exceptions, including for grandfathered

8  semiautomatic pistols on the roster and off-roster semiautomatic pistols available

9  through private transactions.  *Id.* at 978-79.

10     With respect to the roster fees, the Ninth Circuit held that it would "not

11  interfere with the orderly administration of California's roster," explaining that the

12  court was "not here to order California to re-list weapons where the manufacturers

13  or importers have otherwise failed to comply with California law."  *Id.* at 981.

14  **IV.  THE SUPREME COURT DECISION IN *BRUEN***

15     On June 23, 2022, the Supreme Court issued its opinion in *Bruen*, setting forth

16  the current framework for analyzing Second Amendment claims.

17      In *Bruen*, the Supreme Court addressed the constitutionality of New York's

18  requirement that individuals show "proper cause" as a condition of securing a

19  license to carry a firearm in public.  142 S. Ct. at 2123.  New York defined "proper

20  cause" as a showing of "special need for self-protection distinguishable from that of

21  the general community."  *Id.* at 2123.

22     Before turning to the merits, the Court announced a new methodology for

23  analyzing Second Amendment claims.  It recognized that lower courts, including

24  the Ninth Circuit, had "coalesced around a 'two-step' framework for analyzing

25  Second Amendment challenges that combines history with means-end scrutiny."

26  *Id.* at 2125.  The Supreme Court in *Bruen* declined to adopt that two-step approach

27  and announced a new standard for analyzing Second Amendment claims that is

28

10

Oppo. to Pltfs.' Mtn. for Prelim. Inj. (3:20-cv-02190-DMS-DEB)

1   "centered on constitutional text and history." *Id.* at 2126, 2128–29.  Under this
2   text-and-history approach,

> When the Second Amendment's plain text covers an individual's
> conduct, the Constitution presumptively protects that conduct.  The
> government must then justify its regulation by demonstrating that it
> is consistent with the Nation's historical tradition of firearm
> regulation.

7   *Id.* at 2129–30.  Applying that test to the case before it, the Court held that
8   New York's "proper cause" requirement was inconsistent with the Second
9   Amendment's text and history, and therefore unconstitutional.  *Id.* at 2134–
10   56.

11        The Court began its analysis by considering "whether the plain text of the
12   Second Amendment protects [plaintiffs'] proposed course of conduct—carrying the
13   handguns publicly for self-defense."  *Id.* at 2134.  This involved application of the
14   "'textual elements' of the Second Amendment's operative clause— "the right of the
15   people to keep and bear arms shall not be infringed."  *Id.* (*citing Heller*, 554 U.S. at
16   592).  The Court easily concluded that the plaintiffs were part of the "people"
17   protected by the Second Amendment.  *Id.*  Turning to the terms "keep" and "bear"
18   arms, the Court concluded that the right to "bear" arms protected the public carry of
19   handguns for self-defense, reasoning that since "self-defense is 'the *central*
20   *component*' of the [Second Amendment] right itself," and "[m]any Americans
21   hazard greater danger outside the home than in it," it would make "little sense" to
22   confine that right to the home.  *Id.* at 2135.  The Court explained that the terms
23   "keep" and "bear" mean that the Second Amendment's text protects individuals'
24   rights to "'keep' firearms in their home, at the ready for self-defense," *id.* at 2134,
25   and to carry arms on one's person in and outside the home in case of confrontation,
26   *id.* at 2135.  The Court also noted that no party disputed "that handguns are

27

28

11

1    weapons 'in common use' today for self-defense." *Id.* at 2134 (citing *Heller*, 554
2    U.S. at 627.

3       Because the plain text of the Second Amendment covered the *Bruen* plaintiffs'
4    proposed course of conduct, the burden then shifted to New York to show that the
5    prohibition was consistent with "the Nation's historical tradition of firearm
6    regulation." *Id.* at 2135. The Court explained that in some cases, this inquiry
7    would be "fairly straightforward," such as when a challenged law addresses a
8    "general societal problem that has persisted since the 18th century." *Bruen*, 142 S.
9    Ct. at 2131. But in others—particularly those where the challenged laws address
10   "unprecedented societal concerns or dramatic technological changes"—this
11   historical analysis requires a "more nuanced approach." *Id.* at 2132. Governments
12   can justify regulations of that sort by "reasoning by analogy," a process that
13   requires the government to show that its regulation is "'relevantly similar'" to a
14   "well-established and representative historical analogue." *Id.* at 2333 (citation and
15   emphasis omitted). And while the Court did not "provide an exhaustive survey of
16   the features that render regulations relevantly similar under the Second
17   Amendment," it did identify "two metrics: how and why the regulations burden a
18   law-abiding citizen's right to armed self-defense." *Id.* "Therefore, whether modern
19   and historical regulations impose a comparable burden on the right of armed self-
20   defense and whether that burden is comparably justified are central considerations
21   when engaging in an analogical inquiry." *Id.* at 2133.

22       After conducting a lengthy survey of "the Anglo-American history of public
23   carry," the Court held that New York had failed to how that its regulation was
24   consistent with the nation's historical tradition of firearm regulation. *Id.* at 2156.

25       While *Bruen* announced a new standard for analyzing Second Amendment
26   claims, it also made clear that governments may continue to adopt reasonable gun
27   safety regulations. The Court recognized that the Second Amendment is not a
28   "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. Nor does it protect a right to

12

"keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). Indeed, as Justice Alito explained, *Bruen*'s majority opinion did not "decide anything about the kinds of weapons that people may possess." 142 S. Ct. at 2157 (Alito, J., concurring).

