Rob Bonta
Attorney General of California
Anthony R. Hakl
Supervising Deputy Attorney General
Gabrielle D. Boutin
Deputy Attorney General
State Bar No. 267308
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone:  (916) 210-6053
  Fax: (916) 324-8855
  E-mail:  Gabrielle.Boutin@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official
capacity as California Attorney General, and
Allison Mendoza, in her official capacity as Acting
Director of the Department of Justice Bureau of
Firearms*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

### CIVIL DIVISION

| | |
|---|---|
| **LANA RAE RENNA et al.,** | 8:17-cv-00746-JLS-JDE |
| Plaintiffs, | **DECLARATION OF SAUL CORNELL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of California; and ALLISON MENDOZA, in her official capacity as Acting Director of the Department of Justice Bureau of Firearms,** | |
| Defendants. | Date:        February 10, 2023<br>Time:        1:30 p.m.<br>Dept:        13A (13th Floor)<br>Judge:      The Honorable Dana M.<br>                   Sabraw<br>Trial Date:   None set<br>Action Filed:        11/10/2020 |

1

I, Saul Cornell, declare that the following is true and correct:

1.     I have been asked by the Office of the Attorney General for the State of California to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.  This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past.  My report explores these issues in some detail.  Finally, I have been asked to evaluate the statutes at issue in this case, particularly regarding their connection to the tradition of firearms regulation in American legal history.

2.     This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.     I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA

1   Law School, the University of Pennsylvania Law School, Columbia Law School,

2   Duke Law School, Pembroke College Oxford, Robinson College, Cambridge,

3   Leiden University, and McGill University.[1]

4        My writings on the Second Amendment and gun regulation have been widely

5   cited by state and federal courts, including the majority and dissenting opinions in

6   *Bruen*.[2]   My scholarship on this topic has appeared in leading law reviews and top

7   peer-reviewed legal history journals.  I authored the chapter on the right to bear

8   arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter

9   in *The Cambridge History of Law in America* on the Founding era and the Marshall

10  Court, the period that includes the adoption of the Constitution and the Second

11  Amendment.[3]   Thus, my expertise not only includes the history of gun regulation

12  and the right to keep and bear arms, but also extends to American legal and

13  constitutional history broadly defined.  I have provided expert witness testimony in

14  *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850

15  (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct.,

16  Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*,

17  No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.);

18  *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-

19  1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.);

20  *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Rupp v. Bonta*, No.

21  8:17-cv-00746-JLS-JDE (C.D. Cal.); and Nat'l Assoc. for Gun Rights, et al., v.

22  Campbell, D. Mass. No. 1:22-cv-11431-FDS (filed Jan. 31, 2023).

23      [1] For a full *curriculum vitae* listing relevant invited and scholarly

24  presentations, *see* Exhibit 1.

25      [2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

26      [3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE
    U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber

27  eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the
    Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544

28  (Christopher Tomlins & Michael Grossberg eds., 2008).

**RETENTION AND COMPENSATION**

4.      I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports; $750 per hour for depositions and court appearances; and an additional $100 per hour for travel time.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

5.      The opinion I provide in this report is based on my review of the operative complaint filed in this lawsuit, my review of the state laws at issue in this lawsuit, my education, expertise, and research in the field of legal history.  The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

**SUMMARY OF OPINIONS**

6.      Understanding text, history, and tradition require a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment.

7.      It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights claims.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4]  Each of the new states, either by

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for*

statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]  No legal principle was more important to the common law than the concept of the peace.[6]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8]

8.     In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous terms that there was a "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[9]  The dominant understanding of

---

*the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms.  The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012).  It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND*

the Second Amendment and its state constitutional analogues at the time of their

adoption in the Founding period forged an indissoluble link between the right to

keep and bear arms with the goal of preserving the peace.[10]

9.      "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined

with the scope they were thought to have when the people adopted them."[11]

Included in this right was the most basic right of all: the right of the people to

regulate their own internal police.  Although modern lawyers and jurists are

accustomed to thinking of state police power, the Founding generation viewed this

concept as a right, not a power.[12]  The first state constitutions clearly articulated

such a right — including it alongside more familiar rights such as the right to bear

arms.[13]  Pennsylvania's Constitution framed this estimable right succinctly:  "That

---

*Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016).

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937).  For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013).  On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[11] *Heller*, 554 U.S. at 634–35; William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution,* 20 J. POL'Y HIST. 47 (2008).

[12] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[13] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

1   the people of this State have the sole, exclusive and inherent right of governing and

2   regulating the internal police of the same.  Thus, if Justice Scalia's rule applies to

3   the scope of the right to bear arms, it must also apply to the scope of the right of the

4   people to regulate their internal police, a point that Chief Justice Roberts and

5   Justice Kavanaugh have each underscored.[14]  The history of gun regulation in the

6   decades after the right to bear arms was codified in both the first state constitutions

7   and the federal bill of rights underscores this important point.

8          10.     In the years following the adoption of the Second Amendment and its

9   state analogues, firearm regulation increased.  Indeed, the individual states

10  exercised their police powers to address longstanding issues and novel problems

11  created by firearms in American society.

12  **I.      THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND**

13         ***HELLER***

14         11.     The United States Supreme Court's decisions in *Heller*, *McDonald*[15],

15  and *Bruen* have directed courts to look to text and history for guideposts in

16  evaluating the scope of permissible firearms regulation under the Second

17  Amendment.  In another case involving historical determinations, Justice Thomas,

18  the author of the majority opinion in *Bruen*, has noted that judges must avoid

19  approaching history, text, and tradition with an "ahistorical literalism."[16]  Legal

20  texts must not be read in a decontextualized fashion detached from the web of

21  historical meaning that made them comprehensible to Americans living in the past.

22

23         [14]   John Roberts, Transcript of Oral Argument at 44, *Heller*, 554 U.S. 570;

24  *Heller v. District of Columbia* (Heller II), 670 F.3d 1244, 1270 (D.C. Cir. 2011)
    (Kavanaugh, J., dissenting); Joseph S. Hartunian, Gun Safety in the Age of

25  Kavanaugh  117 Michigan Law Review online 104 (2019).

26         [15] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

27         [16] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019)
    (Thomas, J.) (criticizing "ahistorical literalism").

28

Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[17]

12.   Following the mandates set out in *Heller, McDonald* and more recently in *Bruen*, history provides essential guideposts in evaluating the scope of permissible regulation under the Second Amendment.[18]  Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[19]  The Court acknowledged that when novel problems created by firearms are issue the analysis must reflect this fact:  "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

13.   In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[20]  Indeed, such research is still ongoing: new materials continue to emerge; and in the months since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[21]

---

[17] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[18] *Bruen*, 142 S. Ct. 2111.

[19] *Id*.

[20] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[21] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles &

14.     Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[22]

15.     One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard-wired into the Second Amendment itself. As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights. Although "free-standing balancing" is precluded by *Heller*, the plain meaning of the Amendment's text recognizes a role for regulation explicitly and further underscores that actions inimical to a free state fall outside of the scope of the right instantiated in the text.[23] Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.

---

Darrell A.H. Miller eds., forthcoming 2023).

[22] *Bruen*, 142 S. Ct. at 2132–33.

[23]  U.S. Const. amend. II.

16.    Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear.  The First Amendment prohibits "abridging" the rights it protects.  In standard American English in the Founding era, to "abridge" meant to "reduce."  Thus, the First Amendment prohibits a diminishment of the rights it protects.  The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[24]  In Founding-era American English, the word "infringement" meant to "violate" or "destroy."  In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text.  Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying *right*.

17.    John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[25]

---

[24] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation:  "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

[25] *Liberty,*  A NEW LAW DICTIONARY (1792) *See  also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

18.     Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[26]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[27]  Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[28]  Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[29]   And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[30]  Copies of these dictionary entries are attached hereto as Exhibit 2.  Although today the two terms are conflated by some, the meanings of abridge and infringe were and remain distinct. The Founding generation was far more nuanced in distinguishing between the differences between these two terms.

19.     Regulation, including robust laws, were not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[31]  As one

---

[26] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[27] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[28] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[29] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[30] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

[31] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[32] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[33]

20.     The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty were not antithetical to one another.  The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control.  "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[34]  Rather than limit rights, regulation was the essential means of preserving rights, including self-defense.[35]  In fact, without robust regulation of arms, it would have been impossible

[32] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[33] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[34] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) *s* (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[35] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15

to implement the Second Amendment and its state analogues.  Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[36]  The individual states also imposed loyalty oaths, disarming those who refused to take such oaths.  No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.  Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[37]

21.    In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.  As long as such laws did not destroy the right of self-defense, the individual states enjoyed broad latitude to regulate arms.[38]

---

GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic.  This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[36] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[37] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[38] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early*

## II.   FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.     Guns have been regulated from the dawn of American history.[39]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[40]  Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[41]

23.     The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to preserve the peace.[42]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[43]  To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government.  In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[44]

---

*American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[39] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[40] *Id.*

[41] Ruben & Miller, *supra* note 20, at 1.

[42] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[43] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[44] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public:*

24.    *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[45]  Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[46]

25.    Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment.  A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[47]

26.    The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[48]  Levels of gun

_____

*From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[45] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[46] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[47] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[48] It is important to recognize that there were profound regional differences in early America.  *See* JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE (1988).  These differences also had important consequences for the evolution of American law.  *See generally* David Thomas Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America.  These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region.  The data presented in Figure 1 is based on the pioneering research of Ohio State historian Randolph Roth. It captures one of the essential facts necessary to understand what fears motivated American gun policy in the era of the Second Amendment.  The pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military style weapons which were relatively expensive and had little utility in a rural society.  Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[49] Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life.  Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[50]

27.     Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period.  Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes.  Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only

[49] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[50] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

corrosive, but it attracted moisture like a sponge.  Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume.  As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded.  Why do they always show the gun over the fireplace?  Because that's the warmest, driest place in the house."[51] Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses.  Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[52]

**Figure 1**



Figure 2.3   Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

28.     As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment.  Nor were guns the primary

---

[51] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[52] Sweeney, *supra* note 49.

weapon of choice for those with evil intent during this period.[53]   The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that they were less likely to be used in crimes of passion. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

29.    The Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America. The Founding generation faced a different, but no less serious problem, American  reluctance  to purchase the type of weapons needed to effectively arm their militias. Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by military tactics.  A gun had to be able to receive a bayonet and serve as a bludgeon if necessary.  The light weight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin, but were not well suited to eighteenth-century ground wars. When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved.  Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[54]

30.    Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities.  Gun policy in the Founding era

---

[53] HAAG, *supra* note 45.

[54] Sweeney, *supra* note 49.

reflected these realities, and accordingly, one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogeneous industrial society capable of producing a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation.[55]  Put another way, laws created for a society without much of a gun violence problem enacted at a time of relative gun scarcity, at least in terms of militia weapons, have limited value in illuminating the challenges Americans face today.

31.   Another aspect of Founding era gun policy that needs to be acknowledged is the active role that government took in encouraging the manufacturing of arms.  The American firearms industry in its infancy was largely dependent on government contracts and subsidies.  Thus, government had a vested interest in determining what types of weapons would be produced.  Government regulation of the firearms industry also included the authority to inspect the manufactures of weapons and impose safety standards on the industry.

32.   As business historian Lindsay Schakenbach Regele notes, "by 1810, western Massachusetts produced more small arms than anywhere else in the Northeast."[56]  Beginning in 1794 the federal armory in Springfield, Massachusetts served as a spur to technological innovation in the region.  In the years following the War of 1812, the Armory served as an incubator for other local producers and gunsmiths, so much so that one Pittsfield gunsmith, Lemuel Pomeroy praised the federal government for its actions which encouraged gunsmiths "to fabricate arms

---

[55] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

[56] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

of the first quality."[57]  The Springfield Armory's output accounted for most of the guns produced in the state.

33.    In 1805, Massachusetts enacted a law requiring all guns, before sale, to be inspected, marked, and stamped by an inspector.  The state revised the proof statute two more times in the decades leading up to the Civil War.[58]  These requirements  ensured that the guns sold to the public were safe and suitable for use.  Although the guns produced by the Springfield Armory were not subject to state law, because they were under federal control, these arms were nonetheless subjected to thorough testing and were stamped as well.  Indeed, the fact that these arms had undergone a rigorous testing and evaluation process became a major selling point that was advertised to increase their value and desirability as surplus military arms in the booming  consumer market for guns that exploded in the decades after the War of 1812.[59]

34.    The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[60]  The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[61]  The same technological changes and economic forces that made wooden

---

[57] Lindsay Schakenbach Regele, MANUFACTURING ADVANTAGE: WAR, THE STATE, AND THE ORIGINS OF AMERICAN INDUSTRY, 1776–1848 (2019) at 65-66.

