| | |
|---|---|
| Raymond M. DiGuiseppe<br>The DiGuiseppe Law Firm, P.C.<br>4320 Southport-Supply Road, Suite 300<br>Southport, NC 28461<br>P: 910-713-8804<br>E: law.rmd@gmail.com | Michael P. Sousa<br>Law Offices of Michael P. Sousa, APC<br>3232 Governor Dr., Suite A<br>San Diego, CA 92122<br>P: 858-453-6122<br>E: msousa@msousalaw.com |
| Bradley A. Benbrook<br>Stephen M. Duvernay<br>Benbrook Law Group, PC<br>701 University Avenue, Suite 106<br>Sacramento, CA 95825<br>P: 916-447-4900<br>E: brad@benbrooklawgroup.com | William A. Sack<br>Firearms Policy Coalition<br>426 Campbell Avenue<br>Havertown, PA 19083<br>P: 916-596-3492<br>E: Wsack@fpclaw.org |

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Lana Rae Renna; Danielle Jaymes; Laura Schwartz; Michael Schwartz; Robert Macomber; Clint Freeman; John Klier; Justin Smith; John Phillips; Cheryl Prince; Darin Prince; Ryan Peterson; PWGG, L.P.; North County Shooting Center, Inc.; Gunfighter Tactical, LLC; Firearms Policy Coalition, Inc.; San Diego County Gun Owners PAC; Citizens Committee for the Right to Keep and Bear Arms; and Second Amendment Foundation,<br><br>              Plaintiffs,<br><br>   v.<br><br>Robert Bonta, Attorney General of California; and Allison Mendoza,[1] Director of the California Department of Justice Bureau of Firearms,<br><br>             Defendants. | Case No.: 20-cv-2190-DMS-DEB<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT**<br><br>Date: February 10, 2023<br>Time: 1:30 p.m.<br>Courtroom 13A (13th Floor)<br>Hon. Dana M. Sabraw |

---

[1] Allison Mendoza is substituted for former Bureau of Firearms Director Luis Lopez and former Acting Director Blake Graham. Fed. R. Civ. P. 25(d).

**TABLE OF CONTENTS**

1. The Second Amendment's Text Covers Plaintiffs' Proposed Conduct .......... 1
   a. Textual Analysis ................................................................. 1
   b. Common Use ..................................................................... 3
   c. The Various Aspects Of UHA Operate Together To Effect The Ban ........ 5
2. The UHA Is Inconsistent With The Nation's Historical Tradition Of Firearms Regulation ................................................................. 6
3. The Challenge to the Removal Provision is Justiciable ........................ 10
4. No Further Discovery Is Necessary To Rule On This Motion .................. 11
5. The Remaining Preliminary Injunction Factors Favor Plaintiffs ............... 12

Case 3:20-cv-02190-DMS-DEB   Document 74   Filed 02/03/23   PageID.1347   Page 3 of 15


# TABLE OF AUTHORITIES

**Cases**

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) .................................................................................................. 4

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .......................................................................................... passim

*Jackson v. City & Cnty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ..................................................................................... 9

*Konigsburg v. State Bar of Cal.*,
  366 U.S. 36 (1961) ..................................................................................................... 2

*Koons v. Reynolds*,
  --- F.Supp.3d --- (2023), 2023 WL 128882 (D. N.J. Jan. 9, 2023) ......................... 12

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ................................................................................... 12

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S.Ct. 2111 (2022) ........................................................................................ passim

*Parker v. District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007) ................................................................................... 4

*Pena v. Lindley*,
  898 F.3d 969 (9th Cir. 2018) ..................................................................................... 1

*People v. Yanna*,
  297 Mich. App. 137. 144 (2012) ............................................................................... 4

**Statutes**

1805 Mass. Acts 588, § 1 ............................................................................................. 8

2 Acts And Laws Of The Commonwealth Of Massachusetts (1890) ......................... 9

Cal. Penal Code § 319109(b)(4)-(6) ............................................................................ 5

-ii-

## REPLY MEMORANDUM

The State's opposition demonstrates why the Court should treat the motion as a motion for summary judgment and enter judgment for Plaintiffs. No amount of additional discovery or research will change the result here: (1) the UHA's Roster ban is covered by the Second Amendment, and (2) the State cannot meet its burden of justifying the ban under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022). Plaintiffs respond to the State's oversized opposition as follows:

