1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   LANA RAE RENNA, et al.,                    Case No.:  20-cv-2190-DMS-DEB

12                              Plaintiffs,      **ORDER GRANTING IN PART AND**
                                                 **DENYING IN PART PLAINTIFFS'**
13   v.                                          **MOTION FOR PRELIMINARY**
                                                 **INJUNCTION**
14   ROBERT BONTA, Attorney General of
     California; and ALLISON MENDOZA,
15   Director of the California Department of
     Justice Bureau of Firearms,
16
17                              Defendants.
18

19        Plaintiffs seek to enjoin enforcement of California's handgun "roster" requirements,

20   which have prohibited the manufacture and retail sale in California of a large segment of

21   modern handguns that are otherwise in common use throughout the United States for self-

22   defense and other lawful purposes.  The challenged roster requirements are codified in

23   California's Unsafe Handgun Act ("UHA") and limit handgun manufacturing and retail

24   sales to those handguns that can satisfy numerous testing and safety feature requirements

25   not required in 47 other states.  As a result, Plaintiffs allege no modern handguns have been

26   added to the roster's list and approved for commercial sale in more than a decade, and the

27   limited number of handguns currently listed on the roster continues to shrink because of

28   the testing and safety feature requirements as well as the assessment of annual roster fees

                                         1

on manufacturers as a condition to retention of their handguns on the roster.  Plaintiffs further allege the roster will shrink at an accelerated pace in the future because of the UHA's "three-for-one" roster removal provision, which mandates that for each new roster-compliant handgun added to the roster, three "grandfathered" handguns must be removed in reverse order of their dates of admission to the roster.

Plaintiffs argue these roster requirements "all operate together" to ban the retail sale of hundreds of modern "off-roster" handguns in common use and violate their rights to "keep and bear arms" secured by the Second Amendment to the United States Constitution. Despite Plaintiffs' request to enjoin the entirety of the UHA's roster requirements, their focus has been on three specific requirements of the UHA and the impact of those requirements on a particular type of handgun: semiautomatic pistols.  These types of handguns have been banned from commercial sale in California because they lack three features required by the UHA.  Two of the mandated features require that these arms have a chamber load indicator and magazine disconnect mechanism, both of which are designed to prevent accidental discharges and increase gun safety.  The third requirement, microstamping, is intended to help law enforcement solve gun-related crimes by allowing quick identification of the handgun used at a crime scene from information imprinted on spent cartridge casings.  Defendants argue the California Legislature passed these requirements to further important state interests: gun safety, and general public safety through enhanced criminal investigations.

While the topic of gun regulation and its permissible scope is hotly debated in America's political theater, the role of this Court is to determine whether the roster provisions of the UHA violate Plaintiffs' Second Amendment rights under United States Supreme Court precedent in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  *Bruen* abrogated the "means-end" approach used by circuit courts across the country to determine the constitutionality of gun regulations under the Second Amendment, including a Ninth Circuit decision that previously upheld the UHA's chamber load indicator, magazine disconnect mechanism, and microstamping requirements.  *See*

*Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018).   Under *Bruen*, when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct, in which case the State "may not simply posit that the regulation promotes an important interest," such as public safety. 142 S. Ct. at 2126.  Rather, to justify its regulation, the State must demonstrate that the regulation is consistent with this Nation's historical traditions of firearm regulations.  *Id.*

Under this newly formulated standard, the Court concludes that Plaintiffs' desire to commercially purchase newer models of semiautomatic handguns in common use is covered by the Second Amendment and presumptively protected.  Because the State is unable to show the UHA's chamber load indicator, magazine disconnect mechanism, and microstamping requirements are consistent with the Nation's historical arms regulations, Plaintiffs are entitled to a preliminary injunction against the State's enforcement of those three provisions, which operate to prohibit the commercial sale of these arms, as well as the three-for-one roster removal provision, which depends on the enforceability of those provisions.  However, Plaintiffs have not met their burden to show that the UHA's roster listing requirement, and its fees, safety device, and testing requirements violate their Second Amendment rights.  Plaintiffs' motion for preliminary injunction is therefore granted in part and denied in part.

# I.

# BACKGROUND

## A. California's Unsafe Handgun Act

The UHA regulates the commercial sale of handguns by requiring the California Department of Justice ("CDOJ") to maintain a "roster" listing all handguns that have been tested by a certified testing laboratory, "have been determined to be *not* unsafe handguns," and may be lawfully manufactured and sold by licensed firearms dealers in California.  Cal. Penal Code § 32015(a) (emphasis added).  Under the UHA, all handguns are considered "unsafe" and may not be commercially sold in California unless the CDOJ determines them "not to be unsafe" and authorizes their inclusion on the roster.  Manufacturing or selling

an "unsafe" handgun, *i.e.*, an "off-roster" handgun, is a violation of the UHA and subjects the offender to misdemeanor criminal and civil penalties, including up to one year imprisonment and fines up to $10,000. *Id.* § 32000(a)(1)-(3).

An "unsafe handgun" is defined as "any pistol, revolver, or other firearm capable of being concealed upon the person" that does not have certain safety features and does not meet firing and drop-safety testing requirements. Cal. Penal Code § 31910. The statute is broken into two subparts: first, it provides that a revolver[1] is deemed "unsafe" unless it meets three specified criteria, *id.* § 31910(a)(1)-(3), and second, it provides that a semiautomatic pistol[2] is deemed "unsafe" unless it meets six specified criteria. *Id.* § 31910(b)(1)-(6). The first three criteria apply to both revolvers and semiautomatic pistols: they must have a mechanical "safety device,"[3] and they must satisfy fire testing and drop-safety testing requirements. Those three requirements were first enacted in 1999, *see* California Unsafe Handgun Act, 1999 Cal. Stat. ch. 248 (SB 15), and are currently set forth in Cal. Penal Code §§ 31910 (a)(1)-(3) (revolvers), and (b)(1)-(3) (semiautomatic pistols).

Over time, California enacted three more requirements for semiautomatic pistols—in addition to the safety device and testing requirements—for inclusion on the roster. Since 2007, semiautomatic pistols must have a chamber load indicator ("CLI") and magazine disconnect mechanism ("MDM"). *See id.* § 31910(b)(4)-(5). A CLI is a "device that plainly indicates that a cartridge is in the firing chamber." *Id.* § 16380. An MDM is "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from

---

[1] A revolver has a cylinder in the center of the firearm with multiple chambers that hold the ammunition and rotates with each pull of the trigger.

[2] A semiautomatic handgun holds ammunition in a detachable magazine which, once inserted in the gun, automatically feeds a fresh round into the chamber of the gun with each pull of the trigger and ejected fired round.

[3] Revolvers must have a "safety device that, either automatically in the case of a double-action firing mechanism, or by manual operation in the case of a single-action firing mechanism, causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge." Cal. Penal Code § 31910(a)(1). Semiautomatic pistols must "have a positive manually operated safety device." *Id.* § 31910(b)(1).

operating to strike the primer of ammunition in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." *Id.* § 16900.   Since 2013, semiautomatic pistols also must have "microstamping" capability.  "Microstamping" is a set of "microscopic arrays of characters" that are imprinted onto the cartridge case of each fired round which can be used to "identify the make, model, and serial number of the pistol" used at a crime scene.   *Id.* § 31910(b)(6)(A).[4]   Accordingly, the UHA limits the manufacture and commercial sale of newer models of semiautomatic handguns to those that have a manually operated safety device, meet firing and drop-safety testing requirements, and have the CLI, MDM, and microstamping features.   Stated differently, newer models of semiautomatic handguns that lack these safety features and have not met the testing requirements are deemed "unsafe," may not be added to the roster, and may not be manufactured or commercially sold in California.