Moreover, Justice Kavanaugh—joined by Chief Justice Roberts—wrote separately to underscore the "limits of the Court's decision." *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring). Justice Kavanaugh reiterated *Heller*'s observation that "the Second Amendment allows a 'variety' of gun regulations." *Id.* at 2162 (quoting *Heller*, 554 U.S. at 636).[9] In particular, Justice Kavanaugh emphasized that that the "presumptively lawful measures" that *Heller* identified—including laws "imposing conditions and qualifications on the commercial sale of arms," and prohibitions on "dangerous and unusual weapons"—remained constitutional. *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626–27, 627 n.26). Justice Kavanaugh also quoted the passage in *Heller* providing that the prohibition on "dangerous and unusual weapons" also supported "another *limitation* on the right to keep and carry arms"—"that the sorts of weapons protected were those in common use at the time." *Id.* (emphasis added) (quoting *Heller*, 554 U.S. at 626–27, 627 n.26).

## LEGAL STANDARDS

Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th

---

[9] These observations are consistent with the Court's assurances that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 561 U.S. at 785 (plurality opinion) (quotation marks and citation omitted).

Cir. 2016) (internal quotation omitted).  "To obtain an injunction that instructs an opposing party to change its behavior, thus altering the status quo, a plaintiff must show 'extreme or very serious damage' will occur unless the requested injunction is granted."  *Baird v. Bonta*, No. 2:19-CV-00617-KJM-AC, 2022 WL 17542432, at *4 (E.D. Cal. Dec. 8, 2022) (quoting *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (denying motion to preliminarily enjoin California public carry law).

To obtain injunctive relief, "a plaintiff must establish a likelihood of success on the merits, irreparable harm in the absence of preliminary relief, a balance of equities in the movant's favor, and that the injunction is in the public interest. *Snyder*, 28 F.4th at111.  "When the government is a party, these last two factors," balance of the equities and public interest, "merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014); *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (same).

Alternatively, "[a] preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted) Plaintiffs must make a showing of all four *Winter* factors even under the alternative sliding scale test.  *Id.* at 1132, 1135; *see also Baird*, 2022 WL 17542432, at *4 (declining to enjoin California public carry law on grounds that plaintiffs failed to show that injunction would serve public interest or that the balance of harms favored an injunction).

### ARGUMENT

As an initial matter, Plaintiffs' motion purports to challenge the UHA nearly in its entirety, arguing that all of California Penal Code sections 31910, 32015, and 32000 violate the Second Amendment.  However, these statutes contain numerous separate provisions.  These include, for example, the provisions that lay out the technical requirements for handgun safety mechanisms (§ 31910(a)(1), (b)(1)), and

14

the provisions describing the requirements for chamber load indicators
(§ 31910(b)(4)), magazine disconnect mechanisms (§ 31910(b)(5)), and
microstamping (§ 31910(b)(6)).  They also include the lab testing requirements in
place to ensure firing safety and drop safety.  (§ 31910(a)(2), (3); *id.*, (b)(2), (3))
And they include numerous administrative provisions, such as those that require
DOJ to maintain the roster in the first place (§ 32015(a)), and collect roster fees
(§ 32015(b)), as well as the roster removal provision (§ 31910(b)(7)).  Thus, while
Plaintiffs' motion often paints with a broad brush, consideration of this motion
requires an analysis of each of the provisions at issue, and any relief must be
tailored accordingly.  *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558
(9th Cir. 1990) ("an injunction must be narrowly tailored to give only the relief to
which plaintiffs are entitled"); *see also Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970, 974 (9th Cir. 1991) (an injunction "must be tailored to remedy the
specific harm alleged").

     To be sure, though, Plaintiffs have failed to meet their burden to show that
they are entitled to a preliminary injunction.  Plaintiffs cannot show that they have a
likelihood of success on the merits because their Second Amendment claim fails as
a matter of law as to each challenged UHA provision.  First, with respect to the
roster removal provision, Plaintiffs cannot establish that the provision will ever
affect the number of semiautomatic pistols on the roster.  This claim therefore fails
for lack of standing and ripeness.  Second, under *Bruen*'s plain text analysis, the
Second Amendment does not protect any right to purchase a handgun not subject to
the challenged UHA provisions.  Plaintiffs have not shown (as is their burden) that
the chamber load indicator, magazine disconnect mechanism, and microstamping
requirements or roster removal provision prevent them from exercising their right to
self-defense by keeping handguns in the home or carrying them in public for self-
defense.  Hundreds of models of handguns that are suitable for self-defense are
available to purchase under the UHA.  Further, Plaintiffs have not even attempted

15

1    to show that the roster fees, lab testing requirements, and safety mechanism

2    requirements prevent them from obtaining *any* model of handgun.  Third, under the

3    history prong of the *Bruen* analysis, the challenged UHA provisions are "consistent

4    with the Nation's historical tradition of firearm regulation" (*Bruen*, 142 S.Ct. at

5    2130) because states have regulated for firearm safety, particularly to prevent

6    accidents and unintentional detonations, since the earliest days of the republic.

7        Plaintiffs also cannot establish the *Winter* factor of irreparable harm absent a

8    preliminary injunction.  Plaintiffs assert that, absent an injunction, the UHA's

9    requirements will continue to violate their Second Amendment rights.  However,

10   because the challenged provisions do not violate Plaintiffs' Second Amendment

11   rights, so no such harm will occur.

12       Finally, Plaintiffs cannot show that the equities and public interest weigh in

13   favor of an injunction.  Pending trial, Plaintiffs' "central" Second Amendment right

14   to self-defense is secure because, as the Ninth Circuit found in *Pena*, the challenged

15   UHA provisions "place almost no burden on the physical exercise of Second

16   Amendment rights."  *Pena*, 898 F.3d at 978.   Plaintiffs therefore have not shown,

17   and cannot show, the required "extreme or very serious damage" required to justify

18   disturbing the established status quo here.  *Baird,* 2022 WL 17542432, at *4.  On

19   the other hand, an injunction would upset the long-established status quo by

20   permitting unsafe handguns to be sold in California prior to trial, creating public

21   safety risks.  Given that the balance of equities favor the State, even if Plaintiffs

22   could raise "serious questions going to merits"—which they cannot—they still

23   cannot show that the balance of hardships "tips sharply" in their favor, and

24   therefore are not entitled to an injunction.  *Alliance for the Wild Rockies*, 632 F.3d

25   at 1135.