[58] 1805 Mass. Acts 588, An Act to Provide for the Proof of Fire Arms Manufactured Within This Commonwealth, Ch. 35.  A copy of this law is attached hereto as Exhibit 3.  The law was revised in 1837 and  later in 1859, see  Chap 49, Sec. 27 (Firearms), General Statutes of the Commonwealth of Massachusetts: Revised by Commissioners Appointed under a Resolve of February 16, 1855, Amended by the Legislature, and Passed December 28, 1859 (1860).

[59] Lindsay Schakenbach Regele, *Guns for the Government: Ordnance, the Military 'Peacetime Establishment,' and Executive Governance in the Early Republic* 34 STUDIES IN AMERICAN POLITICAL DEVELOPMENT 132, 145 (2020).

[60] Cornell, *supra* note 3, at 745.

[61] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).

clocks and other consumer goods such as Currier and Ives prints common items in many homes also transformed American gun culture.[62]  These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common.  The culmination of this gradual evolution in both firearms and ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican-American War.[63]  Economic transformation was accompanied by a host of profound social changes that gave rise to America's first gun violence crisis.  As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity.  The change in behavior was most noticeable in the case of handguns. [64]

35.    The response of states to the emergence of new firearms that threatened the peace was a plethora of new laws.  In sort, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, the individual states enacted laws to address these problems.  In every instance apart from a few outlier cases in the Slave South, courts upheld such limits on the unfettered exercise a right to keep and bear arms.  The primary limit identified by courts in evaluating such laws was the threshold question about abridgement: did the law negate the ability to act in self-defense.[65]  In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition.  Responding in this fashion

---

[62] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY (Eric Foner ed., 1990).

[63] WILLIAM N. HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND (1st ed. 1996).

[64] Cornell, *supra* note 3, at 716.

[65] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.

36.   Not all guns were treated equally by the law in early America.  Some guns were given heightened constitutional protection and others were treated as ordinary property subject to the full force of state police power authority.[66]  The people themselves acting through their legislatures retained the fundamental right to determine which dangerous weapons were exempted from the full protection of the constitutional right to keep and bear arms. The antebellum case law examined by Heller makes clear that the metric used by courts to evaluate laws was simple and reflected the concept of infringement. Laws that undermined the right of self-defense were generally struck down, regulations that limited but did not destroy the right were upheld.[67]

37.   Some states opted to tax some common weapons to discourage their proliferation.[68]

---

[66] Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022).

[67]  The best illustration of this rule is *Reid,* discussed by *Heller* at 629.

[68]  1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15. ("The following subjects The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.").  Anderson Hutchinson, Code of Mississippi: Being an Analytical Compilation of the Public and General Statutes of the Territory and State, with Tabular References to the Local and Private Acts, from 1798 to 1848 : With the National and State Constitutions, Cessions of the Country by the Choctaw and Chickasaw Indians, and Acts of Congress for the Survey and Sale of the Lands, and Granting Donations Thereof to the State (1848) at 182. *See also* 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same.

38.     In particular not all hand guns were created equal in the eyes of the law.  During Reconstruction a number of states prohibited guns that were deemed to pose a particular risk because they were easily concealed.[69]

## III.   THE POLICE POWER AND FIREARMS REGULATION

39.     The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[70]  The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[71]  By the early nineteenth century, the term "police" was a fixture in American law.[72]  Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[73]  The Founding era's conception of a basic police right located in legislatures

---

[69] 1879 Tenn. Pub. Acts 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; 1881 Ark. Acts 192, An Act to Preserve the Public Peace and Prevent Crime, ch. XCVI (96), § 3.

[70] PA. CONST. OF 1776, Ch. I, art iii.

[71] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[72] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[73] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

40.     The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[74]  The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[75]

41.     Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[76]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many

---

[74] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[75] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[76] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

other things of the like nature."[77]  State police power authority was at its pinnacle in matters relating to guns or gun powder.[78]

42.    Every aspect of the manufacture, sale, and storage of gun powder was regulated due to the substance's dangerous potential to detonate if exposed to fire or heat.  Firearms were also subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons.[79]

43.    Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[80]  New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[81]

---

[77] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[78] CORNELL, *supra* note 35.

[79] Cornell and DeDino, *supra* note 38; public carry by contrast was limited by common law and criminal statutes, see, Cornell, *supra* note 42.

[80] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.  A opy of this law is attached hereto as Exhibit 4.

[81] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City,  2 LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE at 191-2 (Thomas Greenleaf, ed., 1792).  A copy of this law is attached hereto as Exhibit 5.

44.     The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. The application of the police power to firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[82]  This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home.

45.     A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[83]

46.     Nor was Chief Justice John Marshall unique in highlighting the centrality of this idea to American law. [84]  The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal

---

[82] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[83] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864. See "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/.

[84] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

legislation touching health or public safety in early America.[85]  Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power.  Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise.  There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[86]

47.    In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures.  Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout

---

[85] FREUND, *supra* note 72, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); DUBBER, *supra* note 12; GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (Princeton Univ. Press, 2015).

[86] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

American history.[87]  A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[88]

48.    No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance.  Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged.  This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[89]  Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[90]  This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power.

---

[87] CORNELL, THE POLICE POWER, *supra* note 35.

[88] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.  A copy of this law is attached hereto as Exhibit 6.

[89] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[90] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[91]

49.   One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[92]  The case is a classic example of antebellum police power jurisprudence.  The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns.  "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[93]  In the court's view, the regulation of arms was at the very core of state police power.[94]  The judicial determination was straightforward: was the challenged law a legitimate exercise of the police power or not?

## IV.  RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO REGULATE FIREARMS (1863-1877)

50.   Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms.  These two rights were separate in the Founding era but were mutually reinforcing:  both rights were exercised in a manner that furthered the goal of ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation

---

[91] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[92] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[93] *Id.* at 616.

[94] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms.  For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 72, at 91.

of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle.  This change reflected two profound transformations in American politics and law between 1776 and 1868.  First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.  As a result, state constitutions no longer included positive affirmations of a police right.  Secondly, the constitutional "mischief to be remedied" had changed as well.[95]  Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military.  By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists.  In place of these ancient fears, a new apprehension stalked Americans:  the proliferation of especially dangerous weapons and the societal harms they caused.[96]

51.     The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[97]  For example, the 1868 Texas

---

[95] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century.  For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61.  The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822).  For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

[96] *See McDonald*, 561 U.S. at 767–68

[97] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth*

Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns.  "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[98]  Nor was Texas an outlier in this regard.  Sixteen state constitutions adopted during this period employed similarly expansive language.[99]  Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms.  Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[100]

52.   This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies.  The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[101]

---

*Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[98] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[99] Cornell, *supra* note 97, at 75–76.

[100] *Id.*

[101] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

53.     Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety.  Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder.  In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power.  As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[102]

54.     Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government.  The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[103]  As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good. [104]

---

[102] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (20052006).

[103] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[104] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

55.     It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation.  Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms.  Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[105]  Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[106]

56.     Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[107]  Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[108]

57.     In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety.  Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun

---

[105] *See* Spitzer, *supra* note 39, at 59–61 tbl. 1.

[106] *Id.*

[107] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[108] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

regulations.[109]  The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction.  The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican–controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[110]

58.    The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns.   American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## V.    *BRUEN*'S FRAMEWORK AND THE SCOPE OF PERMISSIBLE REGULATION

59.    The power to regulate and in some cases prohibit guns and gun powder has always been central to the police power authority of states and localities.  At different moments in American history communities have regulated weapons.  As the Second Amendment's text makes clear, weapons that undermine the security of a free state are not within the scope of its protections.  In short, social, and

---

[109] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

[110] *See* Darrell A. H. Miller*, Peruta, The Home-Bound Second Amendment, and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

34

1  economic transformation were always accompanied by legal transformation.  Put

2  another way, as times change, the law changes with them.[111]

3      60.    Political scientist Robert Spitzer's overview of the history of firearms

4  regulation underscores a basic point about American law:  "The lesson of gun

5  regulation history here is that new technologies bred new laws when circumstances

6  warranted."[112]  States and localities have regulated gunpowder and arms, since the

7  earliest days of the American Republic.  The statutes at issue in this case are

8  analogous to a long-established tradition of firearms regulation in America,

9  beginning in the colonial period and stretching across time to the present.  This

10  venerable tradition of using police power authority to craft specific laws to meet

11  shifting challenges has continued to the present day.[113]  The adaptability of state

12  and local police power provided the flexibility governments needed to deal with the

13  problems created by changes in firearms technology and gun culture.

14      61.    The metric used by courts to adjudicate questions about the scope of

15  permissible regulation has remain constant over the long arc of American history.

16  To constitute an infringement of the right the law must burden the right of self-

17  defense to such a degree that it effectively negates it. As long as laws stay within

18  this threshold they have been held to be constitutional.

19

20

21

22

23

24

25

26      [111] Spitzer, *supra* note 37.

27      [112] *Id.*

28      [113] GERSTLE, *supra* note 85.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2023 at Redding, CT.

_Saul Cornell_

Saul Cornell

# Exhibit 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| Book Publications |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller (University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)  (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique,"  Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contextualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II: The Return of the Founders," Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?: The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993): 26-30

"Politics of the Middling Sort: The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed: Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

## Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

## Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

### Book Manuscript Reviewer:

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

### Invited Lectures:

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria: Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke: The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America: Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:  The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?" Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux, France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association, (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up: The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*"  Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour*, PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, American Quarterly (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## Federal Courts:

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).


**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022) [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, NYSRPA v. Bruen, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, Young v. State of Hawaii  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief, Gould v. Morgan, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, Flanagan vs. Becerra, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, Gill v. Whitford (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief, Woollard v Gallagher, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

## Law Review Symposia Organized

### Second Amendment:

 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).
"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).
"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).
"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

### New Originalism:

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).
"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).

# Exhibit 2

Case 3:20-cv-02190-DMS-DEB   Document 72-5   Filed 01/27/23   PageID.1313   Page 54 of 82

# DICTIONARIUM BRITANNICUM:

Or a more COMPLEAT

## UNIVERSAL ETYMOLOGICAL

# ENGLISH DICTIONARY

Than any EXTANT.

### CONTAINING

Not only the Words, and their Explication; but their Etymologies from the *Antient British, Teutonick, Low* and *High Dutch, Saxon, Danish, Norman* and *Modern French, Italian, Spanish, Latin, Greek, Hebrew, Chaldee,* &c. each in its proper Character.

### ALSO

Explaining hard and technical Words, or Terms of Art, in all the *ARTS, SCIENCES,* and *MYSTERIES* following. Together with *ACCENTS* directing to their proper Pronunciation, shewing both the *Orthography* and *Orthoepia* of the *English Tongue,*

### VIZ. IN

AGRICULTURE, ALGEBRA, ANATOMY, ARCHITECTURE, ARITHMETICK, ASTROLOGY, ASTRONOMY, BOTANICKS, CATOPTRICKS, CHYMISTRY, CHYROMANCY, CHIRURGERY, CONFECTIONARY, COOKERY, COSMOGRAPHY, DIALLING, DIOPTRICKS, ETHICKS, FISHING, FORTIFICATION, GARDENING, GAUGING, GEOGRAPHY, GEOMETRY, GRAMMAR, GUNNERY, HANDICRAFTS, HAWKING, HERALDRY, HORSEMANSHIP, HUSBANDRY, HYDRAULICKS, HYDROGRAPHY, HYDROSTATICKS, LAW, LOGICK, MARITIME *and* MILITARY AFFAIRS, MATHEMATICKS, MECHANICKS, MERCHANDIZE, METAPHYSICKS, METEOROLOGY, NAVIGATION, OPTICKS, OTACOUSTICKS, PAINTING, PERSPECTIVE, PHARMACY, PHILOSOPHY, PHYSICK, PHYSIOGNOMY, PYROTECHNY, RHETORICK, SCULPTURE, STATICKS, STATUARY, SURVEYING, THEOLOGY, *and* TRIGONOMETRY.

Illustrated with near Five Hundred CUTS, for Giving a clearer Idea of those Figures, not so well apprehended by verbal Description.

### LIKEWISE

A Collection and Explanation of WORDS and PHRASES us'd in our antient Charters, Statutes, Writs, Old Records and Processes at Law.