**1.      The Second Amendment's Text Covers Plaintiffs' Proposed Conduct.**

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S.Ct. at 2126. If it does, as here, the State then bears the burden of justifying the regulation by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. at 2126.

         a.      <u>Textual Analysis</u>. Plaintiffs showed in the motion that the conduct they wish to engage in (keeping and bearing arms not listed on the Roster for self-defense) is covered by the Second Amendment's text. And the "arms" they seek are likewise covered by the text. "[T]he Second Amendment extends, prima facie, to *all* instruments that constitute bearable arms." *Bruen*, 142 S.Ct. at 2132 (emphasis added, citation omitted). The State responds (Opp. at 20-22) that, notwithstanding *Bruen* and what the Second Amendment actually says, the proposed conduct here is *not* covered by the Second Amendment because the Plaintiffs can still buy the on-Roster handguns that California permits them to buy. This is not a textual argument and is therefore simply beside the point. Indeed, even the panel majority in the now-discredited *Pena v. Lindley*, 898 F.3d 969, 978 (9th Cir. 2018) decision did not go so far as to say that the Roster's ban fell outside the Second Amendment's scope.

The State cannot evade the textual reality by protesting that the Roster's ban isn't as draconian as the ban in *District of Columbia v. Heller*, 554 U.S. 570 (2008), since the Roster does not enact a "total ban on possessing *any* handgun in the

1  home." Opp. 20:14-15 (emphasis in brief). Nor does it help the State to argue that, in
2  *Bruen*, New York's law "prevented individuals from 'bear[ing] arms because it
3  prevented them from carrying *any* handgun outside the home for self-defense." *Id*. at
4  20:18-20 (emphasis in brief). Not only is their reading of *Bruen* simply wrong—the
5  State *did* issue carry licenses to those establishing a "special need" under its law, 142
6  S.Ct. at 2123—neither case stands for the proposition that regulation short of a total
7  ban raises no Second Amendment concern. Indeed, *Bruen* repeatedly referred to the
8  judicial task of evaluating a regulation's "burden" on the right to armed self-defense,
9  *e.g.*, 142 S.Ct. at 2132-33.

10  The State leans (Opp. at 22:4-15) on *Heller*'s statement that the Second
11  Amendment does not confer "a right to keep and carry any weapon whatsoever in any
12  manner whatsoever and for whatever purpose." 554 U.S. at 626. But the *Heller* Court
13  immediately elaborated on this statement by cataloguing the principal examples of the
14  limitations it had either previously found or presumed existed on the Second
15  Amendment's scope. *Id*. at 626-27 (noting the decision should not, for example, "cast
16  doubt on longstanding prohibitions" on possession by felons or the mentally ill or
17  "laws forbidding the carrying of firearms in sensitive places"). Conspicuously missing
18  from these "limitations" is a statement that guns in common use may be banned so
19  long as other guns are available. In fact, *Heller rejected* that very argument: "It is no
20  answer to say, as petitioners do, that it is permissible to ban the possession of handguns
21  so long as the possession of other firearms (*i.e.*, long guns) is allowed." *Id*. at 629. In
22  sum, *Heller* bars the argument that the availability of *other* handguns matters here.[2]

---

[2] The State asserts (Opp. at 22 n.13) that the Second Amendment's use of the word "infringe" shows, based on select dictionary definitions, the Founders sought to protect only the right to keep and bear arms from being "destroyed." The State posits that this is different than the First Amendment's purportedly stronger protection of speech rights from being "abridged." This cannot be squared, however, with *Bruen*'s citation to *Konigsburg v. State Bar of Cal*., 366 U.S. 36, 50 n.10 (1961), both times it announced the formulation of its text and history test. 142 S.Ct. at 2126 & 2130. *Konigsburg* affirmed that the First and Second Amendments expressed "*equally* unqualified command[s]." 366 U.S. at 50 n.10 (emphasis added).

Finally, *Heller* and *Bruen* also foreclose the argument that "Plaintiffs have not shown that the handguns available on the roster are generally unsuitable or insufficient for self-defense." Opp. at 22-23 & n.14. While the State ignores the evidence outlining the particular needs of the individual Plaintiffs and members of the organizational plaintiffs,[3] *Heller* confirms that such evidence is not even necessary:

> There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. **Whatever the reason**, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

*Heller*, 554 U.S. at 629 (emphasis added). And *Bruen* went on to affirm that laws "*restricting* the public carry of weapons that are unquestionably in common use today"—that is, handguns—fall within the Second Amendment's coverage. 142 S.Ct. at 2143. In short, the Second Amendment's text applies to the Roster ban.