The UHA contains a number of exceptions to the ban on commercial sales of handguns without the CLI, MDM and microstamping features.   Handguns that were "already listed on the roster" when the CLI, MDM and microstamping requirements became effective are exempt.   Cal. Penal Code §§ 31910(b)(4), (b)(5), (b)(6)(A) ("grandfather" provisions).   Handguns sold to law enforcement officials, and certain curios or relics are also exempt.  *Id.* § 32000(b)(3)-(4).   Pistols used in Olympic target shooting are exempt, *id.* § 32105, as are handguns in private party transfers, in which two parties who are not licensed firearms dealers wish to enter into a sale.  *Id.* § 32110(a).   So, too, are handguns that are delivered for consignment sale or as collateral for a pawnbroker loan, and handguns used solely as props for video production.  *Id.* § 32110(f), (h).   The UHA

---

[4]  The CLI provision applies only to centerfire semiautomatic pistols, not rimfire semiautomatic pistols.  *See* Cal. Penal Code § 31910(b)(4).  The MDM and microstamping requirements apply to both centerfire and rimfire semiautomatic pistols.  *See id.* §§ 31910(b)(5), (6).  Rimfire ammunition is generally lower velocity, less lethal and smaller than centerfire ammunition.  The distinction between rimfire and centerfire arms or ammunition is not relevant to the determination of this case.

does not restrict *possession* of off-roster handguns in the home or elsewhere; rather, its focus is to limit the manufacture and commercial *sale* of such handguns.

Manufacturers must also pay an initial $200 testing fee for a new handgun to be added to the roster. *Id.* § 32015(b)(1); Cal. Code of Regs. tit. 11 ("CCR"), §§ 4070-4072. Once a handgun is added to the roster, it is valid for one year, after which the manufacturer may renew the listing by paying an annual fee. 11 CCR § 4070; *see id.* § 4071. A handgun model may be removed from the roster for a variety of reasons, including if: (1) the annual fee is not paid; (2) the handgun model sold after certification is modified from the model submitted for testing; or (3) the handgun is deemed "unsafe" based on further testing. 11 CCR § 4070(c); *see also* Cal. Penal Code § 32015(b)(2) (stating any handgun "manufactured by a manufacturer who . . . fails to pay" the roster fee "may be excluded from the roster."). In addition, in January 2021, the California Legislature accelerated the removal of semiautomatic handguns from the roster by requiring removal of three such grandfathered handguns for every approved semiautomatic pistol added to the roster ("three-for-one removal provision"). Cal. Penal Code § 31910(b)(7).

## B. The Plaintiffs and Their Claim

Plaintiffs are law-abiding individuals, licensed firearm retailers, and organizations, with individual and retail members, who allege the UHA prevents them from exercising their Second Amendment rights to purchase handguns not listed on the roster for self-defense, *i.e.,* off-roster handguns. (Third Amended Complaint ("TAC") ¶¶ 16, 17-54, 59 (alleging the UHA "prevent[s] Plaintiffs … from purchasing [off-roster] handguns that are categorically in common use for self-defense and other lawful purposes, and thus violate[s] the Second and Fourteenth Amendments to the United States Constitution.").)[5]

---

[5] "Strictly speaking, [a state] is bound to respect [an individual's] right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 142 S.Ct. at 2137. However, since the protections of the Second Amendment are made applicable to the states through the Due Process Clause of the Fourteenth Amendment, *McDonald v. Chicago,* 561 U.S. 742 (2010), the Court refers to the claim at issue here as one under the Second Amendment.

Plaintiffs allege that, but for the UHA, they would have available for purchase on the retail market hundreds of these off-roster handguns. (*See* TAC ¶¶ 17-38.) Because of the roster, the number of handguns available for retail sale "is a small fraction of the total number of handgun makes and models commercially available throughout the vast majority of the United States[.]" (*Id.* ¶ 71.) Plaintiffs also allege that each layer of regulation under the UHA has hastened the dramatic shrinkage of handguns available for purchase in California. Plaintiffs allege there were nearly 1,300 makes and models of approved handguns on the roster in 2013, but that the list has steadily declined over the past decade to 815 as of October 24, 2022. (*Id.* ¶ 73.).

Plaintiff Lana Rae Renna alleges that but for the UHA she would purchase the Smith & Wesson M&P® 380 SHIELD™ EZ® (*id.* ¶ 18); Danielle Jaymes would purchase a Sig 365, G43X, Glock 19 Gen5, Sig P320, and/or a Nighthawk Lady Hawk (*id.* ¶ 21); Laura Schwartz would purchase a Glock 19 Gen5 and/or Springfield Armory Hellcat (*id.* ¶ 23); Michael Schwartz would purchase a Glock 19 Gen5 and/or Springfield Armory Hellcat (*id.* ¶ 25); John Klier would purchase a Glock 19 Gen5 (*id.* ¶ 27); Justin Smith would purchase a CZ P10, Walther Q5 SF, and/or Glock 19 Gen4 and/or Gen5 (*id.* ¶ 29); John Phillips would purchase a Sig Sauer P365, Sig Sauer P320 M17, Glock 17 Gen5 MOS, Fabrique National Herstal 509, and/or Fabrique National Herstal FNX-9 (*id.* ¶ 31); Cheryl Prince would purchase a Sig Sauer P365 (*id.* ¶ 33); Darin Prince would purchase a Sig Sauer P320 AXG Scorpion (*id.* ¶ 35); and Ryan Peterson would purchase a Fabrique National Herstal 509 Tactical, Sig Sauer P220 Legion (10mm), Staccato 2011, Glock 19 Gen5, Glock 17 Gen5 MOS, and Wilson Combat Elite CQB 1911 (9mm). (*Id.* ¶ 38.) The retailer Plaintiffs allege that but for the UHA they would purchase at wholesale and "make available for [retail] sale . . . all of the constitutionally protected [off-roster] new handguns on the market that are available outside of California." (*Id.* ¶¶ 42, 46, 50.) The institutional Plaintiffs promote Second Amendment rights and are filled with individual and retailer members who desire to purchase and sell off-roster handguns. (*Id.* ¶¶ 51-54.)

All of the handguns identified in the TAC are semiautomatic pistols, not revolvers. While revolvers and semiautomatic pistols are subject to the UHA's mechanical safety device and firing and drop-safety testing requirements, Cal. Penal Code § 31910(a)(1)-(3) & (b)(1)-(3), the focus of the subject litigation has been on the UHA's CLI, MDM, microstamping, and three-for-one removal requirements, *id.* § 31910(b)(4)-(7), as those requirements apply only to the peculiar mechanics and operation of semiautomatic pistols, the arms specifically identified in the TAC.