26

27

28

16

Oppo. to Pltfs.' Mtn. for Prelim. Inj. (3:20-cv-02190-DMS-DEB)

**I.**   **PLAINTIFFS CANNOT SHOW THAT THEIR CHALLENGE IS LIKELY TO SUCCEED ON THE MERITS**

**A.**   **Plaintiffs' Challenge to the Roster Removal Provision Fails for Lack of Standing and Ripeness**

Plaintiffs cannot succeed on their challenge to the roster removal provision because Plaintiffs lack Article III standing, and because this claim is unripe.

"The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" the elements of Article III standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To show standing, a plaintiff must show an injury that is, among other things, "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). The plaintiff must also show, "a 'causal connection between the injury' and the challenged action of the defendant." *Multistar Industries, Inc. v. U.S. Dept. of Transp.*, 707 F.3d 1045, 1054 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The roster removal provision requires that, for "each semiautomatic pistol newly added to the roster," DOJ must remove from the roster three semiautomatic pistols that lack a chamber load indicator, magazine disconnect mechanism, or microstamping. § 31910(b)(7). Under the UHA, to add a semiautomatic pistol to the roster, it must include a chamber load indicator, magazine disconnect mechanism, and microstamping capability. § 31910(b)(4)-(6). But it is Plaintiff's position that, at least as of now, "[n]o commercially available semiautomatic handguns manufactured in the United States have the microstamping technology and the two additional features required under the UHA" and that "literally no new models of guns have been added to the Roster since 2013." Memo. at 3. In addition, Plaintiffs have submitted no evidence showing that the relevant provision has resulted in the removal of any handgun from the roster. Nor is there any evidence that at any point in the future will a semiautomatic pistol will be added to the roster such that three pistols will have to be removed under the provision.

17

1   Plaintiffs have therefore failed to show that any injury that is caused by the roster

2   removal provision is either "actual," meaning that it has already occurred, or

3   "imminent." *Friends of the Earth*, 528 U.S. at 180-81. As a result, Plaintiffs have

4   failed to show that they have standing to challenge the roster removal provision.

5         For similar reasons, Plaintiffs have failed to show that their challenge is

6   prudentially ripe. Prudential ripeness requires the Court "to first consider the

7   fitness of the issues for judicial review, followed by the hardship to the parties of

8   withholding court consideration." *Oklevueha Native Am. Church of Haw., Inc. v.*

9   *Holder*, 676 F.3d 829, 837 (9th Cir. 2012).

10        First, this challenge is not fit for review. Fitness for review relates to whether

11  "further factual development would significantly advance [the court's] ability to

12  deal with the legal issues presented." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*,

13  538 U.S. 803, 812 (2003) (internal quotation omitted). Here, the record contains no

14  evidence indicating what effect, if any, the roster removal provision will actually

15  have on the roster. Plaintiffs' claim that the provision will cause the number of

16  handguns on the roster to shrink dramatically is pure speculation. Similarly, it is

17  unknown whether there will be any meaningful qualitative differences between the

18  semiautomatic pistols that stay on the roster or are added to the roster, on one hand,

19  and those that are removed, on the other. We know only that the roster cannot

20  shrink to zero because (1) the provision activates only upon the addition of a

21  "newly added" semiautomatic pistol, which cannot then be removed under the

22  provision, and (2) the roster also includes revolvers and non-semiautomatic pistols

23  not subject to removal under the provision. (§ 31910(b)(7)). And, Plaintiffs' own

24  filings indicate that the roster has recently *grown* in the last two years from 779 in

25  January 4, 2021 (*see* First Amended Complaint, ECF No. 10, ¶ 51) to "just over

26  800" now. (Memo. at 4 (citing Phillips Decl., ¶ 10)). In fact, the number of

27  handguns on the roster has consistently hovered around 800 since 2014. Gonzalez

28  Decl., ¶ 19. Thus, assuming, *arguendo*, that the Second Amendment would protect

18

1  some minimum number or variety of semiautomatic pistol models on the roster,

2  "further factual development would significantly advance" this Court's ability to

3  consider Plaintiffs' Second Amendment claim.  *Nat'l Park Hosp. Ass'n*, 538 U.S. at

4  812.

5      Second, Plaintiffs have not shown that they would experience any hardship if

6  the Court does not consider the constitutionality of the roster removal provision at

7  this time.  They have submitted no evidence regarding when any semiautomatic

8  pistol may be "newly added" to the roster in the future, thus causing any other

9  semiautomatic pistols to be removed.  And, they have submitted no evidence of

10  how the provision could otherwise harm them in the meantime.

11      Thus, *both* factors of prudential ripeness strongly show that Plaintiffs'

12  challenge to the roster removal provision is unripe.  Plaintiffs' claim as to the roster

13  removal provision therefore is a nonjusticiable one.

### B.   Under *Bruen*'s Plain Text Analysis, the Second Amendment Does Not Protect a Right to Purchase Particular Handgun Models That Do Not Meet One or More of the UHA's Requirements

16  As set forth below, the plain text of the Second Amendment does not protect

17  Plaintiffs' desire to purchase models of semiautomatic pistol models that are not

18  subject to the UHA's requirements.