### ALSO

The Theogony, Theology, and Mythology of the *Egyptians, Greeks, Romans,* &c. being an Account of their Deities, Solemnities, either Religious or Civil, their Divinations, Auguries, Oracles, Hieroglyphicks, and many other curious Matters, necessary to be understood, especially by the Readers of *English* POETRY.

To which is added,

A Collection of Proper Names of Persons and Places in *Great-Britain,* with their Etymologies and Explications.

The Whole digested into an Alphabetical Order, not only for the Information of the Ignorant, but the Entertainment of the Curious ; and also the Benefit of Artificers, Tradesmen, Young Students and Foreigners.

*A WORK useful for such as would* UNDERSTAND *what they* READ *and* HEAR, SPEAK *what they* MEAN, *and* WRITE *true* ENGLISH.

Collected by several Hands,

The *Mathematical Part* by G. GORDON, the *Botanical* by P. MILLER. The Whole Revis'd and Improv'd, with many thousand Additions,

By N. BAILEY, Φιλόλογος.

## LONDON:

Printed for T. COX at the *Lamb* under the *Royal-Exchange.* M,DCC,XXX.


Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

Generated for Dennis E Baron (University of Illinois at Urbana-Champaign) on 2013-07-30 21:01 GMT  /  http://hdl.handle.net/2027/nyp.33433002977704
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Compendium_Cornell
Page 0258

A B

A B

ABO'MASUM [ with *Anatomists* ] One of the four Stomachs of ruminant Animals, *i.e.* such as chew the Cud ; the other three are called *Venter*, *Reticulum*, and *Omasum*.

ABO'MINARE [*abominari*], according to the native Sense of the Word, from *ab* and *omen*, L. signifies to account a Thing for an ill Omen, or an unlucky Sign, and therefore to pray against it by certain Forms of Speech to be abhorred, loathed or hated.

To ABO'MINATE [*abominari*, of *ab* and *omen*] properly signifies to take a thing for an ill Sign or unlucky Omen ; to pray against it, or with the contrary, by certain Forms and Speeches, we use it for to abhor, hate or loath.

ABOMINA'TION, a thing to be abhor'd or loathed, a detestable thing. L.

ABOMINO'SE [*abominosus*, L.] full of Abomination.

ABORI'GINES [of *ab* and *origo*] the People of Italy by *Saturn*, or such Nations as the *Italians*, who pretend to have been anciently without Original or Derivation from any other Nation or People.

ABON [with the ancient *Britains*] signified a River, and was a general Name for all Rivers.
AVON

To ABO'RT [*abortie*, F. of *ab* and *orior*, L.] to miscarry, or bring forth the Fœtus, before it is arrived at its Maturity for Birth.

ABO'RTION [of *aborior*, L. to rise or spring up untimely] the untimely Exclusion of the Fœtus, commonly called a Miscarriage in Women.

ABO'RTION [with *Gardeners*] a Term used of Fruits that are produced too early before their Time, as when Trees happening to be blasted by noxious Winds, are subject to this Malady, never bringing their Fruit to Maturity.

ABO'RTION [of *abortor*, F.] Miscarriage in Women, or the bringing forth a Child before its Time, that is not in a Capacity to live.

ABO'RTIVE [*abortivus*, L.] pertaining to such a Birth, still-born, untimely, also that comes to nothing, as an abortive Design.

An ABO'RTIVE, a sort of fine Vellum made of the Skin of a Cast-calf or Lamb.

ABO'RTIVENESS, Miscarriage ; also Unsuccessfulness.

ABO'VE [of *abuvtan*, *Sax.*] aloft, higher ; also more than, as over and above.

ABOU'T [of *abutan*, *Sax.*] round about, also near in Time and Place ; also ready, as *about to go*.

ABOU'TED [with *Gardeners*] a Term used to denote that Trees are budded. It properly signifies a Swelling formed in the human Body, which has come to a Head or Abscess, and is applied to Trees, in that the Buds of them do in like manner arise like small Heads.

ABRACADA'BRA, this Word is a Spell or Charm, which is still in Use and Esteem with some superstitious Persons, who pretend to do Wonders by it in the Cure of Agues and Fevers, which is to be written in the Form of a Triangle, decreasing one Letter every Line till it comes to a Point ; and the Illiterate write the Letters in *English* Characters in the same Form.

```
A B R A C A D A B R A
  A B R A C A D A B R
    A B R A C A D A B
      A B R A C A D A
        A B R A C A D
          A B R A C A
            A B R A C
              A B R A
                A B R
                  A B
                    A
```

A'BRACAR, a Name which *Basilides*, an Heretick of the second Century, gave to God, who he said was the Author of 365, *i.e.* the 365 Days in the Year, to which the Letters of the Word *Abracadabra* are said to amount in the Time of their Superstition is said to have lived in the Time of *Adrian*, and had its Name after *Abrafon*, or A-*brasax* [Αβϛεξας, Gr.] a Deity that the Author adored, this he made his supreme Deity, and ascribed to him several petty subordinate Divinities, as 7 Angels, who presided over the Heavens, and also according to the Number of Days in the Year, he held 365 Virtues or Powers, or dependent Intelligences, the Value of the Letters in the Word, according to the *Greek* Numbers made 365 thus,

A B P A Ξ A Σ
1   2   100   1   60   1   200

ABRAHAM's BALM [in *Botany*] the Hemp-tree.
To ABRA'DE [*abrado*, L.] to shave off.
ABRA'SION, a shaving off ; also a razing or blotting out.

ABRA'SION [with *Surgeons*] a superficial raising of the Skin.

ABRASION [in a *Medicinal Sense*] the wearing away the natural Mucus, which covers the Membranes, particularly those of the Stomach and Guts, by corrosive or sharp Humours.

ABRASION [with *Philosophers*] that Matter which is worn off by Attrition of Bodies one against another.

ABRENUNCIA'TION, a renouncing or forsaking any thing entirely. F. of L.

A'BRIC [with *Chymists*] Sulphur.

To ABRI'DGE [*abreger*, F.] to make shorter in Words, to contract, still retaining the Sense and Substance.

To ABRIDGE [in *Law*] to make a Declaration, or count short, by leaving out Part of the Plaint or Demand, and praying that the Defendant may answer to the other.

ABRI'DGMENT [*abregement*, F.] an abridging, &c. wherein the less material Things are insisted on but briefly, and so the whole brought into a lesser Compass ; an Epitome or short Account of a Matter ; a Summary or short Account of the Matter of a Book.

ABRIDGMENT [of *account*, &c. in *Law*] is the making it shorter by abstracting some of its Circumstances.

ABROCAME'NTUM See *Abbrochment*.

To A'BROGATE [*abrogatum*, Sup. of *abrogare*, L.] to disannul or abolish, especially to repeal or make a Law void, which was before in Force.

ABROGA'TION, a disannulling, &c. L.

ABROO'D [of *bpenan*, *Sax.*] as to sit abrood as an Hen on Eggs, to cherish.

ABROTANI'TES [Αβϛοτονιτης, Gr.] Wine made of Southernwood.

ABRO'TANUM [Αβϛοτανον, Gr.] the Herb Southernwood.
ABROTONI'TES [Αβϛοτονιτης, Gr.] Wormwood Wine.
ABRU'PT [*abruptus*, L.] Breaking off suddenly ; unseasonable ; also rough, hasty.

The ABRUPT [*abruptum*, L.] the uneven, rough, broken, or craggy, Part of the Abyss. *Milton.*

ABRU'PTNESS, the breaking or being broken off on a sudden ; also Cragginess of a Rock, Mountain, &c.

A'BSCESS [*abscessus*, L. of *abs* and *cedo*, L. to retire ; because the Parts are disunited by the Matter] a gross Tumor, Ulcer, or Swelling in any Part of the Body, which may either be dissolved, or be brought to run with Matter.

To ABSCI'ND [*abscindere*, L.] to cut off.

ABSCI'SSÆ [in *Conick Sections*, or other *Curvilineal Figures*] are the Parts of the Axis cut off by the Ordinates, and accounted downwards from the Vertex of the Section, thus V b or V B are the *Abscissæ* in this Figure. Some Writers call these the *Intercepted Axes* or intercepted Diameters.



ABSCI'SSION [of *ab* and *scindo*, to cut] a cutting off. L.

ABSCISSION [with *Astrologers*] a Term used, when three Planets being within the Bounds of their Orbs, and in different Degrees of the Sign ; the third comes to a Conjunction with the middle Planet, and cuts off the Light of the first.

To ABSCO'ND [*abscondere*, L.] to hide one's self.

A'BSENT [*absens*, L.] that is out of the Way, missing or wandring.

To A'BSENT *one's self*, to be voluntarily absent, not to appear, to keep out of the Way.

ABSENTA'NEOUS [*absentaneus*, L.] pertaining to Absence, done in Absence.

ABSENTEE's, a Parliament held in *Dublin* the 28th of *Henry* VIII.

ABSI'NTHIATED [ *absinthiatus*, L. ] mingled with Wormwood.

ABSINTHIO'MENON [Αψινθιομενον, Gr.] Southernwood, or Wormwood gentle.

ABSI'NTHITES [Αψινθιτης, Gr.] Wine made of Wormwood.

ABSI'NTHIUM [Αψινθιον, Gr.] Wormwood.

A'BSIS [ [A'ψις, Gr.] the bowed or arched Roof of a APSIS Room, House, Oven, &c. also the Ring or Compass of a Wheel.

ABSIS [in *Astronomy*] is when the Planets moving to APSIS their highest or lowest Places are at a Stay ; the high *Absis* being called the *Apogæum*, and the low *Absis* the *Perigæum*.

To ABSI'ST [*absistere*, L.] to cease or leave off.

ABSOLE'TE [*absoletus*, L.] out of Use, neglected.

ABSO'LVATORY [of *absolutorius*, L.] pertaining to a Discharge or Acquittal.

ABSO-

Generated for Dennis E Baron (University of Illinois at Urbana-Champaign) on 2013-07-30 21:01 GMT / http://hdl.handle.net/2027/nyp.33433002977704
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

## IN

INFIRM, [*Infirmus*, L.] weak, feeble, crazy, fickly.
INFIRMARY [*Infirmarium*, L. *Infirmarie*, F.] an Apartment, or Lodgings, for fick People.
INFIRMNESS [*Infirmitas*, L.] Weakness, feebleness of
INFIRMITY [*Infirmitas*, L.] Body, Sickness.
INFISTULATED [*ex* and *fistulatus*, L.] turned to or become fiftulous; alfo full of Fiftula's.
To INFIX, [*infixum*, fup. of *infigere*, L.] to fix or faften into.
To INFLAME, [*Inflammare*, L.] to fet ones Heart on fire, to heat, to inrage or incenfe; alfo to provoke, to put into a Paffion.
INFLAMMABLENESS [of *inflammable*, F; *inflammare*, L.] capablenefs of being inflamed or fet on fire.
INFLAMMATION [in *Medicine*] a bliftering heat, a Tumor occafioned by an obftruction, by means whereof the Blood in the Flefh and Mufcles, flowing into fome part fafter than it can run off again, fwells up and caufes a Tenfion with an unufual forenefs, rednefs and heat.
INFLAMMATIVE, of an inflaming Nature or Quality.
INFLA'TE Expreffion, an Expreffion fwelling with big Words; but to no great purpofe.
To INFLATE [*inflatus*, L.] to blow, fwell, or puff up with Wind.
INFLATION [in *Medicine*] a puffing up, a windy Swelling, the extenfion of a part occafioned by windy Humours.
To INFLECT [*inflectere*, L.] to bend or bow.
INFLECTION ⎫ a bending or bowing.
INFLEXION ⎬
INFLECTION [with *Grammar*.] is the variation of Nouns and Verbs in their feveral Cafes, Tenfes and Declenfions.
INFLE'CTION [in *Opticks*] a multiplex Refraction of the Rays of Light, caufed by the unequal thicknefs of any Medium; fo that the Motion or Progrefs of the Ray is hindred from going on in a right Line, and is *inflected* or bent back on the infide by a Curve.