**b.** **Common Use.** The State argues (Opp. at 23-24) that *Heller*'s "common use" "limitation" on the Second Amendment's scope somehow means it is "necessary" to a claim, but not "sufficient," to show the "arm" being restricted is in common use. But this is apparently a restatement of the argument that there is no right to a "particular model" of firearm even if it is in common use. *See* Opp. 24:10-12.

The State gets this precisely backward: *Bruen* affirms that the only way a handgun in common use could be "restricted" from being kept or borne for self-defense is if the State can meet its burden of showing such a regulation is historically justified. It cannot do so here because *Bruen* and *Heller* have already established that the relevant historical tradition in case of bans on bearable arms is the tradition of banning "dangerous and unusual weapons." *Bruen*, 142 S.Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). By definition, arms in common use cannot be banned. *Ibid.*; *see* ECF

---

[3] E.g., ECF No. 76-1, Renna Decl., ¶¶ 5–8; ECF No. 71-5, Phillips Decl., ¶ 15; ECF No. 71-7, Schwartz Decl., ¶ 8.

No. 71-1, Plaintiffs' MPI Br. 11:15–12:8 & 13:14–14:26. Because handguns are in common use for self-defense, the Second Amendment prohibits California from banning some of them through the UHA's regulations.

The State thus offers a last-gasp argument (Opp. at 24-25) that, even if we are right about the history, Plaintiffs have failed to submit sufficient evidence to establish that the many hundreds of models of handguns banned by the Roster are, in fact, commonly used throughout the country. A model-by-model evidentiary showing that the hundreds of Roster-banned semi-automatic handguns are commonly used is plainly not required by *Heller* or *Bruen*. As shown repeatedly in the motion and above, *Heller* and *Bruen* affirm that the textual analysis looks at whether the *category* of weapons is protected as "arms," and handguns undisputedly are. *Bruen*, 142 S.Ct. at 2128, 2134; *Heller*, 554 U.S. at 629 ("handguns are the most popular weapon chosen by Americans for self-defense in the home"). Courts routinely decide purely legal issues that depend only on the existence of certain "legislative facts" rather than "adjudicative facts" that are developed in discovery or "determined in trials." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012). Indeed, *Heller* supported its conclusion that handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family" by citing to a social science paper cited in another case for the same point. *Id*. at 628-29 (citing *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)). Justice Alito, in his concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), concluded that stun guns "are widely owned and accepted as a legitimate means of self-defense across the country" by quoting a Michigan Court of Appeal's statement—supported in turn by citation to a law review article—that "hundreds of thousands" of them had been sold to private citizens, *id*. at 420 (citing *People v. Yanna*, 297 Mich. App. 137. 144 (2012)). It is established that the category of handguns is commonly used, so the State cannot argue that its ban of a huge segment of the category falls outside the Second Amendment's protection.

1    While it was not necessary to do so, Plaintiffs did submit declarations that reiterate the obvious point that Roster-banned handguns are popular throughout the United States. The Ostini Declaration, for instance, notes at page 5 the uncontroversial point that "modern semiautomatic handguns are not on the roster"—indeed, it's undisputed that the Roster has banned nearly *all* such new models over the past 20 years. It doesn't take a product expert to grasp that 20 years' worth of new semi-automatic handguns are commonly used outside of California. And the Phillips Declaration establishes a firm foundation for John Phillips' knowledge that Roster-banned semi-automatic handguns are commonly sold and used outside of California (¶¶ 3-19). Tellingly, the State makes *zero* effort to actually dispute with its own evidence that the Roster-banned handguns are commonly used, because it cannot do so in good faith.

This argument is aimed solely at delaying the inevitable. No amount of discovery could yield a different conclusion. Indeed, in *Bruen*, the Supreme Court rejected the argument that remand was necessary to develop an evidentiary record on a variety of facts and instead directed that judgment be entered in favor of the plaintiffs. 142 S.Ct. at 2135 n.8. The same result is appropriate here.