Based on these allegations, Plaintiffs filed this action on November 10, 2020. (ECF No. 1.)  Plaintiffs initially challenged the UHA, AB 1621, and other state regulations. (*See id.*)  On January 4, 2021, Plaintiffs filed a FAC, alleging two claims under 42 U.S.C. § 1983—one for deprivation of Second Amendment rights, as secured by the Fourteenth Amendment, and one for violation of the Fourteenth Amendment right to equal protection of laws.  (ECF No. 10.)  Defendants moved to dismiss the FAC, (ECF No. 12), and this Court granted in part and denied in part the motion on April 23, 2021.  (ECF No. 17.)  Specifically, this Court granted Defendants' motion and dismissed Plaintiffs' Second Amendment challenge to the CLI, MDM, and microstamping provisions as "foreclosed" by *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018), (ECF No. 17 at 6), and denied the motion as to Plaintiffs' challenge to the three-for-one roster removal provision.  (*Id.* at 9-14) (holding Defendants "have not met their burden to show the imposition of the three-for-one provision is a reasonable fit for their stated [public safety] objective.")

Thereafter, on June 23, 2022, the Supreme Court issued its opinion in *Bruen*, which fundamentally changed Second Amendment jurisprudence.  *See United States v. Rahimi*, 61 F.4th 443, 450 (5th Cir. 2023) (stating prior two-step means-end inquiry used by circuit courts to analyze laws that might impact Second Amendment is rendered "obsolete" by *Bruen*).  In light of *Bruen*, Plaintiffs filed a Second Amended Complaint ("SAC") (ECF No. 49), and motion for preliminary injunction. (ECF No. 53.)  The motion for preliminary injunction targeted portions of AB 1621, which prohibited computer numerical control ("CNC") milling machines used to make untraceable, non-serialized firearms or parts (*i.e.*,

"ghost guns").  (*See id.*)  The Court heard argument after a full round of briefing, but prior to any decision on the matter, Plaintiffs withdrew their motion and voluntarily dismissed the AB 1621 claim.  (ECF No. 63.)

The parties thereafter stipulated that Plaintiffs would file a Third Amended Complaint.  (ECF No. 65.)  The TAC solely challenges the UHA under the Second and Fourteenth Amendments.  (ECF No. 67.)  That challenge is now before the Court on the present motion.

**C. The Ninth Circuit's Decision in *Pena v. Lindley***

In *Pena*, the Ninth Circuit addressed whether the CLI, MDM, and microstamping provisions of the UHA violated the plaintiffs' Second Amendment rights using the now obsolete two-step means-end inquiry.  898 F.3d 969 (9th Cir. 2018).  Under that approach, the *Pena* court noted it must first consider whether the UHA "burdens conduct protected by the Second Amendment, and if it does, we apply an appropriate level of scrutiny."  *Id.* at 975 (citation and quotations omitted).  At the first step, *Pena* assumed without deciding that the CLI, MDM and microstamping provisions of the UHA burdened conduct protected by the Second Amendment.  *Id.* at 976.  After determining the "UHA does not effect a substantial burden" on the plaintiffs' Second Amendment rights, *Pena* concluded the appropriate standard of review was "intermediate scrutiny," *id.* at 979, and then applied that level of scrutiny to determine whether the UHA was reasonably tailored to address the State's substantial interests in public safety and criminal investigation.

Applying that standard, *Pena* focused on a number of factors it believed lessened the severity of the burden on the plaintiffs' Second Amendment rights, including the plaintiffs' ability under the UHA to "buy an operable handgun suitable for self-defense—just not the exact gun they want," and the exceptions provided by the UHA to purchase grandfathered guns (without CLI, MDM, and microstamping features) and off-roster guns through private transactions.  *Id.* at 978-79.  Applying the UHA and its CLI, MDM and microstamping requirements to the plaintiffs' conduct (i.e., the ability to commercially purchase off-roster semiautomatic handguns), the Ninth Circuit upheld the UHA because the law was

reasonably tailored to address the important state interests of public safety and law enforcement investigation. *Id.* at 979-86.

Under *Bruen,* however, the two-step means-end inquiry employed by *Pena* is now obsolete. 142 S.Ct. at 2127. As noted, when the Second Amendment's plain text covers an individual's conduct, as here, the Constitution presumptively protects that conduct, in which case the state "may not simply posit that the regulation promotes an important interest." *Id.* at 2126. So today, *Pena* and its analysis of the subject regulations are of limited relevance. Instead, the State must demonstrate the UHA is consistent with this Nation's historical traditions of firearm regulations. *Id.* With this background in mind, the Court turns to whether Plaintiffs are entitled to a preliminary injunction against enforcement of these provisions of the UHA under the *Bruen* framework.[6]

## II.

## DISCUSSION

### A. Preliminary Injunction

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (internal quotation marks omitted). A preliminary injunction requires Plaintiffs to show that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without preliminary relief, and (3) the balance of equities tips in their favor and an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (stating balance of equities and public interest merge into one factor when the government

---

[6] *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (explaining in situations "where the reasoning or theory of our prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority" district courts are required to "reject the prior circuit opinion as having been effectively overruled.").

is a party).  Likelihood of success on the merits is a "threshold inquiry," and thus if a movant fails to establish that factor, the court "need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).

Plaintiffs move to enjoin the entirety of the UHA's roster requirements codified in Cal. Penal Code §§ 31910, 32000(a) and 32015(a),(b)(2).  Plaintiffs argue:

> To be clear, the Plaintiffs contend that the UHA's roster fees, the testing requirements, and the roster removal provisions all operate together, along with the UHA's primary mechanisms—the requirements that semiautomatic handguns must have chamber load indicator, magazine disconnect mechanism, and microstamping capability to join the roster[]—to accomplish the [sales] ban.

(Reply Br. at 5 (ECF No. 74).)  Defendants correctly note that the UHA has many distinct roster provisions, enacted at different times for different purposes, and any relief must be specific.  *See Orantes-Hernandez v. Tornburgh*, 919 F.2d 549, 558 (9th Cir. 1990) (explaining "an injunction must be narrowly tailored to give only the relief to which plaintiffs are entitled.").  Here, Plaintiffs have not met their burden to show the UHA's manufacturer roster fee assessment violates their Second Amendment rights.  Plaintiffs are individuals, retail sellers, and nonprofit organizations and foundations consisting of individuals and retail sellers, not manufacturers.  It is unclear on the present record how Plaintiffs have standing to complain about fees that must be paid by manufacturers to have their handgun models remain on the roster.  Similarly, Plaintiffs have failed to address how the UHA's firing and drop-safety testing requirements for revolvers and semiautomatic pistols violate their rights.  Plaintiffs also presented no argument or evidence that the roster listing requirement *itself* or the mechanical "safety device" requirements for revolvers and semiautomatic pistols violate their rights.  Accordingly, the Court denies without prejudice Plaintiffs' motion for such relief.

However, as discussed in detail below, Plaintiffs have shown likely success on their claim that the UHA's CLI, MDM and microstamping requirements violate their Second Amendment rights.  In addition, because the UHA's three-for-one removal provision

depends on the CLI, MDM, and microstamping provisions, it too is unenforceable.  *See* Cal. Penal Code § 31910(b)(7) (stating "for each semiautomatic pistol newly added to the roster," CDOJ shall "remove from the roster exactly three semiautomatic pistols lacking one or more of the applicable [CLI, MDM and microstamping] features described in [§ 31910(b)(4)-(6)]").