### 1.   The chamber load indicator, magazine disconnect mechanism, and microstamping requirements do not prevent plaintiffs from keeping handguns in the home or carrying them in public for self-defense

22  Under *Bruen*, the plain text analysis begins with an assessment of whether the

23  Second Amendment's plain text protects the plaintiffs' "proposed course of

24  conduct."  *Bruen*, 142 S. Ct. at 2134.  The *plaintiff*, not the government, has the

25  burden to make this showing.  *See Bruen*, 142 S. Ct. at 2134 (noting that the

26  government "d[id] not dispute" that the plain text of the Second Amendment

27  covered the plaintiffs' proposed conduct); *see also Nat'l Ass'n for Gun Rights, Inc.*

28  *v. City of San Jose*, No. 22-cv-501-BLF, __ F. Supp. 3d __, 2022 WL 3083715, at

19

*8 (N.D. Cal. Aug. 3, 2022) ("If the conduct at issue is covered by the text of the Second Amendment, the burden then *shifts* to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation" (emphasis added)).[10]

Here, Plaintiffs' proposed course of conduct is to purchase off-roster semiautomatic pistols that do not include a chamber load indicator, magazine disconnect mechanism, or microstamping.  Plaintiffs cannot and have not shown that this conduct is protected by the Second Amendment's protection of individuals' rights to either "keep" or "bear" arms.

As explained in *Bruen*, these terms mean that the Second Amendment protects individuals' rights to "'keep' firearms in their home, at the ready for self-defense," *id*. at 2135, and to carry arms on one's person in and outside the home in case of confrontation, *id*. at 2136.  Thus, in *Heller*, the challenged law prevented individuals from "keep[ing]" and "bear[ing]" arms because it constituted a total ban on possessing *any* handgun in the home.  *See Heller*, 554 U.S. at 628; *see also id.* at 629 (quoting *State v. Reid*, 1 Ala. 612, 616–617 (1840) for the proposition that a regulation amounting to "a destruction of" the Second Amendment right would be unconstitutional).  And, in *Bruen*, the challenged law prevented individuals from "bear[ing]" arms because it prevented them from carrying *any* handgun outside the home for self-defense.  *See Bruen* 142 S. Ct. at 2134–35.

---

[10] The Supreme Court's assignment of this burden to plaintiffs is consistent with how the Supreme Court "protect[s] other constitutional rights." *Bruen*, 142 S. Ct. at 2130.  As explained in *Bruen*, in free speech cases under the First Amendment, the government bears the burden of justifying its actions only "[w]hen the Government restricts speech." *Id.* at 2130 (quotation marks and citation omitted).  Plaintiffs who assert free speech claims are "oblig[ed]" to "demonstrate that the First Amendment even applies" to the "assertedly expressive conduct" in which they wish to engage. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  And when scrutinizing free exercise claims, the Court first asks whether the plaintiff has shown that the government "has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2021).  "Should a plaintiff make a showing like that," the burden then shifts to the government to justify its action. *Id.* at 2422.

20

1    Here, in contrast, the chamber load indicator, magazine disconnect
2    mechanism, and microstamping requirements do not prevent plaintiffs from either
3    keeping handguns in the home or carrying them in public for self-defense.  As the
4    Ninth Circuit previously concluded, these regulations "place almost no burden on
5    the physical exercise of Second Amendment rights."  *Pena*, 898 F.3d at 978.  The
6    requirements only apply to the sales of certain semiautomatic pistols—ones that
7    lack the required safety features.  They therefore do not prevent Plaintiffs from
8    continuing to possess any firearm or from carrying any firearm in any place.  They
9    also do not prevent Plaintiffs from acquiring new arms suitable for self-defense.
10   The chamber load indicator, magazine disconnect mechanism, and microstamping
11   requirements do not prevent plaintiffs from purchasing any revolver, non-
12   semiautomatic pistol, or any firearm that is not a handgun.  Even within the sub-
13   category of semiautomatic pistols, the requirements still provide plaintiffs with
14   hundreds of models to choose from.  Gonzalez Decl., ¶ 19. [11]  And the non-
15   compliant firearms may be sold if manufacturers add the safety features.  Finally,
16   these requirements impose no limit to the total number of firearms (or
17   semiautomatic pistols, specifically) that plaintiffs may possess, carry, or obtain for
18   self-defense.  In sum, unlike in *Heller* and *Bruen*, the chamber load indicator,
19   magazine disconnect mechanism, and microstamping requirements do not prevent
20   Plaintiffs from "keep[ing]" or "bear[ing]" arms in the home or in public for self-
21   defense.  The plain text of the Second Amendment therefore does not protect
22   Plaintiffs' desire to purchase off-roster semiautomatic pistols without these safety
23   features.  *See Pena*, 898 F.3d at 978 ("[B]eing unable to purchase a subset of
24   semiautomatic weapons, without more, does not significantly burden the right to
25   self-defense in the home."); *see also Defense Distributed v. Bonta*, 2022 WL

26   _____

27   [11] As of December 31, 2022, the roster included 314 revolvers, 16 non-
semiautomatic pistols, and 499 semiautomatic pistols, for a total of 829 handgun
models.  Gonzalez Decl. ¶ 19.  Among the semiautomatic pistols, 32 had a chamber
28   load indicator and a magazine disconnect mechanism.  *Id.*

15524977, *4, (C.D. Cal. Oct. 21, 2022) (holding that law restricting use of milling machines to federally-licensed manufacturers or importers was plainly outside the text of the Second Amendment, failing the threshold question in *Bruen*).