INFLECTION *Point of any Curve* [*Geometry*] is that Point or Place, where the Curve begins to bend back again a contrary way. As for inftance, when a Curve Line as A, F, K, is partly concave and partly convex towards any right Line, as A, B, or towards a faxt point, as then the Point F, which divides the concave from the convex part, and confequently is at the beginning of the one, and the end of the other, is called the Point of Inflection, as long as the Curve being continued in towards F, keeps its courfe the fame; but the Point K is called the Point of Retrogreffion, where it begins to reflect back again towards that part or fide where it took its original.
INFLE'XIBLENESS [*inflexibilitas*, L. inflexibilité, F.]
INFLEXIBILITY ⎬ that which cannot be bowed or bended; alfo an inflexible Temper, obftinatenefs, ftiffnefs.
To INFLICT [*inflictum*, L.] to lay a Punifhment upon.
INFLI'CTION, a fmiting, a laying a Punifhment upon. *L.*
INFLUENCE [*influentia*, L.] an Emiffion of a Power or Virtue; alfo the working or prevailing upon a power over, &c.
INFLUENCE [in *Aftrology*] a quality fuppofed to flow from the Bodies of the Stars, or the Effect of their Heat and Light, to which, the pretenders to that Art, attribute all the Events that happen on the Earth.
INFLUENCED [of *influentia*, L.] fwayed, biaffed, inclined towards, wrought upon.
To INFLUENCE [*influentia*, of *influere*, L.] to flow into, to have an influence upon, to produce or caufe; to fway or have power over.
INFLUENT [*influens*, L.] flowing into.
INFLUENT [*Juices* [in *Medicine*] fuch juices of a human Body, that by the contrivance of Nature and laws of Circulation, fall into another Current or Receptacle; as the *Bile* into the Gall-Bladder, &c.
INFLUENTIAL, influencing or bearing fway.
INFLUX [*influxus*, L.] a flowing or running into, efpecially of one River into another.
To INFOLD [of *in* and *pealban*, Sax.] to fold or wrap up.
To INFORCE [*insorcir*, F.] to prevail upon by force of Argument, to conftrain or oblige.
INFO'RCEMENT [*infortiamentum*] fuch a compulfion or reftraint.
To INFO'RM [*informare*, L.] to give notice, to tell, to inftruct, to teach, to make acquainted with.
INFORM [*informis*, L.] unfhapen, without form; alfo.
INFORMA *Pauperis* [*i. e.* under the form of a poor Perfon] is when a Perfon having made Oath before a Judge, that he is not worth 5 Pound, his Debts paid, is admitted to fue, ha-

ving Council or an Attorney affigned to manage his Bufinefs without any Fees. *L.*
INFORMATION, an informing relation, advice; alfo inftruction, a making known; alfo an accufation brought againft one before a Magiftrate. *F.* of *L.*
INFORMATUS *non fum* [*i. e.* I am not informed] a formal anfwer made in Court, by an Attorney who has no more to fay in the defence of his Client.
INFORMED *Stars* [with *Aftrologers*] are fuch fixed Stars as are not ranged under any form or particular conftellation.
INFORMER, one who in any Court of Judicature informs againft, or profecutes any Perfons who tranfgrefs any Law or penal Statute.
INFO'RMOUS [*informis*, L.] that is without form, fafhion or fhape.
INFORTUNATE [*infortunatus*, L.] unfortunate, unlucky, unhappy.
INFO'RTUNATENESS, unhappinefs, unluckinefs.
INFORTUNES [with *Aftrologers*] the Planets *Saturn* and *Mars*, fo called by reafon of their ill-difpofed Natures and unfortunate Influences.
INFRA *Scapularis Mufculus* [with *Anatomifts*] a broad or flefhy Mufcle of the Arm, arifing from the lower fide of the *Scapula*, and ending in the third Ligament of the Shoulder. *L.*
INFRA *Spinatus Mufculus* [with *Anat.*] a Mufcle of the Arm, fo termed from the being placed below the Spine, under which it arifes from the *Scapula*, and is inferted to the Shoulder Bone. This Mufcle moves the Arm directly backwards.
INFRA'CTION, a breaking in, a rupture or violation of a Treaty, a Law, Ordinance, &c.
To INFRA'NCHISE [of *affranchir*, F.] to fet free, to give one his Liberty; to make a Freeman or Denizon; to incorporate into a Society or Body politick.
INFRA'NCHISEMENT [*affranchiffement*, F.] a making free, &c. alfo delivery, difcharge, releafe.
INFRALAPSA'RIANS, a Sect who hold that God has created a certain number of Men, before the fall of *Adam*, only to be damned, without allowing them the means neceffary for their Salvation, if they would labour never fo much after it.
INFRANGIBLE [of *infrangibilis*, L.] not to be broken; durable, ftrong.
INFRA'NGIBLENESS, uneaptbrnefs of being broken.
INFREQUENCY [of *infrequentia*, L.] feldomnefs.
INFREQUENT [of *infrequens*, L.] feldom happening, rare, uncommon.
INFRICA'TION ⎫ a rubbing or chafing. *L.*
INFRICTION ⎬
To INFRI'NGE [*infringere*, L.] to break a Law, Cuftom or Privilege.
INFRI'NGEMENT, fuch violation or breach.
INFRUCTUO'SE [*infructuofus*, L.] unfruitful.
INFRUCTIFEROUS [*infrugiferus*, L.] bearing no Fruit.
INFU'CATED [*infucatus*, L.] painted over.
INFUCA'TION, a painting of the Face, a colouring or difguifing. *L.*
INFULA, a Name antiently given to fome of the pontifical Ornaments, which are faid to be Filaments or Fringes of Wool, with which Priefts, Victims and even Temples were adorned.
To INFU'MATE [*infumare*, L.] to Smoke or dry in the Smoke.
INFUMA'TION, a drying in the Smoke. *L.*
INFUNDIBULIFO'RMES [with *Botanifts*] a term applied to fuch Flowers, as are fhaped like a Funnel.
INFUNDI'BULUM, a Tunnel or Funnel for the pouring of Liquors into a Veffel. *L.*
INFUNDIBULUM *Cerebri* [*Anatomy*] the Brain Tunnel, a hollow place in the Root of the Brain, through which ferous Humours are difcharged. *L.*
INFUNDIBULUM *Renum* [*Anatomy*] the *Pelvis* or Bafin of the Reins, thro' which the Urine paffes to the Ureters and Bladder. *L.*
INFU'RIATE [of *in* and *furiatus*, L.] ftark Mad; alfo recovered from Madnefs.
INFUSCA'TION, a making dark or dufky. *L.*
To INFU'SE [*Infufum*, fup. of *infundere*, L.] to pour in, or into; to fteep or foak; alfo to infpire or endue with.
INFUSION, a pouring in, &c. *L.*
INFUSION [in *Pharmacy*] is a fteeping of any kinds of Drugs, Roots, Leaves, &c. in fome Liquor proper to draw out their Virtues.
To INGA'GE. See *To Engage*.
To INGE'MINATE [*ingeminare*, L.] to double or repeat often.
INGEMINATED *Flowers* [with *Botanifts*] are fuch when one Flower ftands on, or grows out, of another.

Ise

Generated for Dennis E Baron (University of Illinois at Urbana-Champaign) on 2013-07-30 21:05 GMT  /  http://hdl.handle.net/2027/nyp.33433029777704
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

An Universal Etymological

# *E N G L I S H*

# DICTIONARY;

## COMPREHENDING

The Derivations of the Generality of Words in the *English* Tongue, either Ancient or Modern, from the Ancient *British*, *Saxon*, *Danish*, *Norman*, and Modern *French*, *Teutonick*, *Dutch*, *Spanish*, *Italian*; as also from the *Latin*, *Greek*, and *Hebrew* Languages, each in their proper Characters.

### AND ALSO

A brief and clear Explication of all difficult Words, derived from any of the aforesaid Languages, and Terms of Art, relating to ANATOMY, BOTANY, PHYSICK, PHARMACY, SURGERY, CHYMISTRY, PHILOSOPHY, DIVINITY, MATHEMATICKS, GRAMMAR, LOGICK, RHETORICK, MUSICK, HERALDRY, MARITIME AFFAIRS, MILITARY DISCIPLINE, HORSEMANSHIP, HUNTING, HAWKING, FOWLING, FISHING, GARDENING, HUSBANDRY, HANDICRAFTS, CONFECTIONARY, CARVING, COOKERY, &c.

### TOGETHER WITH

A large Collection and Explication of Words and Phrases used in our Ancient STATUTES, CHARTERS, WRITS, OLD RECORDS, and PROCESSES in Law; and the Etymology, and Interpretation of the Proper Names of MEN, WOMEN, and remarkable *Places* in *Great-Britain*: Also the DIALECTS of our different Countries.

Containing many Thousand Words more than either *Harris*, *Philips*, *Kersey*, or any *English* Dictionary before extant.

To which is added,

A Collection of our most common PROVERBS, with their Explication and Illustration.

The whole WORK compiled and methodically digested, as well for the Entertainment of the Curious, as the Information of the Ignorant; and for the Benefit of young Students, Artificers, Tradesmen, and Foreigners, who are desirous thoroughly to understand what they Speak, Read, or Write.

Twentieth Edition, with considerable Improvements. 1763

*By* N. BAILEY, Φιλόλογος.

## *L O N D O N:*

Printed for T. Osborne, H. Woodfall, J. Beecroft, B. Dodd, W. Strahan, J. Hinton, John Rivington, R. Baldwin, W. Johnston, L. Hawes, W. Clarke, and R. Collins, J. Richardson, T. Longman, G. Keith, T. Caslon, S. Crowder, B. Law and Co. W. Fenner, P. Stevens, R. Withy, C. Henderson, A. and C. Corbett, R. and C. Ware, J. Coote, Z. Stuart, C. Rivington, and J. Hinxman. 1763.

[Price SIX SHILLINGS.]

Compendium_Cornell
Page 0393

## A B

Company, at first called *Abram*, High Father] the great Patriarch of the Nation of the *Jews*.

ABRAHAM's *Balm*, the Hemp-tree, a kind of Willow fo called.

ABRAID [of Abnebian, or Abnoben, *Sax.*] awaked, raifed up. *Chauc.*

A'BRAM [אברם *H. i. e.* High Father; of אב a Father, and רום High] the original Name of the Patriarch *Abraham.*

ABRAM *Cove*, naked or poor man. *Cant.*

ABRA'SION, a fhaving off, a raifing or croffing out.

ABRE'DE, abroad. *Chauc.*

To ABRE'DGE ⎰ to abridge, to fhorten,
To ABREGGE ⎱ *Abbreger*, F. *Chauc.*

To ABRE'IDE ⎰ to ftart up, to awake,
To ABREYD ⎱ arife. *Chauc.*

ABRE'DING, upbraiding. *Chauc.*

ABRENUNCIATION, a renouncing or forfaking a Thing entirely. *L.*

ABRIG ⎰ [among *Chymifts*] Sulphur.
ABRI'CK ⎱

To ABRIDG'E [ *abreger*, F.] to make fhorter in Words, ftill retaining the Senfe and Subftance; alfo to reftrain a Perfon from fome Liberty, &c. before enjoyed.

To ABRIDGE [in *Common Law*] to make a Declaration or Count fhorter, by leaving out Part of the Plaint or Demand, and praying the Defendant may anfwer to the other only.

AN ABRIDG'EMENT [*Abridgement*, F.] an Epitome, a fhort Account of a Book Writing, or Matter.

To AB'ROGATE [*abroger*, F. *abrogatum*, L.] to difannul, to abolifh, to take away; to repeal or make void a Law which was before in Force.

ABROGA'TION, the Act of Repealing, &c. F. of L.

ABRUPT' [*abruptus*, L.] broken off, on a fudden, hafty, rough, unfeafonable.

AB'SALOM [אבשלים *H. i. e.* the Father's Peace, of שלום a Father, and שלום Peace] King *David's* rebellious Son.

AB'SALONISM, the Practice of Rebellion againft a Father.

AB'SCESS ⎰ [*Abfcès*, F. *Abfceffus*, L.] an
AB'SCESSE ⎱ Ulceration arifing in any Part of the Body, and tending to Suppuration; the fame with Impofthume.

ABCES'SION, a going away. *L.*

ABCIS'SÆ [ in *Conic Sections* ] are the Parts of the Axis cut off by the Ordinates.

ABSCIS'SION, a cutting off. *L.*

ABSCISSION [ in *Aftrology* ] is when three Planets being within the Bounds of their Orbs, and in different Degrees of the Sign, the third comes to a Conjunction with the middle Planet, and cuts off the Light of the firft.

To ABSCOND' [*abfcondere*, L.] to conceal or hide one's felf,

## A B

ABSCON'SION, an hiding. *L.*

AB'SENT [*abfens*, L.] not prefent, out of the Way, miffing. *F.*

ABSENTA'NEOUS [*abfentaneus*, L.] done in Abfence, pertaining to Abfence.

AB'SIS ⎰ [of *A, B, C,*] Alphabets of Let-
AP'SIS ⎱ ters to be learned; Horn-Books, Primers, &c.