**c.    The Various Aspects Of UHA Operate Together To Effect The Ban.**

In an apparent bid to start a severability discussion, the State next argues (Opp. at 25-26) that two aspects of the UHA (the fees and lab testing requirements) don't constitute bans by themselves, so they should be treated differently. To be clear, the Plaintiffs contend that the UHA's roster fees, the testing requirements, and the roster removal provisions all operate together, along with the UHA's primary mechanisms—the requirements that semiautomatic handguns must have a chamber load indicator, magazine disconnect mechanism, and microstamping capability to join the roster, § 319109(b)(4)-(6)—to accomplish the ban.

And the State cannot be taken seriously when it argues (Opp. at 26) that the Roster "removal provision" does not implicate the Second Amendment. The State

acknowledges that, "since 2021, for each new semiautomatic pistol added to the roster, the UHA requires DOJ to remove from the roster three semiautomatic pistols that lack a chamber load indicator, magazine disconnect mechanism, or microstamping. § 31910(b)(7)." Opp. at 6:4-7. In other words, this provision requires that whenever a new gun meets the Roster's requirements, a government official picks three previously-approved guns to ban in California. To state this removal *mandate* is to affirm it falls within the Second Amendment's textual prohibition.

### 2. The UHA Is Inconsistent With The Nation's Historical Tradition Of Firearms Regulation.

As noted above and in the motion, *Bruen* already answered the historical question here: Handguns in common use cannot be banned. 142 S.Ct. at 2128 (quoting *Heller*, 554 U.S. at 627) & 2134; *Heller*, 554 U.S. at 625. Even if the Court were to look beyond that and consider the State's supposed historical analogues, the State has failed to meet its burden of demonstrating that the Roster ban "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126. For a historical law to serve as a "proper analogue" to a modern firearm regulation, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132–33. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citations omitted). To carry its burden, "the government [must] identify a well-established and representative" tradition of analogous regulation, and "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 2133 (citation omitted).

The State conspicuously does *not* argue that the UHA is consistent with the historical laws banning "dangerous and unusual" weapons, nor could it in light of *Heller*. 554 U.S. at 627; *Bruen*, 142 S.Ct. at 2143. Much of the State's historical

argument relies instead on general propositions unsupported by any particular laws. *E.g.*, Opp. at 27:17-19 (as long as public safety laws "did not destroy the right of self-defense, the individuals states enjoyed broad latitude to regulate arms"); 28:10-11 ("Firearms were subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons."). The Cornell declaration on which these generalities are based likewise fails to identify any laws supporting the broad statements. This comes nowhere close to satisfying *Bruen*'s standard.

The very few laws identified in the opposition fall far short of demonstrating a historical tradition of limiting arms in common use, let alone a tradition sufficient to justify the UHA. Opp. at 27:24–29:3. The State's leading example is an 1805 Massachusetts law requiring that all firearms manufactured in the state be inspected and certified by a state-appointed "prover" of firearms. The law required all muskets and pistols to pass a discharge test proving that they are operable, and the prover would then stamp their initials and the year of inspection on the firearm.

This law imposed a far lesser burden on Second Amendment rights than the UHA: Massachusetts did not prescribe any particular features or specifications for firearms to be sold in the state. Rather, manufacturers needed only prove that the firearm operated as intended (*i.e.*, to pass a basic objective firing test). Thus, quite unlike the UHA, the "prover" law did not exclude commonly used arms for lacking "safety" characteristics; the Massachusetts legislature was not trying to use the law to force gun manufacturers to *add* unusual "safety" features—a goal the State openly attributes to the UHA. *See*, *e.g.*, Opp. at 33 n.21 ("Although there are currently no semiautomatic pistols on the roster capable of microstamping, the requirement has an important role in transitioning handgun sales in California toward safer models."). Moreover, the prover law only applied to in-state manufacturers—based on the text of the law, Bay Staters remained free to purchase any firearms manufactured out of state, which were not subject to the testing law. Nor, Prof. Cornell notes at paragraphs 32 and 33, did it even apply to the state's largest manufacturer, the federal Springfield

Armory. As such, this "prover" law operates nothing like the UHA's complete ban of today's most popular handgun models from manufacturers like Glock and Sig Sauer—they could pass 100 firing tests to confirm they work, but they would still be banned.

The law's "stamping" requirement provides a good example of some of the differences between the two laws. Under the Massachusetts law, if the gun passed the firing test, the prover would stamp his initials and the year of the test on the barrel using basic engraving tools. 1805 Mass. Acts 588, § 1. Here, by contrast, the State concedes the significant debate, since the UHA's enactment, about whether "microstamping" is even *possible* (Opp. at 25-26), and that there is still not a single gun on the Roster "*capable* of microstamping." Opp. at 33 n.21 (emphasis added). Moreover, as to the "why" question, the prover law's stamp was designed to require testing to ensure the gun worked. The State concedes that the microstamping requirement, by contrast, serves the very different purpose of assisting law enforcement's investigation of crimes. Opp. at 5:14-17; Gonzalez Decl., ¶ 17.