1. Likelihood of Success on the Merits

"A plaintiff seeking a preliminary injunction must establish he is likely to succeed on the merits." *Winter*, 555 U.S. at 20.  Thus, Plaintiffs must show likely success on their claim that the UHA's CLI, MDM, and microstamping requirements violate their Second Amendment rights.  *Bruen* sets out two analytical steps to determine whether a firearm regulation violates an individual's Second Amendment rights.  First, courts must determine whether "the Second Amendment's plain text covers [the] individual's conduct."  142 S. Ct. at 2129-30.  If so, then "the Constitution presumptively protects that conduct," and the government "must justify its regulation by demonstrating that it is consistent with the Nation's historical traditions of firearm regulation."  *Id.* at 2130.  "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Id.* (citation omitted).  Under this framework, Plaintiffs must first demonstrate the Second Amendment's plain text covers their conduct.

a. *Second Amendment and Plaintiffs' Conduct*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  To determine whether the plain text of the Amendment covers the conduct regulated by the challenged law, it is necessary to "identify and delineate the specific course of conduct at issue." *National Ass'n for Gun Rights, Inc. v. City of San Jose*, --- F.Supp.3d ---, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022) (citing *Bruen*, 142 S. Ct. at 2134).  The course of conduct at issue here is Plaintiffs' desire to commercially purchase off-roster semiautomatic handguns that are in common use for self-defense and other lawful purposes.

Determining the scope of the Second Amendment and whether it covers the conduct at issue is "rooted in the Second Amendment's text, as informed by history." *Bruen*, 142 S. Ct. at 2127.   In *Bruen*, the Supreme Court interpreted the Second Amendment in light of "historical tradition" and held the Amendment protects all arms "in common use," and "handguns . . . are indisputably in 'common use' for self-defense today." *Bruen*, 142 S. Ct. at 2143 (citing *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)) (cleaned up). Because the arms at issue (semiautomatic pistols) are handguns, and handguns are "indisputably in common use" today, *id.*, semiautomatic pistols categorically are "Arms" covered by the Second Amendment.  The Amendment does not parse between types, makes and models of arms.  *See Heller*, 554 U.S. at 629 (stating "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.")  All handguns are covered, so long as they are in common use.  Thus, Plaintiffs' ability to commercially purchase off-roster semiautomatic handguns falls within the plain text of the Second Amendment and is presumptively protected.

Defendants do not dispute that handguns, as a category, are covered by the Second Amendment.  Nor do Defendants dispute that "the right to keep arms, necessarily involves the right to purchase them." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (cleaned up).   Rather, Defendants argue that Plaintiffs' desire to purchase at retail *particular* semiautomatic handguns (those without the CLI, MDM and microstamping features) is not covered by the Second Amendment.   In support of this argument, Defendants note the UHA is not a categorical ban on *all* handguns like that in *Heller*, as Plaintiffs have available for purchase on the retail market hundreds of roster-compliant handguns, including single shot handguns,[7] revolvers and older models of semiautomatic pistols.  (ECF No. 72 at 20-21.)  Defendants point out that as of December 31, 2022, the

---

[7]  A single-shot handgun is capable of holding only a single round of ammunition and must be manually reloaded with each fired round.

roster list included many handguns from which Plaintiffs could choose, including 16 single-shot handguns, 314 revolvers and 499 semiautomatic pistols. (*Id.* at 21) (citing Declaration of Salvador Gonzalez ISO Defendants Opposition to Preliminary Injunction ("Gonzalez Decl.") ¶ 19.) But the *availability* of handguns on the roster for retail purchase does not address in any way whether Plaintiffs' desire to purchase off-roster semiautomatic handguns is *covered* by the Second Amendment. Instead, the argument focuses on the *burden* imposed on Plaintiffs' rights, which assumes Plaintiffs' conduct is protected (covered) by the Amendment. Defendants' argument is therefore rejected as it fails to address the plain text of the Amendment.[8]

Next, Defendants argue the Second Amendment is limited to arms in "common use." The Supreme Court in *Heller* recognized that the "right to keep and carry" under the Second Amendment is limited to arms "in common use at the time[,]" 554 U.S. at 627 (citations omitted), and noted that "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* The State does not argue that the off-roster semiautomatic handguns at issue are "dangerous and unusual." Indeed, many of these handguns are used by law enforcement. Rather, it argues Plaintiffs have failed to show that these handguns are "in common use" and therefore Plaintiffs' conduct is not covered by the Amendment. (ECF No. 72 at 24.) This argument is a stretch under any reasonable assessment.

---

[8] Defendants advance a related non-textual argument that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose[,]" quoting *Heller*, 554 U.S. at 628. (Opp'n at 22) (ECF No. 72.) However, as noted, *Heller* admonishes that "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." 554 U.S. at 629. Thus, Defendants' argument that it is constitutionally permissible to prohibit commercial sales of state-of-the-art semiautomatic pistols, so long as Plaintiffs can purchase single shot handguns, revolvers and older grandfathered models of semiautomatic pistols that are shrinking in number and less desirable runs headlong into *Heller's* admonition. As *Bruen* reiterates, the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" 142 S. Ct at 2156 (quoting *McDonald v. City of Chi., Ill.,* 561 U.S. 742, 780 (2010)).

Defendants argue Plaintiffs have not produced any raw data to support the proposition that off-roster handguns are in "common use."  Yet, the Supreme Court has already stated that handguns are "'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family.'"  *Heller*, 554 U.S. at 628-29 (quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)).  Indeed, handguns are the "quintessential self-defense weapon[,]" *Heller*, 554 U.S. at 629, and "are indisputably in 'common use' for self-defense today." 142 S. Ct. at 2143.  The most popular handguns today are semiautomatic pistols.  (ECF No. 71-5, Declaration of John Phillips ISO Plaintiffs' Motion for Preliminary Injunction ("Phillips Decl.") ¶¶ 12-18 (stating semiautomatic handguns identified by Plaintiffs in this litigation are top-sellers across the country).)  And the roster *itself* shows even older models of grandfathered semiautomatic pistols are the most popular type of handgun in California, far outpacing revolvers: 499 to 314.  (ECF No. 72 at 21 n.11 (citing Gonzalez Decl. ¶ 19).

Plaintiffs submitted several declarations in support of their motion and argument that off-roster handguns are in common use, to which Defendants lodged objections.  Discussion of one those declarations suffices to address Defendants' objections.

Declarant John Phillips is president and founder of Poway Weapons & Gear and PWG Range ("PWGG"), a licensed firearms dealership in Poway, California, and operator of one the largest indoor gun ranges in the country.  (Phillips Decl. ¶ 2) (stating PWGG serves more than 200,000 people a year in its retail store, more than 80,000 on its ranges for target shooting, and more than 8,000 students for firearms training and education).  Phillips is a member of a nationwide buying group with more than 450 retail members in all 50 states, whose members "order more than $1 billion in firearms annually." (*Id.* ¶ 5.)  Phillips also serves on the retail advisory board of Smith & Wesson Brands, Inc., where he is familiar with market needs and purchasing trends.  (*Id.* ¶ 6.)  He is versed in the roster, meets with all major firearms manufacturers who visit PWGG to sell their products, and reviews retailers' online sales portals and authoritative industry publications which identify handguns that are available and commonly used throughout the nation.  (*Id.* ¶¶ 6-8.)  He is

licensed to carry concealed, and he is a trained firearms instructor.  (*Id.* ¶ 21.)  Based on his training, experience and personal knowledge, Phillips states that the roster has shrunk over the past decade from nearly 1,300 approved handguns to just over 800, (*id.* ¶ 10), and Californians are left to choose from a contracting list of aging handgun models that are inferior to and less desirable than newer models of semiautomatic pistols in terms of ergonomics, reliability, ambidextrous configurations, and safety. (*Id.* ¶¶ 10-13.) He further states the semiautomatic handguns identified by Plaintiffs in this litigation are top-sellers and in common use throughout the country, and the roster bans all of these handguns in addition to "many hundreds, and likely thousands, of other models of handguns in common use throughout the United States[.]"  (*Id.* ¶¶ 10-18.)