Plaintiffs appear to argue that the Second Amendment confers an unfettered right for an individual to purchase any handgun models that they prefer or believe would be most effective for their individualized purposes. *See* Pltfs.' Memo. at 4-6. Case law does not support this proposition. The laws at issue in *Heller* and *Bruen* were struck down for thwarting the Second Amendment's "core lawful purpose of self-defense," because they prevented individuals from keeping or carrying any of the "entire class" of handguns. *Heller*, 554 U.S. at 628; *Bruen* 142 S. Ct. at 2134–35. The cases did not purport to provide individuals with unlimited choices regarding which handguns to keep and bear. To the contrary, *Heller* made clear, and the Supreme Court confirmed in *Bruen*, that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."[12, 13] *Heller*, 554 U.S. at 628; *accord McDonald,* 561 U.S. at 786; *accord Bruen*, 142 S. Ct. at 2128. Plaintiffs have not shown that the handguns

---

[12] This established principle is not overcome by the brief excerpts from *Heller* and *Caetano* selectively cited by Plaintiffs. Pltfs.' Memo. at 11. In *Heller*, the Court stated that "the Second Amendment extends prima facie to all instruments that constitute bearable arms, *even those not existence at the time of the founding*" to specifically refute the defendant's argument that the Second Amendment protects only weapons existing in the 18th century. *Heller*, 554 U.S. at 582. In *Caetano*, the Court stated that the Second Amendment protects weapons "typically possessed by law-abiding citizens for lawful purposes" to refute the same argument." *Caetano v. Massachusetts*, 577 U.S. 416-47.

[13] This principle is also consistent with the Second Amendment's command that the right to keep and bear arms may not be "infringed." The definitions of the term "infringe" at the time of the founding, included to "violate" or "destroy." In contrast, founding era definitions of the term "abridge" (featured in the First Amendment) include "to shorten," "to diminish," or "to deprive of." See Declaration of Saul Cornell (Cornell Decl.) at 10-11 and Exh. 2 (18th century dictionary definitions).

available on the roster are generally unsuitable or insufficient for self-defense.[14]

Indeed, the handguns on the roster are suitable and sufficient for that purpose.

Gonzalez Decl., ¶ 9.  The chamber load indicator, magazine disconnect mechanism,

and microstamping requirements do not ban the possession or carry of any firearm

at all and therefore do not eliminate or destroy Second Amendment rights.  Rather,

the requirements "impos[e] conditions and qualifications on the commercial sale of

arms," and are therefore "presumptively lawful."  *Heller*, 554 U.S. at 626–27;

*accord McDonald,* 561 U.S. at 786; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J.,

concurring); *see also Pena*, 898 F.3d at 975–76.

> **2.    Plaintiffs have not demonstrated that the chamber load indicator, magazine disconnect mechanism, and microstamping requirements prevent them from purchasing weapons in "common use"**

The Supreme Court's references to weapons "in common use" in *Heller* (and

in *Bruen* while discussing *Heller*) do not support Plaintiffs' motion.[15]  *See Heller*,

554 U.S. at 627; *Bruen*, 142 S. Ct. at 2143, 2162; *see also* Pltfs.' Memo. at 11, 13-

14.  This is because those references establish only that "common use" is

necessary—but not sufficient—criteria to establish Second Amendment protection

at all.  This is why in *Heller*, following the Court's non-exhaustive list of regulation

categories outside Second Amendment protection, the Court stated that "common

use" was "another important *limitation* on the right to keep and carry arms."

---

[14] For example, Plaintiff Phillips testifies that one particular off-roster pistol, the Glock 5 is "safer" that its on-roster predecessor, the Glock 3.  But he provides no technical details to explain why and certainly does not establish that a Glock 3 (or any other on-roster model) is unsuitable for self-defense.  This type of testimony cannot support the "extraordinary remedy" of a preliminary injunction.

[15] The common use inquiry occurs at the textual stage of the text-and-history standard. In *Bruen*, the Court situated the "common use" inquiry in the textual stage of its analysis, rather than the historical stage at which the government bears the burden.  *Bruen*, 142 S. Ct. at 2134.  Before turning to whether the plain text of the Second Amendment covered the plaintiff's proposed course of conduct of carrying (i.e., "bearing") handguns in public for self-defense, the Court confirmed that the plaintiffs were "part of 'the People' whom the Second Amendment protects and that "handguns are weapons 'in common use' today for self-defense."  *Id.* (citing *Heller*, 554 U.S. at 627, and *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016)).

*Heller*, 554 U.S. at 627 (emphasis added).  The Court then added that this "*limitation* is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (emphasis added).  In *Bruen,* Justice Kavanaugh's plurality opinion quotes this language verbatim.  *Bruen*, 142 S. Ct. at 2162.  And, the majority opinion in *Bruen* cites *Heller* for the proposition that "the Second Amendment protects *only* the carrying of weapons that are those 'in common use at the time.'"  *Bruen*, 142 S.Ct. at 2143.  Supreme Court precedent therefore establishes that the Second Amendment generally protects individuals' rights to keep and carry *only* weapons in common use, but that is not the end of the relevant inquiry.  In other words, that a particular model of semiautomatic pistol may be in "common use" alone does not mean an individual has the Second Amendment right to keep and carry it.

Moreover, even *if* Plaintiffs were correct that all models of handguns in "common use" may be kept and carried under the Second Amendment and that no other limitations apply, Plaintiffs still cannot show that the UHA is unconstitutional, either facially or as-applied to any particular handgun models. Plaintiffs claim that the "UHA bans the sale of at least hundreds of models of constitutionally protected handguns in common use throughout the United States." Memo. at 4.  Yet, Plaintiffs' purported evidence of "common use" is inadmissible and, in any event, insufficient to meet their prima facie burden to prove common usage.  *See* Defs.' Obj. Nos. 1, 7, 12-15, 17..

Plaintiffs submit evidence primarily in the declarations of Plaintiff John Phillips and Joseph Ostini.  Plaintiff Phillips is a California firearms dealer who does not claim to sell firearms in any other state.  Phillips Decl., ¶ 2.  His declaration merely summarily states that certain models are "commonly used" or "top-selling" outside of California.  *Id.*, ¶¶ 12, 13, 16.  Mr. Ostini, whose declaration is nearly two years old, appears to be an attorney employed at Plaintiff Firearms Policy Coalition.  His non-expert declaration, purportedly based on an

24

internet search and a review of trade publications, merely states that many different off-roster handgun models are available for sale outside of California.  Ostini Decl. at  2-6.  Neither declarant provides any quantitative information, including how many of any handgun model are used for self-defense or even sold outside of California.  Plaintiffs have therefore failed to submit sufficient prima facie evidence of the "common us[age]" of any handgun models, much less all handgun models.