AB'SIS ⎰ [*Αψις*, Gr.] the bowed or arched
AP'SIS ⎱ Roof of an Oven, Room, Houfe, &c. the Ring or Compafs of a Wheel : Alfo a Term ufed by *Aftronomers*, when the Planets moving to their Apogæum or Perigæum are at a ftay.

ABSOLU', abfolved. *F.*

ABSOL'VATORY [*abfolutoire*, F. of *abfolutorius*, L.] belonging to a Pardon or Acquittal.

To ABSOLV'E [*abfolvere*, L.] to acquit or difcharge of an Accufation or Crime laid againft one. *L.*

ABSOLUTE [*abfolu*, F. of *abfolutus*, L.] free from the Power of another; that has Perfection in itfelf, arbitrary, unlimited.

ABSOLUTE *Equation* [in *Aftronomy*] are the Sums of the Eccentrick and Optic Equations.

ABSOLUTE *Eftate* [*Law Term*] is one free of all manner of Incumbrances and Conditions.

ABSOLUTE *Gravity* [among *Philofophers*] is that Property in Bodies by which they are faid to weigh fo much, without any regard to any Circumftances of Modification, and is always as the Quantity of Matter therein contained.

An ABSOLUTE *Number* [in an *Algebraick Equation*] is that which poffeffeth one entire Part or Side of the Equation, and is always a known Quantity.

ABSOLUTE *Space* is that which, confidered in its own Nature, without regard to any outward Thing, always continues the fame, and is immoveable.

AB'SOLUTELY [ *abfolument*, F. of *abfolute*, L.] after an abfolute Manner, as the Terms of a Propofition are faid to be taken abfolutely, *i. e.* without relation to any thing elfe. Sometimes it is ufed in oppofition to Terms and Conditions; as, *God does not forgive Men abfolutely*, *but upon Condition of Repentance and Amendment.*

ABSOLU'TION, a Pardoning, Remiffion or Forgivenefs of Sins pronounced by a Prieft. F. of L.

AB'SONANT [ *abfonans*, L. ] properly founding harfh, difagreeing from the Purpofe, abfurd.

AB'SONOUS [*abfonus*, L.] the fame as *Abfonant.*

ABSONIA'RE [ *Old Record* ] to fhun, avoid, deteft.

To ABSORB' [*abforber*, F. *abforbere*, L.] to fwallow up, to wafte or confume.

ABSORB'-

## IN

**INFLEX'IBLENESS,** ⎱ Obftinacy, Stiff-
**INFLEXIBIL'ITY,** ⎰ nefs, an inflexi-
ble Humour.  *F.* of *L.*

**INFLEXI'BLE** [*inflexibilis,* I.. i. e. *non flexibilis*] which cannot be bended or bowed ; nor to be prevailed upon or perfuaded.

**INFLEX'ION,** a Bending, Turning, Winding.  *L.*

To **INFLICT'** [*infligir,* F. *inflictum,* L. q. d. *fligere in*] to dath or ftrike againft, to lay a Punifhment upon.

**INFLIC'TION,** a laying a Punifhment upon, a Smiting.  *L.*

**IN FLUENCE** [*influentia,* L.] a flowing into, a fending forth Power or Virtue ; the Power of a Superior over an Inferior.

To **IN FLUENCE** [*influer,* F.] to fway, or have Power over.

**IN'FLUENT** [*influens,* L.] flowing into.

**IN'FLUENT** *Juices* [among *Phyficians*] Juices of a human Body, that by the Contrivance of Nature, and Laws of Circulation, fall into another Current or Receptacle ; as the *Bile* to the *Gall-Bladder,* &c.

**INFLUEN'TIAL,** influencing, or bearing Sway.

**IN'FLUX** [*influxus,* L.] a flowing, or running into.

To **INFOLD'** [of *in* and geałban, *Sax.* einfalten, *Teut.*] to fold or wrap vp.

To **INFORC'E** [*enforcer,* F.] to prevail upon by Force of Argument, to ftrengthen.

**INFORC'EMENT,** a Compulfion, or Conftraint.  *F.*

To **INFORM'** [*informer,* F. *informare,* L. q. d. *in formam ducere*] to give notice, to tell, to teach, inftruct, or make acquainted with.

**INFORM'** [ *informis,* L. ] mif-fhapen, without Form.

*In* FORMA *Pauperis* [*Law Phrafe*] is having Clerks and Counfel affigned without Fees, upon Affidavit made, that, the Suitor's Debts being paid, he is not worth five Pounds. *L.*

**INFORMA'TION,** a making known, Telling, Advice, Inftruction ; an Accufation or Charge brought againft one.  *L.*

**INFORMA'TUS** *non fum* [ i. e. I am not informed] a formal Anfwer made in Court by an Attorney, when he has no more to fay in defence of his Client.  *L. T.*

**INFORM'ED** *Stars* [in *Aftronomy*] are fuch of the fixed Stars as are caft into, or ranged under, any Form.

**INFORM'ER,** one who informs in a Court of Judicature, or before a Magiftrate, againft fuch as tranfgrefs the Law.

**INFORM'OUS** [*informe,* F. *informis,* L.] without Form, Shape, or Fafhion.

**INFOR'TUNATE** [*infortuné,* F. of *infortunatus,* L. i. e. *non fortunatus*] unhappy, unlucky.

**INFOR'TUNE,** Misfortune.  *Chauc.*

**INFOR'TUNES** [in *Aftrology*] Saturn and *Mars,* fo called, becaufe of their unfortunate Influences.

**INFORTUNID** [*infortunatus,* L.] unfortunate.  *Chauc.*

To **INFRAN'CHISE** [ of *franc,* F. *france,* Ital. free] to make a Freeman or Denizen ; to incorporate into a Society or Body Politick.

**INFRANCHISE'MENT,** infranchifing, fetting free, Difcharge, Releafe.

**INFRA** *Scopularis Mufculus* [in *Anatomy*] a Mufcle of the Arm, which arifes from the lower Part of the *Scopula.*  L.

**INFRA** *Spinatus Mufculus* [in *Anatomy*] a Mufcle of the Arm placed below the *Spina.*  L.

**INFRAC'TION,** a breaking in.  *L.*

**INFRAN'GIBLE** [*infrangibilis,* L.] not to be broken, durable, ftrong.

**INFRE'QUENT** [*infrequens,* L.] that feldom happens, rare, uncommon,  *F.*

**INFRICA'TION,** ⎱ a rubbing or cha-
**INFRIC'TION,** ⎰ fing.  *F.*

To **INFRING'E** [*infringere,* L. q. d. *to break in upon*] to break a Law, Cuftom, or Privilege.

**INFRING'MENT,** fuch Violation, Breach, &c.

**INFRUGIF'EROUS** [*infrugiferus,* L.] not bearing Fruit.

**INFUCA'TION,** a painting of the Face, a colouring or difguifing.  *L.*

**INFUMA'TION,** a drying in Smoak.*L.*

**INFUNDIBULIFOR'MES** [among *Botanifts*] any Flowers fhaued like a Funnel.

**INFUNDIBULUM** *Cerebri* [in *Anatomy*] the Brain Tunnel, a hollow Place in the Root of the Brain, through which ferous Humours are difcharged.  L.

**INFUNDIB'ULUM** *Renum* [in *Anatomy*] the Bafon through which the Urine paffes to the Ureters and Bladder.  *L.*

**INFU'RIATE** [of *in* and *furiatus,* L.] ftark mad or recovered from Madnefs.

To **INFUS'CATE** [*infufcatum,* L.] to make dark or dufky.

**INFUSCA'TION,** a making dark or dufky.  L.

To **INFUSE** [*infufer* F. of *infufum, Sup.* L. i. e. *fundre in*] to pour in or into, to foak or fteep, to endue with, or infpire.

**INFU'SION,** a pouring in.  *F.* of *L.*

**INFU'SION** [in *Pharmacy*] a fteeping of Drugs, Leaves, Roots, &c. in fome Liquor, in order to get out their Virtue.

An **ING** [Ȝnꝺ, *Dan.*] a Meadow or low Ground, a Common.  *Lincolnfhire.*

To **INGEMI'NATE** [*ingeminatum,* L.] to double or repeat often.

**INGEM'INATED** *Flowers* [among *Florifts*] is when one Flower grows out of another.

**INGEMINA'TION,** a Doubling or Repeating.

L l1                                                         **To**

A

# DICTIONARY

OF THE

## ENGLISH LANGUAGE:

IN WHICH

The WORDS are deduced from their ORIGINALS,

AND

ILLUSTRATED in their DIFFERENT SIGNIFICATIONS

BY

EXAMPLES from the beſt WRITERS.

TO WHICH ARE PREFIXED,

A HISTORY of the LANGUAGE,

AND

AN ENGLISH GRAMMAR.

By SAMUEL JOHNSON, A.M.

IN TWO VOLUMES.

VOL. I.

THE SECOND EDITION.

Cum tabulis animum cenſoris ſumet honeſti :
Audebit quæcunque parum ſplendoris habebunt,
Et ſine pondere erunt, et honore indigna ferentur,
Verba movere loco ; quamvis invita recedant,
Et verſentur adhuc intra penetralia Veſtæ :
Obſcurata diu populo bonus eruet, atque
Proferet in lucem ſpecioſa vocabula rerum,
Quæ priſcis memorata Catonibus atque Cethegis,
Nunc ſitus informis premit et deſerta vetuſtas.          HOR.

LONDON,
Printed by W. STRAHAN,
For J. and P. KNAPTON; T. and T. LONGMAN; C. HITCH and L. HAWES;
A. MILLAR; and R. and J. DODSLEY.
MDCCLV.

Digitized by Google

BIBLIOTHECA
REGIA
MONACENSIS.

Digitized by Google

## A B R

6. Relating to the person, as a servant.

Liking very well the young gentleman, such I took him to be, admitted this Deiphantus *about* me, who well shewed there is no service like his that serves because he loves. *Sidney*, b. ii.

Good master, corporal, captain, for my old dame's sake, stand my friend: she hath no body to do any thing *about* her when I am gone, and she is old and cannot help herself.

*Shakespeare's Henry* IV. *p.* ii.

ABO'UT. *adv.*

1. Circularly.

The weyward sisters, hand in hand,
Posters of the sea and land,
Thus do go *about*, *about*,
Thrice to thine, and thrice to mine,
And thrice again to make up mine.    *Shakesp. Macbeth.*

2. In circuit.

My honest lads, I'll tell you what I am *about*.—Two yards and more.—No quips now Pistol: indeed I am in the waste two yards *about*; but I am about no waste, I am about thrift.

*Shakespeare's Merry Wives of Windsor.*

A tun *about* was ev'ry pillar there,
A polish'd mirrour shone not half so clear.    *Dryd. Fables.*

3. Nearly.

When the boats were come within *about* sixty yards of the pillar, they found themselves all bound, and could go no farther; yet so as they might move to go *about*, but might not approach nearer.    *Bacon's New Atalantis.*

4. Here and there; every way.

Up rose the gentle virgin from her place,
And looked all *about*, if she might spy
Her lovely knight to move his manly pace.

*Fairy Queen*, b. i. cant. 2. stanz. 33.

A wolf that was past labour, had the wit in his old age, to make the best of a bad game; he borrows a habit, and so *about* he goes, begging charity, from door to door, under the disguise of a pilgrim.    *L'Estrange.*

5. With *to* before a verb; as, *about to fly*; upon the point, within a small distance of.

These dying lovers, and their floating sons,
Suspend the fight, and silence all our guns:
Beauty and youth, *about* to perish, finds
Such noble pity in brave English minds.    *Waller.*

6. The longest way, in opposition to the short straight way.

Gold hath these natures; greatness of weight; closeness of parts; fixation; pliantness, or softness; immunity from rust; colour, or tincture of yellow: Therefore the sure way (though most *about*) to make gold, is to know the causes of the several natures before rehearsed.    *Bacon's Natural Hist.* N° 328.

Spies of the Volscians
Held me in chase, that I was forc'd to wheel
Three or four miles *about*; else had I, Sir,
Half an hour since brought my report.    *Shakesp. Coriolanus.*

7. To bring about; to bring to the point or state desired; as, *he has brought about his purposes*.

Whether this will be brought *about*, by breaking his head, I very much question.    *Spectator.*

8. To come about; to come to some certain state or point.

Wherefore it came to pass, when the time was come *about*, after Hannah had conceived, that she bare a son. 1 *Sam.* i. 20.

One evening it befel, that looking out,
The wind they long had wish'd was come *about*;
Well pleas'd they went to rest; and if the gale
Till morn continu'd, both reslov'd to fail.    *Dryd. Fables.*

9. To go about a thing; to prepare to do it.

Did not Moses give you the law, and yet none of you keepeth the law? Why go ye *about* to kill me? *John* vii. 19.