In any event, this single regulation from one state is insufficient to uphold the UHA's ban. *Heller*, 554 U.S. at 632, and *Bruen*, 142 S.Ct. at 2153, teach that only one law is not enough to establish a tradition. And because the Massachusetts law stands alone, it is not a "well-established and representative historical analogue," so relying on it to uphold the UHA would "risk[] endorsing [an] outlier[]." *Bruen*, 142 S.Ct. at 2133.

Next, the State trots out a handful of 19th-century fire-safety regulations. The State first identifies a Massachusetts law that prohibited storing loaded weapons in Boston homes, which the State claims reflects a broad concern about "the unintended discharge of firearms." Opp. at 28:11–14. But the Opposition (and Professor Cornell) only cite § 2 of the law, which conveniently omits the rationale for the municipal restriction. This is concerning, since *Heller* rejected the District of Columbia's attempt to analogize this same law because it was directed at *fire* safety, not gun control. Because the law's purpose "was to eliminate the danger to firefighters posed by the

'depositing of loaded Arms' in buildings," it "gives reason to doubt that colonial Boston authorities would have enforced that general prohibition against someone who temporarily loaded a firearm to confront an intruder." 554 U.S. at 631; *see* 2 Acts And Laws Of The Commonwealth Of Massachusetts 120 (1890) (noting that "the depositing of loaded Arms in the Houses [of Boston] is dangerous to the Lives of those who are disposed to exert themselves when a Fire happens to break out").[4]

The State's reliance on the Massachusetts powder law fares no better here. The Opposition lumps it together with three additional gunpowder storage regulations to bolster the historical record: Firearms need gunpowder, the argument goes, so these restrictions "necessarily affected the ability of gun owners to use firearms for self-defense." Opp. at 28:15–29:3. But *Bruen* demands more. A smattering of early 19th-century regulations is not a "well-established and representative" historical tradition of regulation of any kind.

But even if the State could catalogue similar gunpowder storage laws in *every* state at the Founding, such laws are not "relevantly similar" to the UHA's ban on the retail sale of handguns in common use across the country. These laws fail both the "how" and "why" metrics that are "central" to *Bruen*'s analogical analysis. The gunpowder regulations and UHA do not impose "comparable" burdens on Second Amendment rights. Whereas the historical laws restricted the amount of gunpowder that could be kept or regulated the manner of storage, the UHA prohibits the sale of a class of weapons altogether. Neither are the regulations comparably justified: The gunpowder regulations were based on the danger of combustion in residential dwellings in the event of a fire. The UHA, on the other hand, is motivated by the State's generalized assertion that particular—and manifestly uncommon—features are necessary to prevent handguns from being "unsafe."

---

[4] The Ninth Circuit likewise rejected San Francisco's attempt to analogize the Massachusetts fire-protection law to support its handgun ordinance. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014) (finding that Boston's firearm-and-gunpowder storage law was historically irrelevant based on *Heller*).

1   The State sums up by arguing that the UHA is permissible because it imposes a burden that is "actually less than historical regulations' burdens on firearms" based on these miscellaneous restrictions. Opp. at 29:18–23 This is an attempt to swap *Bruen*'s standard for the interest-balancing test it rejected. The Court left no room for doubt that this is inappropriate: courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry." 142 S.Ct. at 2122 n.7.

In sum, the UHA flunks *Bruen*'s historical test, so the State has failed to meet its burden.

### 3. The Challenge to the Removal Provision is Justiciable.

The State claims "Plaintiffs lack Article III standing" to challenge the three-for-one removal provision of the UHA and that "this claim is unripe" because they "cannot establish that the provision will ever affect the number of semiautomatic pistols on the roster." Opp. 15, 17. The State argues there's no evidence the provision "has resulted in the removal of any handgun from the roster" or that "at any point in the future … a semiautomatic pistol will be added to the roster such that three pistols will have to be removed under the provision." *Id.* at 18.