Defendants object to Phillips's declaration on grounds of improper lay opinion and insufficient evidence to support the witness's personal knowledge under Federal Rules of Evidence 701 and 602, respectively.  Specifically, Defendants object to Phillips's opinions that the Glock43 is one of the top-selling firearms designed for concealed carry in the country, that the Sig Sauer 320 is the most popular carry gun in the nation, and that those handguns in addition to the Sig 365, Glock 17 Gen 5, FN 509 and FNX-0 are widely sold and possessed outside of California and in common use throughout the country.  The objections are overruled as Phillips's opinions are based on his particular training, experience and personal knowledge in the industry.  His opinions are proper lay opinions based on sufficient data, facts and experience.  Phillips's opinions corroborate what is evident—that the roster bans commercial sale of newer models of semiautomatic handguns that are in common use.  Therefore, any limitation of the Second Amendment to arms in common use imposed by *Heller* does not assist Defendants because the arms in question are in common use.

Finally, Defendants argue the UHA falls within a category of "lawful regulatory measures" identified in *Heller*.  The Supreme Court in *Heller* catalogued a number of "presumptively lawful regulatory measures" that are presumed to be consistent with the historical scope of the Second Amendment, including: "longstanding prohibitions on the

possession of firearms by felons and the mentally ill, [ ] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [ ] *laws imposing conditions and qualifications on the commercial sale of arms*[,] … [and laws] prohibiting the carrying of dangerous and unusual weapons." 554 U.S. at 626-27 (emphasis added). In a single conclusory pronouncement, Defendants argue that because the CLI, MDM, and microstamping requirements of the UHA do not ban possession of handguns and do not bar commercial sales of hundreds of grandfathered handguns on the roster that are suitable for self-defense, the UHA merely "'imposes conditions and qualifications on the commercial sale of arms'" and "[is] 'presumptively lawful'" under *Heller*. (ECF No. 72 at 23 (quoting *Heller*, 554 U.S. at 626-27).)

A one sentence conclusion by Defendants that the provisions of the UHA are presumptively lawful "conditions and qualifications on the commercial sale of arms" is insufficient, particularly in light of *Pena* and persuasive authority to the contrary. In *Pena*, the Ninth Circuit declined to define "the parameters of the Second Amendment's individual right in the context of commercial sales." 898 F.3d at 976. *Pena* observed the Ninth Circuit "has strained to interpret the phrase 'conditions and qualifications on the commercial sale of arms'" and viewed the language as "sufficiently opaque" such that it cannot be relied upon alone. *Id.* at 976 (cleaned up). Judge Bybee, concurring in *Pena*, noted that "the Supreme Court in *Heller* could not have meant that anything that *could* be *characterized* as a condition and qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny." *Id.* at 1007 (original emphasis) (Bybee, J., concurring). Similarly, in *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d. Cir. 2010), the Third Circuit noted that "[i]f there were somehow a categorical exception for [commercial sales] restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." The Court agrees.

In *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407 (4th Cir. 2021), *vacated as moot on other grounds*, 14 F.4th 322 (4th Cir. 2021), certain

federal statutes prohibited licensed firearms dealers from selling handguns and handgun ammunition to anyone under the age of 21.  The Fourth Circuit rejected the government's argument that those federal laws were presumptively lawful regulations as "conditions and qualifications on the commercial sale of arms." 5 F.4th at 416.  It stated, "[a] condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records." *Id.* at 416 (original emphasis).  *Hirschfeld* noted that the federal laws in question there "operate as a total ban on *buying* a gun from a licensed dealer that has met the required [licensing] conditions and qualifications to sell arms," *id.* (original emphasis), and therefore declined to find that those laws constituted conditions on commercial sales.[9]

*Hirschfeld* reasoned that "a law's substance, not its form, determines whether it qualifies as a condition on commercial sales." *Id.* at 416 (citing *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)).  Providing examples of commercial sales laws that turn "a condition or qualification into a functional prohibition" the court referenced: "a Chicago ordinance that allowed firearm transfers only outside city limits;" a "ban on firing ranges within city limits" that was "a serious encroachment" on law-abiding citizens of Chicago from "engaging in target practice in the controlled environment of a firing range;" and "a commercial zoning and distancing law [that] worked in tandem to functionally preclude any gun ranges, thus severely restricting Second Amendment rights." *Hirschfeld*, 5 F.4th at 416 (citations and quotations omitted).

Here, like the examples cited in *Hirschfeld*, the CLI, MDM, and microstamping provisions of the UHA operate as a "functional prohibition."  Collectively they prohibit the commercial sale of a large subset of handguns in common use—hundreds of state-of-the-

---

[9]  *But see NRA v. Bondi*, --- F.4th ---, 2023 WL 2484818, at *2 (11th Cir. Mar. 9, 2023) (stating a Florida statute prohibiting persons under the age of 21 from buying firearms is a law imposing conditions and qualifications on the commercial sale of firearms).  Although the court stated the Florida statute is an example of a commercial sales regulation, it did not further elaborate and instead assumed the "'Second Amendment's plain text' covers 18-to-20-year-olds when they buy firearms." *Id.* at *6.

art semiautomatic pistols—and have done so for more than a decade, thus precluding law-abiding citizens from purchasing these arms on the retail market for lawful purposes.  These handguns are sold throughout the United States, in 47 states.  California is a distinct outlier.  If the commercial sales limitation identified in *Heller* were interpreted as broadly as the State suggests, the exception would swallow the Second Amendment.  States could impose virtually any condition or qualification on the sale of any arm covered by the Second Amendment, no matter how prohibitory.  The Court, therefore, declines the State's invitation to characterize the CLI, MDM, and microstamping requirements as a law merely imposing conditions and qualifications on the sales of arms.  It is undisputed that there are no commercially available semiautomatic handguns manufactured in the United States that have the CLI, MDM and microstamping features.  (ECF No. 71-5; Phillips Decl., ¶ 9.)  "As a result, literally no new models of [semiautomatic handguns] have been added to the [r]oster since 2013."[10]  (*Id.*)  Accordingly, the Court rejects Defendants' argument and finds these provisions of the UHA are not regulations that merely impose conditions and qualifications on the commercial sales of arms but operate collectively as an outright prohibition on commercial sales of a wide segment of modern arms in common use for self-defense and other lawful purposes.[11]

For these reasons, the Court concludes Plaintiffs' desire to purchase the arms in question on the retail market falls within the plain text of the Second Amendment and is not subject to any presumptively lawful exception identified in *Heller*.  As such, Plaintiffs' conduct is presumptively protected and the burden shifts to Defendants to justify the UHA

---

[10]  Aside from the UHA exemptions for grandfathered handguns and private sales, Defendants acknowledge Plaintiffs can only purchase on the retail market "revolver[s], *non*-semiautomatic pistol[s], [and] any firearm that is not a handgun."  *See* Opp'n at 22 (ECF No. 72) (emphasis added).  It is also undisputed that private sales of off-roster handguns to ordinary people are generally limited to supplies (and sales) from law enforcement officials and people who move from out of state into California with an off-roster handgun.  Those sales opportunities are few in number and carry a significant price markup compared to retail sales.