### 3. The roster fees, safety mechanism requirement, and lab testing requirements do not prevent plaintiffs from keeping handguns in the home or carrying them in public for self-defense

Plaintiffs' challenge also fails with respect to the UHA's roster fees and the requirements that handguns include a safety mechanism and meet firing and drop safety criteria as determined by an independent lab.  *See* §§ 32015(b), 31910(a)(1)-(3) & 31910(b)(1)-(3).

Applying *Bruen*'s plain text analysis, Plaintiffs' proposed course of conduct is to purchase handguns for which no fees have been paid, that include no safety mechanism, and/or that have not been subjected to drop and firing testing.  This conduct is not protected by the Second Amendment right to "keep and bear Arms."  As with the chamber load indicator, magazine disconnect mechanism, and microstamping requirements, these additional requirements do not prevent Plaintiffs possessing or carrying any handguns at all and do not prevent Plaintiffs from purchasing approximately 800 different models of handguns in unlimited numbers.

Furthermore, Plaintiffs have not even attempted to show that the roster fee, safety mechanism, and testing requirements (or any of the other miscellaneous provisions of Penal Code sections 31910, 32015, and 32000) have caused any handguns to be ineligible for the roster and therefore unavailable to purchase.  As a result, even if Plaintiffs *did* have the Second Amendment right to purchase any conceivable model of handgun—which they do not—they would still have failed to

show that these particular requirements have any effect (i.e., infringe) on that right by preventing them from purchasing any handgun.[16]  Plaintiffs have therefore failed to show that any of these provisions violate their Second Amendment rights to keep and bear arms.

### 4. The roster removal provision does not prevent Plaintiffs from keeping handguns in the home or carrying them in public for self-defense

Even if Plaintiffs' challenge to the roster removal provision were justiciable, it would also fail *Bruen*'s plain text analysis.  The provision does not prevent Plaintiffs from keeping and bearing arms merely because it may cause the number of handgun models available for sale to decrease to an unknown number fewer than 800.  Like the other challenged requirements, the roster removal provision is readily distinguishable from the total bans of an "entire class" of arms at issue in *Heller* and *Bruen*.  *See Heller*, 554 U.S. at 628; *Bruen* 142 S. Ct. at 2134–35.  The provision does not prevent Plaintiffs from either keeping handguns in the home or carrying them in public for self-defense.  It does not prevent Plaintiffs from continuing to possess and obtain any number of additional arms suitable for self-defense, including revolvers, non-semiautomatic pistols, and hundreds of models of semiautomatic pistols.  Like the other challenged provisions, the roster removal provision therefore does not violate the Second Amendment.

In sum, Plaintiffs' challenges to various UHA provisions fails the plain text inquiry of the applicable text-and-history approach under *Bruen*.  Their claim therefore fails on the merits and this Court need not proceed to the second prong of the *Bruen* analysis.  *See Bruen*, 142 S. Ct. at 2126; *Defense Distributed v. Bonta*, No. 22-6200-GW-AGRx, 2022 WL 15524977, at *3 n.5 (C.D. Cal. Oct. 21, 2022)

---

[16] Because Plaintiffs have failed to show that these requirements affect their ability to keep and bear any arms, they have also failed to establish the element of causation required for their section 1983 claim.  *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008) (section 1983 claim requires proof of causation-in-fact and proximate causation between conduct and deprivation of rights).

(explaining that *Bruen* requires "plain-text analysis first, then history if necessary").

Nevertheless, as explained below, the historical analysis also establishes that the challenged UHA provisions do not violate the Second Amendment.

### C.   Under *Bruen*, The Challenged UHA Provisions are Consistent with the Nation's History of Regulating Firearm Safety

Even if the Court were to conclude that challenged UHA provisions implicate the the plain text of the Second Amendment, those requirements are nevertheless valid as "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.  States have regulated for firearm safety, particularly to prevent accidents and unintentional detonations, since the earliest days of the republic.  *See* Cornell Decl., ¶¶ 60; *see also id.* at 14-29.  The challenged UHA's provisions are analogous to those laws because they impose a "comparable," if not lesser "burden on the right of armed self-defense" and are "comparably justified." *Bruen*, 142 S. Ct. at 2133.

Early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goal of promoting public safety.  Cornell Decl., ¶ 21.  As long as such laws did not destroy the right of self-defense, the individual states enjoyed broad latitude to regulate arms.  *Id.*  In the Founding era, the government took an active role in encouraging the manufacturing of arms.  *Id.*, ¶ 31.  The American firearms industry in its infancy was largely dependent on government contracts and subsidies.  *Id.*  Thus, the government had a vested interest in determining what types of weapons would be produced.  *Id.*

Government regulation of the firearms industry included the authority to inspect the manufactures of weapons and impose safety standards on the industry. *Id.*  By 1810, western Massachusetts was the leading small arms producer in the Northeast.  *Id.*, ¶ 32.  Beginning in 1794 the federal armory in Springfield, Massachusetts served as a spur to technological innovation in the region.  *Id.*  In the

27

years following the War of 1812, the Armory served as an incubator for other local producers and gunsmiths. *Id.* In 1805, Massachusetts enacted a law requiring all guns, before sale, to be inspected, marked, and stamped by an inspector. [17] *Id.*, ¶ 32 and Exh. 3. The state revised the statute two more times in the decades leading up to the Civil War. *Id.* These requirements ensured that the guns sold to the public were safe and suitable for use. *Id.* Although the guns produced by the Springfield Armory were not subject to state law, because they were under federal control, these arms were nonetheless subjected to thorough testing and were stamped as well. *Id.*

Firearms were subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons. *Id.*, ¶ 42. Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb. *Id.*, ¶ 43 and Exh. 4.[18]

Gun powder was also subject to regulations relating to every aspect of its manufacture, sale, and storage due to the substance's dangerous potential to detonate if exposed to fire or heat. *Id.*, ¶ 42. Gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home. *Id.*, ¶ 44. Nevertheless, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history. *Id.*, ¶ 47. New York City, for example, granted broad power to the government to search for gun powder and transfer

---

[17] 1805 Mass. Acts 588, An Act to Provide for the Proof of Fire Arms Manufactured Within This Commonwealth, Ch. 35.