In common language, they say, to *come about* a man, to circumvent him.

Some of these phrases seem to derive their original from the French *a bout*; *venir à bout d'une chose*; *venir bout de quelque chose*.

A-B9. for Archbishop; which see.

ABRACADA'BRA. A superstitious charm against agues.

To ABRA'DE. *v. a.* [*abrado*, Lat.] To rub off; to wear away from the other parts; to waste by degrees.

By this means there may be a continued supply of what is successively *abraded* from them by decursion of waters.

*Hale's Origin of Mankind.*

ABRAHAM'S BALM. The name of an herb.

ABRA'SION. [See ABRADE.]

1. The act of abrading; a rubbing off.

2. [In medicine.] The wearing away of the natural mucus, which covers the membranes, particularly those of the stomach and guts, by corrosive or sharp medicines, or humours. *Quincy.*

3. The matter worn off by the attrition of bodies.

ABRE'AST. *adv.* [See BREAST.] Side by side; in such a position that the breasts may bear against the same line.

My cousin Suffolk,
My soul shall thine keep company to heaven:
Tarry, sweet soul, for mine, then fly *abreast*. *Shak.* Henry V.

For honour travels in a streight so narrow,
Where one but goes *abreast*.    *Shakesp. Troilus and Cressida.*

## A B R

The riders rode *abreast*, and one his shield,
His lance of cornel-wood another held;
The third his bow, and glorious to behold!
The costly quiver, all of burnish'd gold.    *Dryden's Fables.*

To ABRI'COT. See APRICOT.

To ABRI'DGE. *v. a.* [*abreger*, Fr. *abbrevio*, Lat.]

1. To make shorter in words, keeping still the same substance.

All these sayings, being declared by Jason of Cyrene in five books, we will essay to *abridge* in one volume. 2 *Macc.* ii. 23.

2. To contract; to diminish, to cut short.

The determination of the will, upon enquiry, is following the direction of that guide; and he, that has a power to act or not to act, according as such determination directs, is free. Such determination *abridges* not that power wherein liberty consists.    *Locke.*

3. To deprive of; in which sense it is followed by the particle *from* or *of*, preceding the thing taken away.

I have disabled mine estate,
By shewing something a more swelling port,
Than my faint means would grant continuance;
Nor do I now make moan to be *abridg'd*
From such a noble rate.    *Shakespeare's Merchant of Venice.*

They were formerly, by the common law, discharged from pontage and murage; but this privilege has been *abridged* them since by several statutes.    *Ayliffe's Parergon Juris Canonici.*

ABRI'DGED OF. *part.* Deprived of, debarred from, cut short.

An ABRIDGER.

1. He that abridges; a shortener.

2. A writer of compendiums or abridgments.

ABRI'DGMENT. *n. f.* [*abregement*, Fr.]

1. The contraction of a larger work into a small compass.

Surely this commandment containeth the law and the prophets; and, in this one word, is the *abridgment* of all points of scripture.    *Hooker*, b. ii. § 5.

Myself have play'd
The int'rim, by remembring you 'tis past;
Then brook *abridgment*, and your eyes advance
After your thought, straight back again to France?

*Shakespeare's Henry* V.

Idolatry is certainly the first-born of folly, the great and leading paradox; nay, the very *abridgment* and sum total of all absurdities.    *South's Sermons.*

2. A diminution in general.

All trying, by a love of littleness,
To make *abridgments*, and to draw to less,
Even that nothing which at first we were.    *Donne.*

3. Restraint, or abridgment of liberty.

The constant desire of happiness, and the constraint it puts upon us, no body, I think, accounts an *abridgment* of liberty, or at least an *abridgment* of liberty, to be complained of.    *Locke.*

ABRO'ACH. *adv.* [See To BROACH.]

1. In a posture to run out; to yield the liquor contained; properly spoken of vessels.

The Templer spruce, while ev'ry spout's *abroach*,
Stays 'till 'tis fair, yet seems to call a coach. *Swift's Misc.*

The jarrs of gen'rous wine (Acestes' gift,
When his Trinacrian shores the navy left)
He set *abroach*, and for the feast prepar'd,
In equal portions with the ven'son shar'd.

*Dryden's Virgil's Æneid, vol.* ii.

2. In a figurative sense: in a state to be diffused or advanced; in a state of such beginning as promises a progress.

That man, that sits within a monarch's heart,
And ripens in the sunshine of his favour,
Would he abuse the count'nance of the king,
Alack! what mischiefs might he let *abroach*,
In shadow of such greatness?    *Shakespeare's Henry* IV. *p.* ii.

ABRO'AD. *adv.* [compounded of *a* and *broad*. See BROAD.]

1. Without confinement; widely; at large.

Intermit no watch
Against a wakeful foe, while I *abroad*,
Thro' all the coasts of dark destruction, seek
Deliverance.    *Milton's Paradise Lost*, b. ii, l. 463.

Again, the lonely fox roams far *abroad*,
On secret rapine bent, and midnight fraud;
Now haunts the cliff, now traverses the lawn,
And flies the hated neighbourhood of man.    *Prior.*

2. Out of the house.

Welcome, sir,
This cell's my court; here have I few attendants,
And subjects none *abroad*.    *Shakespeare's Tempest.*

Lady——walked a whole hour *abroad*, without dying after it; at least in the time I staid; though she seemed to be fainting, and had convulsive motions several times in her head.

*Pope's Letters.*

3. In another country.

They thought it better to be somewhat hardly yoked at home, than for ever *abroad*, and discredited.    *Hooker. Pref.*

Whosoever offers at verbal translation, shall have the misfortune of that young traveller, who lost his own language *abroad*, and brought home no other instead of it. *Sir. J. Denham.*

What

D

Digitized by Google

# I N F

# I N G

He ſhould regard the propriety of his words, and get ſome *information* in the ſubject he intends to handle. *Swift.*

Theſe men have had longer opportunities of *information*, and are equally concerned with ourſelves. *Rogers.*

2. Charge or accuſation exhibited.

3. The act of informing or actuating.

INFO′RMER. *n. ſ.* [from *inform.*]

1. One who gives intelligence.

This writer is either byaſſed by an inclination to believe the world, or a want of judgment to chuſe his informers. *Swift.*

2. One who diſcovers offenders to the magiſtrate.

There were ſpies and *informers* ſet at work to watch the company. *L'Eſtrange.*

Let no court ſycophant pervert my ſenſe,
Nor fly *informer* watch theſe words to draw
Within the reach of treaſon. *Pope.*

*Informers* are a deteſtable race of people, although ſome-times neceſſary. *Swift.*

INFO′RMIDABLE. *adj.* [in and *formidabilis*, Latin.] Not to be feared ; not to be dreaded

Of ſtrength, of courage haughty, and of limb
Heroick built, thou,h of terreſtrial mold ;
Foe not *informidable*, exempt from wound. *Milton.*

INFO′RMITY. *n. ſ.* [from *informis*, Latin.] Shapeleſſneſs.

From this narrow time of geſtation may enſue a ſmalneſs in the excluſion ; but this intereth no *informity*. *Brown.*

INFO′RMOUS. *adj.* [*informe*, French ; *informis*, Latin.] Shapeleſs ; of no regular figure.

That a bear brings forth her young info mous and unſhapen, which ſhe faſhioneth after by licking them over, is an opinion not only common with us at preſent, but hath been delivered by ancient writers. *Brown's Vulgar Errours.*

INFO′RTUNATE. *adj.* [*infortuné*, Fr. *infortunatus*, Latin.] Unhappy. See UNFORTUNATE, which is commonly uſed.

Perkin, ſeeing himſelf priſoner, and deſtitute of all hopes, having found all either falſe, faint, or *infortunate*, did gladly accept of the condition. *Bacon's Henry VII.*

To INFRA′CT. *v. a.* [*infractus*, Latin.] To break.

Falling faſt, from gradual ſlope to ſlope,
With wild *infra′ted* courſe and leſſen'd roar,
It gains a ſafer bed. *Thomſon's Summer.*

INFRA′CTION. *n. ſ.* [*infraction*, French ; *infractio*, Latin.] The act of breaking ; breach ; violation.

By the ſame gods, the juſtice of whoſe wrath
Puniſh'd the *infraction* of my former faith. *Waller.*

The wolves, pretending an *infraction* in the abuſe of their hoſtages, fell upon the ſheep immediately without their dogs. *L'Eſtrange's Fables.*

INFRA′NGIBLE. *adj.* [in and *frangible*.] Not to be broken

Theſe atoms are ſuppoſed *infrangible*, extremely compacted and hard, which compactedneſs and hardneſs is a demonſtra-tion that nothing could be produced by them, ſince they could never cohere. *Cheyne's Phil. Princ.*

INFRE′QUENCY. *n. ſ.* [*infrequentia*, Latin.] Uncommonneſs ; rarity.

The abſence of the gods, and the *infrequency* of objects, made her yield. *Br ome's Note on P. pe's Odyſſey.*

INFRE′QUENT. *adj.* [*infrequens*, Latin.] Rare ; uncommon.

To INFRI′GIDATE. *v. a.* [in and *frigidus*, Latin.] To chill ; to make cold.

The drops reached little further than the ſurface of the li-quor, whoſe coldneſs did not *infrigidate* thoſe upper parts of the glaſs. *Boyle.*

To INFRI′NGE. *v. a.* [*infringo*, Latin ]

1. To violate ; to break laws or contracts.

Thoſe many had not dar'd to do that evil,
If the firſt man that did th' edict *infringe*,
Had anſwer'd for his deed *Shakeſpeare.*

Having *infring'd* the law, I wave my right
As king, and thus ſubmit myſelf to fight. *Waller.*

2. To deſtroy ; to hinder.

Homilies, being plain and popular inſtructions, do not *in-fringe* the efficacy, although but read. *Hooker.*

Bright as the deathleſs gods and happy, ſhe
From all that may *infringe* delight is free. *Waller.*

INFRI′NGEMENT. *n. ſ.* [from *infringe*.] Breach ; violation.

The puniſhing of this *infringement* is proper to that juriſdic-tion againſt which the contempt is. *Clarendon.*

INFRI′NGER. *n. ſ.* [from *infringe*.] A breaker ; a violator.

A clergyman's habit ought to be without any lace, under a ſevere penalty to be inflicted on the *infringers* of the provincial conſtitution. *Ayliffe's Parergon.*

INFU′NDIBULIFORM. *n. ſ.* [*infundibulum* and *forma*, Lat.] Of the ſhape of a funnel or tundiſh.

INFU′RIATE. *adj.* [in and *furia*, Latin.] Enraged ; raging.

At th' other bore, with touch of fire
Dilated and *infuriate*. *Milton.*

Fir'd by the torch of noon to tenfold rage,
Th' *infuriate* hill orth ſhoots the pillar'd flame. *Thomſon.*

INFUSCA′TION. *n. ſ.* [*infuſcatus*, Latin.] The act of darken-ing or blackening.

To INFU′SE. *v. a.* [*infuſer*, French ; *infuſus*, Latin.]

1. To pour in ; to inſtil.

Thou almoſt mak'ſt me waver in my faith,
To hold opinion with Pythagoras,
That ſouls of animals *infuſe* themſelves
Into the trunks of men. *Shakeſp. Merchant of Venice.*

My early reſolution, now my ancient muſe,
That ſtrong Circean liquor ceaſe t' *infuſe*,
Wherewith thou didſt intoxicate my youth. *Denham.*

Why ſhould he deſire to have qualities *infuſed* into his ſon, which himſelf never poſſeſſed ? *Swift.*

Meat muſt be with money bought ;
She therefore, upon ſecond thought,
*Infuſ'd*, yet as it were by ſtealth,
Some ſmall regard for ſtate and wealth. *Swift.*

2. To pour into the mind ; to inſpire into.

For when God's hand had written in the hearts
Of our firſt parents all the rules of good,
So that their ſkill *infuſ'd* ſurpaſs'd all arts
That ever were before, or ſince the flood. *Davies.*

Sublime ideas, and apt words *infuſe*;
The muſe inſtruct my voice, and thou inſpire the muſe. *Roſc.*

He *infuſ'd*
Bad influence into th' unwary breaſt. *Milton.*

*Infuſe* into their young breaſts ſuch a noble ardour as will make them renowned. *Milton.*

3. To ſteep in any liquor with a gentle heat ; to macerate ſo as to extract the virtues of any thing.

Take violets, and *infuſe* a good pugil of them in a quart of vinegar. *Bacon's Natural Hiſtory.*

4. To make an infuſion with any ingredient ; to ſupply, to tinc-ture, to ſaturate with any thing infuſed.

Drink, *infuſed* with fleſh, will nouriſh faſter and eaſier than meat and drink together. *Bacon's Natural Hiſtory.*

5. To inſpire with.

Thou didſt ſmile,
*Infuſ'd* with a fortitude from heav'n. *Shakeſp. Tempeſt.*

*Infuſe* his breaſt with magnanimity,
And make him, naked, foil a man at arms. *Shakeſpeare.*

INFU′SIBLE. *adj.* [from *infuſe*.]