These claims are odd, since the entire point of the provision is to *remove* three guns for every gun added to the Roster. Plaintiffs want—and under the Second Amendment are guaranteed—the opportunity to choose among handguns that are commonly available throughout the country. Not only does the Roster deny them that choice, but the three-for-one removal requirement ensures that their options will only be constricted further in the future.

Moreover, the removal provision does not operate in a vacuum. As the Court has recognized, it operates in conjunction with the requirements that presumptively declare as "unsafe" all semiautomatic handguns lacking all the statutorily-mandated features and that subject existing on-Roster handguns "to removal from the roster for nonpayment of fees or minor changes to a model's materials or design." ECF No. 17 at 14. Thus, the removal provision "imposes an even greater restriction on the pool of

handguns available for sale in California" and necessarily "will accelerate this trend" of eliminating "grandfathered" handguns and other semiautomatic handguns that do not comply with all of the State's "safety" requirements. *Id.* Indeed, countless handguns have been "de-certified" since the UHA was first enacted, including dozens over the last few years alone. *See* https://oag.ca.gov/firearms/de-certified-handguns (Cal. Dept. of Justice, *De-Certified Handgun Models*; last visited 2/1/23).[5]

### 4. No Further Discovery Is Necessary To Rule On This Motion.

The State suggests that the Court should defer ruling for three months to allow it to complete discovery on historical firearm regulations and provide further briefing. Opp. at 30:19–22. Delay is not necessary because the material facts here are beyond any reasonable dispute and no further historical research could possibly justify the UHA's central provisions. Plaintiffs have demonstrated that the UHA bans the retail sale of countless handguns that are in common use for lawful purposes across the country. Under *Heller* and *Bruen*, that is the end of the matter: The Second Amendment prohibits banning arms in common use unless the State can demonstrate that they are both "dangerous and unusual," which it cannot do here.

The State used its three months since the Third Amended Complaint's filing to compile a huge declaration from a professor who styles himself as an expert in "the history of gun regulation" and "American legal and constitutional history." Cornell Decl., 3:11-13. The Court should decide this case on the record before it, which demonstrates that the UHA is unconstitutional.

---

[5] The State also cites fluctuations over the last couple of years in the total number of on-Roster handgun to support its argument that this claim is "speculative." Opp. at 18 (noting a marginal increase in the aggregate over this period). However, many of the approved handguns are the same handgun make and model with merely cosmetic differences. *See* TAC ¶ 75; *California's Handgun Roster: How big is it, really?*, online at https://www.firearmspolicy.org/california-handgun-roster; Phillips Decl., ¶ 9. The publicly available version of the Roster doesn't list the date each handgun was added, but many of the model names and numbers are exactly the same; the only differences are their colors and/or types of material from which they are constructed. Such cosmetic differences artificially inflate the total number of models on the Roster. *See* https://oag.ca.gov/firearms/certified-handguns/search.

**5.      The Remaining Preliminary Injunction Factors Favor Plaintiffs.**

Plaintiffs have satisfied each of the factors necessary for a preliminary injunction. First, Plaintiffs are suffering an ongoing Second Amendment violation, which constitutes irreparable harm. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see Koons v. Reynolds*, --- F.Supp.3d --- (2023), 2023 WL 128882, *22 (D. N.J. Jan. 9, 2023) (collecting cases holding that Second Amendment deprivations constitute irreparable harm). The State's only argument to the contrary is that an injunction would permit "unsafe" handguns to be sold in California—but that argument assumes the constitutional validity of the Roster in the first place.[6] The State's asserted interest in suppressing the sale of handguns that are in common use for lawful purposes throughout the country must give way to the Second Amendment. The public interest cannot be served by violating Plaintiffs' rights and enforcing an unconstitutional law. *Melendres*, 695 F.3d at 1002; *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.").

*      *      *

For the reasons set forth above and in the opening brief, the Court should issue an order declaring the Roster's handgun ban unconstitutional and restraining Defendants from enforcing it.

Dated:  February 3, 2023

| The DiGuiseppe Law Firm, P.C. | Benbrook Law Group, PC |
|---|---|
| By: s/ Raymond M. DiGuiseppe | By: s/ Bradley A. Benbrook |
| Raymond M. DiGuiseppe | Bradley A. Benbrook |
| Attorneys for Plaintiffs | Attorneys for Plaintiffs |

---

[6]   It also ignores that the State has carved out exemptions for numerous categories of government officials and personnel, allowing *them* to freely acquire off-Roster handguns and thus undermining the fundamental premise that these arms are "unsafe."