[11]  The parties did not address the UHA's roster fee requirement and whether it falls within the presumptively lawful category of "conditions and qualifications on the commercial sale of arms."

by proffering historically analogous firearms regulations.  *See Baird v. Bonta*, --- F.Supp.3d ---, 2022 WL 17542432, at *6 (E.D. Cal. Dec. 8, 2022) (stating for a preliminary injunction plaintiffs bear the burden of proving the textual analysis under *Bruen* and defendants bear the burden of proving historical analogues under *Bruen*).

### b. Historical Precedent

The State has the burden of showing relevant "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." *Bruen*, 142 S. Ct. at 2131-32.  The State need not identify a "historical *twin*," for a "well-established and representative historical *analogue*" is sufficient.  *Id.* at 2133 (original emphasis).  "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry."  *Bruen*, 142 S.Ct. at 2133 (citations omitted).   Thus, *Bruen* "distilled two metrics for courts to compare the Government's proffered analogues against the challenged law: *how* the challenged law burdens the right to armed self-defense, and *why* the law burdens that right."  *Rahimi*, 61 F.4th at 454 (citing *Bruen*, 142 S. Ct. at 2133).  Despite the need to assess the how and why, *Bruen* cautioned "[t]his does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry."  *Bruen*, 142 S. Ct. at 2133 n.7.  The key question, therefore, is whether the challenged law, here the CLI, MDM, and microstamping provisions of the UHA, and the State's proffered analogues are "relevantly similar."  *Id.* at 2132.

The analogical inquiry begins with determining "how" and "why" the UHA "burden[s] a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  The UHA (1) prohibits the commercial sale of semiautomatic handguns, that (2) lack CLI, MDM, and microstamping technology.   The first aspect of the UHA goes to *how* the statute accomplishes its goal (prohibiting retail sales of newer models of semiautomatic pistols), and the second goes to its goal, the *why* (public safety and furthering law enforcement investigative tools).  To sustain the UHA's burden on Plaintiffs' Second Amendment

rights, the State must proffer "relevantly similar" historical regulations that imposed "a comparable burden on the right of armed self-defense" that were also "comparably justified." *See Rahimi*, 61 F.4th at 455 (citing *Bruen,* 142 S.Ct. at 2136).

Defendants argue that states "have regulated for firearm safety, particularly to prevent accidents and unintentional detonations, since the earliest days of the republic," (Opp'n at 27), and cite to four historical laws and a declaration from Dr. Saul Cornell, the Paul and Diane Guenther Chair in American History at Fordham University, to meet its burden. Initially, Defendants point to an 1805 Massachusetts law that required certain guns to be inspected, marked, and stamped by an inspector ("prover") before they could be sold. (ECF No. 72-5, Cornell Decl. at ¶ 33; *id.* at Ex. 3.)[12]  The law required that the prover test certain muskets and pistols to ensure they safely discharged.  1805 Mass. Acts 588, § 1. The provers duty "shall be to prove" that the "musket barrels and pistol barrels" are "sufficiently ground, bored and breeched," and to prove the musket and pistol barrels "will carry a twenty-four-pound shot" 80 yards and 70 yards, respectively, without the barrels "burst[ing]" or "in no respect fail[ing.]"  *Id.*  If the firearm passed the test, the prover would stamp his initials and the year of inspection on the firearm.  *Id.*

The "why" of the1805 law is to ensure off-brand firearms operated safely—to prevent "introduct[ion] [of firearms] into use which are unsafe."  *Id.* at Preamble.  In this respect, the goal of the law is similar to the CLI and MDM requirements under the UHA: public safety.  But "how" the 1805 law accomplished its goal is entirely different from the CLI, MDM, and microstamping requirements of the UHA.  While the 1805 law prohibits introduction of firearms that failed inspection (and are "unsafe"), it did not apply to Springfield Armory, which produced the majority of guns in the state,[13] and it did not

---

[12]  In *Boland, et al. v. Bonta*, 22-cv-1421, 2023 WL 2588565, at *6-7 (C.D. Cal. Mar. 20, 2323), the State proffered additional proving laws as comparators to the challenged UHA provisions. *See id.* ECF Nos. 56 at 13-14; 56-3, Ex. 31 at 1-15 (noting Continental Army, Rhode Island, New Hampshire, New Jersey, Maryland, Maine, and Pennsylvania had similar proving laws to the 1805 Massachusetts law).

[13]  Defendants acknowledge that at the time in Springfield, Massachusetts, most guns were manufactured by Springfield Armory, which was under federal control.  (ECF No. 72 at 27-28; Cornell Decl. at ¶ 32.)

preclude the purchase of firearms manufactured out of state.  The 1805 law required only that all other muskets and pistols be "proved" to ensure they fired and discharged safely without malfunctioning, in which case the prover would stamp the firearm and approve it for commercial sale.  *Id.* § 3.[14]  But the 1805 law stopped there.  It did not prescribe particular safety features, nor did it require manufactures to add safety features to already safe arms.  Requiring the *testing* of firearms to ensure they fired safely without malfunctioning is significantly different from requiring manufacturers to *add* mechanical safety features to arms in common use that are indisputably safe and operate as designed for self-defense.

In addition, the "why" of the 1805 stamping requirement is not comparable to microstamping under the UHA, as the former requirement served only to verify that the arm had been tested, was safe—in that it fired without barrel bursting or otherwise failing, and could be sold.  California's microstamping requirement is designed to assist law enforcement in criminal investigations, not firearm discharge safety.  Defendants concede this point. (Opp'n Br. at 5) ("Microstamping is intended to provide important investigative leads in solving gun-related crimes by allowing law enforcement personnel to quickly identify information about the handgun from spent cartridge casings found at the crime scene.") (citation and quotations omitted).

The comparable burden on the right to self-defense is notable too.  As noted, the 1805 law allowed purchasers to buy firearms from Springfield Armory and out of state manufacturers, without proofing.  In contrast, the CLI, MDM, and microstamping provisions prohibit retail sales in the state of a significant segment of the most common self-defense firearm sold in America today.  Accordingly, the State has not shown that the

---

[14]  In this respect, the 1805 law and its barrel safety testing requirements may be similar to the UHA provisions that require handguns to meet firing and drop-safety testing requirements.  The Court reserves ruling on that issue as it was not briefed by the parties.  Similarly, the parties did not address the UHA's safety device requirement.

1805 Massachusetts law is relevantly similar or imposed a comparable burden on the right of armed self-defense to the three UHA provisions at issue.