[18] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

1  powder to the public magazine for safe storage. *Id.*, ¶ 43 and Exh. 5.[19]   A Maine

2  law enacted in 1821 authorized town officials to enter any building in town to

3  search for gun powder. *Id.*, ¶ 47 and Exh. 6.[20]

4      Among firearms, handguns were not widely used until the 1800's. *Id.*, ¶¶ 26,

5  34.  The states responded to the new technology, which presented a novel threat to

6  public safety by passing new laws. *Id.*, ¶ 35.  Apart from a few outlier cases in the

7  South, courts upheld such limits on the right to keep and bear arms. *Id.*  The

8  primary limit identified by courts in evaluating such laws was the threshold

9  question about abridgement: did the law negate the ability to act in self-defense. *Id.*

10  Laws that undermined the right of self-defense were generally struck down,

11  regulations that limited but did not destroy the right were upheld. *Id.*, ¶ 36; *see also*

12  *State v. Reid*, 1 Ala. 612, 616–617 (1840) (cited in *Heller*, 554 U.S. at 629).

13      In sum, States and localities have regulated guns and gunpowder, since the

14  earliest days of the nation's history.  The challenged UHA provisions are

15  "consistent with [this] historical tradition of firearm regulation." *Bruen*, 142 S.Ct.

16  at 2130.  First, the challenged and historical laws are "comparably justified." *Id.* at

17  2133.  Both sets of laws promote public safety, including by preventing accidental

18  detonations.  Second, even if the challenged provisions did burden the right of self-

19  defense—which they do not—that burden would not only be "comparable," but

20  actually less than historical regulations' burdens on firearms.  Historical laws

21  required weapons to be inspected and stamped before sale, prevented individuals

22  from keeping fully loaded weapons in the home, and regulated gun powder in the

23  home. *See, e.g.,* Cornell Decl., Exh. 3-6.  The challenged UHA requirements merely

24

25      [19] An Act to Prevent the Storing of Gun Powder, Within Certain Parts of New
   York City, 2 LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION,
26  AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO
   THE FIFTEENTH SESSION, INCLUSIVE 191 (Thomas Greenleaf, ed., 1792).

27      [20] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the
28  Safe Keeping of Gun Powder, chap. 25, § 5.

Oppo. to Pltfs.' Mtn. for Prelim. Inj. (3:20-cv-02190-DMS-DEB)

require handguns to include particular safety devices and pass certain safety tests. They do not prohibit the possession of any handgun (including any loaded handgun) in the home or elsewhere and allow individuals to purchase hundreds of models of handguns for self-defense.

Plaintiffs argue that *Bruen* forecloses any historical analysis in this case. Pltfs.' Memo. at 13-14. They point to *Bruen*'s assertion that historical prohibitions on "dangerous and unusual" weapons are not analogous to modern handgun bans because handguns, as a "class of firearms" (*Bruen*, 142 S.Ct. at 2143), are not dangerous and unusual today. *Id.* Here, however, neither the challenged UHA provisions nor the analogous historical regulations ban *any* class of firearms, let along for being dangerous and unusual. Both categories of laws instead merely provide additional measures to increase safety of firearms that are sold to and used by the public.

Because the challenged UHA provisions are consistent with the nation's tradition of firearm regulation, even if they implicated rights protected by the Second Amendment, they still would not violate the Second Amendment.

### D.  If the Court Does Not Outright Deny the Motion, Defendants Request Additional Time to Further Develop the Historical Record

If the Court is not prepared to deny the motion based on the existing record, Defendants respectfully request three additional months to complete expert discovery on the issue of analogous historical firearm regulations, followed by further merits briefing.

As *Bruen* itself acknowledged, the historical inquiry can be complex and difficult. 142 S.Ct. at 2134. In the years between *Heller* and *Bruen*, historical scholarship has expanded the understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture. Cornell Decl., ¶ 13. Compilation of the evidence must be undertaken by trained historians through painstaking efforts just to identify the sources

available to them in order to answer a particular historical inquiry. *See* Declaration of Zachary Schrag at 2-5, *Miller v. Bonta*, No. 3:19-cv-1537-BEN-JLB (S.D. Cal. Aug. 29, 2022), (ECF No. 129-1). Indeed, we know that additional evidence exists on the history of the handgun safety mechanisms at issue here. *See, e.g.,* Reply in Support of Motion for Summary Judgment, or in the Alternative Summary Adjudication, by Defendant Stephen Lindley at 3, *Pena v. Lindley*, No. 2:09-cv-01185-KJM-CKDECF (E.D. Cal. Dec. 9, 2013), (ECF No. 76) (citing authorities providing that chamber load indicators and magazine disconnect mechanisms have existed since at least the 1800's and 1910, respectively); *see also id.* (citing *United States v. Marzzarella*, 614 F.3d 85, 93 n.11 (3d Cir. 2010) (abrogated on other grounds) (use of serial numbers arose around 1866)). The research and analysis required to answer the difficult historical questions posed by Bruen calls for a labor-intensive and time-consuming process. Despite working diligently since the filing of the preliminary injunction motion order, there remain areas of inquiry that Defendants have not yet been able to explore fully, including a deeper canvass of historical state and municipal laws and additional primary-source research to further understand and contextualize the Nation's traditions of firearms regulation and related regulations.