1. Poſſible to be infuſed.

From whom the doctrines being *infuſible* into all, it will be more neceſſary to forewarn all of the danger of them. *Hamm.*

2. Incapable of diſſolution ; not fuſible.

Vitrification is the laſt work of fire, and a fuſion of the ſalt and earth, wherein the fuſible ſalt draws the earth and *infuſible* part into one continuum. *Brown's Vulgar Errours.*

INFU′SION. *n. ſ.* [*infuſion*, French ; *infuſio*, Latin.]

1. The act of pouring in ; inſtillation.

Our language has received innumerable elegancies and im-provements from that *infuſion* of Hebraiſms, which are derived to it out of the poetical paſſages in holy writ. *Addiſon.*

2. The act of pouring into the mind ; inſpiration.

We participate Chriſt partly by imputation, as when thoſe things which he did and ſuffered for us are imputed to us for righteouſneſs ; partly by habitual and real *infuſion*, as when grace is inwardly beſtowed on earth, and afterwards more fully both our ſouls and bodies in glory. *Hooker.*

They found it would be matter of great debate, and ſpend much time ; during which they did not deſire their *infuſions*, nor to be troubled with their *infuſions*. *Clarendon.*

Here his folly and his wiſdom are of his own growth, not the echo or *infuſion* of other men. *Swift.*

3. The act of ſteeping any thing in moiſture without boiling.

Repeat the *infuſion* of the body oftener. *Bacon.*

4. The liquor made by infuſion.

To have the *infuſion* ſtrong, in thoſe bodies which have finer ſpirits, repeat the infuſion of the body oftener. *Bacon.*

INFU′SIVE. *adj.* [from *infuſe*.] Having the power of infuſion, or being infuſed. A word not authoriſed.

Still let my ſong a nobler note attune,
And ſing th' *infuſive* force of Spring on man. *Thomſon.*

INGATE. *n. ſ.* [in and *gate*.] Entrance ; paſſage in.

One noble perſon ſtoppeth the *ingate* of all that evil which is looked for, and holdeth in all thoſe which are at his back. *Spenſer on Ireland.*

INGANNA′TION. *n. ſ.* [*ingannare*, Italian.] Cheat ; fraud ; de-ception ; juggle ; deluſion ; impoſture ; trick ; ſlight. A word neither uſed nor neceſſary.

Whoever ſhall reſign their reaſons, either from the root of deceit in themſelves, or inability to reſiſt ſuch trivial *inganna-tions* from others, are within the line of vulgarity. *Brown.*

INGA′THERING. *n. ſ.* [in and *gathering*.] The act of getting in the harveſt.

Thou ſhalt keep the feaſt of *ingathering*, when thou haſt ga-thered in thy labours out of the field. *Ex. xxiii. 16.*

INGE, in the names of places, ſignifies a meadow, from the Saxon *inᵹ*, of the ſame import. *Gibſon's Camden.*

To INGE′MINATE. *v. a.* [*ingemino*, Latin.] To double ; to repeat.

He would often *ingeminate* the word peace, peace. *Clar.ndon.*

INGEMINA′TION. *n. ſ.* [in and *geminatio*, Latin.] Repetition ; reduplication.

INGE′NDERER.

🏠 Home   ☰ Menu

# AMERICAN DICTIONARY of the ENGLISH LANGUAGE

## Dictionary Search

[                    ] 🔍

## Abridge

**ABRIDGE**', *verb transitive* abridj', [G. short, or its root, from the root of break or a verb of that family.]

**1.** To make shorter; to epitomize; to contract by using fewer words, yet retaining the sense in substance - used of writings.

Justin abridged the history of Trogus Pompeius.

**2.** To lessen; to diminish; as to *abridge* labor; to *abridge* power of rights.

**3.** To deprive; to cut off from; followed by of; as to *abridge* one of his rights, or enjoyments. to *abridge* from, is now obsolete or improper.

**4.** In algebra, to reduce a compound quantity or equation to its more simple expression. The equation thus abridged is called a formula.

## Websters Dictionary 1828

### SITEMAP

🏠 Home (https://webstersdictionary1828.com/)

⭐ Preface (/Preface)

🎓 History (/NoahWebster)

📌 Quotations (/Quotes)

### LEGAL

About Us (/AboutUs)

Terms of Use (/Terms)

Privacy Policy (/Privacy)

Copyright Notice (/Copyright)

**OUR WEBSITES**

The Kings Bible (https://thekingsbible.com/)

King James Bible 1611 (https://blackletterkingjamesbible.com/)

King James Bible Dictionary (https://kingjamesbibledictionary.com//)

Websters Dictionary 1828 (https://webstersdictionary1828.com/)

Textus Receptus Bibles (https://textusreceptusbibles.com/)

Treasury of Scripture Knowledge (https://tsk-online.com/)

 (http://www.thekingsbible.com)    (https://www.facebook.com /WebstersDictionary1828)

© Copyright 2022 MasonSoft Technology Ltd (/Copyright)

v4 (2022.7.23)

🏠 Home    ☰ Menu

# AMERICAN DICTIONARY of the ENGLISH LANGUAGE

## Dictionary Search

🔍

## Infringe

**INFRINGE**, *verb transitive* infrinj'. [Latin infringo; in and frango, to break. See Break.]

**1.** To break, as contracts; to violate, either positively by contravention, or negatively by non-fulfillment or neglect of performance. A prince or a private person infringes an agreement or covenant by neglecting to perform its conditions, as well as by doing what is stipulated not to be done.

**2.** To break; to violate; to transgress; to neglect to fulfill or obey; as, to *infringe* a law.

**3.** To destroy or hinder; as, to *infringe* efficacy. [*Little Used*.]

## Websters Dictionary 1828

### SITEMAP

🏠 Home (https://webstersdictionary1828.com/)

⭐ Preface (/Preface)

🎓 History (/NoahWebster)

✈ Quotations (/Quotes)

### LEGAL

About Us (/AboutUs)

Terms of Use (/Terms)

Privacy Policy (/Privacy)

Copyright Notice (/Copyright)

---

**OUR WEBSITES**

---

The Kings Bible (https://thekingsbible.com/)

King James Bible 1611 (https://blackletterkingjamesbible.com/)

King James Bible Dictionary (https://kingjamesbibledictionary.com//)

Websters Dictionary 1828 (https://webstersdictionary1828.com/)

Textus Receptus Bibles (https://textusreceptusbibles.com/)

Treasury of Scripture Knowledge (https://tsk-online.com/)

---

 (http://www.thekingsbible.com)  (https://www.facebook.com /WebstersDictionary1828)

© Copyright 2022 MasonSoft Technology Ltd (/Copyright)

v4 (2022.7.23)

# Exhibit 3



# HEINONLINE

DATE DOWNLOADED: Fri Jan 27 11:43:45 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1805 588 .

ALWD 7th ed.
, , 1805 588 .

Chicago 17th ed.
"," Massachusetts - Acts & Laws, January Session : 588-589

AGLC 4th ed.
'' Massachusetts - Acts & Laws, January Session 588

OSCOLA 4th ed.
'' 1805 588

Provided by:
Fordham University School of Law

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## Proof of Fire-Arms.

*First meeting.* ble inhabitant of said town of *Harrison*, requiring him to notify and warn the inhabitants of said town, who are qualified by law to vote in town affairs, to meet at such time and place as shall be expressed in said warrant, to choose all such officers as other towns within this Commonwealth are required by law to choose in the months of March or April annually; and the officers so chosen shall be qualified as other town officers are.

[This act passed March 8, 1805.]

## CHAP. XXXV.

## An act to provide for the proof of fire arms manufactured within this Commonwealth.

*Preamble.* WHEREAS no provision hath been made by law for the proof of fire arms manufactured in this Commonwealth, by which it is apprehended that many may be introduced into use which are unsafe, and thereby the lives of the citizens be exposed, to prevent which

*Provers of fire-arms to be appointed.* SECT. 1. *BE it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same,* That the Governor, by and with the advice and consent of the Council, be, and he hereby is empowered to appoint, in any part of this Commonwealth where the manufacture of fire arms is carried on, suitable persons to be provers of fire arms, not exceeding two in any county, who shall be sworn to the faithful discharge of their trust, whose duty it shall be to prove all musket barrels and pistol barrels, which being sufficiently ground, bored and breeched, shall be offered to him to be proved; who shall prove the musket barrels twice in manner following, viz. first with a charge consisting of one eighteenth part of a pound of powder, one ounce of which ,in a five & an half inch howitz, at an elevation

*How arms are to be proved.* of forty five degrees, will carry a twenty four pound shot, eighty yards, with a ball suited to the bore of the barrel; the second proof to be with a charge consisting of one twenty second part of the same powder, with a ball suited to the bore of the barrel ; and shall prove the pistol barrels once with a charge consisting of one twenty second part of a pound of powder, one ounce of which, in a five and half inch howitz at an elevation of forty five degrees, will carry a twenty four pound shot seventy yards, with a ball suited to the bore of the barrel ; which said powder and ball it shall be the duty of the prover to provide; and if the said musket and pistol barrels shall stand the proof aforesaid, and shall in no respect fail, then it shall be the duty of the said prover to stamp the same on the

*How approved arms are to be marked.* upper side, and within one and an half inches of the breech of said barrels, with a stamp consisting of the initial letters of the prover's name, and over those letters the letter P. also, in the line of the said initial letters, and further up said barrel the figures designating the year of our Lord in which the proof is made, and over the said figures the letter M. which said letters and figures shall be so deeply impressed on said barrel,

as

First Baptist Society in *Limington.*

as that the same cannot be erased or disfigured, and shall be in the form
following AB 1805; and when any barrels shall burst or shall in any
manner fail in the proving as aforesaid, so that in the opinion of the
prover they are unfit for use, they shall not be stamped, but the said pro-
ver shall suffer the owner to take them away; and any prover so prov-
ing musket or pistol barrels as aforesaid, shall be entitled to receive from   Fees.
the owner, for each musket barrel *thirty three cents,* and for each pistol
barrel *twenty five cents,* whether the same stand proof and are stamped
or not.

SECT. 2.  *And be it further enacted,* That if any person, after the
first day of June next, shall manufacture within this Commonwealth,
any musket or pistol, without having the barrels proved and stamped as   Penalty for
aforesaid, except such as are or may be manufactured in the armory of   not having
the *United States,* or in fulfilment of some contract made and entered   arms proved.
into, or that may hereafter be made and entered into, for the manufac-
turing of fire arms for the *United States,* shall forfeit and pay for every
such musket or pistol the sum of *ten dollars,* to be recovered in an action
of debt, before any court proper to try the same, by any person who
shall sue for and recover the same, to his own use.

SECT. 3.  *And be it further enacted,* That if any person after the   Penalty for sel-
said first day of June next, shall sell and deliver, or shall knowingly pur-   ling or buying
chase, any musket or pistol, which shall have been manufactured within   arms not prov-
this Commonwealth after the said first day of June next, which shall not   ed.
have the marks of proof above required, the person so selling and the
person so purchasing shall each forfeit the sum of *ten dollars,* to be re-
covered by action of debt before any court proper to try the same, to the
use of any person who shall sue for and recover the same.

SECT. 4.  *And be it further enacted,* That if any person shall false-   Penalty for for-
ly forge or alter the stamp of any prover of fire arms, so appointed as   ging stamp
aforesaid, impressed on any musket or pistol barrel, pursuant to this act;
and be convicted thereof before the Supreme Judicial Court, he shall
be punished by fine, not exceeding *fifty dollars,* nor less than *twenty dol-
lars,* according to the nature and aggravation of the offence.
[This act passed March 8, 1805.]