Next, Defendants point to three examples of laws regulating the storage of weapons with or near gun powder, and the storage of gun powder.[15]   The Court considers these examples in tandem since the goal of these laws, the "why," is the same.   First is a 1783 Massachusetts law that prohibited storing a loaded weapon in a home.   Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston.   Defendants state the text of the statute is clear—to prevent "the unintended discharge of firearms [which] posed a serious threat to life and limb."   (ECF No. 72 at 28.)   However, that characterization is not consistent with the Supreme Court's assessment, where it addressed the same law, and stated the 1783 Massachusetts law "text and its prologue[]makes clear that the purpose of the prohibition was to eliminate the danger to firefighters posed by the depositing of loaded Arms in buildings."   *Heller*, 554 U.S. at 631.   The goal of the statue, the why, is to guard against fires and protect firefighters in times when highly combustible gun powder was exposed to kerosine lanterns and candles.   *See* 2 Acts And Laws Of The Commonwealth Of Massachusetts 120 (1890) (stating "the depositing of loaded Arms in the Houses [of Boston] is dangerous to the Lives of those who are disposed to exert themselves when a Fire happens to break out"); *see also Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014) (stating Boston's firearm-and-gunpowder storage law is historically distinct from the challenged firearm regulation in light of *Heller*).

Defendants also cite to a 1792 New York City statute, which granted the government authority to search for gun powder and transfer gun powder to the public magazine for safe

---

[15]   Here, too, the State in *Boland* proffered additional laws regarding storage of weapons with or near gun powder, and the storage of gunpowder.   *See Boland*, 2023 WL 2588565, at *7-8, 8:22-cv-1421, ECF No. 56-3, Ex. 31 at 1-15 (C.D. Cal.) (noting gunpowder regulations in New Jersey, Rhode Island, Pennsylvania, New Hampshire, Connecticut, Iowa, Indiana, Ohio, Vermont, Tennessee, Nebraska, Kentucky, California, and Oklahoma).

storage.  An Act to Prevent the Storage of Gun Powder, within in Certain Parts of New York City, 2 Laws of The State of New-York, Comprising The Constitution, And The Acts of The Legislature, Since The Revolution, From The First To The Fifteenth Session, Inclusive at 191-2 (Thomas, Greenleaf, ed., 1792).  The statute "prevent[ed] the storing of Gun-Powder, within certain Parts of the City of New-York." *Id.*  Defendants additionally cite to an 1821 Maine law, which authorized government officials to enter any building in any town to search for gun powder.  1821 Me. Laws 98, An Act for the Prevention of Damage by Fire and the Safe Keeping of Gun Powder, chap. 25, § 5.  Its purpose: "Prevention of Damage by Fire."  *Id.*  Like the Massachusetts law, the New York City and Maine laws regulated gun powder "due to the substance's dangerous potential to detonate if exposed to fire or heat."  (ECF No. 72-5, Cornell Decl. at ¶ 42.)

The 1783 Massachusetts law, 1792 New York City statute, and 1821 Maine law are not analogues to the challenged provisions of the UHA.  Those laws regulated the storage of gunpowder and loaded firearms with gun powder for fire-safety reasons, not gun-operation safety reasons.  Thus, the goal of these statutes is fire-safety (the why), and that goal is addressed by controlling gun powder and loaded gun storage (the how).  These statutes "do not remotely burden the right of self-defense as much as an absolute ban on handguns."  *Heller*, 554 U.S. at 632.  While the CLI, MDM, and microstamping provisions of the UHA are not an absolute ban on handguns, the provisions operate to ban commercial acquisition of a significant segment of popular handguns designed for self-defense.  The foregoing fire-safety laws are not "relevantly similar" to the UHA roster provisions, and they impose a far less "comparable burden" on Plaintiffs' Second Amendment rights to armed self-defense than does the UHA.

Defendants have not met their burden of presenting relevantly similar, historically comparable analogues to the UHA's CLI, MDM, and microstamping provisions.  Plaintiffs have therefore demonstrated likely success on the merits of these claims.

### c. *Scope of Injunction*

Any relief granted in a preliminary injunction must be narrowly tailored.  *See Orantes-Hernandez*, 919 F.2d at 558.  Having determined the CLI, MDM, and microstamping provisions of the UHA violate Plaintiffs' Second Amendment rights, the Court must address whether the remaining UHA provisions at issue are severable.  If a challenged statute contains "unobjectionable provisions separable from those found to be unconstitutional," the court must sever such provisions.  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (cleaned up).  "A court should refrain from invalidating more of [a] statute than is necessary."  *Id.*  "The standard for determining the severability of an unconstitutional provision is well established: Unless it is evident that the Legislature would not have enacted those [unconstitutional] provisions … independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law."  *Id.* (cleaned up).  In conducting this inquiry, a court must ask "whether the law remains fully operative without the invalid provisions."  *Murphy v. Nat. Collegiate Athletic Ass'n*, 138 S Ct. 1461, 1482 (2018) (cleaned up).

The initial iteration of the UHA in 1999 deemed revolvers and semiautomatic pistols "unsafe" if they lacked a safety device and did not meet firing and drop-safety testing requirements.  Cal. Penal Code § 12126(a)(1)-(3), (b)(1)-(3).  Those provisions stood independently for many years, and later were incorporated in more recent iterations of the UHA.  *See id.* § 31910(a)(1)-(3), (b)(1)-(3).  As discussed, the Legislature thereafter enacted the CLI and MDM provisions in 2003, effective at a later date, *see* Sen. Bill No. 489 (Cal. 2003-2004 Reg. Sess.), § 1, and the microstamping provision in 2007, also effective at a later date.  *See* Assem. Bill No. 1471 (Cal. 2007-2008 Reg. Sess.), § 2.  It is clear the Legislature would have enacted, and in fact did enact, the earlier provisions without the CLI, MDM and microstamping provisions.  Therefore, the CLI, MDM, and microstamping provisions, Cal. Penal Code § 31910(b)(4)-(6), are severable from the rest of the UHA and may be separately enjoined.

Under the three-for-one roster removal provision, for each approved semiautomatic pistol added to the roster, "three semiautomatic pistols lacking one or more of the applicable features described in paragraphs (4), (5), and (6) of subdivision (b)[,]" are removed.  Cal. Penal Code § 31910(b)(7).  Paragraphs (4), (5), and (6) of subdivision (b) refer to the CLI, MDM, and microstamping provisions, respectively.  *Id.* § 31910(b)(4)-(6).  The text of subdivision (b)(7) makes clear it was "obviously meant to work together" with its companion subdivisions (b)(4)–(6).  *Murphy*, 138 S. Ct. at 1483.  Therefore, the three-for-one removal provision cannot be severed as it is not "fully operative without the invalid provisions."  *Id.* at 1482.  As such, the California Legislature could not have intended for it to stand independently of the invalid provisions.  The three-for-one removal provision is therefore enjoined.