Since the previous scheduling order was vacated following the issuance of *Bruen* (*see* ECF No. 46.), there has been no scheduling order in place and therefore currently no expert disclosure or discovery deadlines. Further, this motion is not urgent, as demonstrated by the following facts: (1) the UHA has been California law for many years; (2) six months elapsed between the issuance of *Bruen* and the filing of this motion; and, (3) in that time, Plaintiffs here filed a previous motion for preliminary injunction to enjoin other laws, but did not seek to enjoin the UHA provisions (*see* ECF No. 53).

Accordingly, if the Court were to conclude that Plaintiffs' claims implicate the plain text of the Second Amendment and that Plaintiffs have satisfied the other

*Winter* factors, the Court should provide the parties with additional time to conduct the research and briefing necessary to complete the historical analysis called for by *Bruen*, before the Court then issues its decision on this motion.

## II.   PLAINTIFFS CANNOT ESTABLISH IRREPARABLE HARM ABSENT AN INJUNCTION

Even if Plaintiffs were able to demonstrate a likelihood of success on the merits, Plaintiffs also have not and cannot meet their burden to show that they are likely to suffer irreparable harm absent an injunction. *See Winter*, 555 U.S. at 22.

Plaintiffs assert that, absent an injunction, the UHA's requirements will continue to violate their Second Amendment rights. However, as explained above, the challenged provisions do not violate Plaintiffs' Second Amendment rights, so no such harm will occur. And, as explained above, Plaintiffs cannot argue that, as a practical matter, they lack access to handguns sufficient for self-defense purposes.

## III.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION

Finally, "[a] court cannot enter a preliminary injunction if the moving party does not show 'the balance of equities tips in [its] favor,' and 'an injunction is in the public interest.'" *Baird v. Bonta*, No. 2:19-CV-00617-KJM-AC, 2022 WL 17542432, at *4 (E.D. Cal. Dec. 8, 2022) (quoting *Winter*, 555 U.S. at 20). Courts "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. And, "[w]hen a district court balances the hardships of the public interest against a private interest, "the public interest should receive greater weight." *FTC. v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999).

Here, as explained above, Plaintiffs will not be harmed by the Court's denial of injunctive relief. The challenged UHA provisions do not violate Plaintiffs' Second Amendment rights as an abstract matter, and they "place almost no burden on the physical exercise of Second Amendment rights," i.e., their ability to defend themselves with firearms. *Pena*, 898 F.3d at 978. Plaintiffs will continue to have

32

1   broad access to handguns to exercise their central, "inherent right to self-defense."

2   *Heller*, 554 U.S. at 628.

3        On the other hand, an injunction would upset the long-established status quo

4   by permitting unsafe handguns to be sold in California prior to trial, creating public

5   safety risks.  As the Ninth Circuit concluded in *Pena*'s intermediate scrutiny

6   analysis, "[t]here is no doubt that the governmental safety interests identified for the

7   CLI and MDM requirements are substantial."  *Pena*, 898 F.3d at 981.  The absence

8   of a chamber load indicator or magazine disconnect mechanism in a semiautomatic

9   pistol increases the risk of accidental discharge and injury to Californians from use

10  of these handguns.  Gonzalez Dec., ¶¶ 15-16.  The Ninth Circuit also already

11  concluded in *Pena* that microstamping promotes the substantial government

12  interests in public safety and crime prevention.  *Pena*, 898 F.3d at 982.  The other

13  challenged provisions also effectively increase public safety, including, for

14  example, by ensuring that handguns do not malfunction upon firing, discharge

15  when dropped, or otherwise accidentally discharge.  Gonzalez Dec., ¶ 18, 20.

16       It is true that some of the semiautomatic pistols on the roster have been

17  "grandfathered in," and do not include a chamber load indicator, magazine

18  disconnect mechanism, or microstamping.  However, some of the semiautomatic

19  pistols on the roster *do* include some of these features (Gonzalez Dec., ¶ 19), and

20  more such models may be added to the roster in the future. [21]  An injunction

21  permitting the sales of new handgun models lacking these safety features would

22  therefore likely lead to more sales in California of such handguns as the Court

23  considers the merits of the claim.  The UHA would not permit the State to later

24  claw back those weapons, since the law governs sales, but not possession.   And

25  _____

26  [21] Although there are currently no semiautomatic pistols on the roster capable of microstamping, the requirement plays an important role in transitioning handgun sales in California toward safer models.  Notably, the single-location microstamping requirement has been the subject of litigation in this action since shortly after its enactment in 2020 (*see* Complaint for Injunctive and Declaratory Relief, ECF. No 1), which has likely disincentivized firearms manufacturers from developing compliant models prior to legal resolution.

27

28

any injunction would undermine California's considered effort to enhance the safety of newly-sold handguns. *See Fiscal v. City and County of San Francisco*, 158 Cal. App. 4th 895, 912 (Ct. App. 2008).  Indeed, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quotation and citation omitted).

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' motion for preliminary injunction.

Dated:  January 27, 2023                           Respectfully submitted,

                                                    ROB BONTA
                                                    Attorney General of California
                                                    ANTHONY R. HAKL
                                                    Supervising Deputy Attorney General


                                                    */s/ Gabrielle D. Boutin*
                                                    GABRIELLE D. BOUTIN
                                                    Deputy Attorney General
                                                    *Attorneys for Defendants Rob Bonta,*
                                                    *in his official capacity as California*
                                                    *Attorney General, and Allison*
                                                    *Mendoza, in her official capacity as*
                                                    *Acting Director of the Department of*
                                                    *Justice Bureau of Firearms*

34