## CHAP. XXXVI.

An act to incorporate a number of the inhabitants
in the town of *Limington,* in the county of *York,*
into a separate religious society, by the name
of *The First Baptist Society in Limington.*

SECT. 1.   *BE it enacted by the Senate and House of Representatives, in
General Court assembled, and by the authority of the same,*
That Ebenezer Clarke, James Marrs, Solomon Stone, William Chick,
Barzillai

# Exhibit 4



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)



# 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2

Subject(s):

- Storage (https://firearmslaw.duke.edu/subjects/storage/)

Jurisdiction(s):

- Massachusetts (https://firearmslaw.duke.edu/jurisdictions/massachusetts/)

Year(s):

- 1783 (https://firearmslaw.duke.edu/years/1783/)

"That all cannon, swivels, mortars, howitzers, cohorns, fire arms, bombs, grenades, and iron shells of any kind, that shall be found in any dwelling-house, out-house, stable, barn, store, ware-house, shop, or other building, charged with, or having in them any gun-powder, shall be liable to be seized by either of the Firewards of the said Town: And upon complaint made by the said Firewards to the Court of Common Pleas, of such cannon, swivels, mortar, or howitzers, being so found, the Court shall proceed to try the merits of such complaint by a jury; and if the jury shall find such complaint supported, such cannon, swivel, mortar, or howitzer, shall be adjudged forfeit, and be sold at public auction.

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

# Exhibit 5

# L A W S

#### OF THE

## STATE OF NEW-YORK,

##### COMPRISING THE

# CONSTITUTION,

#### AND THE

## ACTS OF THE LEGISLATURE,

#### SINCE THE REVOLUTION, FROM THE

## FIRST TO THE FIFTEENTH SESSION, INCLUSIVE.



## IN TWO VOLUMES.

## VOLUME II.

Quum Leges aliæ super alias accumulatæ, eas de integro retractare, et in Corpus sanum et habile redigere, ex Usu sit.
                                                                                    BACON.

Misera Servitus est ubi Jus est vagum aut incognitum.                               4 Inst. 246.

NEW-YORK—PRINTED BY THOMAS GREENLEAF—M,DCC,XC,II.

Digitized by Google

**Inhabitants at their town-meetings may direct monies to be raised for repairing engines.** *it further enacted by the authority aforefaid,* That it fhall and may be lawful for the freeholders and inhabitants of the faid town of Brooklyn refiding within the limits aforefaid, at any town-meeting, to direct fuch fum or fums of money as they fhall deem neceffary and proper for the purpofe aforefaid, to be raifed, levied and collected, at the fame-time, and in the fame manner as the monies for the maintenance and fupport of the poor, within the fame town are by law directed to be raifed, levied and collected, and to be paid into the hands of the town-clerk of the fame town, to be by him paid and applied for the purpofes aforefaid, at fuch time and times, and in fuch manner as the major part of the firemen aforefaid, fhall from time to time direct and appoint.

---

### C H A P. LXXXI.

*An* ACT *to prevent the ftoring of Gun-Powder, within certain Parts of the City of New-York.*

Paffed 15th March, 1788.

WHEREAS the practice of ftoring gun-powder within certain parts of the city of New-York, is dangerous to the fafety of the faid city ; Therefore,

I. *Be it enacted by the people of the ftate of New-York, reprefented in fenate and affembly, and it is hereby enacted by the authority of the fame,* That it **No perfon to keep more than 28 pounds of powder in any one place within one mile of the city-hall, and that to be divided into four parcels.** fhall not be lawful for any perfon or perfons, to have or keep any quantity of gun-powder exceeding twenty-eight pounds weight, in any one place, houfe, ftore or out-houfe, lefs than one mile to the northward of the city-hall of the faid city, except in the public magazine at the frefh-water, which faid quantity of twenty-eight pounds, fhall be feparated in four ftone jugs or tin canifters, each of which fhall not contain more than feven pounds ; and if any perfon or perfons fhall keep any greater quantity than twenty-eight pounds, in any one place, houfe, ftore or out-houfe, or if the fame gun-powder fo permitted to be kept as aforefaid, fhall not be feparated in the manner herein above directed, he, fhe or they fhall forfeit all fuch gun pow-der fo kept, contrary to the true intent and meaning of this act, or fo permit-ted to be kept, and which fhall not be feparated as aforefaid ; and fhall alfo forfeit the fum of fifty pounds for every hundred weight of powder, and in that proportion for a greater or lefs quantity, to be recovered with cofts of fuit, in any court having cognizance thereof, by any perfon or perfons who will fue for the fame. Provided always, That all actions and fuits to be commenced, fued or profecuted, againft any perfon or perfons for any thing done contrary to this act, fhall be commenced, fued or profecuted within two calendar months next after the offence committed, and not at any time thereafter.

II. And to avoid dangers from gun-powder laden on board of any fhip or other veffel, arriving from fea ; *Be it further enacted by the authority afore-* **Commanders of vef-fels to land and ftore gun-powder within 24 hours after their arrival.** *faid,* That the commander or owner or owners of every fhip or other veffel arriving from fea, and having gun-powder on board, fhall, within twenty-four hours after her arrival in the harbour, and before fuch fhip or other veffel be hauled a-long fide of any wharf, pier or key within the faid city, land the faid gun-pow-der, by means of a boat or boats, or other fmall craft at any place on the Eaft-'

Digitized by Google

River, eaft of the wharf now building by Thomas Buchanan, or at any place on the North-River, to the northward of the air-furnace, which may be moft contiguous to any of the magazines, and fhall caufe the fame to be ftored in one of the magazines now built, or hereafter to be built for that purpofe, on pain of forfeiting all fuch gun-powder to any perfon or perfons who will fue and profecute for the fame to effect, in manner aforefaid.

III. And to prevent any evil confequences which may arife from the carriage of gun-powder, *Be it further enacted by the authority aforefaid,* That

**No gun-powder to be carried thro' the ftreets but in tight cafks put in bags, on pain of forfeiting the fame.** all gun-powder which fhall be carried through the ftreets of the faid city, by carts, carriages, or by hand, or otherwife, fhall be in tight cafks, well headed and hooped, and fhall be put into bags or leather cafes, and entirely covered therewith, fo that no powder may be fpilled or fcattered in the

paffage thereof, on pain of forfeiting all fuch gun-powder as fhall be conveyed through any of the ftreets aforefaid, in any other manner than is hereby directed ; and it fhall and may be lawful for any perfon or perfons, to feize the fame to his or their own ufe and benefit, and to convey the fame to one of the magazines aforefaid, and thereupon to profecute the perfon or perfons offending againft this act before the mayor or recorder, and any two aldermen of the faid city ; and fuch gun-powder fhall upon conviction be condemned to the ufe of the perfon or perfons feizing the fame.

IV. *And be it further enacted by the authority aforefaid,*

**Mayor, recorder or any two aldermen, may, on fufpicion of gun-powder being concealed, iffue a warrant to fearch for and feize the fame.** That it fhall and may be lawful for the mayor or recorder, or any two aldermen of the faid city, upon application made by any inhabitant or inhabitants of the faid city, and upon his or their making oath of reafonable caufe of fufpicion (of the fufficiency of which the faid mayor or recorder, or

aldermen, is and are to be the judge or judges) to iffue his or their warrant or warrants, under his or their hand and feal, or hands and feals, for fearching for fuch gun-powder, in the day time, in any building or place whatfoever, within the limits aforefaid, or in any fhip or other veffel, within forty-eight hours after her arrival in the harbour, or at any time after fuch fhip or other veffel fhall and may have hauled along fide any wharf, pier or key, within the limits aforefaid : And that upon any fuch fearch it fhall be lawful for the perfons finding any fuch gun-powder, immediately to feize, and at any time within twelve hours after fuch feizure, to convey the fame to one of the magazines aforefaid; and the fame gun-powder being fo removed, to detain and keep, until it fhall be determined by the mayor or recorder and any two aldermen of the faid city, whether the fame is forfeited by virtue of this act : And the perfon or perfons fo detaining the fame, fhall not be fubject or liable to any action or fuit for the detention thereof. Provided always, That nothing in this claufe of this act contained, fhall be conftrued to authorife any perfon having fuch warrant, to take advantage of the fame, for ferving any civil procefs of any kind whatfoever. Provided alfo, That nothing in this act contained fhall extend to fhips of war, or packets in the fervice of the United States or any of them, or of any foreign prince or ftate ; nor to authorife the fearching for gun-powder on board of any fuch fhip or veffel while laying in the ftream, and upwards of one hundred yards from the wharf or fhore.

V. *And be it further enacted by the authority aforefaid,*

**Gun-powder exceeding 28lb. found during a fire, may be feized without warrant.** That if any gun-powder, exceeding twenty-eight pounds, fhall be found in the cuftody of any perfon, during any fire or alarm of fire, in the faid city, by any fireman of the faid

Digitized by Google

city, it fhall be lawful for him to feize the fame, without warrant from the mayor, or recorder or aldermen, and to caufe the fame to be condemned, in manner aforefaid, to his own ufe; any thing in this act to the contrary notwithftanding.

## C H A P. LXXXII.

### *An* ACT *to prevent the Deftruction of Deer.*

Paffed 15th March, 1788.

I. **B**E *it enacted by the people of the ftate of New-York, reprefented in fenate and affembly, and it is hereby enacted by the authority of the fame,* That if any perfon or perfons fhall kill or deftroy any wild buck, doe or fawn, or any other fort of deer whatfoever, at any time in the months of January, February, March, April, May, June or July, every fuch perfon fhall, for every buck, doe or fawn, or other deer fo killed or deftroyed as aforefaid, contrary to the true intent and meaning of this act, forfeit and pay the fum of three pounds, to be recovered with cofts of fuit, in any court having cognizance thereof, by any perfon or perfons who will fue and profecute for the fame; the one moiety of which forfeiture, when recovered, to be paid to the overfeers of the poor of the town or place where the offence fhall be committed for the ufe of the poor thereof; and the other moiety to fuch perfon or perfons as fhall fue and profecute for the fame as aforefaid.

*Any perfon killing a deer in January, February, March, April, May, June or July, to forfeit 3l.*

II. *And be it further enacted by the authority aforefaid,* That every perfon in whofe cuftody fhall be found, or who fhall expofe to fale any green deer fkin, frefh venifon, or deer's flefh, at any time in any of the months before mentioned, and fhall be thereof convicted before any juftice of the peace, by the oath of one credible witnefs, or by the confeffion of the party, fhall, unlefs fuch party fhall prove that fome other perfon killed fuch buck, doe, fawn, or other deer, be deemed and adjudged guilty of the faid offence.

III. And in order the more eafily to convict offenders againft this act, *Be it further enacted by the authority aforefaid,* That it fhall be lawful for any juftice of the peace in any county of this ftate, and every fuch juftice is hereby required, upon demand made by any perfon, affigning a reafonable caufe of fufpicion, upon oath (of the fufficiency of which the faid juftice is to judge) at any time in any of the months before mentioned, to iffue his warrant under his hand and feal, to any conftable of any town or place in the fame county, for fearching in the day time in any houfe, ftore, out-houfe, or other place whatfoever, where any green deer fkin, frefh venifon or deer's flefh, is fufpected to be concealed: And in cafe any green deer fkin, frefh venifon or deer's flefh, fhall upon fuch fearch be found, the perfon in whofe cuftody the fame fhall be found, or who concealed the fame, fhall forfeit the fum of three pounds, to be recovered and applied in manner aforefaid.

IV. *And be it further enacted by the authority aforefaid,* That if any perfon or perfons fhall at any time hunt, purfue or deftroy any wild buck, doe, or fawn, or other deer (except in the county of Suffolk) with any blood-hound or blood-hounds, beagle or beagles, every fuch perfon fhall, for every fuch offence, forfeit and pay the fum of three pounds, to be recovered and applied as aforefaid. Provided, That nothing in this claufe of this act contained, fhall be conftrued to prevent any perfon or perfons from mak-

*Any perfon hunting or killing deer with blood-hounds or beagles, except in Suffolk county, to forfeit three pounds.*

Digitized by Google

# Exhibit 6

Case 3:20-cv-02190-DMS-DEB   Document 72-5   Filed 01/27/23   PageID.1340   Page 81 of 82

10/18/22, 2:26 PM                1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5 | Duke Ce...



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)



# 1821 Me. Laws 98-99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, ch. 25, § 5

Subject(s):

- Storage (https://firearmslaw.duke.edu/subjects/storage/)

Jurisdiction(s):

- Maine (https://firearmslaw.duke.edu/jurisdictions/maine/)

Year(s):

- 1821 (https://firearmslaw.duke.edu/years/1821/)

Be it further enacted, That it shall, and may be lawful for any one or more of the Selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefor according to law.

-  (https://twitter.com/dukefirearmslaw)

Compendium_Cornell
Page 0016

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu
(mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu
(mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

Compendium_Cornell
Page 0017