Unless it is evident the Legislature would not have enacted the rest of the law, "the invalid provisions may be dropped if what is left is fully operative as a law."  *New York v. United States*, 505 U.S. 144, 186 (1992).  Here, the remaining UHA roster provisions are fully operative without the CLI, MDM, microstamping, and three-for-one removal provisions.  There is no indication the Legislature would not have enacted the remaining roster provisions without the invalid provisions.  Therefore, the invalid provisions, Cal. Penal Code §§ 31910(b)(4)-(7), are severed and separately enjoined.[16]

### d. *Discovery Request*

Defendants request additional time to conduct historical research and consult additional experts.  However, Defendants have had three months to mount a defense since the filing of the TAC.  In addition, *Bruen* was decided on June 23, 2022, more than 19 months before Defendants' Opposition Brief was filed in this matter on January 27, 2023.  And in light of *Bruen*, the parties stipulated in July 2022 to vacating the scheduling order

---

[16]   Because the three-for-one roster removal provision is not severable from the CLI, MDM and microstamping provisions, the Court declines to address Defendants' arguments that Plaintiffs' challenge to roster removal provision fails for lack of standing and ripeness.  (Opp'n at 17) (ECF No. 72.)

and the filing of a Second Amended Complaint by Plaintiffs.  (ECF No. 45.)  The need for a historical deep dive to find regulations comparable to the UHA is no surprise to Defendants.  In fact, Defendants were presented with this exact task in November 2022 in *Boland, et al. v. Bonta*, No. 8:22-cv-1421 (C.D. Cal.).  Defendants there briefed a nearly identical challenge under the Second Amendment to the CLI, MDM, and microstamping requirements of the UHA and appeared for a preliminary injunction hearing with the same expert they retained here, Dr. Cornell.  Following that hearing, Defendants provided two additional rounds of briefing on the merits.  The district court in *Boland* issued its decision on March 20, 2023, and provided a reasoned analysis and similar conclusions to those reached by this Court.

Defendants also point to authorities cited to the district court in *Pena v. Lindley*, No. 2:09-cv-01185 (E.D. Cal.) (ECF No. 76), which demonstrate the CLI and MDM technology has existed since the late 1800's and 1910, respectively.  Defendants assert additional time is needed to evaluate those authorities.  However, those authorities simply note the existence of CLI and MDM technology, not regulations mandating use of that technology on arms then for sale.

Finally, the State is engaged in a significant number of related cases in addition to the present case and *Boland*.  *See Defending California's Commonsense Firearms Laws*, CALIFORNIA DEPARTMENT OF JUSTICE, OFFICE OF THE ATTORNEY GENERAL, Sept. 19, 2022, https://oag.ca.gov/ogvp/2a-cases (listing twenty-five lawsuits in which the State is currently defending various California gun laws under Second Amendment challenges.)  Given the amount of time and resources the State has already spent researching historical analogues in this and similar cases, as well as the posture of this case—on for preliminary injunction with the opportunity to further develop the record on a motion for permanent injunction—the Court respectfully denies the State's request for additional time.

2.  Irreparable Harm

It is well-established that loss of "the enjoyment of Second Amendment rights constitutes irreparable injury."  *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1135 (S.D. Cal.

2017).  "[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."  *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009)); *see also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (stating infringements of the Second Amendment are irreparable and cannot be compensated by damages).  So it is here.  The UHA's CLI, MDM, and microstamping provisions infringe Plaintiffs' Second Amendment rights, thus causing irreparable harm.

       3.  <u>Balance of Equities and Public Interest</u>

At this step, it is necessary to "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24.  Defendants contend if this Court enjoins enforcement of the UHA, it creates "public safety risks" because "[t]he absence of a chamber load indicator or magazine disconnect mechanism in a semiautomatic pistol increases the risk of accidental discharge and injury to Californians." (ECF No. 72 at 33.)  But "grandfathered" handguns without CLI, MDM, or microstamping features are already available to Californians.  Of the 499 grandfathered semiautomatic pistols, only 32 have CLI and MDM features.  (*See* ECF No. 72-4, Gonzalez Decl. at ¶ 7.)

Defendants also argue "[t]he status quo poses no threat of injury to Plaintiffs, and an injunction would seriously undermine California's considered effort to improve the safety of handguns sold in California."  (ECF No. 72 at 2.)  However, when challenged government action involves the exercise of constitutional rights, "the public interest . . . tip[s] sharply in favor of enjoining" the law.  *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  As discussed, Plaintiffs have demonstrated likely success that the CLI, MDM, and microstamping requirements violate their rights under the Second Amendment.  Therefore, the balance of equities and public interest tips in favor of Plaintiffs.  A preliminary injunction shall therefore issue.

**B. Bond Requirement**

When a motion for preliminary injunction is granted, the plaintiff is required to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  District courts have wide discretion in determining the amount of bond.  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).  In public interest litigation, "requiring nominal bonds is perfectly proper," *id.*,  and "[c]ourts routinely impose no bond or minimal bond in public interest … cases." *City of South Pasadena v. Slater*, 56 F.Supp.2d 1106, 1148 (C.D. Cal. 1999).  This is such a case.  Accordingly, the Court waives bond.

**C. Stay Pending Appeal**

Under Federal Rule of Civil Procedure 62(c), the district court has discretion to stay enforcement of an injunction pending appeal.  Defendants ask the Court to stay enforcement pending appeal.  A stay is not a matter of right and depends on the circumstances of the particular case. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012).  Courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).  The first two factors are "most critical" in determining whether a stay is appropriate. *Id.*

While Plaintiffs have demonstrated likely success on the merits, and Defendants will not be irreparably injured absent a stay, the Court believes an orderly process is in the best interests of the parties.  The UHA has prohibited commercial sales of the handguns at issue for more than a decade.  This lawsuit has been pending since November 10, 2020, and the parties have litigated at a leisurely pace since its inception.  Everyone was waiting for *Bruen*.  Its arrival does not erase the prior pace of this litigation, and need not hasten it now.  Moreover, the district court in *Boland* recently enjoined enforcement of the CLI,

MDM, and microstamping provisions. *See Boland*, 2023 WL 2588565, at \*1. There, the court stayed enforcement of the injunction for fourteen days pending the State's decision whether to file an appeal. The State has since filed an emergency motion for partial stay pending appeal of the preliminary injunction issued in *Boland*. *See Boland et al. v. Bonta*, No. 23-55276 (Dkt. No. 2-1) (9th Cir. Mar. 27, 2023). On March 22, 2023, after the decision in *Boland* was filed, this Court held a status conference with the parties. Both parties requested that the Court issue its decision, as this case was filed first and presents issues not addressed in *Boland*. Therefore, the Court issues its decision herein but stays enforcement pending appeal or further hearing on this matter.

## IV.

## CONCLUSION AND ORDER

For these reasons, the Court hereby **ORDERS** the following: (1) Plaintiffs' motion for a preliminary injunction is **GRANTED** as to California Penal Code §§ 31910 (b)(4), (5), (6) & (7) (CLI, MDM, microstamping, and three-for-one removal provisions); (2) Plaintiffs' motion for a preliminary injunction is **DENIED** as to all other challenged provisions of the UHA; (3) Defendants are **ENJOINED** from enforcing California Penal Code §§ 31910 (b)(4), (5), (6) & (7) (CLI, MDM, microstamping, and three-for-one removal provisions); (4) posting of bond is waived; and (5) the preliminary injunction is **STAYED** pending appeal or further hearing on this matter, whichever occurs first.

The Court sets the matter for a telephonic status conference on April 14, 2023, at 1:30 p.m., at which time the parties shall advise the Court how they wish to proceed.

**IT IS SO ORDERED.**

Dated: March 31, 2023

Hon. Dana M. Sabraw, Chief Judge
United States District Court

20-cv-2190-DMS-DEB